**IN THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF**

**CALIFORNIA**

**Civil Action No: 8:2025-cv-02134**

**JEFFREY GU,**

2332 N Clay St Apt 3,

Denver, CO 80211,

**Plaintiff, Pro Se,**

```
┌─────────────────────────────────────┐
│              FILED                   │
│   CLERK, U.S. DISTRICT COURT         │
│   ┌─────────────────────────┐        │
│   │      10/08/2025         │        │
│   └─────────────────────────┘        │
│   CENTRAL DISTRICT OF CALIFORNIA     │
│                 cld                  │
│   BY_____DEPUTY            │
│   DOCUMENT SUBMITTED THROUGH THE     │
│   ELECTRONIC DOCUMENT SUBMISSION SYSTEM │
└─────────────────────────────────────┘
```

V.


**CITY OF IRVINE,**

1 Civic Center Plaza,

Irvine, CA 92606,


**JESSICA SANDERS,**

18575 Jamboree Rd 9th Floor,

1

Irvine, CA 92612,

**JEFFREY MELCHING,**

18575 Jamboree Rd 9th Floor,

Irvine, CA 92612,

**TRINITY PHAM,**

1 Civic Center Plaza,

Irvine, CA 92606,

**WILLIAM GO,**

1 Civic Center Plaza,

Irvine, CA 92606,

**IRVINE POLICE DEPARTMENT,**

1 Civic Center Plaza,

Irvine, CA 92606,

**Officers Jane & John Doe (1-10)**

1 Civic Center Plaza,

Irvine, CA 92606,

**THE NEW HOME COMPANY INC.,**

18300 Von Karman Ave., Suite 1000,

Irvine, CA 92612,

**THE NEW HOME COMPANY SOUTHERN CALIFORNIA LLC,**

18300 Von Karman Ave., Suite 1000,

Irvine, CA 92612,

**TNHC REALTY AND CONSTRUCTION INC.,**

18300 Von Karman Ave., Suite 1000,

Irvine, CA 92612,


**BERT L. HOWE & ASSOCIATES, INC.,**

5415 E. La Palma Avenue,

Anaheim Hills, CA 92807,


**Toll Brothers, Inc.,**

1140 Virginia Drive,

Fort Washington, PA 19034,


**TB Proprietary Corp.,**

1140 Virginia Drive,

Fort Washington, PA 19034,


**Toll Southwest LLC,**

1140 Virginia Drive,

4

Fort Washington, PA 19034,

**Defendants.**

**JURY TRIAL DEMANDED**

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF CIVIL RIGHTS**

**(First Amendment Retaliation, Fourth Amendment Unreasonable Seizure, Fourteenth Amendment Due Process, and Related State Law Claims)**

**Table of Contents**

I. INTRODUCTION
    Preview of Exhibits
II. JURISDICTION
III. PARTIES
IV. FACTUAL ALLEGATIONS
    A. Toll Brothers Pre-purchase
    B. Toll Brothers Agreement of Sale
    C. Toll Brothers Construction
    D. Toll Brothers Closing
    E. Toll Brothers Post-closing
    F. City of Wheat Ridge
    G. Toll Brothers History
    H. Toll Brothers Licenses
    I. Toll Brothers Insurance
    J. Marsh
    K. Toll Brothers Consumers
    L. Other Toll Court Cases
    N. Toll Brothers SEC Disclosures
    O. Toll Brothers Statements of Authority

P. Tenure at Toll Brothers

Q. A Tale of Two Kens

R. Employee Evasiveness

S. TB Annual Reports

T. The New Home Company History

U. John Laing Homes Company History

V. The New Home Company Disclosures

W. A Tale of Two Builders

X. TNHC Pre-purchase

Y. TNHC Purchase Agreement

Z. TNHC Closing

AA. Post-Closing

BB. TNHC SB800

CC. TNHC Post-SB800

DD. Irvine Interactions

EE. Irvine Responses

FF. Irvine Building & Safety Department

GG. Irvine's History with Freedom of Speech

V. CAUSES OF ACTION

COUNT 1: DECLARATORY JUDGEMENT (Cal. Bus. & Prof. Code § 7031(b) / 28 U.S.C. § 2201)

Real Parties in Interest (Fed. R. Civ. P. 19)

COUNT 2: VIOLATION OF 42 U.S.C. § 1983 — FOURTH AMENDMENT (UNREASONABLE SEIZURE / DETENTION)

Qualified-Immunity Not Applicable

Municipal Liability

COUNT 3: VIOLATION OF 42 U.S.C. § 1983 – FIRST AMENDMENT (FREEDOM TO PETITION THE GOVERNMENT)

Pattern and Practice of Retaliation Against Speech

Municipal Liability

COUNT 4: VIOLATION OF 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT (PROCEDURAL DUE PROCESS)

Initiation of Police Contact Without Notice or Process

Imposition of Gag and Safety Directive Without Due Process

Systematic Refusal to Explain or Process Plaintiff's Grievances

Municipal Liability

COUNT 5: VIOLATIONS OF THE BANE ACT (CALIFORNIA CIVIL CODE § 52.1)

VI. PRAYER FOR RELIEF

1. Declaratory Relief
2. Injunctive Relief
3. Compensatory Damages
4. Statutory Damages
5. Punitive Damages
6. Attorneys' Fees and Costs
VII. DEMAND FOR JURY TRIAL

## I. INTRODUCTION

This action is not about a single rogue builder or isolated dispute. It concerns a coordinated system among national homebuilders, their counsel, and municipal actors designed to conceal responsibility, evade regulation, and retaliate against those who expose inconvenient truths.

Plaintiff initially brought this suit after the City of Irvine ("**COI**") and The New Home Company, Inc. ("**TNHC**") took steps to suppress his protected activities and intimidate him from pursuing valid regulatory complaints. (See ¶¶ 571, 596, 645, 681, 684, 703, 706.) That retaliation did not end with **COI** and **TNHC**. On September 12, 2025, **Toll Brothers, Inc.**—a builder with a corporate structure equally opaque and evasive as **TNHC's**—filed a federal lawsuit against Plaintiff in Colorado. (See ¶¶ 482-491.) This action mirrored **TNHC's** tactics, specifically incorporating its positions and weaponizing the same pattern of concealment and coercion.

The parallels between **TNHC** and **Toll Brothers** are not coincidental. Both rely on layered shell entities to obscure ownership and liability; both exploit state-level defect statutes—California's SB 800 and Colorado's CDARA—as shields against accountability while ignoring their consumer-protection purposes. Both have elevated inexperienced attorneys into General Counsel

roles soon after their IPOs to manage exposure rather than ensure compliance. Both have misled

not only consumers but investors, through public filings and marketing materials that obscure

who actually builds, warrants, and insures their homes. (See ¶¶ 482-491.)

For consumers, the result is predictable and devastating. Homeowners—particularly second or

third purchasers who remain protected under statutory warranty law—discover that when a

defect arises, they are left pursuing claims against a hollow shell: an inactive entity with no

employees, no assets, and no capacity to perform its legal obligations. This concealment is not

incidental but structural, engineered to frustrate enforcement of long-term consumer protections.

Such misconduct thrives only through municipal complicity. For decades, **COI** has enabled and

concealed these practices through lax permitting, selective enforcement of code violations,

suppression of resident complaints, and retaliation against protected petitioning activity. This

custom of favoritism toward large developers has allowed unlicensed contractors and inspectors

to operate with impunity, undermining both public trust and statutory safeguards. (See ¶¶

459-465, 609-616, 676-680, 719-720.)

The parallel conduct of **TNHC** and **Toll Brothers**, and the timing of **Toll Brothers'** retaliatory

lawsuit, confirm a broader scheme: a continuing effort to reinforce **COI's** suppression of speech

and deter Plaintiff from exposing regulatory noncompliance. Plaintiff therefore brings this

amended complaint not only to address the misconduct of individual Defendants, but to

illuminate the systemic collusion between private builders, their legal counsel, and municipal

officials.

8

Neither the Constitution nor California law—including the Bane Act—permits private corporations and public entities to combine their power to silence citizen oversight. Plaintiff continues undeterred.

**Preview of Exhibits**

To aid the Court's understanding of the counterclaim, several exhibits provide a clear overview of the **TNHC's** corporate structure, **Toll Brothers'** corporate structure, and the consumer experience at issue. Exhibit 269, titled "TNHC Corporate Hierarchy," maps an array of subsidiary entities used by TNHC across the nation (See 📄 Exhibit 269 TNHC Corporate Hierarchy.pdf ). Similarly, Exhibit 87, titled "Corporate Hierarchy," shows the relationship of **Toll Brothers, Inc.** to its numerous subsidiaries (See 📄 Exhibit 87 Corporate Hierarchy.pdf ).

Exhibit 270, titled "TNHC Document Representations," portrays what entity TNHC uses for different purposes across the construction-sale-warranty process. (See 📄 Exhibit 270 TNHC Document Representations.pdf ) And Exhibit 271 more clearly shows how regulators and consumers are shown different entities for different reasons. (See 📄 Exhibit 271 TNHC Entity Document List.pdf ) Exhibit 3, titled "Consumer Journey," depicts the sequence of entities presented to a Toll Brothers homebuyer during the marketing, contracting, and closing process (See 📄 Exhibit 3 Consumer Journey.pdf ).

Collectively, Plaintiff believes these diagrams clearly portray the nature and intention of the entity structures at the heart of this litigation.

## II. JURISDICTION

1.     **Subject Matter Jurisdiction:** This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this case arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983. The Court also has supplemental jurisdiction over related state law claims under 28 U.S.C. § 1367(a), as they form part of the same case or controversy under Article III of the United States Constitution.

2.     **Personal Jurisdiction:** This Court has personal jurisdiction over Defendants because they reside in and/or conduct business in this District, and the acts and omissions giving rise to the claims occurred within this District. Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred within this judicial district.

## III. PARTIES

**A. Plaintiff:**

   **Jeffrey Gu**

      Residence: 2332 N Clay St Apt 3, Denver, CO 80211

      State of Domicile: Colorado

**B. Defendants:**

   **City of Irvine**

      Principal Place of Business: 1 Civic Center Plaza, Irvine, CA 92606

**Jessica Sanders,** in her official capacity as public-facing representative of the City Attorney of the City of Irvine, Associate at Rutan & Tucker

  Business Address: 18575 Jamboree Rd 9th Floor,  Irvine, CA 92612

**Jeffrey Melching,** in his official capacity as public-facing representative of the City Attorney of the City of Irvine, Partner at Rutan & Tucker

  Business Address: 18575 Jamboree Rd 9th Floor,  Irvine, CA 92612

**Trinity Pham,** in her official capacity as Supervising Principal Council Executive Assistant for the City of Irvine

  Business Address: 1 Civic Center Plaza, Irvine, CA 92606

**William Go**, in his official capacity as City Councilmember for the City of Irvine

  Business Address: 1 Civic Center Plaza, Irvine, CA 92606

**Irvine Police Department**

  Principal Place of Business: 1 Civic Center Plaza, Irvine, CA 92606

**Officers Jane & John Doe 1-10**

  Principal Place of Business: 1 Civic Center Plaza, Irvine, CA 92606

**The New Home Company Inc.**

  Principal Place of Business: 18300 Von Karman Ave., Suite 1000, Irvine, CA 92612

11

State of Incorporation: Delaware

**The New Home Company Southern California LLC**

Principal Place of Business: 18300 Von Karman Ave., Suite 1000, Irvine, CA 92612

State of Incorporation: Delaware

**TNHC Realty and Construction Inc.**

Principal Place of Business: 18300 Von Karman Ave., Suite 1000, Irvine, CA 92612

State of Incorporation: Delaware

**Bert L. Howe & Associates, Inc.**

Principal Place of Business: 5415 E. La Palma Avenue, Anaheim Hills, CA 92807

State of Incorporation: California

**Toll Brothers, Inc.**

Principal Place of Business: 1140 Virginia Drive, Fort Washington, PA 19034

State of Incorporation: Delaware

**Toll Southwest LLC**

Principal Place of Business: 1140 Virginia Drive, Fort Washington, PA 19034

State of Incorporation: Delaware

**TB Proprietary Corp.**

Principal Place of Business: 1140 Virginia Drive, Fort Washington, PA 19034

State of Incorporation: Delaware

## IV. FACTUAL ALLEGATIONS

*All referenced corporate registrations, recorded county documents, employee information, licenses, and permits are matters of public record and can be judicially noticed. If Plaintiffs dispute the accuracy of the attached copies, they are in possession of the true and correct versions and should provide them to the Court.*

### A. Toll Brothers Pre-purchase

1.      On January 16, 2022, Jeffrey Gu ("**JG**") received an email titled "Thank you for your interest in The Ridge at Ward Station" from the email tbmailer@tollbrothers.com. (See

📕 Exhibit 1 Gmail - Toll Brothers Inc Thank you for your interest in The Ridge at Ward Stati…

, 📕 Exhibit 2 Colorado Ops.pdf , and 📕 Exhibit 3 Consumer Journey.pdf )

2.      The domain tollbrothers.com is registered by **Toll Brothers, Inc**. of Delaware (See

📕 Exhibit 4 tollbrothers.com whois.pdf )

3.      The email contains the text "You are receiving our email because jeffwgu@gmail.com signed up to receive emails from Toll Brothers, Inc."

4.      **Toll Brothers, Inc.** was incorporated in Delaware on May 28, 1986 and has a file number of 2092118. (See 📕 Exhibit 5 DE SOS Toll Brothers, Inc..pdf )

5.      **Toll Brothers, Inc.** of Delaware has had a corporate headquarters of 1140 Virginia Drive, Fort Washington, PA 19034 since at least 2021.

6.      **Toll Brothers, Inc.** of Delaware is not registered as a foreign corporation in Colorado, as of September 22, 2025.

7.      According to the Plaintiffs' complaint in Paragraph 25, this entity has received a number of accolades, stating that "Toll Brothers has been listed among Fortune Magazine's Most Admired Companies in the World for eleven straight years" and that "Toll Brothers has spent decades cultivating its well-earned reputation and goodwill."

8.      On February 1, 2022, **JG** received an email titled "Best & Finals offers now open for Building #15 [Sites #71-74]" from the email DKOLAR@tollbrothers.com. (See

📄 Exhibit 6 Gmail - Toll Brothers Inc Best and Finals offers now open for Building 15.pdf )

9.      The email was sent by **Dez Kolar**.

10.     The email cc's **Nicole Jorgensen**.

11.     The email contains the text "You are receiving our email because seedlist@tollbrothers.com signed up to receive emails or because your organization has a business relationship with Toll Brothers, Inc."

12.     It also contains the text "10th YEAR ON FORTUNE WORLD'S MOST ADMIRED COMPANIES LIST".

13.     On information and belief, **Ms. Kolar** was a salaried employee of **Toll Brothers, Inc.** of Delaware in 2022 or 2023.

14.     On information and belief, **Ms. Kolar** was not a salaried employee of **Toll Southwest LLC** of Delaware in 2022 or 2023.

15.     **Ms. Kolar** did not have an active real estate license with the Colorado Department of Real Estate in 2022.

14

16.     **Ms. Kolar**, did not have an active real estate license with the Colorado Department of Real Estate in 2023.

17.     On information and belief, **Ms. Jorgensen** was a salaried employee of **Toll Brothers, Inc.** of Delaware in 2022 or 2023.

18.      On information and belief, **Ms. Jorgensen** was not a salaried employee of **Toll Southwest LLC** of Delaware in 2022 or 2023.

19.     **Ms. Jorgensen** did not have an active real estate license with the Colorado Department of Real Estate for the entirety of 2022.

20.     **Ms. Jorgensen** did not have an active real estate license with the Colorado Department of Real Estate in 2023.

21.     On information and belief, **Toll Southwest LLC** of Delaware did not operate a payroll in Colorado from 2020-2024.

22.     On information and belief, **Toll Southwest LLC** of Delaware did not file employment taxes in Colorado from 2020-2024.

23.     **Toll Brothers, Inc** of Delaware and none of its subsidiaries had an active real estate license with the Colorado Department of Real Estate between 2020-2024. (See Exhibit 7 Colorado Toll Brothers License.pdf )

24.     **Toll Brothers Real Estate, Inc** had an active real estate license in Colorado at one period of time. (See Exhibit 8 Gmail - License Expiration Date Toll Brothers.pdf )

25.     This period was between February 11, 2002 and August 19, 2003.

26.     **Toll Brothers Real Estate, Inc** currently has an active real estate license in California. (See Exhibit 9 Public License Lookup - DRE CA.pdf )

27.     On February 5, 2022, **JG** received an email titled "Toll Brothers: We've Received Your Offers" from the email tbmailer@tollbrothers.com. (See

📄 Exhibit 10 Gmail - Toll Brothers Inc Received Your Offers.pdf )

28.     The email displays "Hale, Home Site #74 Minimum Price: $597,790 Your Offer: $646,123 Wellshire, Home Site #73 Minimum Price: $602,925 Your Offer: $611,123"

29.     The email contains the text "Toll Brothers, Inc., 1140 Virginia Drive, Fort Washington, PA 19034 - 855.897.8655"

30.     It also contains the text "10th YEAR ON FORTUNE WORLD'S MOST ADMIRED COMPANIES LIST".

31.     It also contains the text "TOL LISTED NYSE" as a stylized graphic.

32.     The letters TOL refer to the stock ticker symbol TOL.

33.     The ticker symbol TOL refers to **Toll Brothers, Inc** of Delaware.


**B. Toll Brothers Agreement of Sale**

34.     February 12, 2022, **JG** signed an **Agreement of Sale** for a property described as the following: Hale Aberdeen style home on TBI Lot 0074, Legal Lot 7, Block/Tract 5, in the community known as The Ridge at Ward Station having a street address of 5131 Vivian St, Wheat Ridge, CO 80033 (See 📄 Exhibit 11 Agreement of Sale.pdf )

35.     The Seller in this **Agreement of Sale** was **Toll Southwest LLC** of Delaware.

36.     **Toll Southwest LLC** was incorporated in Delaware on July 29, 2011 and has a file number of 5018070. (See 📄 Exhibit 12 DE SOS Toll Southwest.pdf )

37.     **Toll Southwest LLC** of Delaware was registered in Colorado as a foreign company on May 4, 2017 and has ID number 20171351296 (See 📄 Exhibit 13 CO Toll Southwest LLC.pdf )

16

38.    This registration lists "1140 Virginia Dr, Fort Washington, PA 19034, US" as the "Principal office street address" for **Toll Southwest LLC** of Delaware**.**

39.    **Toll Southwest LLC** of Delaware is not registered as a foreign entity with the Pennsylvania Secretary of State.

40.    **Toll Southwest LLC** of Delaware cannot operate in Pennsylvania legally.

41.    This entity was different from the one, **Toll Brothers Inc** of Delaware, that accepted the offer for the same home via email, the offer of $646,123, in ¶¶ 27–33.

42.    According to the Plaintiffs' complaint in Paragraph 28, **Toll Southwest LLC** of Delaware is a "Colorado LLC".

43.    This fact in the Plaintiffs' complaint is verifiably false.

44.    The property cited in the **Agreement of Sale**, according to its structural and architectural plans, had 3 bedrooms, including a 1st floor bedroom with interior walls ("**The Walls**"). (See 📄 Exhibit 14 5131 Walls In Question.pdf  and

📄 Exhibit 15 Acknowledgment by Architect of Bedroom Walls.pdf )

45.    **DJT Design**, the architectural firm that created the designs for the homes at The Ridge at Ward Station, signed their contract for creating the designs for the homes in the neighborhood with **Toll Brothers, Inc.** of Delaware. (See

📄 Exhibit 16 DJT Design Admitting Contract was with Toll Brothers Inc.pdf )

46.    On February 12, 2022, the earnest money of $33,475 for the property was accepted via Stripe. (See 📄 Exhibit 17 Gmail - Toll Bros Receipt )

47.    The payment recipient on the receipt is called "**Toll Bros., Inc**."

17

48.    **Toll Bros., Inc** was incorporated in Pennsylvania, possibly under a different name, on June 30, 1986 and has an ID number of 928642. (See

📄 Exhibit 18 Toll Integrated Systems, Inc.pdf )

49.    **Toll Bros., Inc** of Pennsylvania is not the same entity as **Toll Southwest LLC** of Delaware or **Toll Brothers, Inc** of Delaware.

50.    **Toll Bros., Inc** of Pennsylvania is not a direct subsidiary of **Toll Brothers, Inc** of Delaware.

**C. Toll Brothers Construction**

51.    On May 11, 2022**, JG** received an email titled "Building #15 update" from the email DKOLAR@tollbrothers.com. (See 📄 Exhibit 19 Gmail - Building #15 framing update 1.pdf )

52.    The email contains a photo of the initial framing of the property. The first floor was not yet complete.

53.    The email contains a graphic with the text "Toll Brothers #1 HOME BUILDER FORTUNE WORLD'S MOST ADMIRED COMPANIES 2022".

54.    A February 3, 2022 press release titled "Toll Brothers Named #1 Homebuilder in FORTUNE Magazine Survey of the World's Most Admired Companies" announced this ranking. (See 📄 Exhibit 20 Toll Brothers Fortune 2022 Press Release.pdf )

55.    The press release refers to "Toll Brothers, Inc. (NYSE:TOL) (www.Tollbrothers.com), the nation's leading builder of luxury homes."

56.    This update email came from **Toll Brothers, Inc.** of Delaware.

57.    On May 22, 2022**, JG** took a photo of the 2nd floor framing in construction. (See

📄 Exhibit 21 5-22-22 2nd floor.pdf )

58.     **The Walls** are not present in this photo.

59.     **The Walls** are not present in the photo because they did not exist at the time.

60.     On June 7, 2022, **JG** took a photo of the 3rd floor framing in construction. (See 📄 Exhibit 22 6-7-22 Roof.pdf )

61.     **The Walls** are not present in this photo.

62.     **The Walls** are not present in the photo because they did not exist at the time.

63.     **City of Wheat Ridge** Building Department permit 202102734 pertains to the property at 5131 Vivian St, 80033. (See 📄 Exhibit 23 5131 Vivian Permit.pdf )

64.     On July 15, 2022, inspector **Andrew Haessler** performed a "BLD59 - ROUGH FRAME" inspection, for permit 202102734. (See 📄 Exhibit 24 Rough Frame Inspection 7-15-22.pdf )

65.     **Mr. Haessler** was an employee of Charles Abbot Associates, Inc. ("**CAA**"), according to his LinkedIn profile, at the time. (See 📄 Exhibit 25 LinkedIn Andrew Haessler.pdf )

66.     **CAA** had/has a contract to provide permitting and inspection services to the **City of Wheat Ridge Building Department**. (See 📄 Exhibit 26 Wheat Ridge CAA Contracts.pdf )

67.     **Toll Brothers Inc** of Delaware and their subcontractors at this time did not have any immediate plans to install studs for **The Walls**.

68.     **Toll Brothers Inc** of Delaware and their subcontractors or subsidiaries at this time or prior did not submit any revision applications to the **City of Wheat Ridge** Building Department to add the framing for **The Walls**. (See 📄 Exhibit 27 Gmail - Change orders for 5131 Vivian St.pdf )

69.     **Mr. Haessler** did not make a note in the permitting platform about **The Walls** at this inspection.

70.     **Mr. Haessler** marked this inspection "PARTIAL".

71.     On August 7, 2022, **JG** took a photo of the 1st floor framing. (See 📄 Exhibit 28 8-7-22.pdf )

72.     **The Walls** are not present in this photo.

73.     **The Walls** are not present in the photo because they did not exist at the time.

74.     On or around September 12, 2022, **JG**, his designer **Megan Thompson**, and his hired inspector **Vince Busnardo** tour the property for a pre-drywall walkthrough organized by the builder's staff. (See 📄 Exhibit 29 Gmail - Pre-drywall walk.pdf )

75.     On September 12, 2022, **Mr. Busnardo** created an inspection report for the walkthrough which contains photos. (See 📄 Exhibit 30 Busnardo Inspection.pdf ).

76.     On the page marked "Page 19 of 32" in the report, it shows the first floor without **The Walls**.

77.     Ms. Thompson mentions how **The Walls** were forgotten in a September 26, 2022 follow up email. (See 📄 Exhibit 31 Gmail - Pre-drywall items mention of missing wall Megan.pdf )

78.     On September 21, 2022, inspector **Eric Bowman** performed a "ELE59 - ROUGH ELECTRICAL" inspection, for permit 202102734. (See 📄 Exhibit 32 Electrical Inspection 1 9-21-22.pdf )

79.     In the note for the inspection, he states "Wiring not complete on first floor". (See 📄 Exhibit 33 Electrical Inspection 1 9-21-22 Note.pdf )

80.     **Mr. Bowman** marked this inspection "INCOMPLETE".

81.     **Mr. Bowman** could not mark the inspection "COMPLETE" because **The Walls** were not present in order to put wiring through them.

82.    On September 24, 2022, **JG** took an interior photo of the 1st floor with some plumbing in the first floor bathroom present. (See 📕 Exhibit 34 9-24-22 No Wall Present.pdf )

83.    **The Walls** are not present in this photo.

84.    **The Walls** are not present in the photo because they did not exist at the time.

85.    September 24, 2022 was a Saturday.

86.    **Toll Brothers Inc** and their subcontractors or subsidiaries at this time or prior did not submit any revision applications to the **City of Wheat Ridge** Building Department to add **The Walls**. (See 📕 Exhibit 27 Gmail - Change orders for 5131 Vivian St.pdf )

87.    On September 26, 2022, Mr. Bowman performed a second "ELE59 - ROUGH ELECTRICAL" inspection, for permit 202102734. (See 📕 Exhibit 35 Electrical Inspection 2 9-26-22.pdf )

88.    **Mr. Bowman** marked this inspection "COMPLETE".

89.    **Mr. Bowman** could mark the inspection "COMPLETE" because **The Walls** were present in order to put wiring through them.

90.    The inspection was performed at 7:45am.

91.    **The Walls** were present in this inspection.

92.    Contractors did not perform work at this location on Sunday, September 25, 2022.

93.    The framing for **The Walls** was installed on September 26, the same day as this electrical inspection.

94.    On September 27, 2022, **Mr. Haessler** performed a "BLD59 - ROUGH FRAME" inspection, for permit 202102734. (See 📕 Exhibit 36 Rough Frame Inspection 9-27-22.pdf )

95.    **Mr. Haessler** marked this inspection "COMPLETE".

96.     On October 1, 2022, **JG** took a photo of the 1st floor of **The Walls** with some electrical present. (See 📄 Exhibit 37 10-1-22 Wall Present.pdf )

97.     On October 8, 2022, **JG** took a photo of **The Walls** that shows a grouping of two studs in the upper left and cutouts in a vertical stud near the left of the photo. (See

📄 Exhibit 38 10-8-22 Wall Present 2.pdf )

98.     The cutout of one stud has a visible nail driven horizontally through it.

99.     On October 8, 2022, **JG** took another photo of **The Walls**. (See

📄 Exhibit 39 10-8-22 Wall Present 3.pdf )

100.    This photo shows 2 vertical studs that constitute parts of **The Walls**.

101.    This photo shows 3 cutouts total in the said 2 vertical studs.

102.    The cutouts exceed 25% of the stud width.

103.    The cutouts exceed 40% of the stud width.

104.    The cutouts exceed 50% of the stud width.

105.    The cutouts exceed 55% of the stud width.

106.    The cutouts exceed 60% of the stud width.

107.    The cutouts exceed 66% of the stud width.

108.    IRC 2018 "R602.6 Drilling and notching of studs" states, "Drilling and notching of studs shall be in accordance with the following: 1. Notching. Any stud in an exterior wall or bearing partition shall be permitted to be cut or notched to a depth not exceeding 25 percent of its width. Studs in nonbearing partitions shall be permitted to be notched to a depth not to exceed 40 percent of a single stud width." (See

📄 Exhibit 40 IRC 2018 R6026 Drilling and notching of studs.png.pdf  and

📄 Exhibit 41 IRC 2021 R6026 Drilling and notching of studs diagram.pdf )

22

109.    The City of Wheat Ridge Building Department had adopted the standards within ICC 2018 for all the inspections for this home. (See 📄 Exhibit 42 5131 Vivian COO.pdf )

110.    ICC 2018 includes IRC 2018.

111.    **Mr. Haessler** did not make a note in the permitting platform about these cutouts in this final framing inspection.

112.    **Mr. Haessler** did not make a note in the permitting platform about a violation of IRC 2018 R602.6 in this final framing inspection.

113.    On October 25, 2022, **Mr. Haessler** performed a "BLD65 - DRYWALL FASTENING / MOISTURE BOARD" inspection, for permit 202102734. (See 📄 Exhibit 43 Drywall Fastening Inspection 10-25-22.pdf )

114.    On the date of the inspection, **Mr. Haessler** marked this inspection "COMPLETE".

115.    **Mr. Haessler** did not make a note in the permitting platform about a group of studs protruding from the drywall around **The Walls**.

116.    On November 25, 2022, **JG** took a photo of **The Walls** with drywall and paint. (See 📄 Exhibit 44 11-25-22 Stud Jutting Drywall.pdf )

117.    The photo shows a group of studs protruding from **The Walls**. These are the same studs that appear in ¶¶ 99.

118.    **Mr. Haessler** marked the inspection "COMPLETE" despite this workmanship error.

**D. Toll Brothers Closing**

119.    On January 19, 2023**, JG** closed on the property at 5131 Vivian St. (See 📄 Exhibit 45 Final Closing Disclosure.pdf )

120.    The Seller displayed on this **Closing Disclosure** is **Toll Southwest LLC** of Delaware, with an address of "1140 Virginia Drive Fort Washington , PA 19034" shown.

121.    There is no "Real Estate Broker (S)" listed in the "Contact Information" section of the **Closing Disclosure**.

122.    The Seller displayed on this **Closing Disclosure** is not **Toll Brothers, Inc.** of Delaware.

123.    The **Certificate of Occupancy** for 5131 Vivian St shows the date "01/18/23" and permit number "202102734". (See  📄 Exhibit 42 5131 Vivian COO.pdf )

124.    The listed owner is "TOLL SOUTHWEST LLC" and address is "10 Inverness Dr 125, Englewood, CO 80112".

125.    This address is not the same as the **Toll Southwest LLC** of Delaware "Principal office street address" of "1140 Virginia Dr, Fort Washington, PA 19034, US" listed with the Colorado Secretary of State.

126.    The listed contractor is "TOLL BROTHERS" and address is "10 Inverness Dr 125, Englewood, CO 80112".

127.    "TOLL BROTHERS" does not pertain to any entity incorporated in Delaware registered with the Colorado Secretary of State.

128.    "TOLL BROTHERS" is not the DBA name of any entity owned by **Toll Brothers, Inc** of Delaware registered with the Colorado Secretary of State.

129.    The listed owner and contractor do not have the same name.

130.    The listed owner and contractor do not pertain to the same entity.

131.    Colorado Real Estate Commission statement CP-1 states that "Unlicensed individuals or entities selling real property ("Selling Principals") such as bank owned properties (REOs), homebuilders, iBuyers (Instant Buyers) and any other individual or entity identified in section

24

12-10-201(6)(b), C.R.S., are exempt from being licensed and, as sellers, are not required to use Commission-Approved Forms.". (See 📄 Exhibit 46 Colorado CP-1 2022.pdf )

132.    **Toll Brothers, Inc** of Delaware is a homebuilder.

133.    **Toll Southwest LLC** of Delaware is not a homebuilder.

134.    The marketing for the property at 5131 Vivian St was performed by **Toll Brothers, Inc.** of Delaware.

135.    The marketing for the property at 5131 Vivian St was not performed by **Toll Southwest LLC** of Delaware.

136.    The real estate brokering for the property at 5131 Vivian St was performed by **Toll Brothers, Inc.** of Delaware.

137.    The real estate brokering for the property at 5131 Vivian St was not performed by **Toll Southwest LLC** of Delaware.

138.    The construction for the property at 5131 Vivian St was performed by **Toll Brothers, Inc.** of Delaware.

139.    The construction for the property at 5131 Vivian St was not performed by **Toll Southwest LLC** of Delaware.

140.    The marketing, brokering, and selling for the property at 5131 Vivian St was organized by a single corporate entity.

141.    In an August 19, 2025 email from the Colorado Department of Real Estate, the department provided this opinion: The Colorado Real Estate Commission has not previously determined that the formation and use of subsidiary entities disqualifies the homebuilder exemption. The concerns referenced in your complaint are not addressed in the license law. You

may choose to contact legal counsel to determine other legal options that may be available. (See

📄 Exhibit 47 Gmail -Colorado DRE CP-1 Comment.pdf )

142.    On the **Special Warranty Deed** for 5131 Vivian St, **Toll Southwest LLC** of Delaware is the Grantor and **Jeffrey Gu** is the Grantee. (See

📄 Exhibit 48 5131 Vivian St Special Warranty Deed.pdf )

143.    **Reginald Carveth** was the signatory for the Grantor in this **Special Warranty Deed** and others. (See 📄 Exhibit 198 CO Deed.pdf and 📄 Exhibit 199 PA Deed.pdf )

144.    On information and belief, **Mr. Carveth** was a compensated officer or employee of **Toll Brothers, Inc.** of Delaware at the time of signing.

145.    On information and belief, **Mr. Carveth** was not a compensated officer or employee of **Toll Southwest LLC** of Delaware at the time of signing.

146.    **Toll Southwest LLC** of Delaware's managers at the time of closing consisted of a combination or subset of this group of people: **Douglas Yearley, Richard Hartman, Robert Parahus,** or **Martin Connor.** (See 📄 Exhibit 49 AZ Toll Southwest LLC 2023.pdf and

📄 Exhibit 50 AZ Toll Southwest 2017.pdf )

147.    **Mr. Carveth** was not one of these 3-4 managers of **Toll Southwest LLC** of Delaware at the time of signing.

148.    **Toll Southwest LLC** of Delaware had only one member, **Toll Bros., Inc** of Pennsylvania.

149.    **Toll Southwest LLC** of Delaware still only has one member, as of September 22, 2025, **Toll Bros., Inc.** of Pennsylvania.

150.    **Mr. Carveth** was also not a member of **Toll Southwest LLC** of Delaware at the time of signing.

151.    **Mr. Carveth** was not a compensated officer or employee of **Toll Southwest LLC** of Delaware at the time of signing.

152.    On January 28, 2023, **JG** received an email titled "Helpful information about caring for your new home" from reply@emails.tollbrothers.com. (See

📄 Exhibit 51 Gmail - Helpful information about caring for your new home.pdf )

153.    The email contains the text "You are receiving our email because jeffwgu@gmail.com signed up to receive emails or because your organization has a business relationship with Toll Brothers, Inc"

154.    The email contains a graphic with the text "Toll Brothers #1 HOME BUILDER FORTUNE WORLD'S MOST ADMIRED COMPANIES 2022".

155.    On January 31, 2023, **JG** received an email titled "How was your Toll Brothers Home Building Experience?" from customersurvey@tollbrothersinc.com. (See

📄 Exhibit 52 Gmail - How was your Toll Brothers Home Building Experience?.pdf )

156.    The email's signatory is **Toll Brothers, Inc**. of Delaware CEO **Douglas Yearley**.

157.    In the email, **Mr. Yearley** represents himself as the CEO of **Toll Brothers, Inc**. of Delaware.

158.    **Mr. Yearley** was also one of 3-4 managers for **Toll Southwest LLC** of Delaware at the time of sending the email, according to Arizona filed documents. (See

📄 Exhibit 49 AZ Toll Southwest LLC 2023.pdf  and  📄 Exhibit 50 AZ Toll Southwest 2017.pdf )

159.    The aforementioned email does not portray **Mr. Yearley** as a manager of **Toll Southwest LLC** of Delaware.

160.    The email contains the text "Toll Brothers, Inc., 1140 Virginia Drive, Fort Washington, Pennsylvania 19034"

161.    The domain tollbrothersinc.com is registered by **Toll Brothers, Inc**. of Delaware (See 📄 Exhibit 53 tollbrothersinc.com whois.pdf )

### E. Toll Brothers Post-closing

162.    On August 31, 2023, **JG** sent a warranty request about the garage door of the property not closing properly. (See 📄 Exhibit 54 Gmail -  Garage door wont properly close.pdf )

163.    On December 28, 2023, **JG** sent a warranty request about the luxury vinyl plank (LVP) on the 2nd floor being uneven and bubbling. (See

📄 Exhibit 55 Gmail - Large amount of LVP bubbling.pdf  and

📄 Exhibit 134 LVP Warranty Text.pdf)

164.    One area of the bubbling cited was on the second floor, in the kitchen near the stairs that go to the 3rd floor.

165.    The area of the bubbling cited is right above **The Walls**.

166.    On February 15, 2024, in response to the LVP warranty request, their representative stated that "After careful review of your service request ID #1228317 we have determined that the item mentioned is beyond the scope of the warranty." (See

📄 Exhibit 56 Gmail - Re Large amount of LVP bubbling.pdf )

167.    On March 12, 2024, the warranty team sent a response to a warranty request **JG** made about overly large cracks in the garage slab. (See

📄 Exhibit 57 Gmail - Re Large cracks in slab.pdf )

168.    On April 22, 2024, **JG** sent another request for the garage door not closing correctly. (See 📄 Exhibit 58 Gmail - Garage door closes inconsistently.pdf )

169.    On June 16 and June 18, 2025, **JG** sent 2 Colorado Construction Defect Action Reform Act (CDARA) letters to **Toll Brothers Inc**. (See

📄 Exhibit 59 Toll Brothers CDARA Structure Letter.pdf and

📄 Exhibit 60 Toll Brothers CDARA Window Letter.pdf)

170.    In the first letter, he notes a long crack in the 2nd floor ceiling. (See

📄 Exhibit 61 2nd floor ceiling crack.pdf )

171.    In the same letter, he notes carpet tenting on the 3rd floor, above the long crack. (See

📄 Exhibit 62 3rd floor carpet tenting.pdf )

172.    In the same letter, he notes large cracks in the garage. (See

📄 Exhibit 63 Renter noting larger crack.pdf )

173.    In the second letter, he notes water intrusion in some windows.

174.    **Toll Brothers, Inc.** of Delaware still has not resolved the issues in the two letters.

175.    **Toll Brothers, Inc.** of Delaware was not the named seller on the **Closing Disclosure** or **Agreement of Sale**, but eventually responded to the letters despite this.

176.    On June 18, 2025, **JG** sent a complaint to the Pennsylvania Office of Attorney General, Bureau of Consumer Protection. (See 📄 Exhibit 64 Pennsylvania AG Confirmation Receipt.pdf )

177.    On June 27, 2025, **JG** concluded a communication with **Felten Group** employees **David Sparks**, Vice President of Research & Development, and **Mark Matthews**, Vice President of

Engineering. (See 📄 Exhibit 65 Gmail - Felten Group emails.pdf and

📄 Exhibit 197 Felten Plans First Page.pdf )

178.     **Felten Group** created the structural plans for Building 15 of the Ridge at Ward Station.

179.     **Felten Group** created the structural plans for all the buildings of the Ridge at Ward Station.

180.     **Mr. Sparks** and **Mr. Matthews** refused to provide **JG** the structural plans for Building 15.

181.     **Mr. Sparks** and **Mr. Matthews** refused to provide **JG** the signatory company to the contract to create these plans.

182.     **Mr. Sparks** and **Mr. Matthews** refused to detail whether their company approved or analyzed plans for the installation of **The Walls** on or around the time they were installed.

183.     On July 1, 2025, **JG** concluded an email chain wherein he communicated with **Chris Ferguson** and **Eric Lehman**, two high level officers or employees of **Toll Brothers, Inc** of Delaware in Colorado. (See 📄 Exhibit 66 Chris Ferguson not admitting employment.pdf )

184.     Neither of the gentlemen would confirm who their employer was, with **Mr. Ferguson** writing "Toll Brothers."

185.     On July 9, 2025, an in-house counsel, **Matt Care**, responded on behalf of **Toll Brothers, Inc** of Delaware to **Agent Brian Murray** regarding the PA AG complaint initiated on June 18, 2025. (See 📄 Exhibit 67 Toll Brothers Matt Care PA AG Response 1.pdf )

186.     In the letter, he states "Toll has requested an opportunity to inspect the home".

187.     By July 9, 2025, **JG** had received no communication with **Toll Brothers, Inc.** of Delaware about the CDARA claims noted in the original complaint.

188.    **Mr. Care's** statement to **Mr. Murray** that "Toll has requested an opportunity to inspect the home" was false.

189.    Thus, **Mr. Care** lied to an agent of the Pennsylvania state government.

190.    **JG** brought up this falsity to **Mr. Murray** and asked **Mr. Murra**y to ask **Mr. Care** to furnish evidence of this supposed prior communication with him. (See 📄 Exhibit 68 Email Chain with Brian Murray 1.pdf )

191.    **Mr. Care** could not provide **Mr. Murray** the evidence of communication on or prior to July 9, 2025.

192.    **Mr. Care** attempted to rectify the solution by initiating a phone call from **Mr. Ferguson** to **JG** on July 10, and, eventually, by writing a letter.

193.    On July 17, 2025, **JG** received a CDARA response letter from **Toll Brothers, Inc** of Delaware via FedEx overnight, where **Mr. Care** notes that "I am in-house counsel for Toll Brothers, Inc." ( See 📄 Exhibit 69 TB Formal CDARA Letter )

194.    The Disciplinary Board of the Supreme Court of Pennsylvania registration for **Mr. Care** shows **Toll Bros., Inc.** of Pennsylvania as his employer. (See 📄 Exhibit 70 Care, Matthew Charles.pdf )

195.    This entity is not the same entity as the one he states he is in-house counsel for in his CDARA response letter.

196.    **Mr. Care** sent a letter on behalf of an entity with which he had no employment relationship.

197.    On July 24, 2025, after this formal CDARA response letter, **JG** initiated an email chain with **Mr. Care**. (See 📄 Exhibit 71 Toll CDARA Response.pdf  and 📄 Exhibit 72 Gmail - Re: Toll CDARA Response.pdf )

31

198.    In these emails, **JG** attempted to gain clarity on their entity structure before allowing them into the house for the CDARA inspections.

199.    On August 6, 2025 **JG** asked the following: You say you're the attorney for the seller of my home, which on my closing disclosure and deed states Toll Southwest LLC. Does that mean you are an attorney for Toll Southwest LLC? If so, please provide confirmation of this employment relationship.

200.    **Mr. Care** never answered this specific question.

201.    **Mr. Care** never provided the requested confirmation.

202.    In these email chains, **Mr. Care** wrote that **Mr. Ferguson** works for "Toll Brothers" after being asked for clarification on **Mr. Ferguson's** employment.

203.    On August 8, 2025, **Toll Brothers, Inc.** sent **JG** a cease and desist regarding his entity registrations, the subject of *Toll Brothers Inc, et al. vs Gu, et al*. (See
📄 Exhibit 73 Cease and Desist )


**F. City of Wheat Ridge**

204.    On July 1, 2025, City of Wheat Ridge Chief Building Official **Renee Meriaux** concluded an email chain with **JG**, where they discussed the Contractor's License #190246, which names an entity called "Toll Brothers". (See 📄 Exhibit 74 Gmail - Toll Brother Inc Contractor Info.pdf
and 📄 Exhibit 75 Wheat Ridge License.pdf )

205.    **Ms. Meriaux** is an employee of **CAA.**

206.    **Ms. Meriaux** is the Chief Building Official of the **City of Wheat Ridge Building Department**.

207.    In the email, she states "I recognize you are in the process of researching what entities might be responsible for the conditions observed in on your property, and I respect that. However, be advised that the City is not required to assist in that research, other than to respond to public records requests, each of which must be on the form you have been given. By this message I am informing you that I will not continue to follow up on your questions as you pursue your efforts vid-s-vis the contractors/builders. I will, though, respond to CORA requests as they are received. As to this last, if you send the form, I will be able to respond."

208.    The serifed text style of the email is different from the sans-serifed text style of all **Ms. Meriaux's** other emails.

209.    The serifed text style of the email is the same text style used by **City of Wheat Ridge City Attorney Gerald Dahl** in an email he sent to **JG** on June 25, 2025. (See

📕 Exhibit 76 Gmail - Building plan CORA request.pdf )

210.    This response sent by **Ms. Meriaux** was actually originally written by **Mr. Dahl**.

211.    In a prior email on June 30, 2025, **Ms. Meriaux** states that "Yes, we accepted this COI as Toll Brothers is a DBA of Toll Southwest, LLC We do not regulate SOS requirements."

212.    On July 1, 2025, Senior Deputy City Clerk **Margy Greer** responded to a CORA request for "All documentation the City of Wheat Ridge relied on to confirm that 'Toll Brothers' was a registered DBA of Toll Southwest LLC" (See

📕 Exhibit 77 Gmail - Toll Brothers CORA Clarification.pdf )

213.    She responded that they verify with the SEC EDGAR search tool, pointing to this URL:

https://www.sec.gov/edgar/search/#/ciks=0000794170&entityName=Toll%2520Brothers%252C%2520Inc.%2520(TOL)%2520(CIK%25200000794170)

214.    She did not respond by saying that they use the Colorado Secretary of State Business

Database Search tool, which has this URL:

https://www.sos.state.co.us/biz/BusinessEntityCriteriaExt.do

215.    **JG** followed up in this email chain with **Mr**. **Dahl.** (See

📄 Exhibit 78 Gmail - Dahl Followup.pdf )

216.    On a July 13, 2025 email chain, **JG** brought to **Mr. Dahl's** attention that an Site

Improvement Agreement ("**SIA**") signed between the **City** and **Toll Southwest LLC** of

Delaware had a factual error.

217.    The factual error that JG brought to his attention was the fact that "Toll Southwest LLC"

was referred to in the **SIA** as a "Colorado Limited Liability Company."

218.    In this same email, **JG** brought up the fact that "An SOS filing from Arizona shows only

3 managers for Toll Southwest LLC, and Mr. Mark Bailey is not one of them."

219.    On information and belief, **Mark Bailey** was a compensated officer or employee of **Toll

Brothers, Inc.** of Delaware at the time of signing this SIA.

220.    On information and belief, **Mr. Bailey** was not a compensated officer or employee of **Toll

Southwest** of Delaware at the time of signing this SIA.

221.    **Mr. Bailey** is not one of the 3-4 managers of **Toll Southwest LLC** of Delaware.  (See

📄 Exhibit 49 AZ Toll Southwest LLC 2023.pdf  and  📄 Exhibit 50 AZ Toll Southwest 2017.pdf

)

222.    In this same email, **JG** brought up the fact that 'A statement of authority from slightly

before the signing of the SIA, notarized in Larimer County, has a factual inaccuracy, saying the

LLC was formulated under the laws of "Pennsylvania", which contradicts many other SOAs and

deeds signed before and after this time.'

34

223.    On July 16, 2025, **Mr. Dahl** finished the email chain saying, 'You already have my message to you of July 10:  "I understand your desire to research the Toll Bros entity. The work under this SIA is complete, the City has no need to enquire, and I must decline to research on your behalf."  Respectfully, it is clear you are not satisfied with my responses for the City; however, repeating the request will not change my position. Accordingly, I will not respond to additional repeated requests.'

224.    **Mr. Dahl** was seemingly referring to the entity **Toll Bros., Inc.** of Pennsylvania.

225.    **Mr. Dahl** was not referring to the entity **Toll Southwest LLC** of Delaware.

226.    **Toll Bros., Inc.** of Pennsylvania was not the signatory of the aforementioned SIA or the **Special Warranty Deed** for the property at 5131 Vivian St.

227.    **Mr. Dahl** was confused about what entity he was referring to.

228.    On August 21, 2025, **JG** sent another email to **Mr. Dahl** and **Ms. Meriaux**. (See 📄 Exhibit 79 Gmail - Toll Brothers in Colorado.pdf )

229.    In it, he asks the City to acknowledge 3 matters: '1. Acknowledge that the license issued under "Toll Brothers" was improper because the named entity was not registered in Colorado. Clarify whether the City intends to revoke, amend, or re-issue those permits under the correct legal entity.  Provide a written explanation of how this irregularity will be addressed to protect homeowners from reliance on improperly issued permits'

230.    On August 28, 2025, **Mr. Dahl** responded with "Your August 21 message and attachments were received and filed. Nothing further at this time."

231.    In the first half of September 2025, **JG** called the **Wheat Ridge Building Department** and asked for clarification: "Could you and the City please tell me the reasons for ignoring my questions?"

232.    He was told various times by Deputy CBO **Steve Peck** to make his questions "in writing."

233.    **Mr. Peck** is an employee of **CAA.**

234.    On September 10, 2025, **Ms. Meriaux** emailed CAA officer **Diana Snodgrass**. (See

📄 Exhibit 80 CAA Snodgrass Email.pdf )

235.    On information and belief, **Ms. Snodgrass** is the CFO of CAA.

236.    On information and belief, **Ms. Snodgrass** does not have a direct contractual relationship with the **City of Wheat Ridge**.

237.    The email states, "FYI - Just keeping you in the loop. City Attorney told us to tell him all of his requests must be in writing and we will no longer respond over the phone."

238.    Also on September 10, 2025, **JG's** neighbor and designer **Ms. Thompson** called the **City of Wheat Ridge Building Department**, encountering no request for her to put her communication in writing. (See

📄 Exhibit 81 Neighbor being treated normally Sept 10 2025.pdf )

239.    By this point, it was **City of Wheat Ridge's** policy to require that, for **JG**, "his requests must be in writing and we will no longer respond over the phone."

240.    On September 12, 2025, **Mr. Dahl** sent **JG** a letter titled "Re: Your property at Ridge at Ward Station" (See 📄 Exhibit 82 Wheat Ridge Cease Letter.pdf )

241.    The letter states "As you have been informed, repeated requests for the same actions and questions will not produce different results or answers from those you have already been given. Additionally, your contacts have become increasingly frequent and repetitive, and City staff have the right to be free from harassment. Additional correspondence from you will be retained, and may or may not be responded to as appropriate in the sole discretion of the City."

242.    On September 15, 2025, **City of Wheat Ridge** responded to a CORA request of **JG's** for communications related to directing that JG make all questions in writing. (See

📄 Exhibit 83 Gmail - CORA Request for Directive.pdf )

243.    The City invoked CRS 24-72-204(3) (a)(IV) to withhold some respondent records.

244.    On September 18, 2025, the **City** said that there were no privilege logs related to this withholding. (See 📄 Exhibit 84 Gmail - CORA Request for Privilege Logs.pdf )

**G. Toll Brothers History**

245.    The URL at https://www.tollbrothers.com/about claims that the company does business in 24 states. (See 📄 Exhibit 85 Toll Brothers About.pdf )

246.    The Plaintiffs' complaint also claims that the company does business in 24 states in Paragraph 25.

247.    TB PROPRIETARY CORP. incorporated in Delaware on July 14, 1987 (See

📄 Exhibit 86 DE SOS TB Proprietary Corp.pdf  and  📄 Exhibit 87 Corporate Hierarchy.pdf )

248.    TB PROPRIETARY CORP. of Delaware is also registered as a foreign corporation in New Jersey.

249.    On information and belief, TB PROPRIETARY CORP. of Delaware is only registered in these 2 states as of September 22, 2025. (See 📄 Exhibit 88 Toll Brothers Registrations.pdf )

250.    On information and belief, TB PROPRIETARY CORP. of Delaware is only registered in less than 5 states as of September 22, 2025.

251.    TB PROPRIETARY CORP. of Delaware is the service mark owner for "Toll Brothers".

(See 📄 Exhibit 89 Toll Brothers Trademark.pdf )

252.    TB PROPRIETARY CORP. of Delaware is the service mark owner for "America's Luxury Homebuilder". (See 📄 Exhibit 90 Americans Luxury Homebuilder Trademark.pdf )

253.    These service marks are used in company advertising and branding in all 24 states in which it operates.

254.    TB PROPRIETARY CORP. of Delaware is not registered in all 24 states that use the "Toll Brothers" service mark as of September 22, 2025.

255.    TB PROPRIETARY CORP. of Delaware is not registered in all 24 states that use the "America's Luxury Homebuilder" service mark as of September 22, 2025.

256.    On information and belief, TB PROPRIETARY CORP. of Delaware is 100% owned by TOLL HOLDINGS, INC of Delaware.

257.    On information and belief, TB PROPRIETARY CORP. of Delaware is not 100% owned by TOLL BROTHERS, INC. of Delaware.

258.    TOLL BROTHERS, INC. incorporated in Delaware on May 28, 1986. (See 📄 Exhibit 5 DE SOS Toll Brothers, Inc..pdf )

259.    TOLL BROTHERS, INC. of Delaware is also registered as a foreign corporation in New Jersey.

260.    TOLL BROTHERS, INC. of Delaware is also registered as a foreign corporation in Pennsylvania.

261.    TOLL BROTHERS, INC. of Delaware is also registered as a foreign corporation in California.

262.    On information and belief, TOLL BROTHERS, INC. of Delaware is only registered in these 4 states as of September 22, 2025.

38

263.    On information and belief, TOLL BROTHERS, INC. of Delaware is only registered in less than 6 states as of September 22, 2025.

264.    TOLL BROTHERS, INC. of Delaware is not registered in all 24 states in which the website and complaint Paragraph 25 claim it does business as of September 22, 2025.

265.    TOLL SOUTHWEST LLC incorporated in Delaware on July 29, 2011 (See 📄 Exhibit 12 DE SOS Toll Southwest.pdf )

266.    TOLL SOUTHWEST LLC of Delaware is not registered in Pennsylvania as of September 22, 2025.

267.    TOLL SOUTHWEST LLC of Delaware is 100% owned by TOLL BROS, INC of Pennsylvania. (See 📄 Exhibit 50 AZ Toll Southwest 2017.pdf )

268.    TOLL BROS, INC of Pennsylvania is 100% owned by TOLL HOLDINGS, INC of Delaware. (See 📄 Exhibit 91 Toll Holdings 100 of Toll Bros.pdf )

269.    TOLL HOLDINGS, INC. incorporated in Delaware on August 1, 1989. (See 📄 Exhibit 92 DE SOS Toll Holdings.pdf )

270.    TOLL HOLDINGS, INC. of Delaware is also registered as a foreign corporation in Florida.

271.    TOLL HOLDINGS, INC. of Delaware is also registered as a foreign corporation in North Carolina.

272.    TOLL HOLDINGS, INC of Delaware is not registered in Pennsylvania as of September 22, 2025.

273.    TOLL HOLDINGS, INC of Delaware is 100% owned by TOLL BROTHERS, INC of Delaware. (See 📄 Exhibit 93 Toll Brothers Inc 100 of Toll Holdings.pdf )

274.    TOLL BROTHERS, INC of Delaware maintains more than 200 subsidiaries, many of which are themselves subsidiaries of subsidiaries. (See 📄 Exhibit 94 Subsidiaries List.pdf )

**H. Toll Brothers Licenses**

275.    **City of Wheat Ridge** Building Department permit 202102734 pertained to the property at 5131 Vivian St, 80033. (See 📄 Exhibit 23 5131 Vivian Permit.pdf )

276.    The General Contractor for permit 202102734 has the name "Toll Brothers" and "Contractor No" of 190246. (See 📄 Exhibit 95 202102734 Contact Info.pdf ).

277.    This contractor number pertains to **City of Wheat Ridge** Contractor's License # 190246. (See 📄 Exhibit 96 Wheat Ridge License.pdf )

278.    In response to a CORA request for "Any materials submitted and communications created in the process of the application for the contractor's license for Toll Brothers, License # 190246," the City of Wheat Ridge provided only emails with "Toll Brothers" employees and a Certificate of Liability Insurance. (See

📄 Exhibit 97 Gmail - Toll Brothers License CORA Request.pdf  and

📄 Exhibit 98 Information to prove toll brothers permit.pdf )

279.    The name on the Certificate of Liability Insurance shows the Insured as being "Toll Southwest LLC".

280.    This name is not the same name as on the Contractor's License # 190246, which lists "Toll Brothers".

281.    The listed information in this Contractor's License shows "TOLL BROTHERS" with an address of "10 INVERNESS DR E ENGLEWOOD CO 80112".

282. "TOLL BROTHERS" was not registered as a DBA name with the Colorado Secretary of State between 2019-2024.

283. "TOLL BROTHERS" was not a DBA name of **Toll Southwest LLC** of Delaware according to the Colorado Secretary of State between 2019-2024.

284. The listed address is not the same as the **Toll Brothers, Inc** of Delaware headquarters of "1140 Virginia Drive, Fort Washington, PA 19034."

285. The listed address is not the same as the **Toll Southwest LLC** of Delaware "Principal office street address" of "1140 Virginia Dr, Fort Washington, PA 19034, US" listed with the Colorado Secretary of State.

286. A Douglas County Contractor Registration shows "Toll Bros., Inc" as the "Contractor Name." (See 📄 Exhibit 99 CO Douglas Registration 2025.pdf )

287. Littleton License #AEC000964 shows "Toll Southwest LLC - Class B" next to "Company" (See 📄 Exhibit 100 Littleton Contractor License 2025.pdf )

288. Erie License #GC-005217-2023 shows "TOLL BROTHERS" next to "Company" (See 📄 Exhibit 101 Erie Contractor License 2025.pdf )

289. An Aurora Residential Building Contractor license shows "TOLL BROTHERS" under "Business". (See 📄 Exhibit 102 Aurora Contractor License 2025.pdf )

290. Centennial License with "License Number" "CL-005667-2025" has a "Company Name Toll Brothers, Inc" (See 📄 Exhibit 103 Centennial Contractor License 2025.pdf )

291. Pikes Peak Regional Building Department has Contractor Details for "TOLL BROS., INC." (See 📄 Exhibit 104 Colorado Springs Contractor License 2025.pdf )

292. **Toll Brothers, Inc.** of Delaware did not use the same subsidiary to register as a contractor across various counties, cities, and towns, in Colorado.

293.    At least 3 different entities were named across these 7 different licenses.

**I. Toll Brothers Insurance**

294.    In a Certificate of Liability Insurance dated 10/22/2024, the producer is **Marsh USA LLC**, the first listed policy number is "MWZY 318815 10", "Toll Southwest, LLC" is the Insured, the "Each Occurrence Limit" is "500,000", and the Certificate Holder is **City of Littleton**. (See 📄 Exhibit 105 Littleton COI 2024.pdf )

295.    In a Certificate of Liability Insurance dated 10/22/2024, the producer is **Marsh USA LLC**, the first listed policy number is "MWZY 318815 10", "Toll Southwest, LLC" is the Insured, the "Each Occurrence Limit" is "5,000,000", and the Certificate Holder is **City of Wheat Ridge**. (See 📄 Exhibit 106 Wheat Ridge COI.pdf )

296.    In a Certificate of Liability Insurance dated 10/22/2024, the producer is **Marsh USA LLC**, the first listed policy number is "MWZY 318815 10", "TOLL BROS., INC." is the Named Insured, the "Each Occurrence Limit" is "5,000,000", and the Certificate Holder is **Douglas County**. (See 📄 Exhibit 107 CO Douglas COI 2024.pdf ).

297.    In a Certificate of Liability Insurance dated 10/29/2024, the producer is **Marsh USA LLC**, the first listed policy number is "MWZY 318815 10", "TOLL BROTHERS, INC." is the Insured, the "Each Occurrence Limit" is "5,000,000", and the Certificate Holder is **Town of Erie**. (See 📄 Exhibit 108 Erie COI.pdf )

298.    In a Certificate of Liability Insurance dated 11/4/2024, the producer is **Marsh USA LLC**, the first listed policy number is "MWZY 318815 10", "Toll Bros. Inc." is the Insured, the "Each Occurrence Limit" is "7,000,000", and the Certificate Holder is **Pikes Peak Regional Building Department**. (See 📄 Exhibit 109 Colorado Spring COI 2024.pdf )

299.    In a Certificate of Liability Insurance dated 11/18/2024, the producer is **Marsh USA LLC**, the first listed policy number is "MWZY 318815 10", "Toll brothers, Inc." is the Insured, the "Each Occurrence Limit" is "1,000,000", and the Certificate Holder is **City of Centennial**. (See 📄 Exhibit 110 Centennial COI 2024.pdf )

300.    In a Certificate of Liability Insurance dated 7/1/2025, the producer is **Marsh USA LLC**, the first listed policy number is "MWZY 318815 10", "Toll Brothers, Inc." is the Insured, the "Each Occurrence Limit" is "5,000,000", and the Certificate Holder is **Town of Superior**. (See 📄 Exhibit 111 Superior COI Naming Toll Brothers Inc.pdf )

301.    All of these Certificates display the policy number "MWZY 318815 10"

302.    All of these Certificates, besides the ones that share the name "Toll Southwest, LLC", have a different name for Insured when accounting for capitalization.

303.    All of these Certificates have a unique combination of Insured and "Each Occurrence" limit.

304.    None of these certificates list a producer "CONTACT NAME", "PHONE", or "EMAIL."

**J. Marsh**

305.    **Marsh USA LLC** of Delaware is an insurance broker for **Toll Brothers, Inc.** of Delaware and subsidiaries. (See 📄 Exhibit 111 Superior COI Naming Toll Brothers Inc.pdf and 📄 Exhibit 107 CO Douglas COI 2024.pdf )

306.    **Marsh USA LLC** is 100% owned by **Marsh LLC**. (See 📄 Exhibit 112 AZ MARSH USA LLC.pdf )

307.    **Marsh USA LLC's** headquarters is 1166 AVENUE OF THE AMERICAS, NEW YORK, NY, 10036.

308.    On information and belief, **Marsh LLC** is 100% owned by **MARSH & MCLENNAN COMPANIES, INC**.

309.    On information and belief, **Marsh LLC's** headquarters is 1166 AVENUE OF THE AMERICAS, NEW YORK, NY, 10036.

310.    **Marsh LLC** is not registered in the State of New York.

311.    **Marsh LLC** uses the same symbol in its logo as **MARSH & MCLENNAN COMPANIES, INC**. on its website (See 📄 Exhibit 113 Marsh Homepage.pdf and 📄 Exhibit 114 MarshMcLennan Homepage.pdf )

312.    This mark is owned by **MARSH & MCLENNAN COMPANIES, INC**. (See 📄 Exhibit 115 MM Trademark.pdf )

313.    **MARSH & MCLENNAN COMPANIES, INC's** headquarters is 1166 AVENUE OF THE AMERICAS, NEW YORK, NY, 10036.

314.    The domain marsh.com has the same registrant as marshmclennan.com. (See 📄 Exhibit 116 marsh.com.pdf and 📄 Exhibit 117 marshmclennan.com.pdf )

315.    That registrant is listed as "Marsh & McLennan Corporation".

316.    The listed address in this Certificate of Liability Insurance dated 10/22/2024 is "30 South 17th Street Philadelphia, PA 19103". (See 📄 Exhibit 107 CO Douglas COI 2024.pdf )

317.    This address is currently a Guy Carpenter office. (See 📄 Exhibit 118 30 South 17th Street.pdf )

318.    Guy Carpenter is a subsidiary of **MARSH & MCLENNAN COMPANIES, INC**. It uses the trademark from ¶¶ 312 in its branding.

44

319.     The listed address in this Certificate of Liability Insurance dated 7/1/2025 is "1717 Arch Street Philadelphia, PA 19103". (See

📕 Exhibit 111 Superior COI Naming Toll Brothers Inc.pdf )

320.     This address is currently a Marsh McLennan Agency office. (See

📕 Exhibit 119 1717 Arch Street.pdf )

321.     Marsh McLennan Agency is a subsidiary of **MARSH & MCLENNAN COMPANIES, INC**. It uses the trademark from ¶¶ 312 in its branding.

## K. Toll Brothers Consumers

322.     The profile for "Toll Brothers" has 1.5 out of 5 stars as a rating on the website ConsumerAffairs as of September 22, 2025. (See

📕 Exhibit 120 Toll Brothers Consumer Affairs.pdf )

323.     This profile is available at https://www.consumeraffairs.com/housing/toll-brothers.html.

324.     As of September 22, 2025, there are 332 reviews for this company profile.

325.     The most frequent rating is 1 star, with 269 ratings. (See

📕 Exhibit 121 Toll Brothers Consumer Affairs Frequency.pdf )

326.     This rating contrasts with the accolades stated in Paragraph 25 of the Plaintiffs' complaint.

327.     On October 29, 2019, a Medium user named **Jeremy Smith** posted an article titled "Our Dream Home By Toll Brothers That Turned Into A Nightmare." (See

📕 Exhibit 122 Medium North Carolina.pdf )

328.     In it, he discusses how he lost his down payment, design customization payment, and ultimately the chance to close on the home due to a credit score decrease.

45

329.    The credit score decrease was due to an error on the part of one creditor.

330.    In it, he cites a letter from a Toll Brothers employee named Deveraux Hamilton which references an entity named **Toll NC II, LP**.

331.    **Toll NC II, LP** is one of the many subsidiaries or subsidiaries of a subsidiary of **Toll Brothers, Inc.** of Delaware.

332.    **Toll Brothers, Inc** of Delaware signed the Agreement of Sale with **Mr. Smith** through **Toll NC II, LP** in order to make it difficult for **Mr. Smith** to pursue any recourse for any problems with the transaction.

333.    A Reddit user named "DISGRUNTLED_TB_BUYER" in a post commented on how their buying process with "Toll Brothers" was positive.  (See

📄 Exhibit 123 Toll Brothers Reddit 1.pdf )

334.    In the same post, the user details how "after they get your money and commitment, it only goes downhill."

335.    The user shows a contrast between the positive buying experience and the negative post-buying experience.

336.    Another Reddit user named "Cold_Ad103" states that they had rust problems on the exterior of their million dollar home and were "Simply heartbroken and tired of the pushback. They aren't listening. I have a bad feeling they're just going to do the minimum and patch it up."

📄 Exhibit 124 Toll Brothers Reddit 2.pdf

337.    An article about an apartment complex named "Northside Piers" built on or around 2008 cites complaints about 'leaky walls, poor insulation, mold, faulty plumbing, faulty sewage system, faulty heating, faulty air-conditioning. And the biggest: "The windows are thin and the seams between the panes allow wind and rain to easily come through, residents say. Some

residents have taped around the window panes, but they say rain and air still blows in."'(See

📄 Exhibit 125 Toll Brothers Northside Piers.pdf )

338.    The article states that this was the Toll Brothers response: The company "is aware of these isolated situations and strongly disagrees with the allegations as they have been presented. It "will continue to honor its obligations and provide the quality and customer service for which it is known."

339.    The response implies that Toll Brothers did not view these as systemic issues but were isolated problems unique to each unit.


**L. Other Toll Court Cases**

340.    In prior litigation, **Toll Brothers, Inc.** of Delaware has appeared under varying subsidiary names.

341.    In *Goldan et al. v. Toll Brothers AZ Limited Partnership*, the named defendant was not the parent company, **Toll Brothers, Inc.** of Delaware, but a subsidiary company.

342.    In *Goldan et al. v. Toll Brothers AZ Limited Partnership*, **Toll Brothers AZ Limited Partnership** retained the services of PHLK LLP.

343.    One lawyer representing the case was Brian Plante.

344.    Another lawyer representing the case was **Melanie Woodfin**.

345.    **Toll Brothers AZ Limited Partnership** was named **EDMUNDS-TOLL CONSTRUCTION COMPANY** at one point in time.

346.    **EDMUNDS-TOLL CONSTRUCTION COMPANY** was acquired by **Toll Brothers, Inc.** of Delaware in 1995.

347.    In *Rawlins et al. v. Toll Southwest, LLC*, plaintiffs litigated against an LLC owned by **Toll Bros, Inc**. of Pennsylvania.

348.    In *Bhaskar Koukuntla v. Toll Bros., Inc.*, plaintiff litigated against a corporation owned by **Toll Holdings, Inc** of Delaware, which is in turn owned by **Toll Brothers, Inc.** of Delaware.

349.    In *Paul Tolstyga v. Toll Bros., Inc. and Toll Dallas TX, LLC*, plaintiffs were confronted with multiple subsidiaries of **Toll Brothers, Inc.** of Delaware.

350.    In the examples cited above, plaintiffs pursuing claims in different states sued different subsidiaries of **Toll Brothers, Inc.** of Delaware—a limited partnership in Arizona, an LLC in Utah and Texas, and **Toll Bros., Inc.** of Pennsylvania in other jurisdictions.

## N. Toll Brothers SEC Disclosures

351.    On the investor FAQ page, **Toll Brothers, Inc.** of Delaware answers the question "What companies has Toll Brothers acquired?" with the following text: Toll Brothers has made thirteen acquisitions: Geoffrey H. Edmunds in Scottsdale, Arizona (1995), Coleman Homes' Las Vegas Division (1998), Silverman Homes in metro Detroit (1999), Richard R. Dostie (2003) and The Manhattan Building Company (2003) in northern New Jersey, the central Florida Division of Landstar Homes (2005), CamWest Development LLC in Seattle, Washington (2012), Shapell Industries, Inc. in California (2014), Coleman Homes in Boise, Idaho (2017), Sharp Residential in Atlanta, Georgia (2019), Sabal Homes in South Carolina (2019), Thrive Residential in Nashville and Atlanta (2020), Keller Homes in Colorado Springs (2020), StoryBook Homes in Las Vegas (2021), and Rialto Homes in San Antonio (2022). (See

📄 Exhibit 135 Toll Brothers What Acquisitions Investor FAQ.pdf and

https://investors.tollbrothers.com/resources/financial-faqs)

352.    Public records show that some of these companies still operate independently.

353.    **Manhattan Building Company**, since at least 2005, has operated as an independent company with no affiliation to **Toll Brothers, Inc**. of Delaware or its subsidiaries. (See 📄 Exhibit 136 About — The Manhattan Building Company.pdf )

354.    This is according to Sanford Weiss.

355.    In its press release on the "acquisition" of **CamWest Development LLC**, CEO **Mr. Yearley** is quoted as having stated "We are excited to enter the Seattle market with the acquisition of CamWest." (See 📄 Exhibit 137 CamWest Press Release.pdf )

356.    **CamWest Development LLC** held an active business registration in Washington until 2024. (See 📄 Exhibit 138 CamWest Delinquencies after 2013 acquistion.pdf )

357.    In its 2012 Annual Report to the Washington SOS, "Yes" was marked for the question "Does your company own land, buildings or other real property in Washington?" (See 📄 Exhibit 139 Camwest Annual Reports.pdf )

358.    In its 2013, 2014, and 2015 Annual Reports to the Washington SOS, "No" was marked to the question "Does your company own land, buildings or other real property in Washington?"

359.    **Eric Campbell** remained listed as the sole Member and only person listed under "Governing People" in these 4 reports.

360.    If truly acquired, another member would be listed.

361.    If truly acquired, **Mr. Campbell** would no longer be listed.

362.    A 10-K from 2012 represents that **Toll Brothers, Inc** of Delaware or its subsidiaries purchased only specific assets of **CamWest Development LLC**. (See 📄 Exhibit 140 10-K 2012.pdf )

363.    This pattern repeated itself with the Sharp Residential purchase.

364.    This pattern repeated itself with the Keller Homes purchase.

365.    This pattern repeated itself with the Rialto Homes purchase.

366.    This pattern repeats itself with all the mentioned "acquisitions" except for the "Geoffrey H. Edmunds" acquisition.

**O. Toll Brothers Statements of Authority**

367.    **Toll Southwest LLC** of Delaware has submitted at least 20 different Statements of Authority to various Colorado counties since 2012. (See

📄 Exhibit 152 Statements of Authority.pdf )

368.    The instructions on these forms request a list of individuals from the signatory, typically with this statement: The name/position of each person authorized to execute instruments conveying, encumbering, or otherwise affecting title to real property on behalf the entity is.

369.    These Statements of Authority never list these individuals: **Douglas Yearley, Richard Hartman, Robert Parahus,** or **Martin Connor.**

370.    The individuals listed in these Statements of Authority are not or never have been managers of **Toll Southwest LLC** of Delaware.  (See

📄 Exhibit 49 AZ Toll Southwest LLC 2023.pdf  and  📄 Exhibit 50 AZ Toll Southwest 2017.pdf )

371.    These Statements of Authority never name **Daniel Rhea**.

372.    **Mr. Rhea** has signed for **Toll Southwest LLC** of Delaware for deeds in Arizona. (See

📄 Exhibit 141 AZ Daniel Rhea.pdf )

373.    According to these Statements of Authority, **Mr. Rhea** did not have the authority to sign on behalf of **Toll Southwest LLC** of Delaware.

374.    More generally speaking, Statements of Authority in Colorado show authority but do not grant it.

375.    **JG** obtained Officer's Certificates from Heritage Title Company that name **Toll Southwest LLC** of Delaware. (See 📄 Exhibit 142 Officers Cert 2024.pdf  and 📄 Exhibit 143 Officers Cert 2022.pdf ).

376.    None of these certificates name any of the managers listed in ¶¶ 382 above.

377.    Attorney **Kenneth Greenspan** is the signatory of both Officer's Certificates.

378.    **Mr. Greenspan** is also the signatory of several of the Statements of Authority referenced above.

379.    On information and belief, **Mr. Greenspan** was a compensated officer or employee of **Toll Brothers, Inc.** of Delaware at the time of signing these documents.

380.    On information and belief, **Mr. Greenspan** was not a compensated officer or employee of **Toll Southwest LLC** of Delaware at the time of his signing these documents.

**P. Tenure at Toll Brothers**

381.    Douglas Yearley has worked at **Toll Brothers, Inc.** of Delaware for over 35 years. (See 📄 Exhibit 144 Doulgas Yearley.pdf )

382.    Mark Bailey has worked at **Toll Brothers, Inc.** of Delaware for over 24 years. (See 📄 Exhibit 145 Mark Bailey LinkedIn.pdf )

383.    Daniel Rhea has worked at **Toll Brothers, Inc.** of Delaware for over 11 years. (See 📄 Exhibit 146 Dan Rhea LinkedIn.pdf )

384.    Reginald Carveth has worked at **Toll Brothers, Inc.** of Delaware for over 8 years. (See 📄 Exhibit 147 Reggie Carveth LinkedIn.pdf )

385.    Kenneth Greenspan has worked at **Toll Brothers, Inc.** of Delaware for over 8 years. (See 📄 Exhibit 148 AZ Toll Bros Inc Annual Report 2017.pdf )

## Q. A Tale of Two Kens

386.    **Mr. Greenspan** is currently a Vice President and Secretary at **Toll Brothers, Inc.** of Delaware, as of September 22, 2025. (See 📄 Exhibit 153 Ken Greenspan LinkedIn.pdf )

387.    **Mr. Greenspan** has been working at the company since at least 2017. (See 📄 Exhibit 50 AZ Toll Southwest 2017.pdf )

388.    **Mr. Greenspan's** LinkedIn does not state his tenure at **Toll Brothers, Inc.** of Delaware.

389.    **Mr. Greenspan** has signed many documents registered with Secretaries of State and county recorders. ( 📄 Exhibit 154 Greenspan Docs.pdf , 📄 Exhibit 50 AZ Toll Southwest 2017.pdf , 📄 Exhibit 142 Officers Cert 2024.pdf and 📄 Exhibit 143 Officers Cert 2022.pdf ).

390.    **Mr. Greenspan** often signs for subsidiaries of **Toll Brothers, Inc.** of Delaware.

391.    On information and belief, **Mr. Greenspan** was not a compensated officer or employee of any of these subsidiaries at the time of signing.

392.    **Mr. Greenspan** does not appear on any Annual Reports. (See 📄 Exhibit 155 Toll Directors and Officers Pages 1999 to 2021.pdf )

393.    **Mr. Greenspan** signs documents for subsidiaries in lieu of the General Counsel, who previously frequently signed them.

394.    **Kenneth Gary** became a licensed attorney in Pennsylvania on or around May 27, 1986.

(See 📄 Exhibit 156 Gary, Kenneth J. PA Bar.pdf)

395.    **Toll Brothers, Inc.** of Delaware's IPO date was on or around July, 16 1986. (See

📄 Exhibit 157 Toll Brothers (TOL) IPO Date.pdf )

396.    According to **Mr. Gary's** LinkedIn, he ascended to General Counsel in March of 1990.

(See 📄 Exhibit 158 Ken Gary LinkedIn.pdf )

397.    **Mr. Gary** was a licensed attorney for less than 4 years before ascending to General

Counsel of **Toll Brothers, Inc.** of Delaware.

398.    **Mr. Gary** was General Counsel of **Toll Brothers, Inc.** of Delaware for more than 15

years.

399.    **Mr. Gary** retained this position until 2005, when he joined Beazer Homes as General

Counsel. (See 📄 Exhibit 159 Gary Announcement Beazer Homes 8-K 2005.pdf )

400.    **Mr. Gary** was fired from Beazer Homes as General Counsel in 2007. (See

📄 Exhibit 160 Beazer Homes says fires general counsel.pdf )

401.    **Mr. Gary** was General Counsel for Beazer Homes for less than 3 years.

402.    On information and belief, **Mr. Gary** was never again General Counsel for a major

homebuilder after Beazer Homes.

403.    The Directors and Officers page from the 1999 **Toll Brothers, Inc.** of Delaware Annual

Report states that **Mr. Gary** was "Vice President and General Counsel." (See

📄 Exhibit 155 Toll Directors and Officers Pages 1999 to 2021.pdf )

404.    Documents signed by **Mr. Gary** throughout his tenure and submitted to Secretaries of

State show him simply as "Vice President." (See 📄 Exhibit 161 Gary Docs.pdf )

405.    These documents do not show him writing "General Counsel."

406.    In **Mr. Gary's** current bio page for his realty company, he states that he is a "real estate attorney." (See [PDF] Exhibit 162 Gary current work.pdf )

407.    **Mr. Gary's** current Pennsylvania attorney license is "retired." (See [PDF] Exhibit 156 Gary, Kenneth J. PA Bar.pdf)

408.    **Mr. Gary** does not have an attorney license in Georgia, where he currently operates his realty business.

409.    On information and belief, **Mr. Gary** does not have an active attorney license in any state.

410.    **Mr. Gary's** stating that he is "a real estate attorney" is false.


**R. Employee Evasiveness**

411.    On June 29, **JG** emailed 2 HR managers, **Crystal Vecchione** and **Maryann Heatherby**, for information about the employer for several employees (See [PDF] Exhibit 166 Email - Employees' Employer.pdf  and [PDF] Exhibit 167 Email - Employees' Employer 2.pdf ).

412.    **Ms. Vecchione** is an "Employee Relations Manager" and **Ms. Heatherby** is a "Senior Manager" with "Toll Brothers." (See [PDF] Exhibit 163 Maryann Heatherby | LinkedIn.pdf  and [PDF] Exhibit 164 Crystal Vecchione | LinkedIn.pdf )

413.    **Ms. Vecchione's** email management system responded with an auto-reply email. (See [PDF] Exhibit 165 Email - Receipt Employees' Employer.pdf )

414.    Ultimately, neither manager responded to **JG's** emails.

415.    On June 30, 2025, **JG** concluded an email chain with **Nicole Jorgensen**. (See

📕 Exhibit 168 Gmail - Nicole avoiding question.pdf )

416.    In the chain, **JG** had asked **Ms. Jorgensen** for a contact in the HR department, to which

she replied, "Summer has been great! I hope you've been having a nice summer as well. I'm so

sorry but I don't have a contact for the HR department :/"

417.    **JG** followed up by asking 'I understand, maybe you could clarify something else for me.

Do you specifically work for "Toll Brothers, Inc.""?' and "Is there someone who could better

answer this question?"

418.    These questions were both ignored by Ms. Jorgensen.

419.    **Patricia Rice** is a Colorado notary. (See

📕 Exhibit 169 Gmail - Patricia Rice Notary CO.pdf )

420.    On July 8, 2025, **JG** called **Ms. Rice**. (See

📕 Exhibit 170 Toll Brothers Employee phone calls.pdf )

421.    **JG** asked her if she worked for "Toll Brothers Inc, Toll Bros Inc, or Toll Southwest

LLC."

422.    She did not answer who she worked for.

423.    **JG** also asked her who **Mr. Ferguson** worked for.

424.    She did not answer who **Mr. Ferguson** worked for.

425.    Also on July 8, 2025, **Elizabeth Stein** returned an initial call from **JG**. (See

📕 Exhibit 170 Toll Brothers Employee phone calls.pdf )

426.    **Ms. Stein** is a Pennsylvania notary. (See 📕 Exhibit 171 Liz Stein Pennsylvania.pdf )

427.    **Ms. Stein** works at the **Toll Brothers, Inc.** of Delaware headquarters.

428.    **JG** asked **Ms. Stein** about **Mr. Greenspan**, asking her "What company does he work for?" and "Does he have the authority to sign on behalf of Toll Southwest?"

429.    **Ms. Stein** did not answer these questions.

430.    **Ms. Stein** accused JG of "intruding."

431.    **Ms. Stein** brought this phone call to the attention of **Toll Brothers, Inc.** of Delaware CEO **Mr. Yearley**.

432.    On information and belief, **Ms. Stein** worked down the hallway from **Mr. Yearley**.

433.    The two spoke about **JG** for a few minutes after **Ms. Stein** stopped speaking with **JG**.

434.    On July 31, 2025, **JG** concluded 2 email chains with 2 individuals, one named **David Christensen** and one named **Gilma Drummy**. (See 📄 Exhibit 172 Gmail - Employer Information Dave.pdf  and 📄 Exhibit 173 Gmail - Employment Information Gilma.pdf )

435.    Both are "Broker Associates" for the corporation "TNHC Realty and Construction Inc," which has a license ID of 01870227. (See 📄 Exhibit 174 TNHC Realty License.pdf )

436.    Neither Broker Associate answered **JG's** question about their employment.

437.    As recently as May 16, 2025, **JG** had no problem communicating with **Ms. Drummy**. (See 📄 Exhibit 175 Gmail - Gilma Current for sale homes.pdf )

## S. TB Annual Reports

438.    **Toll Brothers, Inc.** of Delaware Annual Reports going back to 1999 can be accessed at the following URL: https://investors.tollbrothers.com/financials-and-filings/annual-reports

439.    Up to and including the 2020 edition, these reports contained a page showing "Officers and Directors." (See 📄 Exhibit 155 Toll Directors and Officers Pages 1999 to 2021.pdf )

440.    This page shows how tenured many officers of the company were, displaying their number of years at the company.

441.    Every edition after 2020 has a section that states the following: Our Certificate of Incorporation and Bylaws provide for indemnification of our directors and officers. We have also entered into individual indemnification agreements with each of our directors.

442.    Every edition after 2020 does not have an "Officers and Directors" page showing these individuals and their tenure at the company.


**T. The New Home Company History**

443.    **The New Home Company Inc** incorporated in Delaware on June 25, 2009. (See 🗎 Exhibit 176 The New Home Company Inc.pdf )

444.    **The New Home Company Southern California LLC** incorporated in Delaware on June 25, 2009. (See 🗎 Exhibit 177 The New Home Company Southern California LLC.pdf )

445.    **TNHC Realty and Construction Inc** incorporated in Delaware on June 25, 2009. (See 🗎 Exhibit 178 TNHC Realty and Construction Inc.pdf )

446.    These 3 companies were all incorporated in Delaware on the same day.

447.    **H Lawrence Webb** was CEO of The New Home Company Inc from 2009 - 2019. (See 🗎 Exhibit 179 Larry Webb | LinkedIn.pdf )

448.    **H Lawrence Webb** was Executive Chairman of **The New Home Company Inc** from 2019 - 2022.

449.    **Wayne Stelmar** was CIO of The New Home Company Inc until 2017. (See 🗎 Exhibit 180 New Home CIO Wayne Stelmar to Retire.pdf )

**U. John Laing Homes Company History**

450.   **WL Homes LLC** was more commonly known as "John Laing Homes."

451.   **WL Homes LLC** owned the trademark for "John Laing Homes." (See

📄 Exhibit 181 WL Homes LLC Trademark.pdf )

452.   **WL Homes LLC** was registered in California. (See 📄 Exhibit 182 WL Homes LLC.pdf

)

453.   **John Laing Homes (California), Inc** was a separate entity from **WL Homes LLC** in

California. (See 📄 Exhibit 183 John Laing Homes (California), Inc.pdf )

454.   **JLH Realty & Construction, Inc.** was a separate entity from **WL Homes LLC** and

**John Laing Homes (California), Inc** in California. (See

📄 Exhibit 184 JLH Realty and Construction Inc.pdf )

455.   **JLH Realty & Construction, Inc** had a CSLB license number of 687596. (See

📄 Exhibit 185 JLH CSLB License.pdf )

456.   **JLH Realty & Construction, Inc** had a DRE license number of 01176549. (See

📄 Exhibit 187 JLH DRE License.pdf )

457.   Neither **John Laing Homes (California), Inc** nor **WL Homes LLC** ever had a CSLB

license number.

458.   Neither **John Laing Homes (California), Inc** nor **WL Homes LLC** ever had a DRE

license number.

459.   "John Laing Homes" was listed as the owner-builder on a permit from 3/28/2007 for the

Irvine address 31 Iceberg Rose. (See

📄 Exhibit 186 John Laing Homes Permits and Declarations.pdf )

58

460.    "John Laing Homes" had no FBN registration in Orange County at that time. (See 📄 Exhibit 250 OC Recorder Says No FBN John Laing Homes.pdf )

461.    A WL Homes LLC deed from 2000 shows a DBA name of "John Laing Homes." (See 📄 Exhibit 251 John Laing 2000 deed.pdf )

462.    A WL Homes LLC deed from 2003 shows no DBA name at all. (See 📄 Exhibit 252 John Laing 2003 deed.pdf )

463.    WL Homes LLC at some point changed its policy from listing the alternative business name to not listing the alternative business name on deeds in transactions with consumers.

464.    A 2003 Notice of Completion shows "WL Homes LLC" as being the contractor. (See 📄 Exhibit 253 John Laing 2003 Notice of Completion.pdf )

465.    Since WL Homes LLC never had a CSLB license number in California, this Notice of Completion shows evidence of unlicensed contracting.

466.    **WL Homes LLC's** CEO was H Lawrence Webb through March of 2008. (See 📄 Exhibit 188 Webb Steps Down as CEO of John Laing Homes 2008.pdf )

467.    **WL Homes LLC's** executive **Wayne Stelmar** signed documents for WL Homes LLC in July of 2008. (See 📄 Exhibit 189 Wachovia v JLH.pdf )

468.    **WL Homes LLC** filed for bankruptcy in Delaware in February of 2009. (See 📄 Exhibit 190 Home builder John Laing files for bankruptcy | Reuters.pdf )


## V. The New Home Company Disclosures

469.    **Miek Harbur** became a licensed attorney in California on or around December 2, 2011. (See 📄 Exhibit 191 Miek Debeuckelaer Harbur Cali bar.pdf )

470.    **The New Home Company Inc.'s** IPO date was on or around January 30, 2014. (See 📄 Exhibit 192 NWHM IPO Date.pdf )

471.    According to **Ms. Harbur's** LinkedIn, she ascended to General Counsel of **The New Home Company Inc** in January of 2016. (See 📄 Exhibit 193 Miek Harbur | LinkedIn.pdf )

472.    **Ms. Harbur** is currently the General Counsel for **The New Home Company Inc**, as of September 22, 2025.

473.    **Ms. Harbur** was a licensed attorney for less than 5 years before ascending to General Counsel of **The New Home Company Inc.**.

474.    **Ms. Harbur** and/or other employees submitted Form SI-PT for The New Home Company Inc between 2015-2021 to the California Secretary of State. (See 📄 Exhibit 194 Combined SI-PT.pdf )

475.    In each form where this individual was present, "NO" was checked beside **Mr. Webb** under BANKRUPTCY.

476.    In each form where this individual was present, "NO" was checked beside **Mr. Stelmar** under BANKRUPTCY.

477.    State instructions for this question state "Check YES or NO to indicate whether or not an order for relief has been entered in a bankruptcy case during the 10 years preceding the date of this statement with respect to each director." (See 📄 Exhibit 195 Form SI-PT Info.pdf )

478.    **Ms. Harbur** is currently the General Counsel for **The New Home Company Inc**, as of September 22, 2025. (See 📄 Exhibit 193 Miek Harbur | LinkedIn.pdf )

479.    On January 30, 2014, **The New Home Company Inc** made an SEC filing disclosing information for an IPO. (See

📄 Exhibit 196 New Home Co IPO Form 424B4 2019 Speaks sparingly of bankruptcy.pdf )

480.    This filing did not disclose **Mr. Webb's** relationship to the bankruptcy of **WL Homes LLC.**

481.    This filing did not disclose **Mr. Stelmar's** relationship to the bankruptcy of **WL Homes LLC.**

### W. A Tale of Two Builders

482.    Both **The New Home Company, Inc** of Delaware and **Toll Brothers, Inc.** of Delaware, within 4 years of their respective IPOs, hired General Counsels who became licensed attorneys less than 5 years prior to assuming the role. (See ¶¶ 396-397, 469-473.)

483.    Both companies operate centralized marketing, brokerage, and IT systems through the parent company. (See ¶¶ 1-2, 8, 498-500.)

484.    Both companies frequently use subsidiaries as the signatories for contracts with homebuyers. (See ¶¶ 142, 504.)

485.    In both companies, the trademark-holding entity is not the same entity that signs contracts with consumers or interacts with municipal permitting authorities. (See ¶¶ 251, 500.)

486.    Both companies regularly designate subsidiaries—rather than parent companies—as the licensed contractors, builders, or developers on record with municipalities. (See ¶¶ 277, 628.)

487.    When recently contacted, employees from both companies ignored requests from **JG** to provide their employer information. (See ¶¶ 411-437.)

488.    Both companies have a pattern of partnering with municipal governments in ways that limit the redress options available to homeowners. (See ¶¶ 204-244, 609-726.)

489.    Both companies have issued cease-and-desist letters to homeowners and residents who submit prelitigation letters or regulatory complaints concerning construction defects.  (See ¶¶ 203, 571, 596, 645, 684, 703.)

490.    Both companies have misrepresented matters to shareholders while being publicly traded. (See ¶¶ 351-366, 469-481.)

491.    **The New Home Company, Inc** of Delaware or its affiliated counsel appears to have provided **Toll Brothers, Inc.** of Delaware or its affiliated counsel with information about **JG's** recent dispute with **The New Home Company, Inc** of Delaware, information that subsequently appeared in the Federal complaint, *1:25-cv-02884-CYC*, filed on September 12, 2025. (See 📄 Exhibit 257 TB Federal Complaint.pdf )

X. TNHC Pre-purchase

492.    On December 29, 2023, a US Bank employee named Justin Pope emailed **JG**'s email with preapproval instructions and a link to a marketing page about Olivewood in Portola Springs. (See 📄 Exhibit 233 Gmail - US Bank Preapproval Instructions.pdf )

493.    This email was directed towards **JG** and **JG**'s parents, Xian Feng Gu ("**XFG**") and Di Lan Ge ("**DLG**").

494.    **XFG**, born in October 1957, was over 65 at the time of this contact.

495.    **DLG**, born in April 1959, was over 65 at the time of signing the closing documents.

496.    **XFG** and **DLG** immigrated from China in the 1980s.

497.    **XFG** and **DLG** are naturalized US citizens.

498.    The email provided a link to this URL:

https://www.newhomeco.com/region/orange-county/olivewood-portola-springs

499.    The current content for the linked marketing page for Olivewood was copywritten by **The New Home Company Inc** in 2025. (See 📄 Exhibit 234 Sep 2025 Olivewood Webpage.pdf )

500.    The past content for the linked marketing page for Olivewood was copywritten by **The New Home Company Inc.** in 2023. (See

📄 Exhibit 235 October 2023 Olivewood Webpage.pdf )

Y. TNHC Purchase Agreement

501.    On March 15, 2024, **DLG** and **XFG** signed a **Purchase Agreement** as Buyers for Lot No. 0088 on Tract No. 19176. (See 📄 Exhibit 236 Purchase Agreement Final.pdf )

502.    This **Purchase Agreement** was for a property located at 129 Oakstone, in the City of Irvine, State of California.

503.    The purchase price in this Purchase Agreement is $3,699,990

504.    Employees and/or agents of **The New Home Company Southern California LLC** were signatories to this **Purchase Agreement**.

505.    **Key Fact: The New Home Company Southern California LLC** is the named Seller in this Purchase Agreement.

506.    This **Purchase Agreement** contains the text 'on the terms and conditions set forth below in the Basic Provisions and General Provisions, any Addenda attached hereto and the "Limited Warranty" defined below (collectively "Sales Terms"), all of which are incorporated herein by this reference. All references herein to this "Agreement" include the Sales Terms, and the Parties hereby agree to be bound by same.', and we can refer to the entire bundle of documents as the **Agreement**.

507.    **The New Home Company Southern California LLC** is referred to as the Seller and/or merchant builder in the **Agreement**.

508.    **Key Fact:** The **Agreement** contains the text "Seller shall cause construction and completion of the Residence and appurtenant improvements on the Property."

509.    The **Agreement** contains the text "BUYER ACKNOWLEDGES THAT SELLER IS RELYING ON THIS REPRESENTATION AND WARRANTY IN ACCEPTING THIS AGREEMENT AND INCURRING EXPENSES IN CONNECTION WITH THE SALE OF THE PROPERTY AND SELLER'S COMPLETION OF THE CONSTRUCTION AND DEVELOPMENT OF THE PROPERTY."

510.    The **Agreement** contains the text "Seller may, from time to time, in its sole discretion send Buyer progress reports regarding construction of the Residence."

511.    The **Agreement** contains the text "Seller shall complete construction of the Property, including the Residence and all other improvements thereon"

512.    The **Agreement** contains the text "If Seller fails to complete construction of the Property and close Escrow within two (2) years after the Acceptance Date…"

513.    The **Agreement** contains the text "Seller shall use commercially reasonable efforts to complete installation of the Design Studio Options".

514.    **The New Home Company Inc** is only named 1 time in the **Agreement**, in the document titled "RELEASE AND INDEMNITY."

515.    **TNHC Realty and Construction Inc** is not named in the **Agreement**.

516.    **Key Fact: The New Home Company Southern California LLC** is the named "Developer (Contact)" in the Agreement document titled "2007 NEW HOME UNIVERSAL DESIGN OPTION CHECKLIST (AB 1400)"

517.    **The New Home Company Southern California LLC** is a direct subsidiary of **The New Home Company Inc.**

518.    **The New Home Company Southern California LLC** is 100% owned by **The New Home Company Inc.**

519.    **Key Fact: The New Home Company Inc** did not have a CSLB license number at the time of the signing of the **Agreement**.

520.    **Key Fact: The New Home Company Inc** still does not have a CSLB license number as of September 9, 2025.

521.    **Key Fact: The New Home Company Southern California LLC** also did not have a CSLB license number at the time of the signing of the **Agreement**.

522.    **Key Fact: The New Home Company Southern California LLC** also still does not have a CSLB license number as of September 9, 2025.

523.    **The New Home Company Southern California LLC** did not have a **City of Irvine** ("**COI**") Business License at the time of the signing of the **Agreement**.

524.    **The New Home Company Southern California LLC** still does not have a **COI** Business License as of September 9, 2025.

525.    **Key Fact:** In the "Definitions" section of this warranty, one definition states that "Builder means The New Home Company Southern California LLC, a Delaware limited liability company."

Z. TNHC Closing

526.    On June 24, 2024, **XFG** and **DLG** signed closing documents.

527.    **Key Fact:** The Homebuyer Limited Warranty was part of these closing documents. (See 📕 Exhibit 237 Closing Warranty.pdf )

528.    **Key Fact:** On the grant deed submitted to Orange County for Lot 88 of Tract No. 19176, **The New Home Company Southern California LLC** grants the property. (See 📕 Exhibit 238 129 Oakstone Grant Deed.pdf )

529.    The property was granted to the Trustees **XFG** and **DLG** of The Xian Feng Gu and Di Lan Ge Revocable Trust.

530.    On the Closing Disclosure for the property, **The New Home Company Southern California LLC** is the listed name for Real Estate Broker (S). (See 📕 Exhibit 239 Signed CD.pdf )

531.    The listed DRE license number for this field on the Closing Disclosure is 01870227.

532.    01870227 is the DRE license number belonging to **TNHC Realty and Construction Inc.** (See 📕 Exhibit 240 TNHC DRE License.pdf )

533.    **TNHC Realty and Construction Inc** is a direct subsidiary of **The New Home Company Inc**.

534.    **TNHC Realty and Construction Inc** is 100% owned by **The New Home Company Inc.**

535.    This combination between the named Real Estate Broker (S) and the DRE License Number is in every Closing Disclosure for the whole neighborhood.

536.    **The New Home Company Southern California LLC** is not a DRE licensed real estate broker.

537.    **Key Fact:** On the same closing disclosure, **The New Home Company Southern California LLC** is listed as the seller.

538.    **Key Fact:** On the Buyer Statement provided by the Settlement Agent, the Seller is listed as **The New Home Company Southern California LLC**. (See

📄 Exhibit 241 Buyer Statement.pdf )

539.    The statement lists $3,867,154 as the "Total Consideration."

AA. Post-Closing

540.    On July 2, 2024, the first item on the Homeowner Central warranty portal was marked "Completed" for 129 Oakstone. (See 📄 Exhibit 126 Final Warranty List.pdf )

541.    This warranty item pertained to hot water not being delivered properly in the kitchen.

542.    The listed Builder in the Contacts section on the warranty portal is **The New Home Company Southern California LLC**. (See 📄 Exhibit 127 Warranty Portal Contact Page.pdf )

543.    On February 1, 2025, **XFG**, **DLG**, and **JG** signed an agreement for **JG** to handle house matters at 129 Oakstone. (See

📄 Exhibit 128 Owner's Representative and Claims Support Agreement.pdf )

544.    On February 16, 2025, **JG** arrived at the residence and began documenting construction defects and worksite violations. (See 📄 Exhibit 129 Defect Pictures.pdf )

545.    Also from this date onward, **JG** took photos of construction vehicles parked in publicly used thoroughfares.

546.    **JG** also took photos of lack of safety signage and cones in public thoroughfares near large vehicles.

547.    **JG** also took photos of the absence of safety gear on workers .

548.    On April 21, 2025, **JG** submitted a complaint to the California DRE against **TNHC Realty and Construction Inc.** (See 📄 Exhibit 130 DRE Complaint Number.pdf )

BB. TNHC SB800

549.    Also on April 21, 2025, **JG** received an SB800 letter from **TNHC** via PHLK LLP requesting inspection. (See 📄 Exhibit 131 SB800 Initial Letter.pdf )

550.    The letter also had a Certificate of Liability Insurance attached.

551.    Named Insureds on this Certificate of Liability Insurance are **The New Home Company Inc** and **TNHC Realty and Construction Inc.**

552.    **Key Fact: The New Home Company Southern California LLC** is not a Named Insured on this Certificate of Liability Insurance.

553.    On April 22, 2025, certain subcontractors and construction consulting company **Bert L Howe and Associates** inspected the home, as stated in the aforementioned SB800 letter.

554.    **Bert L Howe and Associates** did not have a CSLB license number at the time of inspection.

555.    **Bert L Howe and Associates** still does not have a CSLB license number as of September 9, 2025.

556.    **Bert L Howe and Associates** did not have an Irvine business license number at the time of inspection.

557.    **Bert L Howe and Associates** still does not have an Irvine business license number as of September 9, 2025.

558.    **Key Fact:** On May 15, 2025, the last item on the Homeowner Central warranty portal was marked "Completed." (See 📄 Exhibit 126 Final Warranty List.pdf )

559.    This warranty item pertained to a window having a large scratch.

560.    On May 22, 2025, PHLK sent an SB800 response letter. (See

📄 Exhibit 132 SB800 Final Letter.pdf )

561.    This letter was a response to the inspections performed on April 22, 2025.

562.    This letter denied all claims sent in the previous SB800 notices related to those

inspections.

CC. TNHC Post-SB800

563.    On May 17, 2025, a Saturday, **JG** took photos of **TNHC** worksites between 8am and

8:15am. (See 📄 Exhibit 262 Irvine Construction Hours.pdf )

564.    Irvine's municipal code "restricts construction activities to the hours of 7 am to 7 pm

Monday through Friday, and 9 am to 6 pm on Saturdays."

565.    Contractors at these worksites were violating the Irvine municipal code by working

before 9am on this day.

566.    On May 23, 2025, **JG** sent complaint evidence to the CSLB, issued litigation hold notices

to **The New Home Company Inc** and its law firm, and sent bond-related letters to surety

companies.

567.    On May 27, 2025, JG took photos of the fences leading to unfinished homes. (See

📄 Exhibit 264 TNHC No Sign.pdf )

568.    The 2 photos display worksites off of Oakstone and Brimwood.

569.    These fences are open to traffic.

570.    These photos do not visibly show any signage.

571.     **Key Fact:** On May 27, 2025, **TNHC** via PHLK sent its first cease-and-desist letter to **JG**. (See 📄 Exhibit 133 Cease and Desist 1.pdf )

572.     The letter alleges trespass of company property by **JG**.

573.     The letter alleges harassment of company contractors by **JG**.

574.     The letter alleges that **JG's** conduct was "illegal, dangerous, and disruptive."

575.     In the letter, the company reserves "the right to pursue all appropriate corrective actions, including injunctive relief, restraining orders, and both civil and criminal penalties."

576.     Photos displayed in the letter were taken by an individual who was a subcontractor of the company.

577.     This individual protested at the time that **JG** was taking photos of the worksite.

578.     The individual who took the photos of **JG** was wearing a tan or brown shirt at the time. (See 📄 Exhibit 149 May 20 2025 photos.pdf )

579.     The license plate number of the vehicle of the individual who took the photos was CA 20637B1.

580.     The vehicle did not have a CSLB license number written on the driver side door.

581.     The vehicle did not have a company name written on the driver side door.

582.     The individual transferred their photos of **JG** to **The New Home Company Inc** or subsidiary.

583.     **The New Home Company Inc** or subsidiary transferred the photos to PHLK LLP.

584.     The photos were taken by the individual on May 20, 2025.

585.     The employees in the photos taken by the individual were employees of Solara. (See 📄 Exhibit 149 May 20 2025 photos.pdf )

586.     The employees were wearing neon yellow hoodies.

587.    Solara has a CSLB License number of 1103958.

588.    The employee interacting with **JG** in the photos was wearing sunglasses and had a hood over their head.

589.    The employee interacting with **JG** in the photos had their hands down by their waist.

590.    The employee interacting with **JG** in the photos appeared to be relaxed.

591.    The license plate number of the Solara vehicle in the photo is CA 16073C4.

592.    On June 2, 2025, **JG** flew from Irvine to Denver on Southwest Airlines. (See 📄 Exhibit 150 SNA to DEN.pdf )

593.    On June 9, 2025, **Tokio Marine** sent 2 bond claim denial letters. (See 📄 Exhibit 151 Tokio Marine ACIC Turnstyle Rejection Letter.pdf and 📄 Exhibit 202 Tokio Marine ACIC Aliso Air Inc Rejection Letter.pdf)

594.    On June 10, 2025, **IAT/Harco** sent a bond claim denial letter. (See 📄 Exhibit 203 IAT Harco Glass Fence Bond Claim Denial.pdf )

595.    On June 13, 2025, **JG** sent a litigation hold notice to **COI**.

596.    On June 23, 2025, **The New Home Company Inc** issued its second cease-and-desist letter to **JG**. (See 📄 Exhibit 205 Cease and Desist 2.pdf )

597.    The letter alleges continued "abusive and harassing behavior" after the date of the first cease and desist letter, which was on May 27, 2025.

598.    The letter further asserts that **JG** has "again intentionally and illegally trespassed on **The New Home Company Inc's** construction site and harassed the construction workers."

599.    By June 27, 2025, the author of the letter, PHLK attorney **Melanie Woodfin**, was unable to produce evidence of further trespass by **JG**, despite repeated emails for evidence. (See 📄 Exhibit 204 Melanie Woodfin produces no trespassing evidence.pdf )

71

600.     On June 24, 2025, **JG** flew from Denver to Milwaukee on Southwest Airlines. (See

📄 Exhibit 206 DEN to MKE.pdf )

601.     On June 25, 2025, Ms. Woodfin wrote a response letter to Harco National Insurance

Company regarding a bond claim **JG** initiated with Harco. (See

📄 Exhibit 207 Melanie Woodfin Response to IAT - Harco Stair Railing Bond Claim.pdf )

602.     This letter claims that "We previously outlined such behavior which includes trespassing

on TNHC's active construction site and 16 separate SB 800 Notices, two claims against the Bond

which are duplicative of the Notices, and a letter threatening a lawsuit" and notes that "Mr. Gu

has responded with bad faith conduct including repeated conduct intended to harass and annoy

TNHC."

603.     On July 9, 2025, **IAT/Harco** sent a 2nd bond claim denial letter. (See

📄 Exhibit 208 IAT Harco Door Trim Bond Claim Denial.pdf )

604.     On July 29, 2025, **Tokio Marine/PIC** sent a bond claim denial letter. (See

📄 Exhibit 209 Tokio Marine PIIC July 29 Rejection Letter.pdf )

605.     On August 28, 2025, JG received a response from the CSLB regarding **Pacific Line**

**Clean-up Inc**. (See 📄 Exhibit 263 Pacific Line CSLB.pdf )

606.     **Pacific Line Clean-up Inc** was a contractor hired by **TNHC** or a subsidiary.

607.     The letter states that "Our investigation of your complaint determined that the involved

contractor was responsible for one or more violations of the California Business and Professions

Code."

608.     **JG** had sent a complaint to the CSLB about unmarked vehicles belonging to **Pacific Line**

**Clean-up Inc** operating in the Olivewood neighborhood.

DD. Irvine Interactions

609.    On July 24, 2025, City of Irvine Chief Building Official **Jesse Cardoza** responded to a

series of emails from **JG** about permits from the Toll Brothers. (See

 Exhibit 243 Gmail - Cardoza Toll Brothers Permit.pdf )

610.    In permits 00933670-RBPR and 00933667-RBPR, there is no contractor license listed.

(See  Exhibit 242 Toll Brothers Irvine Elevate.pdf )

611.    **Mr. Cardoza** responds to this problem with "It appears that the two permits with the

missing license information are the result of a clerical error - not an omission of information or a

mistake. I was able to confirm that the contractor license information was validated, but not all of

the information was reflected on the permit. Thank you for brining this to my attention."

612.    In other permits, 00930957-PBP, 00930954-EBP, 00930955-MBP, and 00930956-MISC,

"TOLL BROTHERS MORTGAGE COMPANY" is listed as the contractor, with "Lic. No." of

683543.

613.    CSLB License number 683543 belongs to Toll Bros., Inc. (See

 Exhibit 254 Toll Bros CSLB License.pdf ).

614.    The contractor name listed on 00930957-PBP, 00930954-EBP, 00930955-MBP, and

00930956-MISC was false.

615.    **JG** brought this up to **Mr. Cardoza**, to which he responded, "We don't specifically track

the relative portion of licensed contractors that are also mortgage companies, so I'm unable to

say how common this occurrence is; however, I can confirm that we have issued a  number of

building permits to Toll Brothers under their B - General Building contractor's license. For up-

to-date contractor license information, please visit the California Department of Consumer

Affairs web page (https://www.cslb.ca.gov/).” (See

📄 Exhibit 244 Gmail - Cardoza Toll Brothers Permit 2.pdf )

616.    **Mr. Cardoza** did not address the fact that the name on the permit did not match the name of the license owner.

617.    On July 30, 2025, **JG** obtained the New Residential Construction Permit for 129 Oakstone from **COI** Building and Safety Department Employee Cheryl Charters via email. (See

📄 Exhibit 210 129 Oakstone Construction Permit.pdf )

618.    This permit has a number 00920236-RBP.

619.    Permit 00920236-RBP is the permit for the property at 129 Oakstone, 92618.

620.    **Key Fact:** This permit shows “NEW HOME COMPANY” as the owner under the “OWNER-BUILDER DECLARATION” section.

621.    In the middle section of the permit, “NEW HOME COMPANY” is also listed as “OWNER."

622.    According to the Orange County Recorder Department Fictitious Business Name Search tool, “NEW HOME COMPANY” was an FBN for **TNHC REALTY AND CONSTRUCTION INC**. (See 📄 Exhibit 211 TNHC All FBNs.pdf )

623.    **TNHC REALTY AND CONSTRUCTION INC.** had 7 total FBN registrations under file number 20216607747 with filing date of June 11, 2021: THE NEW HOME COMPANY, NWHM, NEW HOME, NEW HOME COMPANY, TNHC, NEW HOME CO., RUSSELL RANCH.

624.    **Key Fact: TNHC REALTY AND CONSTRUCTION INC** was not the deeded owner of the property at 129 Oakstone at the time of applying for the permit.

625.    **Key Fact: TNHC REALTY AND CONSTRUCTION INC** was not the deeded owner of the land on Tract 19176.

626.    Tract 19176 constitutes the land on which the Olivewood neighborhood was built.

627.    Lot 88 of Tract 19176 constitutes the land on which 129 Oakstone is now designated.

628.    **TNHC REALTY AND CONSTRUCTION INC** has a CSLB license number of 938080 with classification "B - GENERAL BUILDING." (See

📄 Exhibit 212 TNHC CSLB License.pdf )

629.    **Key Fact: TNHC REALTY AND CONSTRUCTION INC** is not listed as the "Contractor" on the New Residential Construction Permit for 129 Oakstone.

630.    **Key Fact:** The CSLB license number for **TNHC REALTY AND CONSTRUCTION INC** is not listed under "Lic. No." on the New Residential Construction Permit for 129 Oakstone.

631.    **Key Fact:** The CSLB classification for **TNHC REALTY AND CONSTRUCTION INC** is not listed under "License Class" on the New Residential Construction Permit for 129 Oakstone.

632.    **Key Fact: TNHC REALTY AND CONSTRUCTION INC** CSLB license information is not listed on the New Residential Construction Permit of any home in the Olivewood neighborhood.

633.    Kristi Blanchard of KB Processing was the applicant and signatory for the permit.

634.    Also on July 30, 2025, JG contacted Mr. Cardoza, writing, "I have obtained a permit for 'New Home Company' (which is not a registered entity California or licensed business entity within Irvine). Could you please explain why the "OWNER-BUILDER DECLARATION" section has no checkboxes filled in?" (See 📄 Exhibit 245 Gmail - Cardoza TNHC Permit.pdf )

75

635.  **Mr. Cardoza** responded with "Thank you for the question. When we transitioned to all electronic permit submittals in 2019, we began collecting permit declarations at permit issuance via a separate, stand-alone document, which is why you'll find many fields empty in the declaration portion of the permit. The separate, complete declaration is printed and sent to the Office of Records at project close-out along with the permit, so all of the required information is captured and preserved - just not on one piece of paper. These separate permit declarations should have been provided to you by the Office of Records as part of your Public Records Request. If they were not, please contact the Office of Records to obtain the additional documents."

636.  **Mr. Cardoza** did not address the fact that "New Home Company" was not a registered entity in the state of California in his response.

637.  The applicant for a Toll Brothers permit for the address 453 Promontory was also Kristi Blanchard of KB Processing (See 📄 Exhibit 255 Toll Brothers Permit 453 Promontory.pdf )

EE. Irvine Responses

638.  **Key Fact:** On July 30, 2025 at 4:01pm PT, **JG** called Councilman **William Go**'s office. (See 📄 Exhibit 213 Irvine Police Phone Call Details.pdf )

639.  **JG** called with the number 303-210-6948.

640.  Instead of reaching **Mr. Go**, **JG** talked to **Trinity Pham**.

641.  At the time, **Ms. Pham** only introduced her first name, "Trinity."

642.  **JG** discussed the permitting failures, code violations, and lack of qualifications of certain employees in the COI Building Department with **Ms. Pham**.

643.  The phone call lasted approximately 7 minutes.

644.    **Key Fact: JG** did not attempt to reach **Ms. Pham** ever again after this phone call.

645.    **Key Fact:** On July 30, 2025 at 8:47pm PT, **JG** received a phone call from an unknown number. (See ⬛ Exhibit 213 Irvine Police Phone Call Details.pdf )

646.    The phone number called was 720-593-1548.

647.    The phone number called was not the same number **JG** used to call **Mr. Go** when he spoke with **Ms. Pham**.

648.    The caller claimed to be a police officer with the **Irvine Police Department**.

649.    The caller had a female sounding voice.

650.    The caller said this was about the call **JG** made earlier to **Mr. Go's** office, the conversation with **Ms. Pham**.

651.    The caller asked **JG** if he said "someone should hurt themselves."

652.    **JG** said he did not remember saying this.

653.    **JG** asked "could you please be more specific?"

654.    The officer said she was "already being specific."

655.    **JG** said "thank you for the intimidation."

656.    The call ended shortly after that.

657.    The call lasted approximately 2 minutes.

658.    On July 31, 2025, **JG** contacted **COI** Human Resources Department and asked for **Ms. Pham's** full name, title, and department.

659.    **Key Fact: JG** did not ask **Ms. Pham's** private information during this or any other call to HR.

660.    The HR employee answered that **Ms. Pham's** title was "Supervising Principal Council Executive Assistant."

661.    **Ms. Pham's** LinkedIn lists "Marketing Communications Manager" as her title, as of July 31, 2025. (See 📄 Exhibit 214 Trinity Pham | LinkedIn.pdf )

662.    On July 31, **JG** also called **COI's** Communications and Engagement Department but reached a voicemail.

663.    An employee named Alyssa called **JG** back.

664.    Alyssa said Trinity Pham is not part of the Communications and Engagement Department.

665.    The Communications and Engagement Department is essentially **COI's** marketing department.

666.    Also on July 31, **JG** emailed City Attorneys **Jeffrey Melching** and **Jessica Sanders** asking for information about the July 30 police phone call. (See

📄 Exhibit 215 Irvine PD July 30 Phone Call.pdf )

667.    The attorneys ignored answering the single question in the email, as of September 9, 2025.

668.    On August 1, 2025, **JG** again contacted **COI** HR department to confirm the title of another staffer, Kalvin Alvarez.

669.    A male HR employee informed **JG** that such information could no longer be shared with him.

670.    On August 4, 2025, **JG** received the Permit Declaration and related documents from **COI** employee Cheryl Charters via email for all the houses in the Olivewood tract. (See

📄 Exhibit 216 129 Oakstone Declaration Docs.pdf )

671.    The Code Compliance Approval cover page has the name "Katie Berg-Curtis" on it.

672.    Ms. Berg-Curtis is not an employee of COI. She is an employee of Alkemi Planning. (See

📄 Exhibit 256 Katie Berg-Curtis | LinkedIn.pdf )

673.    The Permit Declaration and related documents for "Lots 87-89, 96-98 126-131 Oakstone"

portray "New Home Co." as the Property Owner or builder, depending on the document.

674.    "New Home Co." was an FBN for **TNHC Realty and Construction Inc**. (See

📄 Exhibit 211 TNHC All FBNs.pdf )

675.    Kristi Blanchard of KB Processing is the applicant and signatory for the Permit

Declaration and related documents.

676.    All Permit Declarations for the phases in the neighborhood known as Olivewood portray

the applicant company as "New Home Company" or "New Home Co." (See

📄 Exhibit 265 All Declarations.pdf )

677.    Each of the New Residential Construction Permits created for Olivewood, or more

formally tract 19176, show "NEW HOME COMPANY" as the "Owner" in the "Owner-Builder

Declaration" and middle sections of the permit. (See 📄 Exhibit 266 All Olivewood Permits.pdf )

678.    Each of the New Residential Construction Permits created for The Groves, or more

formally tract 19005, show "NEW HOME COMPANY" as the "Owner" in the "Owner-Builder

Declaration" and middle sections of the permit. (See 📄 Exhibit 267 All The Groves Permits.pdf

)

679.    According to the Orange County Recorder Department Fictitious Business Name Search

tool, "NEW HOME COMPANY" was an FBN for **TNHC REALTY AND CONSTRUCTION

INC**. (See 📄 Exhibit 211 TNHC All FBNs.pdf )

680.    **TNHC REALTY AND CONSTRUCTION INC.** applied for New Residential Construction Permits in at least 2 different tracts while also applying under "Owner-Builder Declarations" without being the deeded owner of the properties.

681.    **Key Fact:** On August 5, 2025, **COI**, via attorney Jessica Sanders of Rutan & Tucker, issued a cease-and-desist letter via email to **JG**. (See 📄 Exhibit 217 COI Cease and Desist.pdf )

682.    The letter demands that **JG** "immediately cease all direct contact with City staff and offices."

683.    The letter also claims that **JG's** "repeated calls and attempts to contact Ms. Pham, and requests for her personal contact information are inappropriate and not related to any legitimate request for service or information from the City. It has become necessary for the City and the Irvine Police Department (IPD) to take precautionary matters to preserve Ms. Pham's safety and wellbeing."

684.    Also on August 5, 2025, **TNHC** issued its 3rd cease-and-desist letter. (See 📄 Exhibit 218 Cease and Desist 3.pdf )

685.    This letter alleges further harassment of **TNHC** vendors by **JG**.

686.    **JG** creates a call log of his interactions with **COI** up until that point. (See 📄 Exhibit 219 Irvine Call Log.pdf )

687.    The log shows only 2 hours and 13 minutes of phone calls made over the previous 5 months to **COI**, with most being unanswered.

688.    On August 7, 2025, **JG** submitted a Letter of Concern to the Orange County Grand Jury regarding misconduct by **COI**.

689.    Also on August 7, 2025, JG cc'd all City Councilmembers–**William Go**, **Mike Carroll**, **Melinda Liu**, **Betty Martinez Franco**, **Kathleen Treseder**–**City Attorney Jeffrey Melching,**

**Mayor Larry Agran**, and **City Manager Sean Crumby** on an email asking for details on the basis for the cease and desist letter. (See

📄 Exhibit 259 Gmail - Email to all Irvine City Councilmembers.pdf )

690.    None of these individuals ever reached out to **JG** to voice concerns.

691.    On August 8, 2025, **JG** submitted a Claim for Damages against **COI** in the amount of $5.7 million. (See 📄 Exhibit 220 Claim for Damages Full.pdf )

692.    On August 11, 2025, the **COI's** third-party administrator, George Hills, called **JG** to acknowledge receipt of the Claim for Damages.

693.    Also on August 11, 2025, **Bert L. Howe & Associates** issued a cease-and-desist letter to **JG**. (See 📄 Exhibit 221 BHA Cease and Desist.pdf )

694.    The letter alleges "The Company is working with local authorities, having filed a police report, and is working through our office to obtain a restraining order."

695.    It also states that **JG** has "engaged in months of harassing and inappropriate conduct toward BHA, as well as its employees."

696.    It also states "the Company forewarns that you not respond to the instant letter by making any disparaging and defamatory statements about the Company and its business practices to any third party, including the Company's customers, bonding companies, or state licensing boards. Should you do so, a civil action seeking all available relief, including monetary damages and injunctive relief, will be filed against you."

697.    On August 13, 2025, **COI** rejected **JG's** Claim for Damages with a letter. (See

📄 Exhibit 222 Irvine Claim Denial Letter Aug 13.pdf )

698.    On August 20, 2025, **JG** sent an email to **Mayor Larry Agran** and **City Manager Sean Crumby** noting First Amendment harms. (See

📄 Exhibit 223 Gmail - Agran and Crumby No Response.pdf )

699.    By August 22, 2025, **Mayor Agran** and **City Manager Crumby** did not answer the email about these concerns.

700.    On August 14, 2025, **IAT/Harco** sent a 3rd bond claim denial letter. (See

📄 Exhibit 208 IAT Harco Door Trim Bond Claim Denial.pdf )

701.    On August 21, 2025, **JG** sent an email to the HOA General Manager of Portola Springs, Ellis Calvillo. (See 📄 Exhibit 224 Gmail - HOA Builder at Olivewood.pdf )

702.    Mr. Calvillo stated that the legal name for the builder on record according to the HOA is "**The New Home Company Southern California LLC**."

703.    Also on August 22, 2025, **The New Home Company Inc** issued its 4th cease-and-desist letter. (See 📄 Exhibit 225 Cease and Desist 4.pdf )

704.    The letter states that "TNHC reserves the right to pursue all appropriate corrective actions, including injunctive relief, restraining orders, and both civil and criminal penalties."

705.    On August 22, 2025, **Tokio Marine/PIC** sent a Department of Insurance Response Letter. (See 📄 Exhibit 226 Tokio Marine PIIC CDI Response.pdf )

706.    On August 25, 2025, **COI** issued its second cease-and-desist letter to **JG**. (See

📄 Exhibit 227 COI Cease and Desist 2.pdf )

707.    This letter claims that **JG's** "behavior is disruptive and threatening."

708.    This letter emphasizes that the **City Attorneys Sanders** and **Melching** "will transmit public comments and questions to the relevant City parties as necessary and appropriate."

709.    This letter also states that **JG** "may correspond with myself and Attorney Melching via email only."

710.    This letter also states that "Failure to comply with these directives will leave us with no choice but to consider further action to protect the City's interests, including instituting legal action against you."

711.    Also on August 25, 2025, **JG** sent another email to **Mayor Agran** and **City Manager Crumby**, this time about this second cease-and-desist letter. (See

📄 Exhibit 228 Gmail - Agran and Crumby No Response 2.pdf )

712.    They also did not respond to this email, as of September 9, 2025.

713.    On August 28, **COI** responded to a CPRA request for documents they used to prove ownership for the owner-builder exemption. (See

📄 Exhibit 229 Olivewood proof of ownership.pdf )

714.    These documents point to an entity called "New Home Company".

715.    On October 1, 2025, **JG** received a response to a CPRA request for documents showing authority for signatories of TNHC. (See

📄 Exhibit 248 TNHC Employee Noting Owner Builder.pdf )

716.    In a document dated October 10, 2023, TNHC employee Diana Asmar simply states, "Please note, New Home Company will be pulling permits as owner/builder."

717.    Also on October 1, 2025, **JG** received an extension notification to a CPRA request he made on September 8, 2025 regarding internal communications about measures to "preserve Ms. Pham's safety and wellbeing" due to allegations in the first COI cease and desist letter. (See

📄 Exhibit 249 Sanders Response to CPRA Request for Pham Safety.pdf )

718.    This notification states that "non-exempt public records responsive to your request available to you on a rolling production basis beginning on or about November 10, 2025."

719.    Permits granted to entities linked to Lennar Corporation show an entity named "LENNAR HOMES OF CALIFORNIA" receiving owner-builder permits. (See

📄 Exhibit 268 Lennar Home Permits.pdf )

720.    Permits 00927971-RBP, 00927971-RBP, 00922243-RBP, 00925046-RBP, 00927322-RBP, 00927322-RBP show a signatory under the "OWNER-BUILDER DECLARATION" section, but show no CSLB license number under the "LICENSED CONTRACTORS DECLARATION" section.

721.    On October 7, 2025, **JG** received a CPRA response about his August 1, 2025, and August 3, 2025 from Rutan & Tucker lawyer Shawna McKee. (See

📄 Exhibit 272 Police Call CPRA Request Oct 7.pdf )

722.    The letter is in response to a CPRA request for information  related to the information surrounding the phone call made to 720- 593-1548, my number, at 8:47pm on July 30, 2025."

723.    The first batch of documents contained nothing related to the phone call. (See

📄 Exhibit 273 Irvine Production File 1.pdf )

724.    The contents of the "first batch" of letters are largely simply correspondence with and documents from **JG**.

725.    The letter states, "A second batch of non-exempt public records responsive to your request will be provided on or around December 8, 2025."

726.    December 8, 2025 is more than 4 months from the original CPRA requests.

FF. Irvine Building & Safety Department

727.    **Jesse Cardoza** is the CBO of COI Building and Safety Department as of September 9, 2025.

728.    **Mr. Cardoza** has been in this position since 2021.

729.    **Mr. Cardoza** provides engineering opinions in his role as CBO.

730.    **Mr. Cardoza** uses his engineering expertise in his role as CBO.

731.    **Mr. Cardoza** uses his engineering experience in his role as CBO.

732.    No employee or agent of **COI** has submitted a Notice of Department Designation form to the California BPELSG naming **Mr. Cardoza** as a being in responsible charge as stipulated in the form.

733.    **Mr. Cardoza** has listed "Jesse Cardoza, PE, CASp" in his email signature for the email jcardoza@cityofirvine.org in the past.

734.    **Mr. Cardoza** has listed "Jesse Cardoza, PE, CASp" in his email signature for the email jcardoza@cityofirvine.org frequently in the past.

735.    **Mr. Cardoza's** email response to comment on the handrail code differs materially from **California Building Standard Commission Executive Director Stoyan Bumbalov's** guidance. (See 📄 Exhibit 230 Gmail - Cardoza Contradicting Bumbalov.pdf )

736.    California has not formally adopted International Building Code A101.1.

737.    However, the provision remains a widely recognized international benchmark for the ethical and professional qualifications of code enforcement personnel.

738.  **Mr. Cardoza's** LinkedIn and resume shows less than 10 years of building department experience before ascending for the CBO position. (See

📄 Exhibit 231 Jesse Cardoza Resume and LinkedIn.pdf )

739.  The documents only show 9 years and 1 month of experience.

740.  **Mr. Cardoza's** total professional work experience relating to the role is less than the stated minimum of 10 years stated by International Building Code A101.1. (See

📄 Exhibit 232 A101.1.pdf )

741.  **Mr. Cardoza's** LinkedIn and resume show 5 years and 10 months as a Senior Plan Check Engineer.

742.  In the above role, **Mr. Cardoza's** resume only lists these supervisory activities: 1) Provide leadership and technical oversight to junior staff with respect to customer service, department policy, code interpretation, and plan review procedures. 2)  Provide assistance with the supervision of plan check staff and activities, including budget development/monitoring and employee performance assessment.

GG. Irvine's History with Freedom of Speech

743.  In 2017, COI settled with ICNV for a sum of around $350,000. (See

📄 Exhibit 258 City Pays ICNV $350,000 To Settle Free Speech Case - Irvine Community Ne…

)

744.  ICNV alleged that "Beginning in early 2015, ICNV publisher Franklin J. Lunding sought to place copies of ICNV in the news racks located in the Irvine City Hall lobby, alongside other free newspapers allowed there, including the Irvine World News, a publication of the Orange County Register, which is friendly to the politicians at City Hall. In an act of hostility, the City

repeatedly refused to allow display of ICNV, asserting ICNV was a "political related publication."

745.    On December 9, 2020, City of Irvine released a press release related to the case *West v. Shea*, a lawsuit involving former COI Mayor Christina Shea. (See

📄 Exhibit 261 Statement Regarding West v. Shea Matter | City of Irvine.pdf  and

📄 Exhibit 257 West v Shea.pdf )

746.    This case involved Ms. Shea deleting and blocking content and users related to the BLM movement on her private Facebook account.

747.    COI ended up settling for approximately $40,000 before the case reached discovery.

748.    On April 21, 2022, "Voice of OC" published an article titled "ACLU Calls Out Irvine City Attorney For Silencing Public Commenter." (See

📄 Exhibit 260 ACLU Calls Out Irvine City Attorney For Silencing Public Commenter.pdf )

749.    This article writes that "At the March 8 meeting, Fox called into the meeting and began discussing a 2007 lawsuit that listed Costa Mesa resident Michael Carroll in a fraud case where both he and the Sage Credit Company settled for $65,000.  It's unclear the person listed in the fraud case is the same Mike Carroll who sits on the Irvine City Council. Carroll and Melching didn't respond to questions about the issue" and that "Melching then muted the speaker, saying it was not within the topics allowed for public comment since it wasn't in the control of the city."

## V. CAUSES OF ACTION

## COUNT 1: DECLARATORY JUDGEMENT (Cal. Bus. & Prof. Code § 7031(b) / 28 U.S.C. § 2201)

Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

*Against City of Irvine*

**Real Parties in Interest (Fed. R. Civ. P. 19)**

- The New Home Company Inc.

- TNHC Realty and Construction Inc.

- The New Home Company Southern California LLC

Pursuant to 28 U.S.C. § 2201, Plaintiff seeks a declaration that the **COI** failed to prevent or correct violations of California Business and Professions Code § 7031(b) by approving and accepting permits submitted by entities that misstated their legal status on those permits and related declarations, thereby undermining the statute's consumer-protection objectives.

**The New Home Company Inc.**, **The New Home Company Southern California LLC**, and **TNHC Realty & Construction Inc.** are real parties in interest within the meaning of Fed. R. Civ. P. 19 because the requested declarations directly affect their rights and obligations under California contractor-licensing law. An actual, present controversy exists between Plaintiff and **COI** regarding **COI's** treatment of permit designations in connection with residential construction of the property owned by Plaintiff's family.

88

**COI** permit records identify **TNHC Realty & Construction Inc.** as the "owner-builder" for the project, even though the deeded owner at the time was **The New Home Company Southern California LLC**, an unlicensed entity. Despite this, this unlicensed LLC is named as the "Builder" in the Builder's Warranty Portal and in HOA records, and acted as the builder and signatory in the Purchase Agreement. (See ¶¶ 507, 520, 525, 528, 542, 702.) On information and belief, **COI** knew or should have known that the deeded owner and builder was unlicensed and yet nonetheless permitted **TNHC Realty & Construction Inc.** as the "owner-builder." (See ¶¶ 617-637, 670-680.)

This is just a further example of **COI's** longstanding practice of permitting developers to misrepresent their legal status on building permits and public records. As far back as 2003, **COI** permitted the bankrupt predecessor company to **TNHC**, "John Laing Homes", which was more formally known as **WL Homes LLC**, to apply for owner-builder permits despite the name "John Laing Homes" not being an FBN in Orange County and "John Laing Homes" not being a registered business in California. (See ¶¶ 459-460.) Like **TNHC's** use of **TNHC Realty and Construction Inc.**, this predecessor company used an entity, **JLH Realty and Construction Inc.,** to hold a CSLB license while leveraging its relationship with **COI** to avoid contractor licensing laws and obscure construction liability from consumers by signing contracts via a different entity. (See ¶¶ 455, 628.) As early as 2000, a grant deed from the Orange County Recorder identifies "W.L. Homes, LLC, dba John Laing Homes," even though no fictitious business name statement for "John Laing Homes" was ever filed in Orange County. (See ¶¶ 460-461.) By 2004, even that limited disclosure disappeared, and permits and deeds began listing only "W.L. Homes, LLC"—while the builder continued to receive owner-builder permits under

the unregistered "John Laing Homes" name with the **COI's** knowledge and acquiescence. (See ¶¶ 459, 462.) Plaintiff points out this sordid corporate history in order to clarify that there appears to exist a longstanding relationship between **COI** and **TNHC** leadership to obscure builder identity and liability.

**COI** has more recently continued this collusive and/or lax permitting regime with **Toll Brothers**. On July 24, 2025, Chief Building Official **Jesse Cardoza** responded to Plaintiff's inquiries concerning multiple **Toll Brothers** permits which omitted any contractor-license number. **Mr. Cardoza** characterized the missing information as a "clerical error," asserting that license data had been "validated" but "not reflected on the permit." In other permits, "Toll Brothers Mortgage Company" is listed as the contractor, identifying CSLB License No. 683543. That license, however, belongs to **Toll Bros., Inc.**, a separate entity. When Plaintiff brought this discrepancy to **Mr. Cardoza's** attention, he replied that **COI** "does not specifically track the relative portion of licensed contractors that are also mortgage companies" and declined to explain this facial case of license lending. (See ¶¶ 610-616.) By continuing to approve permits that misidentify the contracting entity or display another corporate name, **COI** has enabled the same pattern of permitting irregularities previously observed with **TNHC**, demonstrating that **COI's** permitting process fails to detect or correct violations of § 7031 and perpetuates public-record inaccuracies affecting homeowner rights and consumer protection.

**COI's** current tolerance of licensing irregularities is not limited to **TNHC** and **Toll Brothers**. Permit records also show that the **COI** granted owner-builder permits to entities linked to **Lennar Corporation** ("**Lennar**"), a publicly traded national homebuilder that constructs far more than four residential structures per year. Some of these permits identify "Lennar Homes of

90

California" as the owner-builder, even though **Lennar** routinely develops and sells numerous housing tracts throughout Orange County and California, and the majority of these permits list no CSLB license number. (See ¶¶ 719-720.) Under California Business and Professions Code § 7044, the "owner-builder" exemption from contractor-licensing requirements applies only when the owner (1) personally performs the work or hires licensed subcontractors, *and* (2) for single-family residential structures, constructs no more than four such structures for sale in a calendar year unless contracting through a licensed general contractor. By definition, **Lennar's** large-scale residential operations exceed this statutory threshold and therefore cannot lawfully claim the owner-builder exemption. **COI's** approval of owner-builder permits for a **Lennar** affiliate thus demonstrates a continuing failure to evaluate applicant eligibility under § 7044 and to ensure compliance with California's contractor-licensing framework. This oversight pattern—spanning multiple national builders—illustrates that **COI** has allowed systemic circumvention of licensing safeguards designed to protect consumers and maintain transparency in the construction permitting process.

Plaintiff acknowledges that the deeded owner of the subject property is a family trust, not Plaintiff individually, and therefore Plaintiff does not seek restitution or disgorgement under Cal. Bus. & Prof. Code § 7031(b). Instead, Plaintiff seeks declaratory relief because **COI's** concealment of a permit discrepancy directly injured him by obstructing his ability to petition the government, chilling his speech, and depriving him of truthful public records concerning his family's home. **COI's** ongoing refusal to acknowledge or correct this discrepancy creates a live controversy: it obscures statutory violations under § 7031(b), prevents accountability for unlicensed contracting, and impairs Plaintiff's ability to pursue redress and rely on accurate

public records regarding the safety and legality of the residence. The requested declarations further bear on the scope of unlawful activity **COI** sought to conceal, which is relevant to assessing punitive damages in Plaintiff's related civil-rights claims.

**Requested Declarations**

1. **Unlicensed Builder. The New Home Company Southern California LLC** acted as a "contractor" within the meaning of Cal. Bus. & Prof. Code § 7026 in connection with the construction of the property at 129 Oakstone without holding a valid contractor's license. (See ¶¶ 507, 521, 525, 528, 542, 702.)

2. **Owner-Builder Misdesignation. COI's** approval of **TNHC Realty & Construction Inc.** as "owner-builder" on permits and declarations for 129 Oakstone was inaccurate and misleading because that entity was not the deeded owner. Such designation does not shield the deeded owner, **The New Home Company Southern California LLC**, from the requirements or penalties of § 7031(b). (See ¶¶ 617-625, 670-680.)

3. **Public-Record Reliance. COI's** permit records cannot be relied upon to demonstrate licensing compliance or to shield **TNHC** entities from liability under § 7031(b). (See ¶¶ 617-625, 670-680.)

4. **Performance Definition.** For purposes of § 7031(b), contractual warranty obligations owed by **The New Home Company Southern California LLC** and related entities constitute "performance," and performance ceases only upon expiration of the warranty period or completion of warranty work. The limitations period for actions under § 7031(b) thus runs from that date. (See ¶¶ 525, 542, 558.)

5. **Civil-Rights Nexus.** The **COI's** refusal to correct or clarify these discrepancies obstructed Plaintiff's ability to petition and access truthful public information, contributing to the constitutional injuries alleged elsewhere in this Complaint. (See ¶¶ 634-636.)

## COUNT 2: VIOLATION OF 42 U.S.C. § 1983 — FOURTH AMENDMENT (UNREASONABLE SEIZURE / DETENTION)

Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

*Against City of Irvine, Irvine Police Department, and Police Officer Jane Doe*

At all relevant times, Defendants City of Irvine ("**COI**") and the Irvine Police Department ("**IPD**") acted under color of state law through their agents and employees, including a female police officer identified herein as Jane Doe ("**Doe**").

On July 30, 2025, **Doe** initiated an unsolicited telephone interrogation concerning Plaintiff's earlier protected communication with **Councilmember Go's** office approximately four hours prior. Acting under color of law and without reasonable suspicion of criminal activity, **Doe** effected a constructive seizure of Plaintiff in violation of the Fourth Amendment, as interpreted in *Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny. (See ¶¶ 638-657.)

The Fourth Amendment, incorporated against the States through the Fourteenth Amendment, protects individuals from unreasonable searches and seizures. A seizure occurs when an officer, by a show of authority, restrains a citizen's liberty. **Doe's** questioning—explicitly linking Plaintiff's prior call to **Councilmember Go's** office with an insinuated threat and demanding

clarification—constituted a show of authority that would cause a reasonable person to believe he was not free to terminate the encounter without legal consequences.

No reasonable suspicion existed to justify this detention or investigative questioning. **Doe's** own inquiry ("Did you say someone should hurt themselves?") demonstrated uncertainty as to any criminal predicate. Even if Plaintiff had made the statement alleged—which he did not recall doing—such speech, without more, is protected expression under the First Amendment and not a crime under federal or California law. **Doe** therefore had no lawful basis to suspect criminal activity. When Plaintiff asked **Doe** to "be more specific," she replied that she was "already being specific," further revealing that the call lacked any articulable basis for suspicion. The exchange underscores that the call was not a legitimate investigation but a baseless show of authority. (See ¶¶ 645-657.)

By initiating this unsolicited call and interrogating Plaintiff about his protected speech, **IPD** and **Doe** effected a seizure by show of authority without reasonable suspicion or probable cause. Even brief seizures are subject to Fourth Amendment scrutiny, and the absence of lawful justification renders the encounter unconstitutional. **COI's** use of police power to question Plaintiff following his protected communication with **Councilmember Go's** office was retaliatory, chilling his exercise of his right to petition and his right to be free from unreasonable seizures.

**Qualified-Immunity Not Applicable**

Defendant **Doe** is not entitled to qualified immunity. The conduct at issue was a deliberate, administrative action, not a split-second judgment made in a fluid or dangerous situation.

94

Defendant **Doe** initiated an unsolicited call—to a different phone number than the one Plaintiff had used to contact **Councilmember Go's** office—only several hours after Plaintiff's lawful communication with that office, and it was expressly tied to that protected activity. **Doe** identified herself as a member of **IPD**, questioned Plaintiff about alleged statements, and implied that the call seemingly concerned the "safety" of a **COI** employee. Under well-established Fourth-Amendment precedent, including *Terry v. Ohio*, 392 U.S. 1 (1968), and *United States v. Mendenhall*, 446 U.S. 544 (1980), a seizure occurs whenever a reasonable person would believe they are not free to terminate an encounter with law enforcement. Any reasonable officer would know that initiating an investigative contact without reasonable suspicion constitutes a seizure within the meaning of the Fourth Amendment. Because the challenged conduct was deliberate, policy-driven, and undertaken without legal justification, no objectively reasonable officer could have believed it was lawful; qualified immunity therefore does not apply.

**Municipal Liability**

Defendant **COI** is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), because the actions of the **IPD** were undertaken pursuant to an official policy, practice, or custom of responding to resident complaints about **COI** staff by initiating police contact without reasonable suspicion or probable cause. This policy, and the failure of municipal leadership to train or supervise officers to prevent such misuse of authority, was the moving force behind the constitutional violation alleged herein.

As a direct and proximate result of Defendants' actions, Plaintiff suffered damages including emotional distress, fear, humiliation, and constitutional injury.

## COUNT 3: VIOLATION OF 42 U.S.C. § 1983 – FIRST AMENDMENT (FREEDOM TO PETITION THE GOVERNMENT)

Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

*Against City of Irvine, Irvine Police Department, Jessica Sanders, Jeffrey Melching, William Go, Trinity Pham, and John/Jane Doe 1-10*

At all relevant times, Defendants **COI, IPD**, **Jessica Sanders**, **Jeffrey Melching**, **William Go**, **Trinity Pham**, and **John/Jane Doe 1-10** acted under color of state law.

Defendants, acting individually and in concert, deprived Plaintiff of his First Amendment right to petition the government for redress of grievances.

Specifically, Defendants **COI**, **Jessica Sanders**, and **Jeffrey Melching** issued a cease-and-desist letter on August 5, 2025, demanding that Plaintiff "immediately cease all direct contact with **COI** staff and offices," and reaffirmed that directive in a second letter dated August 25, 2025. (See ¶¶ 681–683, 706–710.) These directives chilled, burdened, and effectively prohibited Plaintiff from lawfully communicating with elected officials and public employees about matters involving permitting irregularities and building-code violations in hundreds of homes.

Plaintiff's subsequent outreach to Mayor **Larry Agran** and City Manager **Sean Crumby** was met with silence, evidencing institutional endorsement of this unconstitutional restriction at the highest levels of City government. (See ¶¶ 711–712.) Moreover, when alerted by email to the police phone call of July 30, 2025, every **COI** City Councilmember (**William Go**, **Mike**

**Carroll**, **Melinda Liu**, **Betty Martinez Franco**, and **Kathleen Treseder**), even the attorneys amongst them, stayed silent. (See ¶¶ 689-690.)

The stated justifications for the cease-and-desist orders—including alleged "concerns regarding the safety and wellbeing of City staff" and claims of "repeated calls and attempts to contact Ms. Pham"—were wholly pretextual and unsupported by any credible evidence. (See ¶¶ 681–683.) These allegations surfaced only after Plaintiff's protected petitioning activity became politically inconvenient and more systemic than initially believed, demonstrating that the true purpose was to suppress speech and avoid accountability.

In the original cease and desist letter issued by the City, Defendants explicitly stated, "It has become necessary for the City and the Irvine Police Department (IPD) to take precautionary matters to preserve Ms. Pham's safety and wellbeing… This demand to cease and desist is sent to you to both preserve Ms. Pham's safety and prevent further disruption to City operations." (See ¶¶ 681–683.) This admission shows Defendants' conscious decision to invoke police authority not in response to any crime or threat but as a precautionary measure against Plaintiff's lawful communications with government officials. In effect, Defendants repurposed the **IPD** and **John/Jane Doe 1-10** as a private security detail for **COI** staff, weaponizing police power to intimidate a resident engaged in constitutionally protected petitioning.

The unsolicited phone call from **IPD** officer **Doe** following Plaintiff's contact with **Councilmember Go's** office via **Ms. Pham** was a further "show of authority," functionally equivalent to a Terry stop conducted by telephone. Such a seizure required reasonable suspicion;

none existed. The call served only to intimidate and retaliate against Plaintiff for protected speech. (See ¶¶ 645-657.)

Defendants' actions and omissions were undertaken with the intent and effect of silencing Plaintiff's protected expression and excluding him from the democratic process. These acts included, but were not limited to, restricting communication with **COI** officials, obstructing public-records requests, and discouraging formal complaints—all activities at the core of the First Amendment's Petition Clause.

**Pattern and Practice of Retaliation Against Speech**

The unconstitutional conduct described above was not an isolated incident but part of a longstanding pattern and custom within **COI** of suppressing or restricting citizen expression.

1. In 2017, **COI** paid approximately $350,000 to settle a lawsuit brought by *Irvine Community News & Views* ("ICNV"), which alleged that **COI** refused to allow display of its publication in the City Hall lobby because it was "political." (See ¶¶ 743-744.)

2. In 2020, **COI** issued a public statement following *West v. Shea*, a lawsuit involving then-Mayor **Christina Shea**, who deleted comments and blocked users related to the Black Lives Matter movement on her Facebook page. **COI** settled for approximately $40,000 before discovery. (See ¶¶ 745–747.)

3. In 2022, the ACLU of Southern California publicly criticized **COI** City Attorney **Jeffrey Melching** for muting a public commenter during a City Council meeting after the commenter mentioned **Councilmember Mike Carroll's** prior involvement in a civil-fraud case. (See ¶¶ 748–749.)

**Municipal Liability**

These incidents collectively demonstrate a municipal pattern of hostility toward protected expression, consistent with the retaliatory actions directed at Plaintiff in 2025. The unconstitutional conduct was undertaken pursuant to an official policy, longstanding custom, or widespread practice of **COI** and **IPD** to restrict or retaliate against disfavored speech. Accordingly, the City is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), as this policy or practice was the moving force behind the violation of Plaintiff's constitutional rights. The conduct of Defendants was willful, malicious, and in reckless disregard of Plaintiff's federally protected rights.

As a direct and proximate result of Defendants' actions, Plaintiff suffered emotional distress, reputational harm, loss of civic standing, and other compensable injuries.

## COUNT 4: VIOLATION OF 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT (PROCEDURAL DUE PROCESS)

Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

*Against City of Irvine, Irvine Police Department, Jessica Sanders, Jeffrey Melching, William Go, Trinity Pham, and John/Jane Doe 1-10*

At all relevant times, Defendants **COI, IPD**, **Jessica Sanders**, **Jeffrey Melching**, **William Go**, **Trinity Pham**, and **John/Jane Doe 1-10** acted under color of state law.

Defendants violated Plaintiff's rights under the Due Process Clause of the Fourteenth Amendment by depriving him of freedom from arbitrary government intimidation and implied criminal sanction without providing adequate notice, explanation, or an opportunity to be heard.

Defendants attempted to recast Plaintiff's regulatory complaints and public-records requests as "harassment." (See ¶¶ 681–683, 706–710.) In reality, Plaintiff engaged in core protected activity—petitioning government agencies and exercising statutory rights under the California Public Records Act. By contrast, Defendants escalated with aggressive cease-and-desist directives and police intimidation. (See ¶¶ 645-657, 681–683, 706–710.) The disparity between Plaintiff's lawful conduct and Defendants' retaliatory overreach underscores the coercive and unconstitutional nature of their actions.

**Initiation of Police Contact Without Notice or Process**

On July 30, 2025, Defendants **William Go** and **Trinity Pham** facilitated a phone call from **IPD** and Officer **Doe** to Plaintiff, allegedly concerning the earlier conversation Plaintiff had with **Ms. Pham** four hours prior. The communication carried implicit threats of legal or criminal consequences. Plaintiff was never notified in advance of any complaint or investigation, nor provided a meaningful opportunity to understand, contest, or respond to the allegations. This lack of notice or process violated Plaintiff's right to be free from arbitrary and stigmatizing government interference with his liberty interests. (See ¶¶ 638-657.)

**Imposition of Gag and Safety Directive Without Due Process**

Defendants **COI**, **IPD,** City Attorneys **Jessica Sanders** and **Jeffrey Melching**, and **IPD** officers **John/Jane Doe 1-10**, acting under color of state law, violated Plaintiff's Fourteenth Amendment

right to due process by issuing a cease-and-desist letter dated August 5, 2025, that imposed

sweeping restrictions on Plaintiff's ability to contact **COI** officials, departments, and staff

without any notice, hearing, or lawful basis. (See ¶¶ 681–683.)

The letter demanded that all **COI** communication, outside of emergencies and public meetings,

from Plaintiff be sent either to **Ms. Sanders** or **Mr. Melching**. The letter also invoked vague

"safety" concerns purportedly to protect employee **Ms. Pham**, yet identified no threat, incident,

or evidence, revealing the concern as entirely pretextual.

By unilaterally labeling Plaintiff's lawful petitioning activity a safety risk and coordinating with

the **IPD** and officers **John/Jane Doe 1-10** to enforce that restriction, Defendants **COI**, **IPD**,

**Sanders**, **Melching**, and **John/Jane Doe 1-10** deprived Plaintiff of liberty and expressive rights

through an arbitrary and pretextual exercise of municipal power, in violation of both procedural

and substantive due process. This misuse of governmental authority, cloaked in a false "public

safety" rationale, constitutes a deprivation of rights secured by the Fourteenth Amendment.

**Systematic Refusal to Explain or Process Plaintiff's Grievances**

Following both the police phone call and gag directive, Plaintiff repeatedly requested

clarification and explanation from Defendants, including from the **COI** City Manager **Sean**

**Crumby** and Mayor **Larry Agran**. These requests were ignored. The **COI's** refusal to provide

even a minimal post-deprivation process, or to identify what policies governed these actions,

further compounded the constitutional harm. (See ¶¶ 689, 698-699, 711-712.)

**COI** has repeatedly delayed releasing information requested through CPRA beyond a reasonable

amount of time to Plaintiff, exhibiting stonewalling behavior and a desire to prevent Plaintiff

from understanding the basis of these constitutional violations. On September 8, 2025, Plaintiff submitted a California Public Records Act request seeking internal **COI** communications concerning purported measures to "preserve Ms. Pham's safety and wellbeing," as referenced in the first cease-and-desist letter issued by Defendant **Ms. Sanders**. On October 1, 2025, Plaintiff received a notice of extension from **Ms. Sanders**, stating that "non-exempt public records responsive to your request [will be made] available to you on a rolling production basis beginning on or about November 10, 2025." (See ¶¶ 717-718.) This represents more than two months of delay to produce records that directly concern the **COI's** rationale in its original cease and desist letter for restricting Plaintiff's constitutional rights. Even more egregiously, for a CPRA request Plaintiff made for information relating to the police phone call, **COI** has responded that responded records will not be made available until December 8, 2025, and the only records it made available in its first batch of this "response" were simply documents and correspondence Plaintiff had already made with **COI**. Lastly, **Ms. Sanders** lumped together two unrelated CPRA request responses into one, seemingly an attempt to actively obscure the facts behind the original police phone call. (See ¶¶ 721-726.)

**COI's** prolonged and unexplained delay in fulfilling this records request—especially where the underlying correspondence was already well known to **Ms. Sanders** and **Mr. Melching**—illustrates a continued pattern of administrative stonewalling and concealment. By deferring and withholding information critical to Plaintiff's ability to contest the lawfulness of the cease-and-desist order, **IPD**, **Ms. Sanders**, and **Mr. Melching** have further deprived Plaintiff of procedural due process under the Fourteenth Amendment, compounding earlier denials of fair notice and opportunity to be heard.

On August 8, 2025, Plaintiff submitted a Claim for Damages to **COI** in the amount of $5,719,254, detailing **COI's** role in permitting unlicensed construction, its retaliatory use of cease-and-desist orders, and related constitutional violations. On August 11, 2025, **COI's** third-party claims administrator, George Hills, contacted Plaintiff by telephone to acknowledge receipt of the claim. (See ¶¶ 691-692.) Only two days later, on August 13, 2025, **COI** summarily rejected the claim in its entirety without investigation, hearing, or explanation. (See ¶¶ 697.)

This denial—issued less than 48 hours after acknowledgment—illustrates **COI's** systematic refusal to process or meaningfully consider grievances raised by residents, especially those implicating **COI** officials and favored developers. By rejecting Plaintiff's claim without factual review or procedural safeguard, Defendants deprived Plaintiff of due process of law guaranteed by the Fourteenth Amendment, compounding the arbitrary and retaliatory conduct alleged elsewhere in this Complaint.

**Municipal Liability**

**COI's** delay in disclosing the officer's identity exemplifies its broader custom of concealing wrongdoing by **COI** personnel, thereby frustrating accountability and perpetuating constitutional violations, and the unconstitutional conduct described above was undertaken pursuant to an official policy, longstanding custom, or widespread practice of **COI** and **IPD**. Accordingly, **COI** and **IPD** are liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), as the policy or practice was the moving force behind the violation of Plaintiff's constitutional rights.

As a direct and proximate result, Plaintiff suffered emotional distress, reputational harm, loss of civic standing, and other compensable injuries.

## COUNT 5: VIOLATIONS OF THE BANE ACT (CALIFORNIA CIVIL CODE § 52.1)

Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

*All Defendants*

California Civil Code § 52.1 (the "Bane Act") prohibits any person, whether or not acting under color of law, from interfering or attempting to interfere, by threats, intimidation, or coercion, with another person's exercise or enjoyment of rights secured by the Constitution or laws of the United States or of the State of California.

Defendants, acting individually and in concert, interfered with and attempted to interfere with Plaintiff's exercise of protected rights through coordinated threats, intimidation, and coercive conduct.

Beginning in May 2025, Defendants issued or orchestrated false and retaliatory accusations, including claims of trespass and harassment, resulting in at least seven cease-and-desist letters between May 27 and August 25, 2025. (See ¶¶ 203, 563-591, 596, 681, 693, 703, 706.) These letters were calculated to, and did, interfere with Plaintiff's lawful rights to:

1. Document construction conditions;

2. Document entity irregularities;

3. Request contractor information from public agencies;

4. Report violations to the California CSLB and other regulators; and

5. Petition government officials for redress of grievances.

Defendants' conduct was undertaken with the specific intent to chill and deter Plaintiff's oversight and advocacy. The escalating tone of official correspondence, the invocation of police authority, abuse of the judicial process, and the refusal to engage in good-faith dialogue together demonstrate a concerted campaign of coercion and intimidation designed to silence Plaintiff's protected activity. (See ¶¶ 491, 645, 681, 693-696.)

After Plaintiff identified permitting irregularities and building code violations involving **TNHC** within Irvine, the retaliation escalated beyond California. In a direct extension of that campaign, **Toll Brothers** initiated a federal lawsuit against Plaintiff in Colorado, incorporating into its initial pleading details from Plaintiff's California-based regulatory complaints against **TNHC** and **Bert L. Howe & Associates, Inc**. (See ¶¶ 491, 693-696.) This lawsuit was undertaken with knowledge of Plaintiff's ongoing petitioning activity and was intended to chill and punish his lawful participation in government oversight. Such litigation-based intimidation constitutes "threats, intimidation, or coercion" within the meaning of § 52.1. This cross-jurisdictional lawsuit reflects a continuation of the same coercive pattern described herein—an effort by affiliated builder interests to deter and punish Plaintiff's protected investigative and petitioning activity through the burden of interstate litigation. Notably, **Toll Brothers** has previously retained the same outside counsel that represented **TNHC** in California, suggesting the exchange of information and alignment of strategy among related builder entities. (See ¶¶ 344, 599.)

Rather than address the underlying statutory violations, permitting discrepancies, and code violations identified by Plaintiff, Defendants and their allies chose to weaponize legal process and official authority to punish speech and advocacy. The coordination between municipal actors and private builder interests underscores the coercive nexus prohibited by the Bane Act.

As a direct and proximate result of Defendants' acts and omissions, Plaintiff suffered emotional distress, reputational harm, loss of civic standing, and other compensable injuries.

Defendants' conduct was willful, malicious, oppressive, and in reckless disregard of Plaintiff's rights, entitling Plaintiff to recover compensatory and punitive damages, as well as statutory attorney's fees under Cal. Civ. Code § 52(b).

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, and grant the following relief:

### 1. Declaratory Relief

The requested declaratory relief is also necessary to establish the scope of Defendants' unlawful conduct, which in turn is relevant to determining the scale of punitive damages warranted for Defendants' retaliatory and willful misconduct.

WHEREFORE, Plaintiff respectfully requests that the Court:

1. Enter judgment declaring the matters set forth in Count 1, (1)–(5);

2. Order **COI** to correct or supplement its permit records to accurately reflect the ownership and licensing status of the entities involved;

3. Award Plaintiff costs and such other relief as the Court deems just and proper.

**2. Injunctive Relief**

Issue appropriate injunctive orders restraining Defendants from further retaliation, unlawful restriction of speech or petitioning, or interference with Plaintiff's statutory and constitutional rights.

**3. Compensatory Damages**

Award compensatory damages for emotional distress, reputational harm, and other non-economic and economic injuries resulting from the violations of Plaintiff's rights.

**4. Statutory Damages**

Award statutory damages pursuant to California Civil Code § 52.1, including for each proven act of interference with Plaintiff's protected rights.

**5. Punitive Damages**

Plaintiff seeks punitive damages against the individual Defendants in their personal capacities, and against corporate and municipal Defendants, in amounts sufficient to punish and deter willful, malicious, and reckless violations of law.

The harm at issue extends far beyond a single residence. It reflects a multidecade pattern of misconduct spanning multiple builders—including John Laing Homes, The New Home Company, Lennar, and Toll Brothers—and exposes systemic failures in the City of Irvine's permitting, enforcement, and oversight practices. These intertwined relationships have allowed unlicensed or misrepresented entities to construct and sell homes throughout Irvine with

municipal approval, eroding public confidence in California's contractor-licensing framework and consumer-protection laws.

The magnitude of this systemic harm is reflected in the scale and value of the affected neighborhoods. Plaintiff's family home in **TNHC's** *Olivewood* had a final purchase price of **$3,867,154**, and there are approximately 100 homes in the neighborhood. Toll Brothers' *Elevate* community includes approximately 80 homes starting at **$2,789,000** each. Lennar's various Great Park subdivisions–encompassing more than 400 homes initially priced between **$1.25 and $2.25 million**–further illustrate the breadth of this municipal-sanctioned misconduct. Collectively, these developments represent well over **$1 billion** in residential construction activity conducted under the same deficient licensing and oversight regime.

The economic scale of the entities involved underscores the need for meaningful deterrence. Toll Brothers Inc. maintains a market capitalization of approximately **$12.6 billion**; Lennar Corporation exceeds **$30.2 billion**; and The New Home Company's acquisition of Landsea Homes Corporation valued the combined enterprise at roughly **$1.2 billion**. Even the municipal defendant, the City of Irvine, operates with an annual budget of **$298 million**. (See Exhibit 274 Actor Size.pdf ) These figures confirm that the misconduct alleged is not an isolated administrative lapse, but a coordinated pattern among entities of immense financial and institutional capacity—each fully capable of compliance, yet choosing concealment and retaliation instead.

The damages claim of **$5,719,254** previously submitted to COI represents only the measurable portion of the direct harm associated with Plaintiff's family's property. The true injury encompasses broader economic, civic, and constitutional dimensions—namely, the erosion of

statutory safeguards, suppression of lawful petitioning, and institutionalized disregard for contractor licensing and public accountability.

Accordingly, Plaintiff requests that the Court and jury award punitive damages pursuant to **42 U.S.C. § 1983** and **California Civil Code § 52(b)**, in amounts proportionate to:

1. the gravity and duration of Defendants' violations;

2. the financial capacity of corporate and municipal actors involved; and

3. the need to deter future collusion between public agencies and private developers that undermines consumer protection and constitutional guarantees.

Such an award is necessary not only to compensate for individual harm, but to restore integrity to California's systems of public oversight and affirm that coordinated misconduct between private developers and municipal authorities will not be tolerated under federal or state law.

## 6. Attorneys' Fees and Costs

Award reasonable attorneys' fees and litigation costs pursuant to 42 U.S.C. § 1988 and California Civil Code § 52.1(h), including expert witness fees, deposition costs, and related expenses.

## 7. Additional Legal or Equitable Relief

Grant such other and further relief—legal or equitable—as the Court deems just and proper, including declaratory relief and any additional orders necessary to prevent ongoing or future violations of Plaintiff's rights.

## VII. DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Respectfully Submitted,

_____    October 8, 2025

Jeffrey Gu, Plaintiff, Pro Se

**Exhibits**

Exhibit 1 Gmail - Toll Brothers Inc Thank you for your interest in The Ridge at Ward Station.pdf

Exhibit 2 Colorado Ops.pdf

Exhibit 3 Consumer Journey.pdf

Exhibit 4 tollbrothers.com whois.pdf

Exhibit 5 DE SOS Toll Brothers, Inc..pdf

Exhibit 6 Gmail - Toll Brothers Inc Best and Finals offers now open for Building 15.pdf

Exhibit 7 Colorado Toll Brothers License.pdf

Exhibit 8 Gmail - License Expiration Date Toll Brothers.pdf

Exhibit 9 Public License Lookup - DRE CA.pdf

Exhibit 10 Gmail - Toll Brothers Inc Received Your Offers.pdf

Exhibit 11 Agreement of Sale.pdf

Exhibit 12 DE SOS Toll Southwest.pdf

Exhibit 13 CO Toll Southwest LLC.pdf

Exhibit 14 5131 Walls In Question.pdf

Exhibit 15 Acknowledgment by Architect of Bedroom Walls.pdf

Exhibit 16 DJT Design Admitting Contract was with Toll Brothers Inc.pdf

Exhibit 17 Gmail - Toll Bros Receipt.pdf

Exhibit 18 Toll Integrated Systems, Inc.pdf

Exhibit 19 Gmail - Building #15 framing update 1.pdf

Exhibit 20 Toll Brothers Fortune 2022 Press Release.pdf

Exhibit 21 5-22-22 2nd floor.pdf

Exhibit 22 6-7-22 Roof.pdf

Exhibit 23 5131 Vivian Permit.pdf

Exhibit 24 Rough Frame Inspection 7-15-22.pdf

Exhibit 25 LinkedIn Andrew Haessler.pdf

Exhibit 26 Wheat Ridge CAA Contracts.pdf

Exhibit 27 Gmail - Change orders for 5131 Vivian St.pdf

Exhibit 28 8-7-22.pdf

Exhibit 29 Gmail - Pre-drywall walk.pdf

Exhibit 30 Busnardo Inspection.pdf

Exhibit 31 Gmail - Pre-drywall items mention of missing wall Megan.pdf

Exhibit 32 Electrical Inspection 1 9-21-22.pdf

Exhibit 33 Electrical Inspection 1 9-21-22 Note.pdf

Exhibit 34 9-24-22 No Wall Present.pdf

Exhibit 35 Electrical Inspection 2 9-26-22.pdf

Exhibit 36 Rough Frame Inspection 9-27-22.pdf

Exhibit 37 10-1-22 Wall Present.pdf

Exhibit 38 10-8-22 Wall Present 2.pdf

Exhibit 39 10-8-22 Wall Present 3.pdf

Exhibit 40 IRC 2018 R6026 Drilling and notching of studs.png.pdf

Exhibit 41 IRC 2021 R6026 Drilling and notching of studs diagram.pdf

Exhibit 42 5131 Vivian COO.pdf

Exhibit 43 Drywall Fastening Inspection 10-25-22.pdf

Exhibit 44 11-25-22 Stud Jutting Drywall.pdf

Exhibit 45 Final Closing Disclosure.pdf

Exhibit 46 Colorado CP-1 2022.pdf

Exhibit 47 Gmail -Colorado DRE CP-1 Comment.pdf

Exhibit 48 5131 Vivian St Special Warranty Deed.pdf

Exhibit 49 AZ Toll Southwest LLC 2023.pdf

Exhibit 50 AZ Toll Southwest 2017.pdf

Exhibit 51 Gmail - Helpful information about caring for your new home.pdf

Exhibit 52 Gmail - How was your Toll Brothers Home Building Experience?.pdf

Exhibit 53 tollbrothersinc.com whois.pdf

Exhibit 54 Gmail -  Garage door wont properly close.pdf

Exhibit 55 Gmail - Large amount of LVP bubbling.pdf

Exhibit 56 Gmail - Re Large amount of LVP bubbling.pdf

Exhibit 57 Gmail - Re Large cracks in slab.pdf

Exhibit 58 Gmail - Garage door closes inconsistently.pdf

Exhibit 59 Toll Brothers CDARA Structure Letter.pdf

Exhibit 60 Toll Brothers CDARA Window Letter.pdf

Exhibit 61 2nd floor ceiling crack.pdf

Exhibit 62 3rd floor carpet tenting.pdf

Exhibit 63 Renter noting larger crack.pdf

Exhibit 64 Pennsylvania AG Confirmation Receipt.pdf

Exhibit 65 Gmail - Felten Group emails.pdf

Exhibit 66 Chris Ferguson not admitting employment.pdf

Exhibit 67 Toll Brothers Matt Care PA AG Response 1.pdf

Exhibit 68 Email Chain with Brian Murray 1.pdf

Exhibit 69 TB Formal CDARA Letter.pdf

Exhibit 70 Care, Matthew Charles.pdf

Exhibit 71 Toll CDARA Response.pdf

Exhibit 72 Gmail - Re_ Toll CDARA Response.pdf

Exhibit 73 Cease and Desist.pdf

Exhibit 74 Gmail - Toll Brother Inc Contractor Info.pdf

Exhibit 75 Wheat Ridge License.pdf

Exhibit 76 Gmail - Building plan CORA request.pdf

Exhibit 77 Gmail - Toll Brothers CORA Clarification.pdf

Exhibit 78 Gmail - Dahl Followup.pdf

Exhibit 79 Gmail - Toll Brothers in Colorado.pdf

Exhibit 80 CAA Snodgrass Email.pdf

Exhibit 81 Neighbor being treated normally Sept 10 2025.pdf

Exhibit 82 Wheat Ridge Cease Letter.pdf

Exhibit 83 Gmail - CORA Request for Directive.pdf

Exhibit 84 Gmail - CORA Request for Privilege Logs.pdf

Exhibit 85 Toll Brothers About.pdf

Exhibit 86 DE SOS TB Proprietary Corp.pdf

Exhibit 87 Corporate Hierarchy.pdf

Exhibit 88 Toll Brothers Registrations.pdf

Exhibit 89 Toll Brothers Trademark.pdf

Exhibit 90 Americans Luxury Homebuilder Trademark.pdf

Exhibit 91 Toll Holdings 100 of Toll Bros.pdf

Exhibit 92 DE SOS Toll Holdings.pdf

Exhibit 93 Toll Brothers Inc 100 of Toll Holdings.pdf

Exhibit 94 Subsidiaries List.pdf

Exhibit 95 202102734 Contact Info.pdf

Exhibit 96 Wheat Ridge License.pdf

Exhibit 97 Gmail - Toll Brothers License CORA Request.pdf

Exhibit 98 Information to prove toll brothers permit.pdf

Exhibit 99 CO Douglas Registration 2025.pdf

Exhibit 100 Littleton Contractor License 2025.pdf

Exhibit 101 Erie Contractor License 2025.pdf

Exhibit 102 Aurora Contractor License 2025.pdf

Exhibit 103 Centennial Contractor License 2025.pdf

Exhibit 104 Colorado Springs Contractor License 2025.pdf

Exhibit 105 Littleton COI 2024.pdf

Exhibit 106 Wheat Ridge COI.pdf

Exhibit 107 CO Douglas COI 2024.pdf

Exhibit 108 Erie COI.pdf

Exhibit 109 Colorado Spring COI 2024.pdf

Exhibit 110 Centennial COI 2024.pdf

Exhibit 111 Superior COI Naming Toll Brothers Inc.pdf

Exhibit 112 AZ MARSH USA LLC.pdf

Exhibit 113 Marsh Homepage.pdf

Exhibit 114 MarshMcLennan Homepage.pdf

Exhibit 115 MM Trademark.pdf

Exhibit 116 marsh.com.pdf

Exhibit 117 marshmclennan.com.pdf

Exhibit 118 30 South 17th Street.pdf

Exhibit 119 1717 Arch Street.pdf

Exhibit 120 Toll Brothers Consumer Affairs.pdf

Exhibit 121 Toll Brothers Consumer Affairs Frequency.pdf

Exhibit 122 Medium North Carolina.pdf

Exhibit 123 Toll Brothers Reddit 1.pdf

Exhibit 124 Toll Brothers Reddit 2.pdf

Exhibit 125 Toll Brothers Northside Piers.pdf

Exhibit 126 Final Warranty List.pdf

Exhibit 127 Warranty Portal Contact Page.pdf

Exhibit 128 Owner's Representative and Claims Support Agreement.pdf

Exhibit 129 Defect Pictures.pdf

Exhibit 130 DRE Complaint Number.pdf

Exhibit 131 SB800 Initial Letter.pdf

Exhibit 132 SB800 Final Letter.pdf

Exhibit 133 Cease and Desist 1.pdf

Exhibit 134 LVP Warranty Text.pdf

Exhibit 135 Toll Brothers What Acquisitions Investor FAQ.pdf

Exhibit 136 About — The Manhattan Building Company.pdf

Exhibit 137 CamWest Press Release.pdf

Exhibit 138 CamWest Delinquencies after 2013 acquistion.pdf

Exhibit 139 Camwest Annual Reports.pdf

Exhibit 140 10-K 2012.pdf

Exhibit 141 AZ Daniel Rhea.pdf

Exhibit 142 Officers Cert 2024.pdf

Exhibit 143 Officers Cert 2022.pdf

Exhibit 144 Doulgas Yearley.pdf

Exhibit 145 Mark Bailey LinkedIn.pdf

Exhibit 146 Dan Rhea LinkedIn.pdf

Exhibit 147 Reggie Carveth LinkedIn.pdf

Exhibit 148 AZ Toll Bros Inc Annual Report 2017.pdf

Exhibit 149 May 20 2025 photos.pdf

Exhibit 150 SNA to DEN.pdf

Exhibit 151 Tokio Marine ACIC Turnstyle Rejection Letter.pdf

Exhibit 152 Statements of Authority.pdf

Exhibit 153 Ken Greenspan LinkedIn.pdf

Exhibit 154 Greenspan Docs.pdf

Exhibit 155 Toll Directors and Officers Pages 1999 to 2021.pdf

Exhibit 156 Gary, Kenneth J. PA Bar.pdf

Exhibit 157 Toll Brothers (TOL) IPO Date.pdf

Exhibit 158 Ken Gary LinkedIn.pdf

Exhibit 159 Gary Announcement Beazer Homes 8-K 2005.pdf

Exhibit 160 Beazer Homes says fires general counsel.pdf

Exhibit 161 Gary Docs.pdf

Exhibit 162 Gary current work.pdf

Exhibit 163 Maryann Heatherby | LinkedIn.pdf

Exhibit 164 Crystal Vecchione | LinkedIn.pdf

Exhibit 165 Email - Receipt Employees' Employer.pdf

Exhibit 166 Email - Employees' Employer.pdf

Exhibit 167 Email - Employees' Employer 2.pdf

Exhibit 168 Gmail - Nicole avoiding question.pdf

Exhibit 169 Gmail - Patricia Rice Notary CO.pdf

Exhibit 170 Toll Brothers Employee phone calls.pdf

Exhibit 171 Liz Stein Pennsylvania.pdf

Exhibit 172 Gmail - Employer Information Dave.pdf

Exhibit 173 Gmail - Employment Information Gilma.pdf

Exhibit 174 TNHC Realty License.pdf

Exhibit 175 Gmail - Gilma Current for sale homes.pdf

Exhibit 176 The New Home Company Inc.pdf

Exhibit 177 The New Home Company Southern California LLC.pdf

Exhibit 178 TNHC Realty and Construction Inc.pdf

Exhibit 179 Larry Webb | LinkedIn.pdf

Exhibit 180 New Home CIO Wayne Stelmar to Retire.pdf

Exhibit 181 WL Homes LLC Trademark.pdf

Exhibit 182 WL Homes LLC.pdf

Exhibit 183 John Laing Homes (California), Inc.pdf

Exhibit 184 JLH Realty and Construction Inc.pdf

Exhibit 185 JLH CSLB License.pdf

Exhibit 186 John Laing Homes Permits and Declarations.pdf

Exhibit 187 JLH DRE License.pdf

Exhibit 188 Webb Steps Down as CEO of John Laing Homes 2008.pdf

Exhibit 189 Wachovia v JLH.pdf

Exhibit 190 Home builder John Laing files for bankruptcy | Reuters.pdf

Exhibit 191 Miek Debeuckelaer Harbur Cali bar.pdf

Exhibit 192 NWHM IPO Date.pdf

Exhibit 193 Miek Harbur | LinkedIn.pdf

Exhibit 194 Combined SI-PT.pdf

Exhibit 195 Form SI-PT Info.pdf

Exhibit 196 New Home Co IPO Form 424B4 2019 Speaks sparingly of bankruptcy.pdf

Exhibit 197 Felten Plans First Page.pdf

Exhibit 198 CO Deed.pdf

Exhibit 199 PA Deed.pdf

Exhibit 200 Wheat Ridge CGIA Notice of Claim.pdf

Exhibit 201 Toll Brothers Damages - Total Damages.pdf

Exhibit 202 Tokio Marine ACIC Aliso Air Inc Rejection Letter.pdf

Exhibit 203 IAT Harco Glass Fence Bond Claim Denial.pdf

Exhibit 204 Melanie Woodfin produces no trespassing evidence.pdf

Exhibit 205 Cease and Desist 2.pdf

Exhibit 206 DEN to MKE.pdf

Exhibit 207 Melanie Woodfin Response to IAT - Harco Stair Railing Bond Claim.pdf

Exhibit 208 IAT Harco Door Trim Bond Claim Denial.pdf

Exhibit 209 Tokio Marine PIIC July 29 Rejection Letter.pdf

Exhibit 210 129 Oakstone Construction Permit.pdf

Exhibit 211 TNHC All FBNs.pdf

Exhibit 212 TNHC CSLB License.pdf

Exhibit 213 Irvine Police Phone Call Details.pdf

Exhibit 214 Trinity Pham | LinkedIn.pdf

Exhibit 215 Irvine PD July 30 Phone Call.pdf

Exhibit 216 129 Oakstone Declaration Docs.pdf

Exhibit 217 COI Cease and Desist.pdf

Exhibit 218 Cease and Desist 3.pdf

Exhibit 219 Irvine Call Log.pdf

Exhibit 220 Claim for Damages Full.pdf

Exhibit 221 BHA Cease and Desist.pdf

Exhibit 222 Irvine Claim Denial Letter Aug 13.pdf

Exhibit 223 Gmail - Agran and Crumby No Response.pdf

Exhibit 224 Gmail - HOA Builder at Olivewood.pdf

Exhibit 225 Cease and Desist 4.pdf

Exhibit 226 Tokio Marine PIIC CDI Response.pdf

Exhibit 227 COI Cease and Desist 2.pdf

Exhibit 228 Gmail - Agran and Crumby No Response 2.pdf

Exhibit 229 Olivewood proof of ownership.pdf

Exhibit 230 Gmail - Cardoza Contradicting Bumbalov.pdf

Exhibit 231 Jesse Cardoza Resume and LinkedIn.pdf

Exhibit 232 A101.1.pdf

Exhibit 233 Gmail - US Bank Preapproval Instructions.pdf

Exhibit 234 Sep 2025 Olivewood Webpage.pdf

Exhibit 235 October 2023 Olivewood Webpage.pdf

Exhibit 236 Purchase Agreement Final.pdf

Exhibit 237 Closing Warranty.pdf

Exhibit 238 129 Oakstone Grant Deed.pdf

Exhibit 239 Signed CD.pdf

Exhibit 240 TNHC DRE License.pdf

Exhibit 241 Buyer Statement.pdf

Exhibit 242 Toll Brothers Irvine Elevate.pdf

Exhibit 243 Gmail - Cardoza Toll Brothers Permit.pdf

Exhibit 244 Gmail - Cardoza Toll Brothers Permit 2.pdf

Exhibit 245 Gmail - Cardoza TNHC Permit.pdf

Exhibit 246 Gmail - Floyd TNHC Permit.pdf

Exhibit 247 Sanders Response to CPRA Request for Pham Safety.pdf

Exhibit 248 TNHC Employee Noting Owner Builder.pdf

Exhibit 249 Sanders Response to CPRA Request for Pham Safety.pdf

Exhibit 250 OC Recorder Says No FBN John Laing Homes.pdf

Exhibit 251 John Laing 2000 deed.pdf

Exhibit 252 John Laing 2003 deed.pdf

Exhibit 253 John Laing 2003 Notice of Completion.pdf

Exhibit 254 Toll Bros CSLB License.pdf

Exhibit 255 Toll Brothers Permit 453 Promontory.pdf

Exhibit 256 Katie Berg-Curtis | LinkedIn.pdf

Exhibit 257 West v Shea.pdf

Exhibit 258 City Pays ICNV $350,000 To Settle Free Speech Case - Irvine Community News and Views.pdf

Exhibit 259 Gmail - Email to all Irvine City Councilmembers.pdf

Exhibit 260 ACLU Calls Out Irvine City Attorney For Silencing Public Commenter.pdf

Exhibit 261 Statement Regarding West v. Shea Matter | City of Irvine.pdf

Exhibit 262 Irvine Construction Hours.pdf

Exhibit 263 Pacific Line CSLB.pdf

Exhibit 264 TNHC No Sign.pdf

Exhibit 265 All Declarations.pdf

Exhibit 266 All Olivewood Permits.pdf

Exhibit 267 All The Groves Permits.pdf

Exhibit 268 Lennar Home Permits.pdf

Exhibit 269 TNHC Corporate Hierarchy.pdf

Exhibit 270 TNHC Document Representations.pdf

Exhibit 271 TNHC Entity Document List.pdf

Exhibit 272 Police Call CPRA Request Oct 7.pdf

Exhibit 273 Irvine Production File 1.pdf

Exhibit 274 Actor Size.pdf