**Jeffrey Gu**
**jeffwgu@gmail.com**
**2332 N Clay St Apt 3**
**Denver, CO 80211**
**1-720-593-1548**
**Plaintiff Pro Se**

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **Jeffrey Gu,** | **Case No.: 8:25-cv-02134-VBF-DSR** |
| **Plaintiff,** | **SECOND AMENDED COMPLAINT** |
| **vs.** | |
| **City of Irvine et al,** | |
| **Defendants.** | |

**SECOND AMENDED COMPLAINT**

**FOR VIOLATIONS OF CIVIL RIGHTS**

**JURY TRIAL DEMANDED**

**(First Amendment Retaliation, Fourth Amendment Unreasonable Seizure,**

**Fourteenth Amendment Due Process, and Related State Law Claims)**

**Table of Contents**

I. INTRODUCTION

Preview of Exhibits

II. JURISDICTION

III. PARTIES

IV. FACTUAL ALLEGATIONS

A. Toll Brothers Pre-purchase

B. Toll Brothers Agreement of Sale

C. Toll Brothers Construction

D. Toll Brothers Closing

E. Toll Brothers Post-closing

F. City of Wheat Ridge

G. Toll Brothers History

H. Toll Brothers Licenses

I. Toll Brothers Insurance

J. Marsh

K. Toll Brothers Consumers

L. Other Toll Court Cases

N. Toll Brothers SEC Disclosures

O. Toll Brothers Statements of Authority

P. Tenure at Toll Brothers

Q. A Tale of Two Kens

R. Employee Evasiveness

S. TB Annual Reports

T. The New Home Company History

U. John Laing Homes Company History

V. The New Home Company Disclosures

W. A Tale of Two Builders

X. TNHC Pre-purchase

Y. TNHC Purchase Agreement

Z. TNHC Closing

AA. Post-Closing

BB. TNHC SB800

CC. TNHC Post-SB800

DD. Irvine Interactions

EE. Irvine Responses

FF. Irvine Building & Safety Department

GG. Irvine's History with Freedom of Speech

HH. Irvine Police Report

II. Irvine's Record Retention

JJ. Risewell's Unmarked Vehicles

KK. Toll Brothers Entities' Litigation Conduct

LL. BHA's Litigation Conduct

MM. California Police Standards

V. CAUSES OF ACTION

COUNT 1: DECLARATORY JUDGEMENT (Cal. Bus. & Prof. Code § 7031(b) / 28 U.S.C. § 2201)

Real Parties in Interest (Fed. R. Civ. P. 19)

COUNT 2: VIOLATION OF 42 U.S.C. § 1983 — FOURTH AMENDMENT (UNREASONABLE SEIZURE / DETENTION)

Constructive Seizure via Show of Authority

COI Employee False Statements

Qualified-Immunity Not Applicable

Municipal Liability

Joint and Several Liability

COUNT 3: VIOLATION OF 42 U.S.C. § 1983 – FIRST AMENDMENT (FREEDOM TO PETITION THE GOVERNMENT)

COI Employee Statements and First Amendment Retaliation

Pattern and Practice of Retaliation Against Speech

Municipal Liability

COUNT 4: VIOLATION OF 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT (PROCEDURAL DUE PROCESS)

Initiation and Escalation of Police Involvement Without Notice or Process

Imposition of Gag and Safety Directive Without Due Process

Systematic Refusal to Explain or Process Plaintiff's Grievances

Violation CPRA Compliance Requirements

Municipal Liability

COUNT 5: VIOLATIONS OF THE BANE ACT (Cal. Civ. Code § 52.1)

    Building Investigation Retaliation

    The July 30, 2025, Police Intervention as Coercion

    Clandestine Intelligence Referral and Extrajudicial Monitoring

COUNT 6: 42 U.S.C. § 1983 — DENIAL OF ACCESS TO COURTS

    Litigation Falsehoods

    Intentional Concealment of Material Evidence via CPRA Obstruction

    Preservation of Information

COUNT 7: VIOLATIONS OF THE RALPH CIVIL RIGHTS ACT OF 1976 (Cal. Civ. Code § 51.7)

VI. PRAYER FOR RELIEF

    1. Declaratory Relief

    2. Injunctive Relief

    3. Compensatory Damages

    4. Statutory Damages

    5. Punitive Damages

    6. Attorneys' Fees and Costs

VII. DEMAND FOR JURY TRIAL

Exhibits

## I. INTRODUCTION

This Second Amended Complaint adds additional defendants and factual allegations, alters some claims, and adds the Ralph Civil Rights Act of 1976 as a cause of action relative to the First Amended Complaint ("FAC"). (ECF No. 11)

This action is not about a single rogue builder or isolated dispute. It concerns a coordinated system among national homebuilders, their counsel, and municipal

actors designed to conceal responsibility, evade regulation, and retaliate against those who expose inconvenient truths.

Plaintiff initially brought this suit after the City of Irvine ("**COI**") and Risewell Homes Inc. ("**TNHC**") took steps to suppress his protected activities and intimidate him from pursuing valid regulatory complaints. (See ¶¶ 571, 596, 645, 681, 684, 703, 706.) That retaliation did not end with **COI** and **TNHC**. On September 12, 2025, **Toll Brothers, Inc.**—a builder with a corporate structure equally opaque and evasive as **TNHC's**—filed a federal lawsuit against Plaintiff in Colorado. (See ¶¶ 482-491.) This action mirrored **TNHC's** tactics, specifically incorporating its positions and weaponizing the same pattern of concealment and coercion.

The parallels between **TNHC** and **Toll Brothers** are not coincidental. Both rely on layered shell entities to obscure ownership and liability; both exploit state-level defect statutes—California's SB 800 and Colorado's CDARA—as shields against accountability while ignoring their consumer-protection purposes. Both have elevated inexperienced attorneys into General Counsel roles soon after their IPOs to manage exposure rather than ensure compliance. Both have misled not only consumers but investors, through public filings and marketing materials that obscure who actually builds, warrants, and insures their homes. (See ¶¶ 482-491.)

For consumers, the result is predictable and devastating. Homeowners—particularly second or third purchasers who remain protected under statutory warranty law—discover that when a defect arises, they are left pursuing claims against a hollow shell: an inactive entity with no employees, no assets, and no capacity to perform its legal obligations. This concealment is not incidental but structural, engineered to frustrate enforcement of long-term consumer protections.

Such misconduct thrives only through municipal complicity. For decades, **COI** has enabled and concealed these practices through lax permitting, selective enforcement of code violations, suppression of resident complaints, and retaliation against protected petitioning activity. This custom of favoritism toward large developers has allowed unlicensed contractors and inspectors to operate with impunity, undermining both public trust and statutory safeguards. (See ¶¶ 459-465, 609-616, 676-680, 719-720.)

The parallel conduct of **TNHC** and **Toll Brothers**, and the timing of **Toll Brothers'** retaliatory lawsuit, confirm a broader scheme: a continuing effort to reinforce **COI's** suppression of speech and deter Plaintiff from exposing regulatory noncompliance. Plaintiff therefore brings this amended complaint not only to address the misconduct of individual Defendants, but to illuminate the systemic collusion between private builders, their legal counsel, and municipal officials.

Neither the Constitution nor California law—including the Bane Act—permits private corporations and public entities to combine their power to silence citizen oversight. Plaintiff continues undeterred.

**Preview of Exhibits**

To aid the Court's understanding of the counterclaim, several exhibits provide a clear overview of the **TNHC's** corporate structure, **Toll Brothers'** corporate structure, and the consumer experience at issue. Exhibit 269, titled "TNHC Corporate Hierarchy," maps an array of subsidiary entities used by TNHC across the nation (See Exhibit 269 TNHC Corporate Hierarchy.pdf). Similarly, Exhibit 87, titled "Corporate Hierarchy," shows the relationship of **Toll Brothers, Inc.** to its numerous subsidiaries (See Exhibit 87 Corporate Hierarchy.pdf).

Exhibit 270, titled "TNHC Document Representations," portrays what entity TNHC uses for different purposes across the construction-sale-warranty process. (See Exhibit 270 TNHC Document Representations.pdf) And Exhibit 271 more clearly shows how regulators and consumers are shown different entities for different reasons. (See Exhibit 271 TNHC Entity Document List.pdf) Exhibit 3, titled "Consumer Journey," depicts the sequence of entities presented to a Toll Brothers homebuyer during the marketing, contracting, and closing process (See Exhibit 3 Consumer Journey.pdf).

Collectively, Plaintiff believes these diagrams clearly portray the nature and intention of the entity structures at the heart of this litigation.

**II. JURISDICTION**

1.    **Subject Matter Jurisdiction:** This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this case arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983. The Court also has supplemental jurisdiction over related state law claims under 28 U.S.C. § 1367(a), as they form part of the same case or controversy under Article III of the United States Constitution.

2.    **Personal Jurisdiction:** This Court has personal jurisdiction over Defendants because they reside in and/or conduct business in this District, and the acts and omissions giving rise to the claims occurred within this District. Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred within this judicial district.

**III. PARTIES**

**A. Plaintiff:**

**Jeffrey Gu**

Residence: 2332 N Clay St Apt 3, Denver, CO 80211

State of Domicile: Colorado

**B. Defendants:**

**City of Irvine**

Principal Place of Business: 1 Civic Center Plaza, Irvine, CA 92606

**Jessica Sanders,** in her individual and official capacity as public-facing representative of the City Attorney of the City of Irvine, Associate at Rutan & Tucker

Business Address: 18575 Jamboree Rd 9th Floor,  Irvine, CA 92612

**Jeffrey Melching,** in his individual and official capacity as public-facing representative of the City Attorney of the City of Irvine, Partner at Rutan & Tucker

Business Address: 18575 Jamboree Rd 9th Floor,  Irvine, CA 92612

**Trinity Pham,** in her individual and official capacity as Supervising Principal Council Executive Assistant for the City of Irvine

Business Address: 1 Civic Center Plaza, Irvine, CA 92606

**William Go**, in his individual and official capacity as City Councilmember for the City of Irvine

Business Address: 1 Civic Center Plaza, Irvine, CA 92606

**Risewell Homes Inc.**

Principal Place of Business: 18300 Von Karman Ave., Suite 1000, Irvine, CA 92612

State of Incorporation: Delaware

**The New Home Company Southern California LLC**

Principal Place of Business: 18300 Von Karman Ave., Suite 1000, Irvine, CA 92612

State of Incorporation: Delaware

**TNHC Realty and Construction Inc.**

Principal Place of Business: 18300 Von Karman Ave., Suite 1000, Irvine, CA 92612

State of Incorporation: Delaware

**Bert L. Howe & Associates, Inc.**

Principal Place of Business: 5415 E. La Palma Avenue, Anaheim Hills, CA 92807

State of Incorporation: California

**Toll Brothers, Inc.**

Principal Place of Business: 1140 Virginia Drive, Fort Washington, PA 19034

State of Incorporation: Delaware

**Toll Southwest LLC**

Principal Place of Business: 1140 Virginia Drive, Fort Washington, PA 19034

State of Incorporation: Delaware

**TB Proprietary Corp.**

Principal Place of Business: 1140 Virginia Drive, Fort Washington, PA 19034

State of Incorporation: Delaware

**Emma Olague**, in her individual and official capacity as an Officer of the

Irvine Police Department

Business Address: 1 Civic Center Plaza, Irvine, CA 92606

**Kalvin Alvarez,** in his individual and official capacity as Chief of Staff for

the City of Irvine

Business Address: 1 Civic Center Plaza, Irvine, CA 92606

## IV. FACTUAL ALLEGATIONS

*All referenced corporate registrations, recorded county documents, employee*

*information, licenses, and permits are matters of public record and can be*

*judicially noticed. If Plaintiffs dispute the accuracy of the attached copies, they are*

*in possession of the true and correct versions and should provide them to the*

*Court.*

## A. Toll Brothers Pre-purchase

1. On January 16, 2022, Jeffrey Gu ("**JG**") received an email titled "Thank you

for your interest in The Ridge at Ward Station" from the email

tbmailer@tollbrothers.com. (See Exhibit 1 Gmail - Toll Brothers Inc Thank

12

you for your interest in The Ridge at Ward Station.pdf, Exhibit 2 Colorado Ops.pdf, and Exhibit 3 Consumer Journey.pdf)

2.  The domain tollbrothers.com is registered by **Toll Brothers, Inc**. of Delaware (See Exhibit 4 tollbrothers.com whois.pdf)

3.  The email contains the text "You are receiving our email because jeffwgu@gmail.com signed up to receive emails from Toll Brothers, Inc."

4.  **Toll Brothers, Inc.** was incorporated in Delaware on May 28, 1986 and has a file number of 2092118. (See Exhibit 5 DE SOS Toll Brothers, Inc..pdf)

5.  **Toll Brothers, Inc.** of Delaware has had a corporate headquarters of 1140 Virginia Drive, Fort Washington, PA 19034 since at least 2021.

6.  **Toll Brothers, Inc.** of Delaware is not registered as a foreign corporation in Colorado, as of September 22, 2025.

7.  According to the Plaintiffs' complaint in Paragraph 25, this entity has received a number of accolades, stating that "Toll Brothers has been listed among Fortune Magazine's Most Admired Companies in the World for eleven straight years" and that "Toll Brothers has spent decades cultivating its well-earned reputation and goodwill."

8.  On February 1, 2022, **JG** received an email titled "Best & Finals offers now open for Building #15 [Sites #71-74]" from the email

13

DKOLAR@tollbrothers.com. (See Exhibit 6 Gmail - Toll Brothers Inc Best and Finals offers now open for Building 15.pdf)

9. The email was sent by **Dez Kolar**.

10. The email cc's **Nicole Jorgensen**.

11. The email contains the text "You are receiving our email because seedlist@tollbrothers.com signed up to receive emails or because your organization has a business relationship with Toll Brothers, Inc."

12. It also contains the text "10th YEAR ON FORTUNE WORLD'S MOST ADMIRED COMPANIES LIST".

13. On information and belief, **Ms. Kolar** was a salaried employee of **Toll Brothers, Inc.** of Delaware in 2022 or 2023.

14. On information and belief, **Ms. Kolar** was not a salaried employee of **Toll Southwest LLC** of Delaware in 2022 or 2023.

15. **Ms. Kolar** did not have an active real estate license with the Colorado Department of Real Estate in 2022.

16. **Ms. Kolar**, did not have an active real estate license with the Colorado Department of Real Estate in 2023.

17. On information and belief, **Ms. Jorgensen** was a salaried employee of **Toll Brothers, Inc.** of Delaware in 2022 or 2023.

14

18. On information and belief, **Ms. Jorgensen** was not a salaried employee of **Toll Southwest LLC** of Delaware in 2022 or 2023.

19. **Ms. Jorgensen** did not have an active real estate license with the Colorado Department of Real Estate for the entirety of 2022.

20. **Ms. Jorgensen** did not have an active real estate license with the Colorado Department of Real Estate in 2023.

21. On information and belief, **Toll Southwest LLC** of Delaware did not operate a payroll in Colorado from 2020-2024.

22. On information and belief, **Toll Southwest LLC** of Delaware did not file employment taxes in Colorado from 2020-2024.

23. **Toll Brothers, Inc** of Delaware and none of its subsidiaries had an active real estate license with the Colorado Department of Real Estate between 2020-2024. (See Exhibit 7 Colorado Toll Brothers License.pdf)

24. **Toll Brothers Real Estate, Inc** had an active real estate license in Colorado at one period of time. (See Exhibit 8 Gmail - License Expiration Date Toll Brothers.pdf)

25. This period was between February 11, 2002 and August 19, 2003.

26. **Toll Brothers Real Estate, Inc** currently has an active real estate license in California. (See Exhibit 9 Public License Lookup - DRE CA.pdf)

15

27. On February 5, 2022, **JG** received an email titled "Toll Brothers: We've Received Your Offers" from the email tbmailer@tollbrothers.com. (See Exhibit 10 Gmail - Toll Brothers Inc Received Your Offers.pdf)

28. The email displays "Hale, Home Site #74 Minimum Price: $597,790 Your Offer: $646,123 Wellshire, Home Site #73 Minimum Price: $602,925 Your Offer: $611,123"

29. The email contains the text "Toll Brothers, Inc., 1140 Virginia Drive, Fort Washington, PA 19034 - 855.897.8655"

30. It also contains the text "10th YEAR ON FORTUNE WORLD'S MOST ADMIRED COMPANIES LIST".

31. It also contains the text "TOL LISTED NYSE" as a stylized graphic.

32. The letters TOL refer to the stock ticker symbol TOL.

33. The ticker symbol TOL refers to **Toll Brothers, Inc** of Delaware.

**B. Toll Brothers Agreement of Sale**

34. February 12, 2022, **JG** signed an **Agreement of Sale** for a property described as the following: Hale Aberdeen style home on TBI Lot 0074, Legal Lot 7, Block/Tract 5, in the community known as The Ridge at Ward Station having a street address of 5131 Vivian St, Wheat Ridge, CO 80033 (See Exhibit 11 Agreement of Sale.pdf)

16

35. The Seller in this **Agreement of Sale** was **Toll Southwest LLC** of Delaware.

36. **Toll Southwest LLC** was incorporated in Delaware on July 29, 2011 and has a file number of 5018070. (See Exhibit 12 DE SOS Toll Southwest.pdf)

37. **Toll Southwest LLC** of Delaware was registered in Colorado as a foreign company on May 4, 2017 and has ID number 20171351296 (See Exhibit 13 CO Toll Southwest LLC.pdf)

38. This registration lists "1140 Virginia Dr, Fort Washington, PA 19034, US" as the "Principal office street address" for **Toll Southwest LLC** of Delaware**.**

39. **Toll Southwest LLC** of Delaware is not registered as a foreign entity with the Pennsylvania Secretary of State.

40. **Toll Southwest LLC** of Delaware cannot operate in Pennsylvania legally.

41. This entity was different from the one, **Toll Brothers Inc** of Delaware, that accepted the offer for the same home via email, the offer of $646,123, in ¶¶ 27–33.

42. According to the Plaintiffs' complaint in Paragraph 28, **Toll Southwest LLC** of Delaware is a "Colorado LLC".

43. This fact in the Plaintiffs' complaint is verifiably false.

44. The property cited in the **Agreement of Sale**, according to its structural and architectural plans, had 3 bedrooms, including a 1st floor bedroom with interior walls ("**The Walls**"). (See Exhibit 14 5131 Walls In Question.pdf and Exhibit 15 Acknowledgment by Architect of Bedroom Walls.pdf)

45. **DJT Design**, the architectural firm that created the designs for the homes at The Ridge at Ward Station, signed their contract for creating the designs for the homes in the neighborhood with **Toll Brothers, Inc.** of Delaware. (See Exhibit 16 DJT Design Admitting Contract was with Toll Brothers Inc.pdf)

46. On February 12, 2022, the earnest money of $33,475 for the property was accepted via Stripe. (See Exhibit 17 Gmail - Toll Bros Receipt)

47. The payment recipient on the receipt is called "**Toll Bros., Inc**."

48. **Toll Bros., Inc** was incorporated in Pennsylvania, possibly under a different name, on June 30, 1986 and has an ID number of 928642. (See Exhibit 18 Toll Integrated Systems, Inc.pdf)

49. **Toll Bros., Inc** of Pennsylvania is not the same entity as **Toll Southwest LLC** of Delaware or **Toll Brothers, Inc** of Delaware.

50. **Toll Bros., Inc** of Pennsylvania is not a direct subsidiary of **Toll Brothers, Inc** of Delaware.

**C. Toll Brothers Construction**

51. On May 11, 2022**, JG** received an email titled "Building #15 update" from the email DKOLAR@tollbrothers.com. (See Exhibit 19 Gmail - Building #15 framing update 1.pdf)

52. The email contains a photo of the initial framing of the property. The first floor was not yet complete.

53. The email contains a graphic with the text "Toll Brothers #1 HOME BUILDER FORTUNE WORLD'S MOST ADMIRED COMPANIES 2022".

54. A February 3, 2022 press release titled "Toll Brothers Named #1 Homebuilder in FORTUNE Magazine Survey of the World's Most Admired Companies" announced this ranking. (See Exhibit 20 Toll Brothers Fortune 2022 Press Release.pdf)

55. The press release refers to "Toll Brothers, Inc. (NYSE:TOL) (www.Tollbrothers.com), the nation's leading builder of luxury homes."

56. This update email came from **Toll Brothers, Inc.** of Delaware.

57. On May 22, 2022**, JG** took a photo of the 2nd floor framing in construction. (See Exhibit 21 5-22-22 2nd floor.pdf)

58. **The Walls** are not present in this photo.

59. **The Walls** are not present in the photo because they did not exist at the time.

19

60. On June 7, 2022, **JG** took a photo of the 3rd floor framing in construction.

(See Exhibit 22 6-7-22 Roof.pdf)

61. **The Walls** are not present in this photo.

62. **The Walls** are not present in the photo because they did not exist at the time.

63. **City of Wheat Ridge** Building Department permit 202102734 pertains to the property at 5131 Vivian St, 80033. (See Exhibit 23 5131 Vivian Permit.pdf)

64. On July 15, 2022, inspector **Andrew Haessler** performed a "BLD59 - ROUGH FRAME" inspection, for permit 202102734. (See Exhibit 24 Rough Frame Inspection 7-15-22.pdf)

65. **Mr. Haessler** was an employee of Charles Abbot Associates, Inc. ("**CAA**"), according to his LinkedIn profile, at the time. (See Exhibit 25 LinkedIn Andrew Haessler.pdf)

66. **CAA** had/has a contract to provide permitting and inspection services to the **City of Wheat Ridge Building Department**. (See Exhibit 26 Wheat Ridge CAA Contracts.pdf)

67. **Toll Brothers Inc** of Delaware and their subcontractors at this time did not have any immediate plans to install studs for **The Walls**.

20

68. **Toll Brothers Inc** of Delaware and their subcontractors or subsidiaries at this time or prior did not submit any revision applications to the **City of Wheat Ridge** Building Department to add the framing for **The Walls**. (See Exhibit 27 Gmail - Change orders for 5131 Vivian St.pdf)

69. **Mr. Haessler** did not make a note in the permitting platform about **The Walls** at this inspection.

70. **Mr. Haessler** marked this inspection "PARTIAL".

71. On August 7, 2022, **JG** took a photo of the 1st floor framing. (See Exhibit 28 8-7-22.pdf)

72. **The Walls** are not present in this photo.

73. **The Walls** are not present in the photo because they did not exist at the time.

74. On or around September 12, 2022, **JG**, his designer **Megan Thompson**, and his hired inspector **Vince Busnardo** tour the property for a pre-drywall walkthrough organized by the builder's staff. (See Exhibit 29 Gmail - Pre-drywall walk.pdf)

75. On September 12, 2022, **Mr. Busnardo** created an inspection report for the walkthrough which contains photos. (See Exhibit 30 Busnardo Inspection.pdf).

76. On the page marked "Page 19 of 32" in the report, it shows the first floor without **The Walls**.

77. Ms. Thompson mentions how **The Walls** were forgotten in a September 26, 2022 follow up email. (See Exhibit 31 Gmail - Pre-drywall items mention of missing wall Megan.pdf)

78. On September 21, 2022, inspector **Eric Bowman** performed a "ELE59 - ROUGH ELECTRICAL" inspection, for permit 202102734. (See Exhibit 32 Electrical Inspection 1 9-21-22.pdf)

79. In the note for the inspection, he states "Wiring not complete on first floor". (See Exhibit 33 Electrical Inspection 1 9-21-22 Note.pdf)

80. **Mr. Bowman** marked this inspection "INCOMPLETE".

81. **Mr. Bowman** could not mark the inspection "COMPLETE" because **The Walls** were not present in order to put wiring through them.

82. On September 24, 2022, **JG** took an interior photo of the 1st floor with some plumbing in the first floor bathroom present. (See Exhibit 34 9-24-22 No Wall Present.pdf)

83. **The Walls** are not present in this photo.

84. **The Walls** are not present in the photo because they did not exist at the time.

85. September 24, 2022 was a Saturday.

22

86. **Toll Brothers Inc** and their subcontractors or subsidiaries at this time or prior did not submit any revision applications to the **City of Wheat Ridge** Building Department to add **The Walls**. (See Exhibit 27 Gmail - Change orders for 5131 Vivian St.pdf)

87. On September 26, 2022, Mr. Bowman performed a second "ELE59 - ROUGH ELECTRICAL" inspection, for permit 202102734. (See Exhibit 35 Electrical Inspection 2 9-26-22.pdf)

88. **Mr. Bowman** marked this inspection "COMPLETE".

89. **Mr. Bowman** could mark the inspection "COMPLETE" because **The Walls** were present in order to put wiring through them.

90. The inspection was performed at 7:45am.

91. **The Walls** were present in this inspection.

92. Contractors did not perform work at this location on Sunday, September 25, 2022.

93. The framing for **The Walls** was installed on September 26, the same day as this electrical inspection.

94. On September 27, 2022, **Mr. Haessler** performed a "BLD59 - ROUGH FRAME" inspection, for permit 202102734. (See Exhibit 36 Rough Frame Inspection 9-27-22.pdf)

95. **Mr. Haessler** marked this inspection "COMPLETE".

96. On October 1, 2022, **JG** took a photo of the 1st floor of **The Walls** with some electrical present. (See Exhibit 37 10-1-22 Wall Present.pdf)

97. On October 8, 2022, **JG** took a photo of **The Walls** that shows a grouping of two studs in the upper left and cutouts in a vertical stud near the left of the photo. (See Exhibit 38 10-8-22 Wall Present 2.pdf)

98. The cutout of one stud has a visible nail driven horizontally through it.

99. On October 8, 2022, **JG** took another photo of **The Walls**. (See Exhibit 39 10-8-22 Wall Present 3.pdf)

100. This photo shows 2 vertical studs that constitute parts of **The Walls**.

101. This photo shows 3 cutouts total in the said 2 vertical studs.

102. The cutouts exceed 25% of the stud width.

103. The cutouts exceed 40% of the stud width.

104. The cutouts exceed 50% of the stud width.

105. The cutouts exceed 55% of the stud width.

106. The cutouts exceed 60% of the stud width.

107. The cutouts exceed 66% of the stud width.

108. IRC 2018 "R602.6 Drilling and notching of studs" states, "Drilling and notching of studs shall be in accordance with the following: 1. Notching.

24

Any stud in an exterior wall or bearing partition shall be permitted to be cut or notched to a depth not exceeding 25 percent of its width. Studs in nonbearing partitions shall be permitted to be notched to a depth not to exceed 40 percent of a single stud width." (See Exhibit 40 IRC 2018 R6026 Drilling and notching of studs.png.pdf and Exhibit 41 IRC 2021 R6026 Drilling and notching of studs diagram.pdf)

109. The City of Wheat Ridge Building Department had adopted the standards within ICC 2018 for all the inspections for this home. (See Exhibit 42 5131 Vivian COO.pdf)

110. ICC 2018 includes IRC 2018.

111. **Mr. Haessler** did not make a note in the permitting platform about these cutouts in this final framing inspection.

112. **Mr. Haessler** did not make a note in the permitting platform about a violation of IRC 2018 R602.6 in this final framing inspection.

113. On October 25, 2022, **Mr. Haessler** performed a "BLD65 - DRYWALL FASTENING / MOISTURE BOARD" inspection, for permit 202102734. (See Exhibit 43 Drywall Fastening Inspection 10-25-22.pdf)

114. On the date of the inspection, **Mr. Haessler** marked this inspection "COMPLETE".

115. **Mr. Haessler** did not make a note in the permitting platform about a group of studs protruding from the drywall around **The Walls**.

116. On November 25, 2022, **JG** took a photo of **The Walls** with drywall and paint. (See Exhibit 44 11-25-22 Stud Jutting Drywall.pdf)

117. The photo shows a group of studs protruding from **The Walls**. These are the same studs that appear in ¶¶ 99.

118. **Mr. Haessler** marked the inspection "COMPLETE" despite this workmanship error.

**D. Toll Brothers Closing**

119. On January 19, 2023, **JG** closed on the property at 5131 Vivian St. (See Exhibit 45 Final Closing Disclosure.pdf)

120. The Seller displayed on this **Closing Disclosure** is **Toll Southwest LLC** of Delaware, with an address of "1140 Virginia Drive Fort Washington , PA 19034" shown.

121. There is no "Real Estate Broker (S)" listed in the "Contact Information" section of the **Closing Disclosure**.

122. The Seller displayed on this **Closing Disclosure** is not **Toll Brothers, Inc.** of Delaware.

123.   The **Certificate of Occupancy** for 5131 Vivian St shows the date "01/18/23" and permit number "202102734". (See Exhibit 42 5131 Vivian COO.pdf)

124.   The listed owner is "TOLL SOUTHWEST LLC" and address is "10 Inverness Dr 125, Englewood, CO 80112".

125.   This address is not the same as the **Toll Southwest LLC** of Delaware "Principal office street address" of "1140 Virginia Dr, Fort Washington, PA 19034, US" listed with the Colorado Secretary of State.

126.   The listed contractor is "TOLL BROTHERS" and address is "10 Inverness Dr 125, Englewood, CO 80112".

127.   "TOLL BROTHERS" does not pertain to any entity incorporated in Delaware registered with the Colorado Secretary of State.

128.   "TOLL BROTHERS" is not the DBA name of any entity owned by **Toll Brothers, Inc** of Delaware registered with the Colorado Secretary of State.

129.   The listed owner and contractor do not have the same name.

130.   The listed owner and contractor do not pertain to the same entity.

131.   Colorado Real Estate Commission statement CP-1 states that "Unlicensed individuals or entities selling real property ("Selling

Principals") such as bank owned properties (REOs), homebuilders, iBuyers (Instant Buyers) and any other individual or entity identified in section 12-10-201(6)(b), C.R.S., are exempt from being licensed and, as sellers, are not required to use Commission-Approved Forms.". (See Exhibit 46 Colorado CP-1 2022.pdf)

132. **Toll Brothers, Inc** of Delaware is a homebuilder.

133. **Toll Southwest LLC** of Delaware is not a homebuilder.

134. The marketing for the property at 5131 Vivian St was performed by **Toll Brothers, Inc.** of Delaware.

135. The marketing for the property at 5131 Vivian St was not performed by **Toll Southwest LLC** of Delaware.

136. The real estate brokering for the property at 5131 Vivian St was performed by **Toll Brothers, Inc.** of Delaware.

137. The real estate brokering for the property at 5131 Vivian St was not performed by **Toll Southwest LLC** of Delaware.

138. The construction for the property at 5131 Vivian St was performed by **Toll Brothers, Inc.** of Delaware.

139. The construction for the property at 5131 Vivian St was not performed by **Toll Southwest LLC** of Delaware.

28

140. The marketing, brokering, and selling for the property at 5131 Vivian St was organized by a single corporate entity.

141. In an August 19, 2025 email from the Colorado Department of Real Estate, the department provided this opinion: The Colorado Real Estate Commission has not previously determined that the formation and use of subsidiary entities disqualifies the homebuilder exemption. The concerns referenced in your complaint are not addressed in the license law. You may choose to contact legal counsel to determine other legal options that may be available. (See Exhibit 47 Gmail -Colorado DRE CP-1 Comment.pdf)

142. On the **Special Warranty Deed** for 5131 Vivian St, **Toll Southwest LLC** of Delaware is the Grantor and **Jeffrey Gu** is the Grantee. (See Exhibit 48 5131 Vivian St Special Warranty Deed.pdf)

143. **Reginald Carveth** was the signatory for the Grantor in this **Special Warranty Deed** and others. (See Exhibit 198 CO Deed.pdf and Exhibit 199 PA Deed.pdf)

144. On information and belief, **Mr. Carveth** was a compensated officer or employee of **Toll Brothers, Inc.** of Delaware at the time of signing.

145.    On information and belief, **Mr. Carveth** was not a compensated officer or employee of **Toll Southwest LLC** of Delaware at the time of signing.

146.    **Toll Southwest LLC** of Delaware's managers at the time of closing consisted of a combination or subset of this group of people: **Douglas Yearley, Richard Hartman, Robert Parahus,** or **Martin Connor.** (See Exhibit 49 AZ Toll Southwest LLC 2023.pdf and Exhibit 50 AZ Toll Southwest 2017.pdf)

147.    **Mr. Carveth** was not one of these 3-4 managers of **Toll Southwest LLC** of Delaware at the time of signing.

148.    **Toll Southwest LLC** of Delaware had only one member, **Toll Bros., Inc** of Pennsylvania.

149.    **Toll Southwest LLC** of Delaware still only has one member, as of September 22, 2025, **Toll Bros., Inc.** of Pennsylvania.

150.    **Mr. Carveth** was also not a member of **Toll Southwest LLC** of Delaware at the time of signing.

151.    **Mr. Carveth** was not a compensated officer or employee of **Toll Southwest LLC** of Delaware at the time of signing.

152.     On January 28, 2023, **JG** received an email titled "Helpful information about caring for your new home" from reply@emails.tollbrothers.com. (See Exhibit 51 Gmail - Helpful information about caring for your new home.pdf)

153.     The email contains the text "You are receiving our email because jeffwgu@gmail.com signed up to receive emails or because your organization has a business relationship with Toll Brothers, Inc"

154.     The email contains a graphic with the text "Toll Brothers #1 HOME BUILDER FORTUNE WORLD'S MOST ADMIRED COMPANIES 2022".

155.     On January 31, 2023, **JG** received an email titled "How was your Toll Brothers Home Building Experience?" from customersurvey@tollbrothersinc.com. (See Exhibit 52 Gmail - How was your Toll Brothers Home Building Experience?.pdf)

156.     The email's signatory is **Toll Brothers, Inc**. of Delaware CEO **Douglas Yearley**.

157.     In the email, **Mr. Yearley** represents himself as the CEO of **Toll Brothers, Inc**. of Delaware.

158.     **Mr. Yearley** was also one of 3-4 managers for **Toll Southwest LLC** of Delaware at the time of sending the email, according to Arizona filed

31

documents. (See Exhibit 49 AZ Toll Southwest LLC 2023.pdf and Exhibit 50 AZ Toll Southwest 2017.pdf)

159.     The aforementioned email does not portray **Mr. Yearley** as a manager of **Toll Southwest LLC** of Delaware.

160.     The email contains the text "Toll Brothers, Inc., 1140 Virginia Drive, Fort Washington, Pennsylvania 19034"

161.     The domain tollbrothersinc.com is registered by **Toll Brothers, Inc**. of Delaware (See Exhibit 53 tollbrothersinc.com whois.pdf)

**E. Toll Brothers Post-closing**

162.     On August 31, 2023, **JG** sent a warranty request about the garage door of the property not closing properly. (See Exhibit 54 Gmail -  Garage door wont properly close.pdf)

163.     On December 28, 2023, **JG** sent a warranty request about the luxury vinyl plank (LVP) on the 2nd floor being uneven and bubbling. (See Exhibit 55 Gmail - Large amount of LVP bubbling.pdf and Exhibit 134 LVP Warranty Text.pdf)

164.     One area of the bubbling cited was on the second floor, in the kitchen near the stairs that go to the 3rd floor.

165.     The area of the bubbling cited is right above **The Walls**.

166.    On February 15, 2024, in response to the LVP warranty request, their representative stated that "After careful review of your service request ID #1228317 we have determined that the item mentioned is beyond the scope of the warranty." (See Exhibit 56 Gmail - Re Large amount of LVP bubbling.pdf)

167.    On March 12, 2024, the warranty team sent a response to a warranty request **JG** made about overly large cracks in the garage slab. (See Exhibit 57 Gmail - Re Large cracks in slab.pdf)

168.    On April 22, 2024, **JG** sent another request for the garage door not closing correctly. (See Exhibit 58 Gmail - Garage door closes inconsistently.pdf)

169.    On June 16 and June 18, 2025, **JG** sent 2 Colorado Construction Defect Action Reform Act (CDARA) letters to **Toll Brothers Inc**. (See Exhibit 59 Toll Brothers CDARA Structure Letter.pdf and Exhibit 60 Toll Brothers CDARA Window Letter.pdf)

170.    In the first letter, he notes a long crack in the 2nd floor ceiling. (See Exhibit 61 2nd floor ceiling crack.pdf)

171.    In the same letter, he notes carpet tenting on the 3rd floor, above the long crack. (See Exhibit 62 3rd floor carpet tenting.pdf)

172.    In the same letter, he notes large cracks in the garage. (See Exhibit 63 Renter noting larger crack.pdf)

173.    In the second letter, he notes water intrusion in some windows.

174.    **Toll Brothers, Inc.** of Delaware still has not resolved the issues in the two letters.

175.    **Toll Brothers, Inc.** of Delaware was not the named seller on the **Closing Disclosure** or **Agreement of Sale**, but eventually responded to the letters despite this.

176.    On June 18, 2025, **JG** sent a complaint to the Pennsylvania Office of Attorney General, Bureau of Consumer Protection. (See Exhibit 64 Pennsylvania AG Confirmation Receipt.pdf)

177.    On June 27, 2025, **JG** concluded a communication with **Felten Group** employees **David Sparks**, Vice President of Research & Development, and **Mark Matthews**, Vice President of Engineering. (See Exhibit 65 Gmail - Felten Group emails.pdf and Exhibit 197 Felten Plans First Page.pdf)

178.    **Felten Group** created the structural plans for Building 15 of the Ridge at Ward Station.

34

179.    **Felten Group** created the structural plans for all the buildings of the Ridge at Ward Station.

180.    **Mr. Sparks** and **Mr. Matthews** refused to provide **JG** the structural plans for Building 15.

181.    **Mr. Sparks** and **Mr. Matthews** refused to provide **JG** the signatory company to the contract to create these plans.

182.    **Mr. Sparks** and **Mr. Matthews** refused to detail whether their company approved or analyzed plans for the installation of **The Walls** on or around the time they were installed.

183.    On July 1, 2025, **JG** concluded an email chain wherein he communicated with **Chris Ferguson** and **Eric Lehman**, two high level officers or employees of **Toll Brothers, Inc** of Delaware in Colorado. (See Exhibit 66 Chris Ferguson not admitting employment.pdf)

184.    Neither of the gentlemen would confirm who their employer was, with **Mr. Ferguson** writing "Toll Brothers."

185.    On July 9, 2025, an in-house counsel, **Matt Care**, responded on behalf of **Toll Brothers, Inc** of Delaware to **Agent Brian Murray** regarding the PA AG complaint initiated on June 18, 2025. (See Exhibit 67 Toll Brothers Matt Care PA AG Response 1.pdf)

35

186. In the letter, he states "Toll has requested an opportunity to inspect the home".

187. By July 9, 2025, **JG** had received no communication with **Toll Brothers, Inc.** of Delaware about the CDARA claims noted in the original complaint.

188. **Mr. Care's** statement to **Mr. Murray** that "Toll has requested an opportunity to inspect the home" was false.

189. Thus, **Mr. Care** lied to an agent of the Pennsylvania state government.

190. **JG** brought up this falsity to **Mr. Murray** and asked **Mr. Murray** to ask **Mr. Care** to furnish evidence of this supposed prior communication with him. (See Exhibit 68 Email Chain with Brian Murray 1.pdf)

191. **Mr. Care** could not provide **Mr. Murray** the evidence of communication on or prior to July 9, 2025.

192. **Mr. Care** attempted to rectify the solution by initiating a phone call from **Mr. Ferguson** to **JG** on July 10, and, eventually, by writing a letter.

193. On July 17, 2025, **JG** received a CDARA response letter from **Toll Brothers, Inc** of Delaware via FedEx overnight, where **Mr. Care** notes that

36

"I am in-house counsel for Toll Brothers, Inc." ( See Exhibit 69 TB Formal CDARA Letter)

194.    The Disciplinary Board of the Supreme Court of Pennsylvania registration for **Mr. Care** shows **Toll Bros., Inc.** of Pennsylvania as his employer. (See Exhibit 70 Care, Matthew Charles.pdf)

195.    This entity is not the same entity as the one he states he is in-house counsel for in his CDARA response letter.

196.    **Mr. Care** sent a letter on behalf of an entity with which he had no employment relationship.

197.    On July 24, 2025, after this formal CDARA response letter, **JG** initiated an email chain with **Mr. Care**. (See Exhibit 71 Toll CDARA Response.pdf and Exhibit 72 Gmail - Re: Toll CDARA Response.pdf)

198.    In these emails, **JG** attempted to gain clarity on their entity structure before allowing them into the house for the CDARA inspections.

199.    On August 6, 2025, **JG** asked the following: You say you're the attorney for the seller of my home, which on my closing disclosure and deed states Toll Southwest LLC. Does that mean you are an attorney for Toll Southwest LLC? If so, please provide confirmation of this employment relationship.

200.    **Mr. Care** never answered this specific question.

201.    **Mr. Care** never provided the requested confirmation.

202.    In these email chains, **Mr. Care** wrote that **Mr. Ferguson** works for "Toll Brothers" after being asked for clarification on **Mr. Ferguson's** employment.

203.    On August 8, 2025, **Toll Brothers, Inc.** sent **JG** a cease and desist regarding his entity registrations, the subject of *Toll Brothers Inc, et al. vs Gu, et al*. (See Exhibit 73 Cease and Desist)

**F. City of Wheat Ridge**

204.    On July 1, 2025, City of Wheat Ridge Chief Building Official **Renee Meriaux** concluded an email chain with **JG**, where they discussed the Contractor's License #190246, which names an entity called "Toll Brothers". (See Exhibit 74 Gmail - Toll Brother Inc Contractor Info.pdf and Exhibit 75 Wheat Ridge License.pdf)

205.    **Ms. Meriaux** is an employee of **CAA.**

206.    **Ms. Meriaux** is the Chief Building Official of the **City of Wheat Ridge Building Department**.

207.    In the email, she states "I recognize you are in the process of researching what entities might be responsible for the conditions observed in

38

on your property, and I respect that. However, be advised that the City is not required to assist in that research, other than to respond to public records requests, each of which must be on the form you have been given. By this message I am informing you that I will not continue to follow up on your questions as you pursue your efforts vid-s-vis the contractors/builders. I will, though, respond to CORA requests as they are received. As to this last, if you send the form, I will be able to respond."

208. The serifed text style of the email is different from the sans-serifed text style of all **Ms. Meriaux's** other emails.

209. The serifed text style of the email is the same text style used by **City of Wheat Ridge City Attorney Gerald Dahl** in an email he sent to **JG** on June 25, 2025. (See Exhibit 76 Gmail - Building plan CORA request.pdf)

210. This response sent by **Ms. Meriaux** was actually originally written by **Mr. Dahl**.

211. In a prior email on June 30, 2025, **Ms. Meriaux** states that "Yes, we accepted this COI as Toll Brothers is a DBA of Toll Southwest, LLC We do not regulate SOS requirements."

212. On July 1, 2025, Senior Deputy City Clerk **Margy Greer** responded to a CORA request for "All documentation the City of Wheat Ridge relied

39

on to confirm that 'Toll Brothers' was a registered DBA of Toll Southwest LLC" (See Exhibit 77 Gmail - Toll Brothers CORA Clarification.pdf)

213.    She responded that they verify with the SEC EDGAR search tool, pointing to this URL:

https://www.sec.gov/edgar/search/#/ciks=0000794170&entityName=Toll%2 520Brothers%252C%2520Inc.%2520(TOL)%2520(CIK%25200000794170)

214.    She did not respond by saying that they use the Colorado Secretary of State Business Database Search tool, which has this URL:

https://www.sos.state.co.us/biz/BusinessEntityCriteriaExt.do

215.    JG followed up in this email chain with Mr. Dahl. (See Exhibit 78 Gmail - Dahl Followup.pdf)

216.    On a July 13, 2025 email chain, JG brought to Mr. Dahl's attention that an Site Improvement Agreement ("SIA") signed between the City and Toll Southwest LLC of Delaware had a factual error.

217.    The factual error that JG brought to his attention was the fact that "Toll Southwest LLC" was referred to in the SIA as a "Colorado Limited Liability Company."

218. In this same email, **JG** brought up the fact that "An SOS filing from Arizona shows only 3 managers for Toll Southwest LLC, and Mr. Mark Bailey is not one of them."

219. On information and belief, **Mark Bailey** was a compensated officer or employee of **Toll Brothers, Inc.** of Delaware at the time of signing this SIA.

220. On information and belief, **Mr. Bailey** was not a compensated officer or employee of **Toll Southwest** of Delaware at the time of signing this SIA.

221. **Mr. Bailey** is not one of the 3-4 managers of **Toll Southwest LLC** of Delaware. (See Exhibit 49 AZ Toll Southwest LLC 2023.pdf and Exhibit 50 AZ Toll Southwest 2017.pdf)

222. In this same email, **JG** brought up the fact that 'A statement of authority from slightly before the signing of the SIA, notarized in Larimer County, has a factual inaccuracy, saying the LLC was formulated under the laws of "Pennsylvania", which contradicts many other SOAs and deeds signed before and after this time.'

223. On July 16, 2025, **Mr. Dahl** finished the email chain saying, 'You already have my message to you of July 10: "I understand your desire to research the Toll Bros entity. The work under this SIA is complete, the City has no need to enquire, and I must decline to research on your behalf."

41

Respectfully, it is clear you are not satisfied with my responses for the City; however, repeating the request will not change my position. Accordingly, I will not respond to additional repeated requests.'

224.    **Mr. Dahl** was seemingly referring to the entity **Toll Bros., Inc.** of Pennsylvania.

225.    **Mr. Dahl** was not referring to the entity **Toll Southwest LLC** of Delaware.

226.    **Toll Bros., Inc.** of Pennsylvania was not the signatory of the aforementioned SIA or the **Special Warranty Deed** for the property at 5131 Vivian St.

227.    **Mr. Dahl** was confused about what entity he was referring to.

228.    On August 21, 2025, **JG** sent another email to **Mr. Dahl** and **Ms. Meriaux**. (See Exhibit 79 Gmail - Toll Brothers in Colorado.pdf)

229.    In it, he asks the City to acknowledge 3 matters: '1. Acknowledge that the license issued under "Toll Brothers" was improper because the named entity was not registered in Colorado.  Clarify whether the City intends to revoke, amend, or re-issue those permits under the correct legal entity. Provide a written explanation of how this irregularity will be addressed to protect homeowners from reliance on improperly issued permits'

42

230. On August 28, 2025, **Mr. Dahl** responded with "Your August 21 message and attachments were received and filed. Nothing further at this time."

231. In the first half of September 2025, **JG** called the **Wheat Ridge Building Department** and asked for clarification: "Could you and the City please tell me the reasons for ignoring my questions?"

232. He was told various times by Deputy CBO **Steve Peck** to make his questions "in writing."

233. **Mr. Peck** is an employee of **CAA.**

234. On September 10, 2025, **Ms. Meriaux** emailed CAA officer **Diana Snodgrass**. (See Exhibit 80 CAA Snodgrass Email.pdf)

235. On information and belief, **Ms. Snodgrass** is the CFO of CAA.

236. On information and belief, **Ms. Snodgrass** does not have a direct contractual relationship with the **City of Wheat Ridge**.

237. The email states, "FYI - Just keeping you in the loop. City Attorney told us to tell him all of his requests must be in writing and we will no longer respond over the phone."

238. Also on September 10, 2025, **JG's** neighbor and designer **Ms. Thompson** called the **City of Wheat Ridge Building Department**,

43

encountering no request for her to put her communication in writing. (See

Exhibit 81 Neighbor being treated normally Sept 10 2025.pdf)

239.    By this point, it was **City of Wheat Ridge's** policy to require that, for **JG**, "his requests must be in writing and we will no longer respond over the phone."

240.    On September 12, 2025, **Mr. Dahl** sent **JG** a letter titled "Re: Your property at Ridge at Ward Station" (See Exhibit 82 Wheat Ridge Cease Letter.pdf)

241.    The letter states "As you have been informed, repeated requests for the same actions and questions will not produce different results or answers from those you have already been given. Additionally, your contacts have become increasingly frequent and repetitive, and City staff have the right to be free from harassment. Additional correspondence from you will be retained, and may or may not be responded to as appropriate in the sole discretion of the City."

242.    On September 15, 2025, **City of Wheat Ridge** responded to a CORA request of **JG's** for communications related to directing that JG make all questions in writing. (See Exhibit 83 Gmail - CORA Request for Directive.pdf)

243.    The City invoked CRS 24-72-204(3) (a)(IV) to withhold some respondent records.

244.    On September 18, 2025, the **City** said that there were no privilege logs related to this withholding. (See Exhibit 84 Gmail - CORA Request for Privilege Logs.pdf)

**G. Toll Brothers History**

245.    The URL at https://www.tollbrothers.com/about claims that the company does business in 24 states. (See Exhibit 85 Toll Brothers About.pdf)

246.    The Plaintiffs' complaint also claims that the company does business in 24 states in Paragraph 25.

247.    TB PROPRIETARY CORP. incorporated in Delaware on July 14, 1987 (See Exhibit 86 DE SOS TB Proprietary Corp.pdf and Exhibit 87 Corporate Hierarchy.pdf)

248.    TB PROPRIETARY CORP. of Delaware is also registered as a foreign corporation in New Jersey.

249.    On information and belief, TB PROPRIETARY CORP. of Delaware is only registered in these 2 states as of September 22, 2025. (See Exhibit 88 Toll Brothers Registrations.pdf)

250. On information and belief, TB PROPRIETARY CORP. of Delaware is only registered in less than 5 states as of September 22, 2025.

251. TB PROPRIETARY CORP. of Delaware is the service mark owner for "Toll Brothers". (See Exhibit 89 Toll Brothers Trademark.pdf)

252. TB PROPRIETARY CORP. of Delaware is the service mark owner for "America's Luxury Homebuilder". (See Exhibit 90 Americans Luxury Homebuilder Trademark.pdf)

253. These service marks are used in company advertising and branding in all 24 states in which it operates.

254. TB PROPRIETARY CORP. of Delaware is not registered in all 24 states that use the "Toll Brothers" service mark as of September 22, 2025.

255. TB PROPRIETARY CORP. of Delaware is not registered in all 24 states that use the "America's Luxury Homebuilder" service mark as of September 22, 2025.

256. On information and belief, TB PROPRIETARY CORP. of Delaware is 100% owned by TOLL HOLDINGS, INC of Delaware.

257. On information and belief, TB PROPRIETARY CORP. of Delaware is not 100% owned by TOLL BROTHERS, INC. of Delaware.

46

258.    TOLL BROTHERS, INC. incorporated in Delaware on May 28, 1986. (See Exhibit 5 DE SOS Toll Brothers, Inc..pdf)

259.    TOLL BROTHERS, INC. of Delaware is also registered as a foreign corporation in New Jersey.

260.    TOLL BROTHERS, INC. of Delaware is also registered as a foreign corporation in Pennsylvania.

261.    TOLL BROTHERS, INC. of Delaware is also registered as a foreign corporation in California.

262.    On information and belief, TOLL BROTHERS, INC. of Delaware is only registered in these 4 states as of September 22, 2025.

263.    On information and belief, TOLL BROTHERS, INC. of Delaware is only registered in less than 6 states as of September 22, 2025.

264.    TOLL BROTHERS, INC. of Delaware is not registered in all 24 states in which the website and complaint Paragraph 25 claim it does business as of September 22, 2025.

265.    TOLL SOUTHWEST LLC incorporated in Delaware on July 29, 2011 (See Exhibit 12 DE SOS Toll Southwest.pdf)

266.    TOLL SOUTHWEST LLC of Delaware is not registered in Pennsylvania as of September 22, 2025.

267.     TOLL SOUTHWEST LLC of Delaware is 100% owned by TOLL BROS, INC of Pennsylvania. (See Exhibit 50 AZ Toll Southwest 2017.pdf)

268.     TOLL BROS, INC of Pennsylvania is 100% owned by TOLL HOLDINGS, INC of Delaware. (See Exhibit 91 Toll Holdings 100 of Toll Bros.pdf)

269.     TOLL HOLDINGS, INC. incorporated in Delaware on August 1, 1989. (See Exhibit 92 DE SOS Toll Holdings.pdf)

270.     TOLL HOLDINGS, INC. of Delaware is also registered as a foreign corporation in Florida.

271.     TOLL HOLDINGS, INC. of Delaware is also registered as a foreign corporation in North Carolina.

272.     TOLL HOLDINGS, INC of Delaware is not registered in Pennsylvania as of September 22, 2025.

273.     TOLL HOLDINGS, INC of Delaware is 100% owned by TOLL BROTHERS, INC of Delaware. (See Exhibit 93 Toll Brothers Inc 100 of Toll Holdings.pdf)

274.     TOLL BROTHERS, INC of Delaware maintains more than 200 subsidiaries, many of which are themselves subsidiaries of subsidiaries. (See Exhibit 94 Subsidiaries List.pdf)

48

**H. Toll Brothers Licenses**

275.        **City of Wheat Ridge** Building Department permit 202102734 pertained to the property at 5131 Vivian St, 80033. (See Exhibit 23 5131 Vivian Permit.pdf)

276.        The General Contractor for permit 202102734 has the name "Toll Brothers" and "Contractor No" of 190246. (See Exhibit 95 202102734 Contact Info.pdf).

277.        This contractor number pertains to **City of Wheat Ridge** Contractor's License # 190246. (See Exhibit 96 Wheat Ridge License.pdf)

278.        In response to a CORA request for "Any materials submitted and communications created in the process of the application for the contractor's license for Toll Brothers, License # 190246," the City of Wheat Ridge provided only emails with "Toll Brothers" employees and a Certificate of Liability Insurance. (See Exhibit 97 Gmail - Toll Brothers License CORA Request.pdf and Exhibit 98 Information to prove toll brothers permit.pdf)

279.        The name on the Certificate of Liability Insurance shows the Insured as being "Toll Southwest LLC".

280.        This name is not the same name as on the Contractor's License # 190246, which lists "Toll Brothers".

49

281.     The listed information in this Contractor's License shows "TOLL BROTHERS" with an address of "10 INVERNESS DR E ENGLEWOOD CO 80112".

282.     "TOLL BROTHERS" was not registered as a DBA name with the Colorado Secretary of State between 2019-2024.

283.     "TOLL BROTHERS" was not a DBA name of **Toll Southwest LLC** of Delaware according to the Colorado Secretary of State between 2019-2024.

284.     The listed address is not the same as the **Toll Brothers, Inc** of Delaware headquarters of "1140 Virginia Drive, Fort Washington, PA 19034."

285.     The listed address is not the same as the **Toll Southwest LLC** of Delaware "Principal office street address" of "1140 Virginia Dr, Fort Washington, PA 19034, US" listed with the Colorado Secretary of State.

286.     A Douglas County Contractor Registration shows "Toll Bros., Inc" as the "Contractor Name." (See Exhibit 99 CO Douglas Registration 2025.pdf)

287.     Littleton License #AEC000964 shows "Toll Southwest LLC - Class B" next to "Company" (See Exhibit 100 Littleton Contractor License 2025.pdf)

50

288.    Erie License #GC-005217-2023 shows "TOLL BROTHERS" next to "Company" (See Exhibit 101 Erie Contractor License 2025.pdf)

289.    An Aurora Residential Building Contractor license shows "TOLL BROTHERS" under "Business". (See Exhibit 102 Aurora Contractor License 2025.pdf)

290.    Centennial License with "License Number" "CL-005667-2025" has a "Company Name Toll Brothers, Inc" (See Exhibit 103 Centennial Contractor License 2025.pdf)

291.    Pikes Peak Regional Building Department has Contractor Details for "TOLL BROS., INC." (See Exhibit 104 Colorado Springs Contractor License 2025.pdf)

292.    **Toll Brothers, Inc.** of Delaware did not use the same subsidiary to register as a contractor across various counties, cities, and towns, in Colorado.

293.    At least 3 different entities were named across these 7 different licenses.

**I. Toll Brothers Insurance**

294.    In a Certificate of Liability Insurance dated 10/22/2024, the producer is **Marsh USA LLC**, the first listed policy number is "MWZY 318815 10",

"Toll Southwest, LLC" is the Insured, the "Each Occurrence Limit" is "500,000", and the Certificate Holder is **City of Littleton**. (See Exhibit 105 Littleton COI 2024.pdf)

295.    In a Certificate of Liability Insurance dated 10/22/2024, the producer is **Marsh USA LLC**, the first listed policy number is "MWZY 318815 10", "Toll Southwest, LLC" is the Insured, the "Each Occurrence Limit" is "5,000,000", and the Certificate Holder is **City of Wheat Ridge**. (See Exhibit 106 Wheat Ridge COI.pdf)

296.    In a Certificate of Liability Insurance dated 10/22/2024, the producer is **Marsh USA LLC**, the first listed policy number is "MWZY 318815 10", "TOLL BROS., INC." is the Named Insured, the "Each Occurrence Limit" is "5,000,000", and the Certificate Holder is **Douglas County**. (See Exhibit 107 CO Douglas COI 2024.pdf).

297.    In a Certificate of Liability Insurance dated 10/29/2024, the producer is **Marsh USA LLC**, the first listed policy number is "MWZY 318815 10", "TOLL BROTHERS, INC." is the Insured, the "Each Occurrence Limit" is "5,000,000", and the Certificate Holder is **Town of Erie**. (See Exhibit 108 Erie COI.pdf)

298.    In a Certificate of Liability Insurance dated 11/4/2024, the producer is **Marsh USA LLC**, the first listed policy number is "MWZY 318815 10", "Toll Bros. Inc." is the Insured, the "Each Occurrence Limit" is "7,000,000", and the Certificate Holder is **Pikes Peak Regional Building Department**. (See Exhibit 109 Colorado Spring COI 2024.pdf)

299.    In a Certificate of Liability Insurance dated 11/18/2024, the producer is **Marsh USA LLC**, the first listed policy number is "MWZY 318815 10", "Toll brothers, Inc." is the Insured, the "Each Occurrence Limit" is "1,000,000", and the Certificate Holder is **City of Centennial**. (See Exhibit 110 Centennial COI 2024.pdf)

300.    In a Certificate of Liability Insurance dated 7/1/2025, the producer is **Marsh USA LLC**, the first listed policy number is "MWZY 318815 10", "Toll Brothers, Inc." is the Insured, the "Each Occurrence Limit" is "5,000,000", and the Certificate Holder is **Town of Superior**. (See Exhibit 111 Superior COI Naming Toll Brothers Inc.pdf)

301.    All of these Certificates display the policy number "MWZY 318815 10"

302.	All of these Certificates, besides the ones that share the name "Toll Southwest, LLC", have a different name for Insured when accounting for capitalization.

303.	All of these Certificates have a unique combination of Insured and "Each Occurrence" limit.

304.	None of these certificates list a producer "CONTACT NAME", "PHONE", or "EMAIL."

**J. Marsh**

305.	**Marsh USA LLC** of Delaware is an insurance broker for **Toll Brothers, Inc.** of Delaware and subsidiaries. (See Exhibit 111 Superior COI Naming Toll Brothers Inc.pdf and Exhibit 107 CO Douglas COI 2024.pdf)

306.	**Marsh USA LLC** is 100% owned by **Marsh LLC**. (See Exhibit 112 AZ MARSH USA LLC.pdf)

307.	**Marsh USA LLC's** headquarters is 1166 AVENUE OF THE AMERICAS, NEW YORK, NY, 10036.

308.	On information and belief, **Marsh LLC** is 100% owned by **MARSH & MCLENNAN COMPANIES, INC**.

309.	On information and belief, **Marsh LLC's** headquarters is 1166 AVENUE OF THE AMERICAS, NEW YORK, NY, 10036.

310. **Marsh LLC** is not registered in the State of New York.

311. **Marsh LLC** uses the same symbol in its logo as **MARSH & MCLENNAN COMPANIES, INC**. on its website (See Exhibit 113 Marsh Homepage.pdf and Exhibit 114 MarshMcLennan Homepage.pdf)

312. This mark is owned by **MARSH & MCLENNAN COMPANIES, INC**. (See Exhibit 115 MM Trademark.pdf)

313. **MARSH & MCLENNAN COMPANIES, INC's** headquarters is 1166 AVENUE OF THE AMERICAS, NEW YORK, NY, 10036.

314. The domain marsh.com has the same registrant as marshmclennan.com. (See Exhibit 116 marsh.com.pdf and Exhibit 117 marshmclennan.com.pdf)

315. That registrant is listed as "Marsh & McLennan Corporation".

316. The listed address in this Certificate of Liability Insurance dated 10/22/2024 is "30 South 17th Street Philadelphia, PA 19103". (See Exhibit 107 CO Douglas COI 2024.pdf)

317. This address is currently a Guy Carpenter office. (See Exhibit 118 30 South 17th Street.pdf)

318. Guy Carpenter is a subsidiary of **MARSH & MCLENNAN COMPANIES, INC**. It uses the trademark from ¶¶ 312 in its branding.

55

319. The listed address in this Certificate of Liability Insurance dated 7/1/2025 is "1717 Arch Street Philadelphia, PA 19103". (See Exhibit 111 Superior COI Naming Toll Brothers Inc.pdf)

320. This address is currently a Marsh McLennan Agency office. (See Exhibit 119 1717 Arch Street.pdf)

321. Marsh McLennan Agency is a subsidiary of **MARSH & MCLENNAN COMPANIES, INC**. It uses the trademark from ¶¶ 312 in its branding.

## K. Toll Brothers Consumers

322. The profile for "Toll Brothers" has 1.5 out of 5 stars as a rating on the website ConsumerAffairs as of September 22, 2025. (See Exhibit 120 Toll Brothers Consumer Affairs.pdf)

323. This profile is available at https://www.consumeraffairs.com/housing/toll-brothers.html.

324. As of September 22, 2025, there are 332 reviews for this company profile.

325. The most frequent rating is 1 star, with 269 ratings. (See Exhibit 121 Toll Brothers Consumer Affairs Frequency.pdf)

326.     This rating contrasts with the accolades stated in Paragraph 25 of the Plaintiffs' complaint.

327.     On October 29, 2019, a Medium user named **Jeremy Smith** posted an article titled "Our Dream Home By Toll Brothers That Turned Into A Nightmare." (See Exhibit 122 Medium North Carolina.pdf)

328.     In it, he discusses how he lost his down payment, design customization payment, and ultimately the chance to close on the home due to a credit score decrease.

329.     The credit score decrease was due to an error on the part of one creditor.

330.     In it, he cites a letter from a Toll Brothers employee named Deveraux Hamilton which references an entity named **Toll NC II, LP**.

331.     **Toll NC II, LP** is one of the many subsidiaries or subsidiaries of a subsidiary of **Toll Brothers, Inc.** of Delaware.

332.     **Toll Brothers, Inc** of Delaware signed the Agreement of Sale with **Mr. Smith** through **Toll NC II, LP** in order to make it difficult for **Mr. Smith** to pursue any recourse for any problems with the transaction.

333.    A Reddit user named "DISGRUNTLED_TB_BUYER" in a post commented on how their buying process with "Toll Brothers" was positive. (See Exhibit 123 Toll Brothers Reddit 1.pdf)

334.    In the same post, the user details how "after they get your money and commitment, it only goes downhill."

335.    The user shows a contrast between the positive buying experience and the negative post-buying experience.

336.    Another Reddit user named "Cold_Ad103" states that they had rust problems on the exterior of their million dollar home and were "Simply heartbroken and tired of the pushback. They aren't listening. I have a bad feeling they're just going to do the minimum and patch it up." Exhibit 124 Toll Brothers Reddit 2.pdf

337.    An article about an apartment complex named "Northside Piers" built on or around 2008 cites complaints about 'leaky walls, poor insulation, mold, faulty plumping, faulty sewage system, faulty heating, faulty air-conditioning. And the biggest: "The windows are thin and the seams between the panes allow wind and rain to easily come through, residents say. Some residents have taped around the window panes, but they say rain and air still blows in."'(See Exhibit 125 Toll Brothers Northside Piers.pdf)

58

338.    The article states that this was the Toll Brothers response: The company "is aware of these isolated situations and strongly disagrees with the allegations as they have been presented. It "will continue to honor its obligations and provide the quality and customer service for which it is known."

339.    The response implies that Toll Brothers did not view these as systemic issues but were isolated problems unique to each unit.

## L. Other Toll Court Cases

340.    In prior litigation, **Toll Brothers, Inc.** of Delaware has appeared under varying subsidiary names.

341.    In *Goldan et al. v. Toll Brothers AZ Limited Partnership*, the named defendant was not the parent company, **Toll Brothers, Inc.** of Delaware, but a subsidiary company.

342.    In *Goldan et al. v. Toll Brothers AZ Limited Partnership*, **Toll Brothers AZ Limited Partnership** retained the services of PHLK LLP.

343.    One lawyer representing the case was Brian Plante.

344.    Another lawyer representing the case was **Melanie Woodfin**.

345.    **Toll Brothers AZ Limited Partnership** was named **EDMUNDS-TOLL CONSTRUCTION COMPANY** at one point in time.

346. **EDMUNDS-TOLL CONSTRUCTION COMPANY** was acquired by **Toll Brothers, Inc.** of Delaware in 1995.

347. In *Rawlins et al. v. Toll Southwest, LLC*, plaintiffs litigated against an LLC owned by **Toll Bros, Inc**. of Pennsylvania.

348. In *Bhaskar Koukuntla v. Toll Bros., Inc.*, plaintiff litigated against a corporation owned by **Toll Holdings, Inc** of Delaware, which is in turn owned by **Toll Brothers, Inc.** of Delaware.

349. In *Paul Tolstyga v. Toll Bros., Inc. and Toll Dallas TX, LLC*, plaintiffs were confronted with multiple subsidiaries of **Toll Brothers, Inc.** of Delaware.

350. In the examples cited above, plaintiffs pursuing claims in different states sued different subsidiaries of **Toll Brothers, Inc.** of Delaware—a limited partnership in Arizona, an LLC in Utah and Texas, and **Toll Bros., Inc.** of Pennsylvania in other jurisdictions.

### N. Toll Brothers SEC Disclosures

351. On the investor FAQ page, **Toll Brothers, Inc.** of Delaware answers the question "What companies has Toll Brothers acquired?" with the following text: Toll Brothers has made thirteen acquisitions: Geoffrey H. Edmunds in Scottsdale, Arizona (1995), Coleman Homes' Las Vegas

60

Division (1998), Silverman Homes in metro Detroit (1999), Richard R.

Dostie (2003) and The Manhattan Building Company (2003) in northern

New Jersey, the central Florida Division of Landstar Homes (2005),

CamWest Development LLC in Seattle, Washington (2012), Shapell

Industries, Inc. in California (2014), Coleman Homes in Boise, Idaho

(2017), Sharp Residential in Atlanta, Georgia (2019), Sabal Homes in South

Carolina (2019), Thrive Residential in Nashville and Atlanta (2020), Keller

Homes in Colorado Springs (2020), StoryBook Homes in Las Vegas (2021),

and Rialto Homes in San Antonio (2022). (See Exhibit 135 Toll Brothers

What Acquisitions Investor FAQ.pdf and

https://investors.tollbrothers.com/resources/financial-faqs)

352.    Public records show that some of these companies still operate

independently.

353.    **Manhattan Building Company**, since at least 2005, has operated as

an independent company with no affiliation to **Toll Brothers, Inc**. of

Delaware or its subsidiaries. (See Exhibit 136 About — The Manhattan

Building Company.pdf)

354.    This is according to Sanford Weiss.

355.    In its press release on the "acquisition" of **CamWest Development LLC**, CEO **Mr. Yearley** is quoted as having stated "We are excited to enter the Seattle market with the acquisition of CamWest." (See Exhibit 137 CamWest Press Release.pdf)

356.    **CamWest Development LLC** held an active business registration in Washington until 2024. (See Exhibit 138 CamWest Delinquencies after 2013 acquistion.pdf)

357.    In its 2012 Annual Report to the Washington SOS, "Yes" was marked for the question "Does your company own land, buildings or other real property in Washington?" (See Exhibit 139 Camwest Annual Reports.pdf)

358.    In its 2013, 2014, and 2015 Annual Reports to the Washington SOS, "No" was marked to the question "Does your company own land, buildings or other real property in Washington?"

359.    **Eric Campbell** remained listed as the sole Member and only person listed under "Governing People" in these 4 reports.

360.    If truly acquired, another member would be listed.

361.    If truly acquired, **Mr. Campbell** would no longer be listed.

362. A 10-K from 2012 represents that **Toll Brothers, Inc** of Delaware or its subsidiaries purchased only specific assets of **CamWest Development LLC**. (See Exhibit 140 10-K 2012.pdf)

363. This pattern repeated itself with the Sharp Residential purchase.

364. This pattern repeated itself with the Keller Homes purchase.

365. This pattern repeated itself with the Rialto Homes purchase.

366. This pattern repeats itself with all the mentioned "acquisitions" except for the "Geoffrey H. Edmunds" acquisition.

## O. Toll Brothers Statements of Authority

367. **Toll Southwest LLC** of Delaware has submitted at least 20 different Statements of Authority to various Colorado counties since 2012. (See Exhibit 152 Statements of Authority.pdf)

368. The instructions on these forms request a list of individuals from the signatory, typically with this statement: The name/position of each person authorized to execute instruments conveying, encumbering, or otherwise affecting title to real property on behalf the entity is.

369. These Statements of Authority never list these individuals: **Douglas Yearley, Richard Hartman, Robert Parahus,** or **Martin Connor.**

370.    The individuals listed in these Statements of Authority are not or never have been managers of **Toll Southwest LLC** of Delaware.  (See Exhibit 49 AZ Toll Southwest LLC 2023.pdf and Exhibit 50 AZ Toll Southwest 2017.pdf)

371.    These Statements of Authority never name **Daniel Rhea**.

372.    **Mr. Rhea** has signed for **Toll Southwest LLC** of Delaware for deeds in Arizona. (See Exhibit 141 AZ Daniel Rhea.pdf)

373.    According to these Statements of Authority, **Mr. Rhea** did not have the authority to sign on behalf of **Toll Southwest LLC** of Delaware.

374.    More generally speaking, Statements of Authority in Colorado show authority but do not grant it.

375.    **JG** obtained Officer's Certificates from Heritage Title Company that name **Toll Southwest LLC** of Delaware. (See Exhibit 142 Officers Cert 2024.pdf and Exhibit 143 Officers Cert 2022.pdf).

376.    None of these certificates name any of the managers listed in ¶¶ 382 above.

377.    Attorney **Kenneth Greenspan** is the signatory of both Officer's Certificates.

378.     **Mr. Greenspan** is also the signatory of several of the Statements of Authority referenced above.

379.     On information and belief, **Mr. Greenspan** was a compensated officer or employee of **Toll Brothers, Inc.** of Delaware at the time of signing these documents.

380.     On information and belief, **Mr. Greenspan** was not a compensated officer or employee of **Toll Southwest LLC** of Delaware at the time of his signing these documents.

**P. Tenure at Toll Brothers**

381.     Douglas Yearley has worked at **Toll Brothers, Inc.** of Delaware for over 35 years. (See Exhibit 144 Doulgas Yearley.pdf)

382.     Mark Bailey has worked at **Toll Brothers, Inc.** of Delaware for over 24 years. (See Exhibit 145 Mark Bailey LinkedIn.pdf)

383.     Daniel Rhea has worked at **Toll Brothers, Inc.** of Delaware for over 11 years. (See Exhibit 146 Dan Rhea LinkedIn.pdf)

384.     Reginald Carveth has worked at **Toll Brothers, Inc.** of Delaware for over 8 years. (See Exhibit 147 Reggie Carveth LinkedIn.pdf)

385. Kenneth Greenspan has worked at **Toll Brothers, Inc.** of Delaware for over 8 years. (See Exhibit 148 AZ Toll Bros Inc Annual Report 2017.pdf)

**Q. A Tale of Two Kens**

386. **Mr. Greenspan** is currently a Vice President and Secretary at **Toll Brothers, Inc.** of Delaware, as of September 22, 2025. (See Exhibit 153 Ken Greenspan LinkedIn.pdf)

387. **Mr. Greenspan** has been working at the company since at least 2017. (See Exhibit 50 AZ Toll Southwest 2017.pdf)

388. **Mr. Greenspan's** LinkedIn does not state his tenure at **Toll Brothers, Inc.** of Delaware.

389. **Mr. Greenspan** has signed many documents registered with Secretaries of State and county recorders. (Exhibit 154 Greenspan Docs.pdf, Exhibit 50 AZ Toll Southwest 2017.pdf, Exhibit 142 Officers Cert 2024.pdf and Exhibit 143 Officers Cert 2022.pdf).

390. **Mr. Greenspan** often signs for subsidiaries of **Toll Brothers, Inc.** of Delaware.

391. On information and belief, **Mr. Greenspan** was not a compensated officer or employee of any of these subsidiaries at the time of signing.

66

392.    **Mr. Greenspan** does not appear on any Annual Reports. (See Exhibit 155 Toll Directors and Officers Pages 1999 to 2021.pdf)

393.    **Mr. Greenspan** signs documents for subsidiaries in lieu of the General Counsel, who previously frequently signed them.

394.    **Kenneth Gary** became a licensed attorney in Pennsylvania on or around May 27, 1986. (See Exhibit 156 Gary, Kenneth J. PA Bar.pdf)

395.    **Toll Brothers, Inc.** of Delaware's IPO date was on or around July, 16 1986. (See Exhibit 157 Toll Brothers (TOL) IPO Date.pdf)

396.    According to **Mr. Gary's** LinkedIn, he ascended to General Counsel in March of 1990. (See Exhibit 158 Ken Gary LinkedIn.pdf)

397.    **Mr. Gary** was a licensed attorney for less than 4 years before ascending to General Counsel of **Toll Brothers, Inc.** of Delaware.

398.    **Mr. Gary** was General Counsel of **Toll Brothers, Inc.** of Delaware for more than 15 years.

399.    **Mr. Gary** retained this position until 2005, when he joined Beazer Homes as General Counsel. (See Exhibit 159 Gary Announcement Beazer Homes 8-K 2005.pdf)

400.    **Mr. Gary** was fired from Beazer Homes as General Counsel in 2007. (See Exhibit 160 Beazer Homes says fires general counsel.pdf)

67

401.    **Mr. Gary** was General Counsel for Beazer Homes for less than 3 years.

402.    On information and belief, **Mr. Gary** was never again General Counsel for a major homebuilder after Beazer Homes.

403.    The Directors and Officers page from the 1999 **Toll Brothers, Inc.** of Delaware Annual Report states that **Mr. Gary** was "Vice President and General Counsel." (See Exhibit 155 Toll Directors and Officers Pages 1999 to 2021.pdf)

404.    Documents signed by **Mr. Gary** throughout his tenure and submitted to Secretaries of State show him simply as "Vice President." (See Exhibit 161 Gary Docs.pdf)

405.    These documents do not show him writing "General Counsel."

406.    In **Mr. Gary's** current bio page for his realty company, he states that he is a "real estate attorney." (See Exhibit 162 Gary current work.pdf)

407.    **Mr. Gary's** current Pennsylvania attorney license is "retired." (See Exhibit 156 Gary, Kenneth J. PA Bar.pdf)

408.    **Mr. Gary** does not have an attorney license in Georgia, where he currently operates his realty business.

409.    On information and belief, **Mr. Gary** does not have an active attorney license in any state.

410.    **Mr. Gary's** stating that he is "a real estate attorney" is false.

**R. Employee Evasiveness**

411.    On June 29, **JG** emailed 2 HR managers, **Crystal Vecchione** and **Maryann Heatherby**, for information about the employer for several employees (See Exhibit 166 Email - Employees' Employer.pdf and Exhibit 167 Email - Employees' Employer 2.pdf).

412.    **Ms. Vecchione** is an "Employee Relations Manager" and **Ms. Heatherby** is a "Senior Manager" with "Toll Brothers." (See Exhibit 163 Maryann Heatherby | LinkedIn.pdf and Exhibit 164 Crystal Vecchione | LinkedIn.pdf)

413.    **Ms. Vecchione's** email management system responded with an auto-reply email. (See Exhibit 165 Email - Receipt Employees' Employer.pdf)

414.    Ultimately, neither manager responded to **JG's** emails.

415.    On June 30, 2025, **JG** concluded an email chain with **Nicole Jorgensen**. (See Exhibit 168 Gmail - Nicole avoiding question.pdf)

416.    In the chain, **JG** had asked **Ms. Jorgensen** for a contact in the HR department, to which she replied, "Summer has been great! I hope you've

69

been having a nice summer as well. I'm so sorry but I don't have a contact for the HR department :/"

417.    **JG** followed up by asking 'I understand, maybe you could clarify something else for me. Do you specifically work for "Toll Brothers, Inc."?' and "Is there someone who could better answer this question?"

418.    These questions were both ignored by Ms. Jorgensen.

419.    **Patricia Rice** is a Colorado notary. (See Exhibit 169 Gmail - Patricia Rice Notary CO.pdf)

420.    On July 8, 2025, **JG** called **Ms. Rice**. (See Exhibit 170 Toll Brothers Employee phone calls.pdf)

421.    **JG** asked her if she worked for "Toll Brothers Inc, Toll Bros Inc, or Toll Southwest LLC."

422.    She did not answer who she worked for.

423.    **JG** also asked her who **Mr. Ferguson** worked for.

424.    She did not answer who **Mr. Ferguson** worked for.

425.    Also on July 8, 2025, **Elizabeth Stein** returned an initial call from **JG**. (See Exhibit 170 Toll Brothers Employee phone calls.pdf)

426.    **Ms. Stein** is a Pennsylvania notary. (SeeExhibit 171 Liz Stein Pennsylvania.pdf)

70

427.      **Ms. Stein** works at the **Toll Brothers, Inc.** of Delaware headquarters.

428.      **JG** asked **Ms. Stein** about **Mr. Greenspan**, asking her "What company does he work for?" and "Does he have the authority to sign on behalf of Toll Southwest?"

429.      **Ms. Stein** did not answer these questions.

430.      **Ms. Stein** accused JG of "intruding."

431.      **Ms. Stein** brought this phone call to the attention of **Toll Brothers, Inc.** of Delaware CEO **Mr. Yearley**.

432.      On information and belief, **Ms. Stein** worked down the hallway from **Mr. Yearley**.

433.      The two spoke about **JG** for a few minutes after **Ms. Stein** stopped speaking with **JG**.

434.      On July 31, 2025, **JG** concluded 2 email chains with 2 individuals, one named **David Christensen** and one named **Gilma Drummy**. (See Exhibit 172 Gmail - Employer Information Dave.pdf and Exhibit 173 Gmail - Employment Information Gilma.pdf)

435.      Both are "Broker Associates" for the corporation "TNHC Realty and Construction Inc," which has a license ID of 01870227. (See Exhibit 174 TNHC Realty License.pdf)

436.    Neither Broker Associate answered **JG's** question about their employment.

437.    As recently as May 16, 2025, **JG** had no problem communicating with **Ms. Drummy**. (See Exhibit 175 Gmail - Gilma Current for sale homes.pdf)

## S. TB Annual Reports

438.    **Toll Brothers, Inc.** of Delaware Annual Reports going back to 1999 can be accessed at the following URL:

https://investors.tollbrothers.com/financials-and-filings/annual-reports

439.    Up to and including the 2020 edition, these reports contained a page showing "Officers and Directors." (See Exhibit 155 Toll Directors and Officers Pages 1999 to 2021.pdf)

440.    This page shows how tenured many officers of the company were, displaying their number of years at the company.

441.    Every edition after 2020 has a section that states the following: Our Certificate of Incorporation and Bylaws provide for indemnification of our directors and officers. We have also entered into individual indemnification agreements with each of our directors.

442.    Every edition after 2020 does not have an "Officers and Directors" page showing these individuals and their tenure at the company.

**T. The New Home Company History**

443.    **The New Home Company Inc** incorporated in Delaware on June 25, 2009. (See Exhibit 176 The New Home Company Inc.pdf)

444.    **The New Home Company Southern California LLC** incorporated in Delaware on June 25, 2009. (See Exhibit 177 The New Home Company Southern California LLC.pdf)

445.    **TNHC Realty and Construction Inc** incorporated in Delaware on June 25, 2009. (See Exhibit 178 TNHC Realty and Construction Inc.pdf)

446.    These 3 companies were all incorporated in Delaware on the same day.

447.    **H Lawrence Webb** was CEO of The New Home Company Inc from 2009 - 2019. (See Exhibit 179 Larry Webb | LinkedIn.pdf)

448.    **H Lawrence Webb** was Executive Chairman of **The New Home Company Inc** from 2019 - 2022.

449.    **Wayne Stelmar** was CIO of The New Home Company Inc until 2017. (See Exhibit 180 New Home CIO Wayne Stelmar to Retire.pdf)

**U. John Laing Homes Company History**

450.　　**WL Homes LLC** was more commonly known as "John Laing Homes."

451.　　**WL Homes LLC** owned the trademark for "John Laing Homes." (See Exhibit 181 WL Homes LLC Trademark.pdf)

452.　　**WL Homes LLC** was registered in California. (See Exhibit 182 WL Homes LLC.pdf)

453.　　**John Laing Homes (California), Inc** was a separate entity from **WL Homes LLC** in California. (SeeExhibit 183 John Laing Homes (California), Inc.pdf)

454.　　**JLH Realty & Construction, Inc.** was a separate entity from **WL Homes LLC** and **John Laing Homes (California), Inc** in California. (See Exhibit 184 JLH Realty and Construction Inc.pdf)

455.　　**JLH Realty & Construction, Inc** had a CSLB license number of 687596. (See Exhibit 185 JLH CSLB License.pdf)

456.　　**JLH Realty & Construction, Inc** had a DRE license number of 01176549. (See Exhibit 187 JLH DRE License.pdf)

457.　　Neither **John Laing Homes (California), Inc** nor **WL Homes LLC** ever had a CSLB license number.

458.     Neither **John Laing Homes (California), Inc** nor **WL Homes LLC** ever had a DRE license number.

459.     "John Laing Homes" was listed as the owner-builder on a permit from 3/28/2007 for the Irvine address 31 Iceberg Rose. (See Exhibit 186 John Laing Homes Permits and Declarations.pdf)

460.     "John Laing Homes" had no FBN registration in Orange County at that time. (See Exhibit 250 OC Recorder Says No FBN John Laing Homes.pdf)

461.     A WL Homes LLC deed from 2000 shows a DBA name of "John Laing Homes." (See Exhibit 251 John Laing 2000 deed.pdf)

462.     A WL Homes LLC deed from 2003 shows no DBA name at all. (See Exhibit 252 John Laing 2003 deed.pdf)

463.     WL Homes LLC at some point changed its policy from listing the alternative business name to not listing the alternative business name on deeds in transactions with consumers.

464.     A 2003 Notice of Completion shows "WL Homes LLC" as being the contractor. (See Exhibit 253 John Laing 2003 Notice of Completion.pdf)

465.    Since WL Homes LLC never had a CSLB license number in California, this Notice of Completion shows evidence of unlicensed contracting.

466.    **WL Homes LLC'**s CEO was H Lawrence Webb through March of 2008. (See Exhibit 188 Webb Steps Down as CEO of John Laing Homes 2008.pdf)

467.    **WL Homes LLC's** executive **Wayne Stelmar** signed documents for WL Homes LLC in July of 2008. (See Exhibit 189 Wachovia v JLH.pdf)

468.    **WL Homes LLC** filed for bankruptcy in Delaware in February of 2009. (See Exhibit 190 Home builder John Laing files for bankruptcy | Reuters.pdf)

## V. The New Home Company Disclosures

469.    **Miek Harbur** became a licensed attorney in California on or around December 2, 2011. (See Exhibit 191 Miek Debeuckelaer Harbur Cali bar.pdf)

470.    **The New Home Company Inc.'s** IPO date was on or around January 30, 2014. (See Exhibit 192 NWHM IPO Date.pdf)

471. According to **Ms. Harbur's** LinkedIn, she ascended to General Counsel of **The New Home Company Inc** in January of 2016. (See Exhibit 193 Miek Harbur | LinkedIn.pdf)

472. **Ms. Harbur** is currently the General Counsel for **The New Home Company Inc**, as of September 22, 2025.

473. **Ms. Harbur** was a licensed attorney for less than 5 years before ascending to General Counsel of **The New Home Company Inc.**.

474. **Ms. Harbur** and/or other employees submitted Form SI-PT for The New Home Company Inc between 2015-2021 to the California Secretary of State. (See Exhibit 194 Combined SI-PT.pdf)

475. In each form where this individual was present, "NO" was checked beside **Mr. Webb** under BANKRUPTCY.

476. In each form where this individual was present, "NO" was checked beside **Mr. Stelmar** under BANKRUPTCY.

477. State instructions for this question state "Check YES or NO to indicate whether or not an order for relief has been entered in a bankruptcy case during the 10 years preceding the date of this statement with respect to each director." (See Exhibit 195 Form SI-PT Info.pdf)

478.    **Ms. Harbur** is currently the General Counsel for **The New Home Company Inc**, as of September 22, 2025. (See [Exhibit 193 Miek Harbur | LinkedIn.pdf](#))

479.    On January 30, 2014, **The New Home Company Inc** made an SEC filing disclosing information for an IPO. (See [Exhibit 196 New Home Co IPO Form 424B4 2019 Speaks sparingly of bankruptcy.pdf](#))

480.    This filing did not disclose **Mr. Webb's** relationship to the bankruptcy of **WL Homes LLC.**

481.    This filing did not disclose **Mr. Stelmar's** relationship to the bankruptcy of **WL Homes LLC.**

## W. A Tale of Two Builders

482.    Both **The New Home Company, Inc** of Delaware and **Toll Brothers, Inc.** of Delaware, within 4 years of their respective IPOs, hired General Counsels who became licensed attorneys less than 5 years prior to assuming the role. (See ¶¶ 396-397, 469-473.)

483.    Both companies operate centralized marketing, brokerage, and IT systems through the parent company. (See ¶¶ 1-2, 8, 498-500.)

484.    Both companies frequently use subsidiaries as the signatories for contracts with homebuyers. (See ¶¶ 142, 504.)

485.    In both companies, the trademark-holding entity is not the same entity that signs contracts with consumers or interacts with municipal permitting authorities. (See ¶¶ 251, 500.)

486.    Both companies regularly designate subsidiaries—rather than parent companies—as the licensed contractors, builders, or developers on record with municipalities. (See ¶¶ 277, 628.)

487.    When recently contacted, employees from both companies ignored requests from **JG** to provide their employer information. (See ¶¶ 411-437.)

488.    Both companies have a pattern of partnering with municipal governments in ways that limit the redress options available to homeowners. (See ¶¶ 204-244, 609-726.)

489.    Both companies have issued cease-and-desist letters to homeowners and residents who submit prelitigation letters or regulatory complaints concerning construction defects.  (See ¶¶ 203, 571, 596, 645, 684, 703.)

490.    Both companies have misrepresented matters to shareholders while being publicly traded.  (See ¶¶ 351-366, 469-481.)

491.    **The New Home Company, Inc** of Delaware or its affiliated counsel appears to have provided **Toll Brothers, Inc.** of Delaware or its affiliated counsel with information about **JG's** recent dispute with **The New Home**

79

**Company, Inc** of Delaware, information that subsequently appeared in the Federal complaint, *1:25-cv-02884-CYC*, filed on September 12, 2025. (See Exhibit 257 TB Federal Complaint.pdf)

X. TNHC Pre-purchase

492.    On December 29, 2023, a US Bank employee named Justin Pope emailed **JG**'s email with preapproval instructions and a link to a marketing page about Olivewood in Portola Springs. (See Exhibit 233 Gmail - US Bank Preapproval Instructions.pdf)

493.    This email was directed towards **JG** and **JG**'s parents, Xian Feng Gu ("**XFG**") and Di Lan Ge ("**DLG**").

494.    **XFG**, born in October 1957, was over 65 at the time of this contact.

495.    **DLG**, born in April 1959, was over 65 at the time of signing the closing documents.

496.    **XFG** and **DLG** immigrated from China in the 1980s.

497.    **XFG** and **DLG** are naturalized US citizens.

498.    The email provided a link to this URL:

https://www.newhomeco.com/region/orange-county/olivewood-portola-springs

499.　　The current content for the linked marketing page for Olivewood was copywritten by **The New Home Company Inc** in 2025. (See Exhibit 234 Sep 2025 Olivewood Webpage.pdf)

500.　　The past content for the linked marketing page for Olivewood was copywritten by **The New Home Company Inc.** in 2023. (See Exhibit 235 October 2023 Olivewood Webpage.pdf)

Y. TNHC Purchase Agreement

501.　　On March 15, 2024, **DLG** and **XFG** signed a **Purchase Agreement** as Buyers for Lot No. 0088 on Tract No. 19176. (See Exhibit 236 Purchase Agreement Final.pdf)

502.　　This **Purchase Agreement** was for a property located at 129 Oakstone, in the City of Irvine, State of California.

503.　　The purchase price in this Purchase Agreement is $3,699,990

504.　　Employees and/or agents of **The New Home Company Southern California LLC** were signatories to this **Purchase Agreement**.

505.　　**Key Fact: The New Home Company Southern California LLC** is the named Seller in this Purchase Agreement.

506.　　This **Purchase Agreement** contains the text 'on the terms and conditions set forth below in the Basic Provisions and General Provisions,

any Addenda attached hereto and the "Limited Warranty" defined below (collectively "Sales Terms"), all of which are incorporated herein by this reference. All references herein to this "Agreement" include the Sales Terms, and the Parties hereby agree to be bound by same.', and we can refer to the entire bundle of documents as the **Agreement**.

507.    **The New Home Company Southern California LLC** is referred to as the Seller and/or merchant builder in the **Agreement**.

508.    **Key Fact:** The **Agreement** contains the text "Seller shall cause construction and completion of the Residence and appurtenant improvements on the Property."

509.    The **Agreement** contains the text "BUYER ACKNOWLEDGES THAT SELLER IS RELYING ON THIS REPRESENTATION AND WARRANTY IN ACCEPTING THIS AGREEMENT AND INCURRING EXPENSES IN CONNECTION WITH THE SALE OF THE PROPERTY AND SELLER'S COMPLETION OF THE CONSTRUCTION AND DEVELOPMENT OF THE PROPERTY."

510.    The **Agreement** contains the text "Seller may, from time to time, in its sole discretion send Buyer progress reports regarding construction of the Residence."

511.    The **Agreement** contains the text "Seller shall complete construction of the Property, including the Residence and all other improvements thereon"

512.    The **Agreement** contains the text "If Seller fails to complete construction of the Property and close Escrow within two (2) years after the Acceptance Date…"

513.    The **Agreement** contains the text "Seller shall use commercially reasonable efforts to complete installation of the Design Studio Options".

514.    **The New Home Company Inc** is only named 1 time in the **Agreement**, in the document titled "RELEASE AND INDEMNITY."

515.    **TNHC Realty and Construction Inc** is not named in the **Agreement**.

516.    **Key Fact: The New Home Company Southern California LLC** is the named "Developer (Contact)" in the Agreement document titled "2007 NEW HOME UNIVERSAL DESIGN OPTION CHECKLIST (AB 1400)"

517.    **The New Home Company Southern California LLC** is a direct subsidiary of **The New Home Company Inc.**

518.    **The New Home Company Southern California LLC** is 100% owned by **The New Home Company Inc.**

519.    **Key Fact: The New Home Company Inc** did not have a CSLB license number at the time of the signing of the **Agreement**.

520.    **Key Fact: The New Home Company Inc** still does not have a CSLB license number as of September 9, 2025.

521.    **Key Fact: The New Home Company Southern California LLC** also did not have a CSLB license number at the time of the signing of the **Agreement**.

522.    **Key Fact: The New Home Company Southern California LLC** also still does not have a CSLB license number as of September 9, 2025.

523.    **The New Home Company Southern California LLC** did not have a **City of Irvine** ("**COI**") Business License at the time of the signing of the **Agreement**.

524.    **The New Home Company Southern California LLC** still does not have a **COI** Business License as of September 9, 2025.

525.    **Key Fact:** In the "Definitions" section of this warranty, one definition states that "Builder means The New Home Company Southern California LLC, a Delaware limited liability company."

Z. TNHC Closing

526.    On June 24, 2024, **XFG** and **DLG** signed closing documents.

84

527.    **Key Fact:** The Homebuyer Limited Warranty was part of these closing documents. (See Exhibit 237 Closing Warranty.pdf)

528.    **Key Fact:** On the grant deed submitted to Orange County for Lot 88 of Tract No. 19176, **The New Home Company Southern California LLC** grants the property. (See Exhibit 238 129 Oakstone Grant Deed.pdf)

529.    The property was granted to the Trustees **XFG** and **DLG** of The Xian Feng Gu and Di Lan Ge Revocable Trust.

530.    On the Closing Disclosure for the property, **The New Home Company Southern California LLC** is the listed name for Real Estate Broker (S). (See Exhibit 239 Signed CD.pdf)

531.    The listed DRE license number for this field on the Closing Disclosure is 01870227.

532.    01870227 is the DRE license number belonging to **TNHC Realty and Construction Inc.** (See Exhibit 240 TNHC DRE License.pdf)

533.    **TNHC Realty and Construction Inc** is a direct subsidiary of **The New Home Company Inc**.

534.    **TNHC Realty and Construction Inc** is 100% owned by **The New Home Company Inc.**

535.    This combination between the named Real Estate Broker (S) and the DRE License Number is in every Closing Disclosure for the whole neighborhood.

536.    **The New Home Company Southern California LLC** is not a DRE licensed real estate broker.

537.    **Key Fact:** On the same closing disclosure, **The New Home Company Southern California LLC** is listed as the seller.

538.    **Key Fact:** On the Buyer Statement provided by the Settlement Agent, the Seller is listed as **The New Home Company Southern California LLC**. (See Exhibit 241 Buyer Statement.pdf)

539.    The statement lists $3,867,154 as the "Total Consideration."

AA. Post-Closing

540.    On July 2, 2024, the first item on the Homeowner Central warranty portal was marked "Completed" for 129 Oakstone. (See Exhibit 126 Final Warranty List.pdf)

541.    This warranty item pertained to hot water not being delivered properly in the kitchen.

86

542.    The listed Builder in the Contacts section on the warranty portal is **The New Home Company Southern California LLC**. (See Exhibit 127 Warranty Portal Contact Page.pdf)

543.    On February 1, 2025, **XFG**, **DLG**, and **JG** signed an agreement for **JG** to handle house matters at 129 Oakstone. (See Exhibit 128 Owner's Representative and Claims Support Agreement.pdf)

544.    On February 16, 2025, **JG** arrived at the residence and began documenting construction defects and worksite violations. (See Exhibit 129 Defect Pictures.pdf)

545.    Also from this date onward, **JG** took photos of construction vehicles parked in publicly used thoroughfares.

546.    **JG** also took photos of lack of safety signage and cones in public thoroughfares near large vehicles.

547.    **JG** also took photos of the absence of safety gear on workers .

548.    On April 21, 2025, **JG** submitted a complaint to the California DRE against **TNHC Realty and Construction Inc.** (See Exhibit 130 DRE Complaint Number.pdf)

87

BB. TNHC SB800

549.    Also on April 21, 2025, **JG** received an SB800 letter from **TNHC** via PHLK LLP requesting inspection. (See Exhibit 131 SB800 Initial Letter.pdf)

550.    The letter also had a Certificate of Liability Insurance attached.

551.    Named Insureds on this Certificate of Liability Insurance are **The New Home Company Inc** and **TNHC Realty and Construction Inc.**

552.    **Key Fact: The New Home Company Southern California LLC** is not a Named Insured on this Certificate of Liability Insurance.

553.    On April 22, 2025, certain subcontractors and construction consulting company **Bert L Howe and Associates** inspected the home, as stated in the aforementioned SB800 letter.

554.    **Bert L Howe and Associates** did not have a CSLB license number at the time of inspection.

555.    **Bert L Howe and Associates** still does not have a CSLB license number as of September 9, 2025.

556.    **Bert L Howe and Associates** did not have an Irvine business license number at the time of inspection.

557.    **Bert L Howe and Associates** still does not have an Irvine business license number as of September 9, 2025.

558.    **Key Fact:** On May 15, 2025, the last item on the Homeowner Central warranty portal was marked "Completed." (See Exhibit 126 Final Warranty List.pdf)

559.    This warranty item pertained to a window having a large scratch.

560.    On May 22, 2025, PHLK sent an SB800 response letter. (See Exhibit 132 SB800 Final Letter.pdf)

561.    This letter was a response to the inspections performed on April 22, 2025.

562.    This letter denied all claims sent in the previous SB800 notices related to those inspections.

CC. TNHC Post-SB800

563.    On May 17, 2025, a Saturday, **JG** took photos of **TNHC** worksites between 8am and 8:15am. (See Exhibit 262 Irvine Construction Hours.pdf)

564.    Irvine's municipal code "restricts construction activities to the hours of 7 am to 7 pm Monday through Friday, and 9 am to 6 pm on Saturdays."

565.    Contractors at these worksites were violating the Irvine municipal code by working before 9am on this day.

566.    On May 23, 2025, **JG** sent complaint evidence to the CSLB, issued litigation hold notices to **The New Home Company Inc** and its law firm, and sent bond-related letters to surety companies.

567.    On May 27, 2025, JG took photos of the fences leading to unfinished homes. (See Exhibit 264 TNHC No Sign.pdf)

568.    The 2 photos display worksites off of Oakstone and Brimwood.

569.    These fences are open to traffic.

570.    These photos do not visibly show any signage.

571.    **Key Fact:** On May 27, 2025, **TNHC** via PHLK sent its first cease-and-desist letter to **JG**. (See Exhibit 133 Cease and Desist 1.pdf)

572.    The letter alleges trespass of company property by **JG**.

573.    The letter alleges harassment of company contractors by **JG**.

574.    The letter alleges that **JG's** conduct was "illegal, dangerous, and disruptive."

575.    In the letter, the company reserves "the right to pursue all appropriate corrective actions, including injunctive relief, restraining orders, and both civil and criminal penalties."

576.    Photos displayed in the letter were taken by an individual who was a subcontractor of the company.

90

577. This individual protested at the time that **JG** was taking photos of the worksite.

578. The individual who took the photos of **JG** was wearing a tan or brown shirt at the time. (See Exhibit 149 May 20 2025 photos.pdf)

579. The license plate number of the vehicle of the individual who took the photos was CA 20637B1.

580. The vehicle did not have a CSLB license number written on the driver side door.

581. The vehicle did not have a company name written on the driver side door.

582. The individual transferred their photos of **JG** to **The New Home Company Inc** or subsidiary.

583. **The New Home Company Inc** or subsidiary transferred the photos to PHLK LLP.

584. The photos were taken by the individual on May 20, 2025.

585. The employees in the photos taken by the individual were employees of Solara. (See Exhibit 149 May 20 2025 photos.pdf)

586. The employees were wearing neon yellow hoodies.

587. Solara has a CSLB License number of 1103958.

588. The employee interacting with **JG** in the photos was wearing sunglasses and had a hood over their head.

589. The employee interacting with **JG** in the photos had their hands down by their waist.

590. The employee interacting with **JG** in the photos appeared to be relaxed.

591. The license plate number of the Solara vehicle in the photo is CA 16073C4.

592. On June 2, 2025, **JG** flew from Irvine to Denver on Southwest Airlines. (See Exhibit 150 SNA to DEN.pdf)

593. On June 9, 2025, **Tokio Marine** sent 2 bond claim denial letters. (See Exhibit 151 Tokio Marine ACIC Turnstyle Rejection Letter.pdf and Exhibit 202 Tokio Marine ACIC Aliso Air Inc Rejection Letter.pdf)

594. On June 10, 2025, **IAT/Harco** sent a bond claim denial letter. (See Exhibit 203 IAT Harco Glass Fence Bond Claim Denial.pdf)

595. On June 13, 2025, **JG** sent a litigation hold notice to **COI**.

596. On June 23, 2025, **The New Home Company Inc** issued its second cease-and-desist letter to **JG**. (See Exhibit 205 Cease and Desist 2.pdf)

597.    The letter alleges continued "abusive and harassing behavior" after the date of the first cease and desist letter, which was on May 27, 2025.

598.    The letter further asserts that **JG** has "again intentionally and illegally trespassed on **The New Home Company Inc's** construction site and harassed the construction workers."

599.    By June 27, 2025, the author of the letter, PHLK attorney **Melanie Woodfin**, was unable to produce evidence of further trespass by **JG**, despite repeated emails for evidence. (See Exhibit 204 Melanie Woodfin produces no trespassing evidence.pdf)

600.    On June 24, 2025, **JG** flew from Denver to Milwaukee on Southwest Airlines. (See Exhibit 206 DEN to MKE.pdf)

601.    On June 25, 2025, Ms. Woodfin wrote a response letter to Harco National Insurance Company regarding a bond claim **JG** initiated with Harco. (See Exhibit 207 Melanie Woodfin Response to IAT - Harco Stair Railing Bond Claim.pdf)

602.    This letter claims that "We previously outlined such behavior which includes trespassing on TNHC's active construction site and 16 separate SB 800 Notices, two claims against the Bond which are duplicative of the Notices, and a letter threatening a lawsuit" and notes that "Mr. Gu has

responded with bad faith conduct including repeated conduct intended to harass and annoy TNHC."

603. On July 9, 2025, **IAT/Harco** sent a 2nd bond claim denial letter. (See Exhibit 208 IAT Harco Door Trim Bond Claim Denial.pdf)

604. On July 29, 2025, **Tokio Marine/PIC** sent a bond claim denial letter. (See Exhibit 209 Tokio Marine PIIC July 29 Rejection Letter.pdf)

605. On August 28, 2025, JG received a response from the CSLB regarding **Pacific Line Clean-up Inc**. (See Exhibit 263 Pacific Line CSLB.pdf)

606. **Pacific Line Clean-up Inc** was a contractor hired by **TNHC** or a subsidiary.

607. The letter states that "Our investigation of your complaint determined that the involved contractor was responsible for one or more violations of the California Business and Professions Code."

608. **JG** had sent a complaint to the CSLB about unmarked vehicles belonging to **Pacific Line Clean-up Inc** operating in the Olivewood neighborhood.

DD. Irvine Interactions

609.    On July 24, 2025, City of Irvine Chief Building Official **Jesse Cardoza** responded to a series of emails from **JG** about permits from the Toll Brothers. (See Exhibit 243 Gmail - Cardoza Toll Brothers Permit.pdf)

610.    In permits 00933670-RBPR and 00933667-RBPR, there is no contractor license listed. (See Exhibit 242 Toll Brothers Irvine Elevate.pdf)

611.    **Mr. Cardoza** responds to this problem with "It appears that the two permits with the missing license information are the result of a clerical error - not an omission of information or a mistake. I was able to confirm that the contractor license information was validated, but not all of the information was reflected on the permit. Thank you for brining this to my attention."

612.    In other permits, 00930957-PBP, 00930954-EBP, 00930955-MBP, and 00930956-MISC, "TOLL BROTHERS MORTGAGE COMPANY" is listed as the contractor, with "Lic. No." of 683543.

613.    CSLB License number 683543 belongs to Toll Bros., Inc. (See Exhibit 254 Toll Bros CSLB License.pdf).

614.    The contractor name listed on 00930957-PBP, 00930954-EBP, 00930955-MBP, and 00930956-MISC was false.

615.    **JG** brought this up to **Mr. Cardoza**, to which he responded, "We don't specifically track the relative portion of licensed contractors that are

95

also mortgage companies, so I'm unable to say how common this occurrence is; however, I can confirm that we have issued a  number of building permits to Toll Brothers under their B - General Building contractor's license. For up- to-date contractor license information, please visit the California Department of Consumer Affairs web  page (https://www.cslb.ca.gov/).” (See Exhibit 244 Gmail - Cardoza Toll Brothers Permit 2.pdf)

616. **Mr. Cardoza** did not address the fact that the name on the permit did not match the name of the license owner.

617. On July 30, 2025, **JG** obtained the New Residential Construction Permit for 129 Oakstone from **COI** Building and Safety Department Employee Cheryl Charters via email. (See Exhibit 210 129 Oakstone Construction Permit.pdf)

618. This permit has a number 00920236-RBP.

619. Permit 00920236-RBP is the permit for the property at 129 Oakstone, 92618.

620. **Key Fact:** This permit shows "NEW HOME COMPANY" as the owner under the "OWNER-BUILDER DECLARATION" section.

621. In the middle section of the permit, "NEW HOME COMPANY" is also listed as "OWNER."

96

622. According to the Orange County Recorder Department Fictitious Business Name Search tool, "NEW HOME COMPANY" was an FBN for **TNHC REALTY AND CONSTRUCTION INC**. (See Exhibit 211 TNHC All FBNs.pdf)

623. **TNHC REALTY AND CONSTRUCTION INC.** had 7 total FBN registrations under file number 20216607747 with filing date of June 11, 2021: THE NEW HOME COMPANY, NWHM, NEW HOME, NEW HOME COMPANY, TNHC, NEW HOME CO., RUSSELL RANCH.

624. **Key Fact: TNHC REALTY AND CONSTRUCTION INC** was not the deeded owner of the property at 129 Oakstone at the time of applying for the permit.

625. **Key Fact: TNHC REALTY AND CONSTRUCTION INC** was not the deeded owner of the land on Tract 19176.

626. Tract 19176 constitutes the land on which the Olivewood neighborhood was built.

627. Lot 88 of Tract 19176 constitutes the land on which 129 Oakstone is now designated.

628. **TNHC REALTY AND CONSTRUCTION INC** has a CSLB license number of 938080 with classification "B - GENERAL BUILDING." (See Exhibit 212 TNHC CSLB License.pdf)

629. **Key Fact: TNHC REALTY AND CONSTRUCTION INC** is not listed as the "Contractor" on the New Residential Construction Permit for 129 Oakstone.

630. **Key Fact:** The CSLB license number for **TNHC REALTY AND CONSTRUCTION INC** is not listed under "Lic. No." on the New Residential Construction Permit for 129 Oakstone.

631. **Key Fact:** The CSLB classification for **TNHC REALTY AND CONSTRUCTION INC** is not listed under "License Class" on the New Residential Construction Permit for 129 Oakstone.

632. **Key Fact: TNHC REALTY AND CONSTRUCTION INC** CSLB license information is not listed on the New Residential Construction Permit of any home in the Olivewood neighborhood.

633. Kristi Blanchard of KB Processing was the applicant and signatory for the permit.

634. Also on July 30, 2025, JG contacted Mr. Cardoza, writing, "I have obtained a permit for 'New Home Company' (which is not a registered

98

entity California or licensed business entity within Irvine). Could you please explain why the "OWNER-BUILDER DECLARATION" section has no checkboxes filled in?" (See Exhibit 245 Gmail - Cardoza TNHC Permit.pdf)

635.    **Mr. Cardoza** responded with "Thank you for the question. When we transitioned to all electronic permit submittals in 2019, we began collecting permit declarations at permit issuance via a separate, stand-alone document, which is why you'll find many fields empty in the declaration portion of the permit. The separate, complete declaration is printed and sent to the Office of Records at project close-out along with the permit, so all of the required information is captured and preserved - just not on one piece of paper. These separate permit declarations should have been provided to you by the Office of Records as part of your Public Records Request. If they were not, please contact the Office of Records to obtain the additional documents."

636.    **Mr. Cardoza** did not address the fact that "New Home Company" was not a registered entity in the state of California in his response.

637.    The applicant for a Toll Brothers permit for the address 453 Promontory was also Kristi Blanchard of KB Processing (See Exhibit 255 Toll Brothers Permit 453 Promontory.pdf)

EE. Irvine Responses

638.    **Key Fact:** On July 30, 2025 at 4:01pm PT, **JG** called Councilman **William Go**'s office. (See Exhibit 213 Irvine Police Phone Call Details.pdf)

639.    **JG** called with the number 303-210-6948.

640.    Instead of reaching **Mr. Go**, **JG** talked to **Trinity Pham**.

641.    At the time, **Ms. Pham** only introduced her first name, "Trinity."

642.    **JG** discussed the permitting failures, code violations, and lack of qualifications of certain employees in the COI Building Department with **Ms. Pham**.

643.    The phone call lasted approximately 7 minutes.

644.    **Key Fact: JG** did not attempt to reach **Ms. Pham** ever again after this phone call.

645.    **Key Fact:** On July 30, 2025 at 8:47pm PT, **JG** received a phone call from an unknown number. (See Exhibit 213 Irvine Police Phone Call Details.pdf)

646.    The phone number called was 720-593-1548.

647.    The phone number called was not the same number **JG** used to call **Mr. Go** when he spoke with **Ms. Pham**.

648.    The caller claimed to be a police officer with the **Irvine Police Department**.

100

649. The caller had a female sounding voice.

650. The caller said this was about the call **JG** made earlier to **Mr. Go's** office, the conversation with **Ms. Pham**.

651. The caller asked **JG** if he said "someone should hurt themselves."

652. **JG** said he did not remember saying this.

653. **JG** asked "could you please be more specific?"

654. The officer said she was "already being specific."

655. **JG** said "thank you for the intimidation."

656. The call ended shortly after that.

657. The call lasted approximately 2 minutes.

658. On July 31, 2025, **JG** contacted **COI** Human Resources Department and asked for **Ms. Pham's** full name, title, and department.

659. **Key Fact: JG** did not ask **Ms. Pham's** private information during this or any other call to HR.

660. The HR employee answered that **Ms. Pham's** title was "Supervising Principal Council Executive Assistant."

661. **Ms. Pham's** LinkedIn lists "Marketing Communications Manager" as her title, as of July 31, 2025. (See Exhibit 214 Trinity Pham | LinkedIn.pdf)

662.    On July 31, **JG** also called **COI's** Communications and Engagement Department but reached a voicemail.

663.    An employee named Alyssa called **JG** back.

664.    Alyssa said Trinity Pham is not part of the Communications and Engagement Department.

665.    The Communications and Engagement Department is essentially **COI's** marketing department.

666.    Also on July 31, **JG** emailed City Attorneys **Jeffrey Melching** and **Jessica Sanders** asking for information about the July 30 police phone call. (See Exhibit 215 Irvine PD July 30 Phone Call.pdf)

667.    The attorneys ignored answering the single question in the email, as of September 9, 2025.

668.    On August 1, 2025, **JG** again contacted **COI** HR department to confirm the title of another staffer, Kalvin Alvarez.

669.    A male HR employee informed **JG** that such information could no longer be shared with him.

670.    On August 4, 2025, **JG** received the Permit Declaration and related documents from **COI** employee Cheryl Charters via email for all the houses

in the Olivewood tract. (See Exhibit 216 129 Oakstone Declaration Docs.pdf)

671.    The Code Compliance Approval cover page has the name "Katie Berg-Curtis" on it.

672.    Ms. Berg-Curtis is not an employee of COI. She is an employee of Alkemi Planning. (See Exhibit 256 Katie Berg-Curtis | LinkedIn.pdf)

673.    The Permit Declaration and related documents for "Lots 87-89, 96-98 126-131 Oakstone" portray "New Home Co." as the Property Owner or builder, depending on the document.

674.    "New Home Co." was an FBN for **TNHC Realty and Construction Inc**. (See Exhibit 211 TNHC All FBNs.pdf)

675.    Kristi Blanchard of KB Processing is the applicant and signatory for the Permit Declaration and related documents.

676.    All Permit Declarations for the phases in the neighborhood known as Olivewood portray the applicant company as "New Home Company" or "New Home Co." (See Exhibit 265 All Declarations.pdf)

677.    Each of the New Residential Construction Permits created for Olivewood, or more formally tract 19176, show "NEW HOME

103

COMPANY" as the "Owner" in the "Owner-Builder Declaration" and middle sections of the permit. (See Exhibit 266 All Olivewood Permits.pdf)

678.    Each of the New Residential Construction Permits created for The Groves, or more formally tract 19005, show "NEW HOME COMPANY" as the "Owner" in the "Owner-Builder Declaration" and middle sections of the permit. (See Exhibit 267 All The Groves Permits.pdf)

679.    According to the Orange County Recorder Department Fictitious Business Name Search tool, "NEW HOME COMPANY" was an FBN for **TNHC REALTY AND CONSTRUCTION INC**. (See Exhibit 211 TNHC All FBNs.pdf)

680.    **TNHC REALTY AND CONSTRUCTION INC.** applied for New Residential Construction Permits in at least 2 different tracts while also applying under "Owner-Builder Declarations" without being the deeded owner of the properties.

681.    **Key Fact:** On August 5, 2025, **COI**, via attorney Jessica Sanders of Rutan & Tucker, issued a cease-and-desist letter via email to **JG**. (See Exhibit 217 COI Cease and Desist.pdf)

682.    The letter demands that **JG** "immediately cease all direct contact with City staff and offices."

104

683.    The letter also claims that **JG's** "repeated calls and attempts to contact Ms. Pham, and requests for her personal contact information are inappropriate and not related to any legitimate request for service or information from the City. It has become necessary for the City and the Irvine Police Department (IPD) to take precautionary matters to preserve Ms. Pham's safety and wellbeing."

684.    Also on August 5, 2025, **TNHC** issued its 3rd cease-and-desist letter. (See Exhibit 218 Cease and Desist 3.pdf)

685.    This letter alleges further harassment of **TNHC** vendors by **JG**.

686.    **JG** creates a call log of his interactions with **COI** up until that point. (See Exhibit 219 Irvine Call Log.pdf)

687.    The log shows only 2 hours and 13 minutes of phone calls made over the previous 5 months to **COI**, with most being unanswered.

688.    On August 7, 2025, **JG** submitted a Letter of Concern to the Orange County Grand Jury regarding misconduct by **COI**.

689.    Also on August 7, 2025, JG cc'd all City Councilmembers–**William Go**, **Mike Carroll**, **Melinda Liu**, **Betty Martinez Franco**, **Kathleen Treseder**–City Attorney Jeffrey Melching, Mayor Larry Agran**, and **City Manager Sean Crumby** on an email asking for details on the basis for

105

the cease and desist letter. (See Exhibit 259 Gmail - Email to all Irvine City Councilmembers.pdf)

690. None of these individuals ever reached out to **JG** to voice concerns.

691. On August 8, 2025, **JG** submitted a Claim for Damages against **COI** in the amount of $5.7 million. (See Exhibit 220 Claim for Damages Full.pdf)

692. On August 11, 2025, the **COI's** third-party administrator, George Hills, called **JG** to acknowledge receipt of the Claim for Damages.

693. Also on August 11, 2025, **Bert L. Howe & Associates** issued a cease-and-desist letter to **JG**. (See Exhibit 221 BHA Cease and Desist.pdf)

694. The letter alleges "The Company is working with local authorities, having filed a police report, and is working through our office to obtain a restraining order."

695. It also states that **JG** has "engaged in months of harassing and inappropriate conduct toward BHA, as well as its employees."

696. It also states "the Company forewarns that you not respond to the instant letter by making any disparaging and defamatory statements about the Company and its business practices to any third party, including the Company's customers, bonding companies, or state licensing boards. Should

you do so, a civil action seeking all available relief, including monetary damages and injunctive relief, will be filed against you."

697. On August 13, 2025, **COI** rejected **JG's** Claim for Damages with a letter. (See Exhibit 222 Irvine Claim Denial Letter Aug 13.pdf)

698. On August 20, 2025, **JG** sent an email to **Mayor Larry Agran** and **City Manager Sean Crumby** noting First Amendment harms. (See Exhibit 223 Gmail - Agran and Crumby No Response.pdf)

699. By August 22, 2025, **Mayor Agran** and **City Manager Crumby** did not answer the email about these concerns.

700. On August 14, 2025, **IAT/Harco** sent a 3rd bond claim denial letter. (See Exhibit 208 IAT Harco Door Trim Bond Claim Denial.pdf)

701. On August 21, 2025, **JG** sent an email to the HOA General Manager of Portola Springs, Ellis Calvillo. (See Exhibit 224 Gmail - HOA Builder at Olivewood.pdf)

702. Mr. Calvillo stated that the legal name for the builder on record according to the HOA is "**The New Home Company Southern California LLC**."

703. Also on August 22, 2025, **The New Home Company Inc** issued its 4th cease-and-desist letter. (See Exhibit 225 Cease and Desist 4.pdf)

704.    The letter states that "TNHC reserves the right to pursue all appropriate corrective actions, including injunctive relief, restraining orders, and both civil and criminal penalties."

705.    On August 22, 2025, **Tokio Marine/PIC** sent a Department of Insurance Response Letter. (See Exhibit 226 Tokio Marine PIIC CDI Response.pdf)

706.    On August 25, 2025, **COI** issued its second cease-and-desist letter to **JG**. (See Exhibit 227 COI Cease and Desist 2.pdf)

707.    This letter claims that **JG's** "behavior is disruptive and threatening."

708.    This letter emphasizes that the **City Attorneys Sanders** and **Melching** "will transmit public comments and questions to the relevant City parties as necessary and appropriate."

709.    This letter also states that **JG** "may correspond with myself and Attorney Melching via email only."

710.    This letter also states that "Failure to comply with these directives will leave us with no choice but to consider further action to protect the City's interests, including instituting legal action against you."

711.    Also on August 25, 2025, **JG** sent another email to **Mayor Agran** and **City Manager Crumby**, this time about this second cease-and-desist letter. (See Exhibit 228 Gmail - Agran and Crumby No Response 2.pdf)

712.    They also did not respond to this email, as of September 9, 2025.

713.    On August 28, **COI** responded to a California Public Records Act (CPRA) request for documents they used to prove ownership for the owner-builder exemption. (See Exhibit 229 Olivewood proof of ownership.pdf)

714.    These documents point to an entity called "New Home Company".

715.    On October 1, 2025, **JG** received a response to a CPRA request for documents showing authority for signatories of TNHC. (See Exhibit 248 TNHC Employee Noting Owner Builder.pdf)

716.    In a document dated October 10, 2023, TNHC employee Diana Asmar simply states, "Please note, New Home Company will be pulling permits as owner/builder."

717.    On October 1, 2025 and March 5, 2026, **JG** received correspondence about a CPRA request he made on September 8, 2025 regarding internal communications about measures to "preserve Ms. Pham's safety and wellbeing" due to allegations in the first COI cease and desist letter. (See

Exhibit 249 Sanders Response to CPRA Request for Pham Safety.pdf

andExhibit 286 March 5 CPRA Production.pdf)

718.    The provided responses provided none of the requested information.

719.    Permits granted to entities linked to Lennar Corporation show an entity named "LENNAR HOMES OF CALIFORNIA" receiving owner-builder permits. (See Exhibit 268 Lennar Home Permits.pdf)

720.    Permits 00927971-RBP, 00927971-RBP, 00922243-RBP, 00925046-RBP, 00927322-RBP, 00927322-RBP show a signatory under the "OWNER-BUILDER DECLARATION" section, but show no CSLB license number under the "LICENSED CONTRACTORS DECLARATION" section.

721.    On October 7, 2025, **JG** received a CPRA response about his August 1, 2025, and August 3, 2025 from Rutan & Tucker lawyer Shawna McKee. (See Exhibit 272 Police Call CPRA Request Oct 7.pdf)

722.    The letter is in response to a CPRA request for information  related to the information surrounding the phone call made to 720- 593-1548, my number, at 8:47pm on July 30, 2025."

723.    The first batch of documents contained nothing related to the phone call. (See Exhibit 273 Irvine Production File 1.pdf)

724.    The contents of the "first batch" of letters are largely simply correspondence with and documents from **JG**.

725.    The letter states, "A second batch of non-exempt public records responsive to your request will be provided on or around December 8, 2025."

726.    December 8, 2025 is more than 4 months from the original CPRA requests.

FF. Irvine Building & Safety Department

727.    **Jesse Cardoza** is the CBO of COI Building and Safety Department as of September 9, 2025.

728.    **Mr. Cardoza** has been in this position since 2021.

729.    **Mr. Cardoza** provides engineering opinions in his role as CBO.

730.    **Mr. Cardoza** uses his engineering expertise in his role as CBO.

731.    **Mr. Cardoza** uses his engineering experience in his role as CBO.

732.    No employee or agent of **COI** has submitted a Notice of Department Designation form to the California BPELSG naming **Mr. Cardoza** as a being in responsible charge as stipulated in the form.

733.    **Mr. Cardoza** has listed "Jesse Cardoza, PE, CASp" in his email signature for the email jcardoza@cityofirvine.org in the past.

734.    **Mr. Cardoza** has listed "Jesse Cardoza, PE, CASp" in his email signature for the email jcardoza@cityofirvine.org frequently in the past.

735.    **Mr. Cardoza's** email response to comment on the handrail code differs materially from **California Building Standard Commission Executive Director Stoyan Bumbalov's** guidance. (See Exhibit 230 Gmail - Cardoza Contradicting Bumbalov.pdf)

736.    California has not formally adopted International Building Code A101.1.

737.    However, the provision remains a widely recognized international benchmark for the ethical and professional qualifications of code enforcement personnel.

738.    **Mr. Cardoza's** LinkedIn and resume shows less than 10 years of building department experience before ascending for the CBO position. (See Exhibit 231 Jesse Cardoza Resume and LinkedIn.pdf)

739.    The documents only show 9 years and 1 month of experience.

740.    **Mr. Cardoza's** total professional work experience relating to the role is less than the stated minimum of 10 years stated by International Building Code A101.1. (See Exhibit 232 A101.1.pdf)

741.    **Mr. Cardoza's** LinkedIn and resume show 5 years and 10 months as a Senior Plan Check Engineer.

742.    In the above role, **Mr. Cardoza's** resume only lists these supervisory activities: 1) Provide leadership and technical oversight to junior staff with respect to customer service, department policy, code interpretation, and plan review procedures. 2) Provide assistance with the supervision of plan check staff and activities, including budget development/monitoring and employee performance assessment.

GG. Irvine's History with Freedom of Speech

743.    In 2017, COI settled with ICNV for a sum of around $350,000. (See Exhibit 258 City Pays ICNV $350,000 To Settle Free Speech Case - Irvine Community News and Views.pdf)

744.    ICNV alleged that "Beginning in early 2015, ICNV publisher Franklin J. Lunding sought to place copies of ICNV in the news racks located in the Irvine City Hall lobby, alongside other free newspapers allowed there, including the Irvine World News, a publication of the Orange County Register, which is friendly to the politicians at City Hall. In an act of hostility, the City repeatedly refused to allow display of ICNV, asserting ICNV was a "political related publication."

745.    On December 9, 2020, City of Irvine released a press release related to the case *West v. Shea*, a lawsuit involving former COI Mayor Christina Shea. (See Exhibit 261 Statement Regarding West v. Shea Matter | City of Irvine.pdf and Exhibit 257 West v Shea.pdf)

746.    This case involved Ms. Shea deleting and blocking content and users related to the BLM movement on her private Facebook account.

747.    COI ended up settling for approximately $40,000 before the case reached discovery.

748.    On April 21, 2022, "Voice of OC" published an article titled "ACLU Calls Out Irvine City Attorney For Silencing Public Commenter." (See Exhibit 260 ACLU Calls Out Irvine City Attorney For Silencing Public Commenter.pdf)

749.    This article writes that "At the March 8 meeting, Fox called into the meeting and began discussing a 2007 lawsuit that listed Costa Mesa resident Michael Carroll in a fraud case where both he and the Sage Credit Company settled for $65,000.  It's unclear the person listed in the fraud case is the same Mike Carroll who sits on the Irvine City Council. Carroll and Melching didn't respond to questions about the issue" and that "Melching

114

then muted the speaker, saying it was not within the topics allowed for

public comment since it wasn't in the control of the city."

**HH. Irvine Police Report**

750.    On October 27, 2025, **JG** received police reports related to case

number 25-08420, 10 days after his specific request for it. (See Exhibit 275

Police Report.pdf)

751.  On October 16, 2025, **JG** called the IPD general number and confirmed that

the only case related to him is a case with a number 25-08420.

752.  The report with number IPD-25-08420-001 lists "757 - Olague, Emma" as

the "Reporting Officer" and an "Entered Date" of "7/30/2025 8:53:27 PM."

Officer Emma Olague is female.

753.  The report lists "671 - Rakic, Miljan" as the FTO. Officer Miljan Rakic is

male.

754.  This report lists 3 parties, each with "No" under "Party Confidential."

755.  The Party marked "O1" has their information redacted throughout the

document.

756.  On information and belief, this Party is **Trinity Pham**.

115

757. The Party marked "O2" has their information redacted.

758. On information and belief, this Party is **Kalvin Alvarez**.

759. The Party marked "O3" does not have their information redacted throughout the document.

760. This Party is **Jeffrey Gu**, the Plaintiff of this case.

761. The "Narrative" section of this report recounts that

On Tuesday, 7/30/2025 at approximately 1820 hours, Officer M. Rakic (Badge No. 671) and I (Officer E. Olague, Badge No. 757) were dispatched to City Hall, 1 City Center Plaza, in the City of Irvine, County of Orange, for a criminal threat investigation. A caller allegedly made threatening phone calls to the Office of Counselman William GO.

At the time of the call for service, the reporting party [Pham] was no longer working so we responded to her residence to speak with her about this incident. The following is a summary of our conversation with [Pham]

[Pham] is the Supervising Principal Council Executive Assistant of City Council Member William GO and was working today when at approximately 1600 hours, she received a telephone call from Jeffrey GU. [Pham] explained GU emailed City Council Member GO a couple weeks ago to receive help regarding a permit for Toll Brother's. Toll Brother's is a home builder that creates luxury homes.

762. On information and belief, the individual speaking in this section with **Officer Olague** was **Trinity Pham**.

116

763. **Ms. Pham** stated to **Officer Olague** that her job title is "Supervising

Principal Council Executive Assistant."

764. **Ms. Pham** did not state to **Officer Olague** that her job title is "Marketing

Communications Manager."

765. Ms. Pham states that her position is "Marketing Communications Manager"

on LinkedIn, as recounted in ¶¶ 661.

766. The email being discussed is an email chain from around late July. (See

Exhibit 243 Gmail - Cardoza Toll Brothers Permit.pdf)

767. **JG** was not asking for help about expediting permits in the email.

768. **JG** pointed out permitting irregularities to **Jesse Cardoza** in the email chain.

769. In the same interaction, the **Officer Olague** writes the following:

> While speaking with GU, _____ stated GU seemed frustrated that he was
> not getting the answer he wanted and was randomly "spouting" things off.
> alleged that GU made two threats during the conversation. Gu said "I'm
> going to expose the city" and "I'm going to come after the city council."
> _____ said GU did not elaborate on either of these statements. _____
> also informed us that GU told her, "You should kill yourself." said that she
> was not fearful GU was going to come after her and he was just "rambling"
> when the statements came out.

117

770. **Officer Olague** also writes that "_____ informed us that she notified the Chief of Staff" and that "I was unable to determine that a criminal threat occurred."

771. **JG** never made statements telling **Trinity Pham** to "kill herself."

772. On information and belief, the **Chief of Staff** being referred to is **Kalvin Alvarez**.

773. **Officer Olague** next spoke to this **Chief of Staff** and recounts the following:

_____was familiar with GU and explained GU had been contacting Counselman [sic] GO's office regarding his frustration over new building permits. _____ said GU was initially following up with these permits via email. He continued to explain GU contacted the City of Irvine for permits for 2 different locations. The first location was 129 Oakstone, Irvine and the second location was 156 Creation, Irvine. GU requested that permitting related to a stair railing be expedited at 129 Oakstone. Several weeks later he again contacted the office, now requesting that "new build" permits be expedited [sic] at 156 Creation.

GU called the office approximately 2 to 3 weeks ago and told _____ that the council office "needed to do their job." GU told_____ multiple times that he was going to release sensitive information about the City of Irvine. _____said GU stated, "I'm gonna release information and that's a bomb you don't want to deal with." _____clarified that "a bomb you don't want to deal with" meant GU was going to release potentially damning information about the city. _____said this was a "political threat" and he did not believe any violence was going to occur. _____ also stated that GU had previously contacted other councilmembers allegedly in hopes of expediting a permitting process.

774. The previous paragraph includes the statement that '_____said this was a "political threat" and he did not believe any violence was going to occur.'

775. The house and stairwell at 129 Oakstone was already completed at the time of JG's conversation with Mr. Alvarez.

776. The stairwell at 129 Oakstone does not have its own construction permit with the **City of Irvine Building & Safety Department**.

777. There was no permit or stair railing to be expedited at 129 Oakstone.

778. **JG** did email CBO **Jesse Cardoza** about handrail building code violations at 129 Oakstone. (See Exhibit 230 Gmail - Cardoza Contradicting Bumbalov.pdf)

779. **JG** was and is not a contractor or employee of **Toll Brothers, Inc.** or of its affiliates.

780. **JG** had no reason to request the expediting of a construction permit at 156 Creation.

781. **JG** never made statements referencing a bomb to this **Chief of Staff**.

782. Of all the council members, **JG** only ever contacted Councilman **William Go** directly about these permits or building code violations.

783. **JG** only ever cc'd all the councilmembers in no more than 8 emails, and the emails were never about expediting permits. (See Exhibit 277 Councilmember Emails.pdf)

784. **Officer Olague** further recounts in her report, after the conversations with both city employees, that

> Using departmental resources, I discovered that GU did not have a known active Irvine address and his last address on record was in Denver, CO. GU also did not hold a California identification card or drivers license. I located a phone number for GU, which had a Colorado area code. Additionally, I did not locate any registered weapons.

785. **Officer Olague** further recounts that

> GU admitted he called the Council Member's office in an attempt to speak to GO. He alleged that the reason for the phone call was to discuss information he found related to the permitting process. I asked GU about the threatening statements but he claimed he had "no memory" of the comments made. I advised him of the allegation's [sic] made and he again said he had no memory of the comments. At the end of the brief conversation, I requested GU to remain professional when contacting any city employees. GU stated, "thank you for the intimidation officer." I concluded the conversation.

786. **Officer Olague** further writes that

> We drove to to [sic] the two addresses provided by 129 Oakstone appeared to be vacant as there was no furniture or visible activity inside. We then drove to the second location 156 Creation and discovered the house is still under construction.

120

Based on statements made by all parties, I determined GU contacted the office of City Council Member William GO on several occasions related to various permitting requests. He was not happy with the responses and called the office to follow up and express his frustrations. GU was irate and stated he was going to release information about the City of Irvine. There is no evidence or statements to suggest that GU made a threat of violence against the city, the Counselman [sic] or any of his staff.

787. She concludes the narrative with the statement that "No crime could be substantiated. I notified IPD Intel via email and request this incident report be forwarded to IPD Investigations for appropriate disposition."

788. The next day, on July 31, 2025, **Officer Olague** entered a report for Report Number OR-IPD-25-08420-001, which has an "Entered Date" of "7/31/2025 6:14:13 PM." (See Exhibit 275 Police Report.pdf)

789. July 29, 2025 was a Tuesday.

790. July 30, 2025 was a Wednesday.

791. July 31, 2025 was a Thursday.

792. The report starts off by stating that

On Tuesday, 7/30/2025 at approximately 1630 hours, Officer M. Rakic (Badge No. 671) and I (Officer E. Olague, Badge No. 757) were notified that Jefferey [sic] GU contacted Counselman [sic] William GO'S office again today.

Prior to this call for service, I was informed the City of Irvine's Human Resources (HR) department initiated a cease and desist letter which will later be served to GU.

793. **Officer Olague** erroneously writes that this new incident was on July 30, 2025 when it was actually on July 31, 2025.

794. **Officer Olague** erroneously writes that this incident occurred on a Tuesday, when it actually occurred on a Thursday.

795. **Officer Olague** does not identify the individual who initially notified her and Officer Rakic about JG's supposed contact.

796. **Officer Olague** does not identify the individual who informed her about the cease and desist letter.

797. **COI** HR Department initiated the drafting of the cease and desist letter sent to **JG** on August 5, 2025.

798. On information and belief, **Officer Olague** again spoke with **Trinity Pham** for this report.

799. **Officer Olague** summarizes the conversation:

_____ was notified by HR receptionists that GU contacted HR 3 to 4 times today. _____ did not speak with GU but he was attempting to get in contact with her through the HR receptionist. GU also asked the HR receptionist for _____ contact information several times. It should be

122

noted that _____ information was not released to GU. _____ said she believed that the city may have blocked GU from calling because she did not receive any telephone calls from him today. Additionally, I instructed_____ not to engage in conversation with GU and to document any further interaction with him. I informed_____ a cease and desist letter was initiated through the City of Irvine HR department. I also provided with _____ Detective Smith and Detective Belvin's contact information. She did not provide any additional information, so I concluded the conversation.

800. **Officer Olague** discusses with **Ms. Pham** phone conversations **JG** recounts in ¶¶ 658-661.

801. **JG called** HR on July 31, 2025 in order to learn **Ms. Pham's** full name and title because he believed she initiated the chain of events that led to the police phone call he received the night earlier, recounted in ¶¶ 645-657.

802. **Ms**. **Pham's** full name and title was all the information he learned about **Ms. Pham** from HR that day.

803. If **JG** wanted to speak with somebody in **Councilman Go's** office, he could have called the office directly.

804. The public number listed for COI Councilmembers is 949-724-6233.

805. **JG** has called this number in the past. (See Exhibit 219 Irvine Call Log.pdf)

123

806. **JG** indeed used this number to call **Councilman Go's** office on July 30, 2025, when he ended up speaking with **Ms. Pham**.

807. On information and belief, **COI** did not have a call block initiated on any of **JG's** phone numbers at the time of this police report.

808. The beginning of **Officer Olague's** report states that "Jefferey GU contacted Counselman [sic] William GO'S office again today."

809. It also states that **Ms. Pham** "she believed that the city may have blocked GU from calling because she did not receive any telephone calls from him today."

810. Nobody from **William Go's** office received a phone call from **JG** on July 31, 2025.

811. **Ms. Olague** provided **Ms. Pham** with **Detective Smith** and **Blevin's** contact information towards the end of their call.

812. The cease and desist letter from Jessica Sanders dated August 5, 2025 lists the email jmelching@rutan.com at the top. (See Exhibit 217 COI Cease and Desist.pdf)

813. The email jmelching@rutan.com belongs to **Jeffrey Melching**.

124

814. The letter states that "It has become necessary for the City and the Irvine Police Department (IPD) to take precautionary matters [sic] to preserve Ms. Pham's safety and wellbeing."

815. As of August 5, 2025, the only case number involving **JG** was IPD-25-08420. (See Exhibit 275 Police Report.pdf)

816. None of the reports under case number IPD-25-08420 mention any "precautionary measures" taken for **Ms. Pham's** safety.

817. No additional reports were opened for case number IPD-25-08420, nor were additional cases made for **JG** after July 31, 2025.

818. On information and belief, the "precautionary matters [sic]" cited in the cease and desist letter were never actually coordinated with **IPD**.

819. On information and belief, IPD has no record of taking "precautionary matters [sic] to preserve Ms. Pham's safety and wellbeing."

820. On information and belief, **Officer Olague** took no "precautionary matters [sic] to preserve Ms. Pham's safety and wellbeing" after speaking with her on July 31, 2025.

821. On information and belief, no **IPD** officer took precautionary measures to preserve Ms. Pham's safety and wellbeing after July 31, 2025.

125

822.  On October 28 and 29, JG called COI HR Department in an attempt to obtain information about the initiator of the cease and desist letter and contacts with IPD. (See Exhibit 279 COI HR Contacts.pdf)

823.  No employee in HR provided the said information.

824.  On October 30, 2025, **JG** attempted to call **Officer Olague's** extension (2266) at 949-724-7212 after being provided it by **IPD** personnel.

825.  The system provided the message "I do not recognize that as a valid entry" each time he tried to enter it.

826.  **JG** confirmed with **IPD** personnel that this extension was not working.

827.  **JG** emailed **Officer Olague** asking for this same HR initiator information. (See Exhibit 280 Olague Emails.pdf).

828.  She did not ultimately provide it as of November 11, 2025.

829.  **JG** emailed **Detective Blevins** for details about the report. (See Exhibit 282 Blevins Emails.pdf)

830.  He did not ultimately provide this information as of November 11, 2025.

831.  **JG** emailed **Officer Rakic** for details about the report. (See Exhibit 292 Rakic Emails.pdf)

832.  He did not ultimately provide this information as of November 11, 2025.

833. On November 3, 2025, **JG** received a CPRA response letter from **Ms. Sanders** on behalf of **COI**, in response to his request for information on the HR initiator. (See Exhibit 281 HR Info Denial.pdf)

834. The letter states the following:

> This office has now determined that your request seeks certain records that are exempt from disclosure, including pursuant to Government Code sections 7922.000, 7923.600, 7927.705 (attorney-client and work product privileges). (Gov. Code, §§ 7922.000, 7923.600; 7927.705; City of San Jose v. Superior Court (1999) 74 Cal.App.4th 1008.) The City did not identify any non- exempt public records responsive to your request.

## II. Irvine's Record Retention

835. Both police report narratives are preceded by text that states that

> The following is a summary account of the events which occurred during this call for service. The contacts were recorded on my department issued body-worn camera (BWC). For further detail, refer to the video footage recorded on my AXON BWC.

(See Exhibit 275 Police Report.pdf)

836. The Claim for Damages, includes points that reference the phone call: "3. Retaliatory police call on 7/30 defamed and intimidated our son following protected speech" and "3. City Council authorized or permitted misuse of police resources against a whistleblower." (See Exhibit 220 Claim for Damages Full.pdf)

127

837. On August 3, 2025, **JG** submitted separate CPRA requests to the Irvine Police Department and COI. (See Exhibit 276 CPRA Requests.pdf)

838. Item number 8 requested "Any recording or notes produced from the officer's phone call itself."

839. Neither organization provided the bodycam footage from the call in these CPRA requests, nor the police report associated with it.

840. On October 27, 2025, **JG** received an email from the **IPD** stating that "Your request for body-worn camera (BWC) footage has been denied. BWC footage is not released unless it is subpoenaed in an active court case." (See Exhibit 278 Gmail - IPD BWC REQUEST.pdf)

841. **COI** states in their Reply that "Plaintiff also fails to explain why he claims a concern bodycam footage would be lost even if any could exist" and "...bodycam footage would only be preserved for 60 days, (Cal. Penal Code, § 832.18(b)(5)(A)), a period of time that elapsed after the telephone call before Plaintiff filed his Complaint in this case." (ECF. No. 108 at p.4)

842. On April 22, 2026 at 11:24am, **JG** called the **IPD** Records Unit and spoke with an employee named Jamie.

843. Jamie stated that bodycam footage is retained for between 2 years and permanently, depending on the case.

**JJ. Risewell's Unmarked Vehicles**

844.    **JG** took photos of pickup trucks owned by **Risewell Homes Inc**, TNHC Realty and Construction Inc, and/or The New Home Company Southern California LLC on January 31, February 3, February 9, and February 27, 2026. (See Exhibit 283 Unmarked vehicles photos 2026.pdf)

845.    These photos were taken near the corner of Brimwood and Mistwater, Irvine, CA 92618.

846.    Brimwood and Mistwater, throughout January-March 2026, was openly accessible to all individuals accessing the community.

847.    On January 31, February 3, February 9, and February 27, 2026, JG received no warnings not to appear on the street to take these photos.

848.    None of the pickup trucks in the photos have a CSLB license number or company name on them.

849.    **JG** also took pictures on March 3, 2026. (See Exhibit 284 Unmarked vehicles photos March 3.pdf)

850.    The photos were also taken near the corner of Brimwood and Mistwater.

851.    One photo shows a man with a black shirt and black cloth over his head.

852.    The man does not have a uniform that shows a company name.

853. The man does not have a uniform that shows "Risewell Homes."

854. The man is not wearing a traffic safety vest.

855. Another photo shows a man unloading a box off a white pickup truck.

856. He was working on the lot for 212 Mistwater.

857. The pickup truck does not have a CSLB license number or company name on it.

858. Visible in the photo is an orange traffic cone.

859. The photo was taken from Mistwater.

860. The photo was not taken from within the visible fencing.

861. When an employee with sunglasses and a white polo shirt with the name "Risewell Homes" on it appeared next to one pickup truck, **JG** asked what company he worked for.

862. The individual was a construction supervisor or manager with **Risewell Homes Inc**, **TNHC Realty and Construction Inc**, and/or **The New Home Company Southern California LLC**.

863. The individual did not answer **JG's** question.

864. The individual threatened to call the police.

865. **JG** attempted to disengage and ride away on his ebike.

130

866.    After a few moments, another man in a white polo shirt started to approach and engage **JG**.

867.    The man later identified himself as an inspector for **COI**.

868.    On March 12, 2026, **Risewell Homes Inc.** via PHLK sent **JG** another cease and desist letter, claiming that **JG** was found "trespassing and harassing a Risewell employee working in the Olivewood Community." (See Exhibit 285 PHLK March 2026 Cease and Desist.pdf)

869.    It also states that "you are hereby placed on notice that any continued trespass and harassment of Risewell or Risewell employees may result in immediate legal action without further warning."

**KK. Toll Brothers Entities' Litigation Conduct**

870.  In their original verified complaint for *Toll Brothers Inc. et al v. Gu et al.*, Defendants **Toll Brothers Inc., Toll Southwest LLC,** and **TB Proprietary Corp** claim that "There is a good faith basis to believe that damages exceed the minimum jurisdictional threshold of $75,000." (*Toll Brothers Inc. et al v. Gu et al.*, No. 1:25-cv-02884, ECF No. 1, at p. 5  (D. Colo. Sept. 12, 2025).)

871.  In their more recent motion for default judgment in that case, they ask that the court "Order that Nominal Defendants be required to pay Plaintiffs' costs of

this action in the amount of $5,588.55." (*Toll Brothers Inc. et al v. Gu et al.*, No. 1:25-cv-02884, ECF No. 179, at p. 20  (D. Colo. Sept. 12, 2025).)

**LL. BHA's Litigation Conduct**

872.    The original complaint for *Toll Brothers Inc. et al v. Gu et al.* includes a narrative supplied by BHA, which states that

> …on August 5, 2025, Yang Gu, also known as Ge Yang, who is believed to related to Defendant Gu, attempted to defeat the key fob security features which permit access to BHA's corporate headquarters in Anaheim Hills, California, in order to gain access to locked offices.

(*Toll Brothers Inc. et al v. Gu et al.*, No. 1:25-cv-02884, ECF No. 1, at p. 11  (D. Colo. Sept. 12, 2025).)

873.    Plaintiff's brother's name has only ever been Yang Gu.

874.    In their August 11, 2025 cease and desist letter, BHA addresses it to "Jeffrey Gu and Yang Gu." (See Exhibit 221 BHA Cease and Desist.pdf)

875.    In the same letter, BHA states that

> Most recently, on August 5, 2025, Mr. Yang Gu attempted to enter the Company's corporate headquarters located in Anaheim Hills, California, by attempting to defeat the key fob security features. Video footage depicts Yang Gu parking more than 300 feet from the entrance of BHA's headquarters, approaching the front door, attempting to access the facility, then quickly returning to his vehicle when unsuccessful. Of note, Mr. Gu was wearing a heavy coat with a hoodie cap, at approximately 3:00 p.m. on a 90 degree Fahrenheit day. The vehicle Yang Gu was driving was consistent with the vehicle he drove to the April 22, 2025 site inspection.

132

876. In their more recent motion to dismiss, they assert that

> On August 5, 2025, [Jeffrey Gu] attempted to break into BHA's corporate offices in Anaheim Hills. Security cameras captured Gu dressed in a hoodie and wearing all black on a 90-degree day outside the BHA office.

and that "BHA reported the matter to the police. (Barana Decl., ¶ 7)." (ECF No. 76-1 at p. 6)

877.    Plaintiff called the Anaheim Police Department on December 23, 2025 at 7:55 am Pacific Time for 8 minutes and spoke to Dispatcher #2819. Plaintiff asked for a CAD number involving Plaintiff or his brother around the address 5415 La Palma Ave in Anaheim—BHA's national corporate headquarters—between August 4-10, 2025. The dispatcher said there was no police report associated with that address and these two individuals for that timeframe.

878.    Jeffrey Gu (Plaintiff) and his brother Yang Gu are two completely different people.

**MM. California Police Standards**

879. California POST maintains a guide on "Investigative Report Writing." (See

Exhibit 287 POST Investigative Report Writing.pdf)

133

## V. CAUSES OF ACTION

## COUNT 1: DECLARATORY JUDGEMENT (Cal. Bus. & Prof. Code § 7031(b) / 28 U.S.C. § 2201)

Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

*Against City of Irvine*

**Real Parties in Interest (Fed. R. Civ. P. 19)**

- Risewell Homes Inc.

- TNHC Realty and Construction Inc.

- The New Home Company Southern California LLC

Pursuant to 28 U.S.C. § 2201, Plaintiff seeks a declaration that the **COI** failed to prevent or correct violations of California Business and Professions Code § 7031(b) by approving and accepting permits submitted by entities that misstated their legal status on those permits and related declarations, thereby undermining the statute's consumer-protection objectives.

**The New Home Company Inc.**, **The New Home Company Southern California LLC**, and **TNHC Realty & Construction Inc.** are real parties in interest within the meaning of Fed. R. Civ. P. 19 because the requested declarations directly affect their rights and obligations under California contractor-licensing law. An actual, present controversy exists between Plaintiff and **COI** regarding **COI's** treatment of

134

permit designations in connection with residential construction of the property owned by Plaintiff's family.

**COI** permit records identify **TNHC Realty & Construction Inc.** as the "owner-builder" for the project, even though the deeded owner at the time was **The New Home Company Southern California LLC**, an unlicensed entity. Despite this, this unlicensed LLC is named as the "Builder" in the Builder's Warranty Portal and in HOA records, and acted as the builder and signatory in the Purchase Agreement. (See ¶¶ 507, 520, 525, 528, 542, 702.) On information and belief, **COI** knew or should have known that the deeded owner and builder was unlicensed and yet nonetheless permitted **TNHC Realty & Construction Inc.** as the "owner-builder." (See ¶¶ 617-637, 670-680.)

This is just a further example of **COI's** longstanding practice of permitting developers to misrepresent their legal status on building permits and public records. As far back as 2003, **COI** permitted the bankrupt predecessor company to **TNHC**, "John Laing Homes", which was more formally known as **WL Homes LLC**, to apply for owner-builder permits despite the name "John Laing Homes" not being an FBN in Orange County and "John Laing Homes" not being a registered business in California. (See ¶¶ 459-460.) Like **TNHC's** use of **TNHC Realty and Construction Inc.**, this predecessor company used an entity, **JLH**

135

**Realty and Construction Inc.,** to hold a CSLB license while leveraging its relationship with **COI** to avoid contractor licensing laws and obscure construction liability from consumers by signing contracts via a different entity. (See ¶¶ 455, 628.) As early as 2000, a grant deed from the Orange County Recorder identifies "W.L. Homes, LLC, dba John Laing Homes," even though no fictitious business name statement for "John Laing Homes" was ever filed in Orange County. (See ¶¶ 460-461.) By 2004, even that limited disclosure disappeared, and permits and deeds began listing only "W.L. Homes, LLC"—while the builder continued to receive owner-builder permits under the unregistered "John Laing Homes" name with the **COI's** knowledge and acquiescence. (See ¶¶ 459, 462.) Plaintiff points out this sordid corporate history in order to clarify that there appears to exist a longstanding relationship between **COI** and **TNHC** leadership to obscure builder identity and liability.

**COI** has more recently continued this collusive and/or lax permitting regime with **Toll Brothers**. On July 24, 2025, Chief Building Official **Jesse Cardoza** responded to Plaintiff's inquiries concerning multiple **Toll Brothers** permits which omitted any contractor-license number. **Mr. Cardoza** characterized the missing information as a "clerical error," asserting that license data had been "validated" but "not reflected on the permit." In other permits, "Toll Brothers Mortgage

Company" is listed as the contractor, identifying CSLB License No. 683543. That license, however, belongs to **Toll Bros., Inc.**, a separate entity. When Plaintiff brought this discrepancy to **Mr. Cardoza's** attention, he replied that **COI** "does not specifically track the relative portion of licensed contractors that are also mortgage companies" and declined to explain this facial case of license lending. (See ¶¶ 610-616.) By continuing to approve permits that misidentify the contracting entity or display another corporate name, **COI** has enabled the same pattern of permitting irregularities previously observed with **TNHC**, demonstrating that **COI's** permitting process fails to detect or correct violations of § 7031 and perpetuates public-record inaccuracies affecting homeowner rights and consumer protection.

**COI's** current tolerance of licensing irregularities is not limited to **TNHC** and **Toll Brothers**. Permit records also show that the **COI** granted owner-builder permits to entities linked to **Lennar Corporation** ("**Lennar**"), a publicly traded national homebuilder that constructs far more than four residential structures per year. Some of these permits identify "Lennar Homes of California" as the owner-builder, even though **Lennar** routinely develops and sells numerous housing tracts throughout Orange County and California, and the majority of these permits list no CSLB license number. (See ¶¶ 719-720.) Under California Business and

137

Professions Code § 7044, the "owner-builder" exemption from contractor-licensing requirements applies only when the owner (1) personally performs the work or hires licensed subcontractors, *and* (2) for single-family residential structures, constructs no more than four such structures for sale in a calendar year unless contracting through a licensed general contractor. By definition, **Lennar's** large-scale residential operations exceed this statutory threshold and therefore cannot lawfully claim the owner-builder exemption. **COI's** approval of owner-builder permits for a **Lennar** affiliate thus demonstrates a continuing failure to evaluate applicant eligibility under § 7044 and to ensure compliance with California's contractor-licensing framework. This oversight pattern—spanning multiple national builders—illustrates that **COI** has allowed systemic circumvention of licensing safeguards designed to protect consumers and maintain transparency in the construction permitting process.

Plaintiff acknowledges that the deeded owner of the subject property is a family trust, not Plaintiff individually, and therefore Plaintiff does not seek restitution or disgorgement under Cal. Bus. & Prof. Code § 7031(b). Instead, Plaintiff seeks declaratory relief because **COI's** concealment of a permit discrepancy directly injured him by obstructing his ability to petition the government, chilling his speech, and depriving him of truthful public records concerning his family's home.

138

**COI's** ongoing refusal to acknowledge or correct this discrepancy creates a live controversy: it obscures statutory violations under § 7031(b), prevents accountability for unlicensed contracting, and impairs Plaintiff's ability to pursue redress and rely on accurate public records regarding the safety and legality of the residence. The requested declarations further bear on the scope of unlawful activity **COI** sought to conceal, which is relevant to assessing punitive damages in Plaintiff's related civil-rights claims.

**Requested Declarations**

1. **Unlicensed Builder. The New Home Company Southern California LLC** acted as a "contractor" within the meaning of Cal. Bus. & Prof. Code § 7026 in connection with the construction of the property at 129 Oakstone without holding a valid contractor's license.  (See ¶¶ 507, 521, 525, 528, 542, 702.)

2. **Owner-Builder Misdesignation. COI's** approval of **TNHC Realty & Construction Inc.** as "owner-builder" on permits and declarations for 129 Oakstone was inaccurate and misleading because that entity was not the deeded owner. Such designation does not shield the deeded owner, **The New Home Company Southern California LLC**, from the requirements or penalties of § 7031(b). (See ¶¶ 617-625, 670-680.)

139

3. **Public-Record Reliance. COI's** permit records cannot be relied upon to demonstrate licensing compliance or to shield **TNHC** entities from liability under § 7031(b). (See ¶¶ 617-625, 670-680.)

4. **Performance Definition.** For purposes of § 7031(b), contractual warranty obligations owed by **The New Home Company Southern California LLC** and related entities constitute "performance," and performance ceases only upon expiration of the warranty period or completion of warranty work. The limitations period for actions under § 7031(b) thus runs from that date. (See ¶¶ 525, 542, 558.)

5. **Civil-Rights Nexus.** The **COI's** refusal to correct or clarify these discrepancies obstructed Plaintiff's ability to petition and access truthful public information, contributing to the constitutional injuries alleged elsewhere in this Complaint. (See ¶¶ 634-636.)

**COUNT 2: VIOLATION OF 42 U.S.C. § 1983 — FOURTH AMENDMENT (UNREASONABLE SEIZURE / DETENTION)**

Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

*Against City of Irvine, William Go, Trinity Pham, Kalvin Alvarez, and Emma Olague*

140

At all relevant times, Defendant City of Irvine ("**COI**") acted under color of state law through their agents and employees, including **Officer Emma Olague, William Go, Trinity Pham, and Kalvin Alvarez**.

**Constructive Seizure via Show of Authority**

Officer Olague's actions constituted an unreasonable seizure within the meaning of the Fourth Amendment. Although no arrest occurred, the officer initiated and maintained an investigative detention against Plaintiff's person and property without any articulable reasonable suspicion of a crime. (See ¶¶ 784-787.) The officer's own report admits she was formally dispatched at 6:20 pm–approximately 2 hours after the phone call between Ms. Pham and Plaintiff–specifically for a "criminal threat investigation," a high-stakes designation that would lead any reasonable person to believe they were not free to ignore the ensuing state inquiry without legal consequence. (See ¶ 761.)

The report clearly demonstrates that the interaction was not a voluntary, consensual exchange but a show of official authority constituting an unreasonable seizure under the Fourth Amendment. (See ¶ 785.) Officer Olague initiated contact, informed Plaintiff of "allegations," and questioned him regarding purported "threatening statements," thereby conveying that Plaintiff was the subject of a police investigation. A reasonable person in Plaintiff's position would not have felt

141

free to terminate the encounter without risk of escalation. The officer's framing of the call—reciting accusations, demanding explanations, and issuing directives about future conduct—functioned as a coercive assertion of state authority rather than a casual or advisory conversation. Plaintiff's contemporaneous response —"thank you for the intimidation officer"—reflects his perception that the interaction was compelled and intimidating, not voluntary.  (See ¶¶ 655, 785.) In the absence of any warrant, exigent circumstances, or reasonable suspicion of criminal activity, this investigatory detention violated Plaintiff's Fourth Amendment right to be free from unreasonable seizures.

At the time Officer Olague first determined that a criminal threat had not occurred, the investigation should have ceased. Instead, she escalated it by accessing Plaintiff's personal identifying information, checking for firearms registration, contacting him, and driving to two separate private properties — one of which was owned by Platinff's family — despite acknowledging that there was no evidence of criminal conduct or imminent danger after conversations with COI staff. (See ¶¶ 784, 786.)  This conduct transformed baseless employee complaints into a pretextual intelligence-gathering operation, undertaken solely to appease COI's political staff.

Despite Officer Olague's contemporaneous conclusion that "no crime could be substantiated" and that there was "no evidence" of a threat of violence, she intentionally extended the scope of the unreasonable search and seizure by referring Plaintiff's personal information and the political threat narrative to the IPD Investigations and Intelligence units. (See ¶ 787.) This referral, initiated without the requisite criminal predicate or reasonable suspicion, constituted an extrajudicial expansion of state authority designed to maintain a permanent, non-consensual intelligence record of Plaintiff's protected activity and personal intent.

Also relevant is the fact that the reports misidentify the dates of the alleged incidents (listing "Tuesday, July 30, 2025," when the actual events occurred on Wednesday, July 30 and Thursday, July 31, 2025), memorialize defamatory statements Plaintiff never made ("you should kill yourself" and "bomb you don't want to deal with"), and attribute to Plaintiff motives and employment affiliations that are demonstrably false (claiming he sought to expedite Toll Brothers permits despite having no employment with that company). Although Officer Olague was at times summarizing statements made by City employees, her report fails to acknowledge or qualify the obvious unreliability of those statements. If she believed the allegations to be false or unsubstantiated — as her own conclusion that "no crime could be substantiated" implies — she had a duty to say so

143

expressly. Instead, she recorded those claims as though they were credible, omitted any notation of doubt, and distributed the report internally within IPD and COI.

By endorsing and circulating false or unreliable statements as official law-enforcement findings rather than identifying them as baseless, Officer Olague acted with reckless disregard for the truth and deprived Plaintiff of his right to be free from unreasonable governmental intrusion and reputational seizure under the Fourth Amendment. Each of these errors compounds the lack of probable cause and demonstrates that Officer Olague acted with objective unreasonableness and deliberate indifference to the truth.

Accordingly, Officer Olague's conduct — in concert with COI employees Trinity Pham and Kalvin Alvarez — constituted an unreasonable search and seizure under color of state law, in violation of Plaintiff's rights under the Fourth Amendment.

**COI Employee False Statements**

William Go, Trinity Pham and Kalvin Alvarez, acting under color of state law as COI employees, knowingly provided false and misleading statements that triggered and perpetuated Officer Olague's unlawful police investigation. (See ¶¶ 769-775.) These individuals had reason to know their allegations were false or grossly exaggerated, yet each affirmatively relayed them to law enforcement for the purpose of prompting an official response. Their actions foreseeably caused

Officer Olague to initiate an unwarranted investigation, to access Plaintiff's

personal and property information, and to conduct in-person surveillance — all

without probable cause or reasonable suspicion.

At the time of the incident, Ms. Pham identified herself to IPD as the Supervising

Principal Council Executive Assistant to Councilmember William Go. However,

her publicly available professional profile has listed her title as "Marketing

Communications Manager." The discrepancy between her public representation

and her actual City title casts doubt on her credibility and on the accuracy of the

information she provided to IPD.

Go, Pham, and Alvarez's actions and statements were the direct and proximate

cause of the seizure and reputational injury suffered by Plaintiff, rendering them

jointly liable under 42 U.S.C. § 1983 for violating his Fourth Amendment rights.

**Qualified-Immunity Not Applicable**

**Officer Olague, Mr. Go, Ms. Pham, and Mr. Alvarez** are not entitled to

qualified immunity. The conduct at issue were deliberate judgments made in a

situation without danger. **Officer Olague** initiated an unsolicited call—to a

different phone number than the one Plaintiff had used to contact **Councilmember**

**Go's** office— several hours after Plaintiff's lawful communication with that office,

and it was expressly tied to that protected activity. **Officer Olague** identified

145

herself as a member of **IPD**, questioned Plaintiff about alleged statements, and implied that the call seemingly concerned the "safety" of a **COI** employee. Under well-established Fourth-Amendment precedent, including *Terry v. Ohio*, 392 U.S. 1 (1968), and *United States v. Mendenhall*, 446 U.S. 544 (1980), a seizure occurs whenever a reasonable person would believe they are not free to terminate an encounter with law enforcement. Any reasonable officer would know that initiating an investigative contact without reasonable suspicion constitutes a seizure within the meaning of the Fourth Amendment. Because the challenged conduct was deliberate, policy-driven, and undertaken without legal justification, no objectively reasonable officer could have believed it was lawful; qualified immunity therefore does not apply.

By her own account, Officer Olague had already:

1.  Interviewed the reporting individuals, who both confirmed that Plaintiff made no threats of violence and that they were not afraid;

2.  Concluded in her written report that "no crime could be substantiated"; and

3.  Spoken directly with Plaintiff, who was cooperative and non-threatening during a brief phone call.

146

Despite these findings, Officer Olague continued to conduct investigative acts,
including querying Plaintiff's personal and weapons-registration records,
documenting those searches in the report, and proceeding to a residential visit.
Each of these steps occurred after she had explicitly determined there was no
criminal predicate or ongoing threat.

Accordingly, Officer Olague, Mr. Go, Ms. Pham, and Mr. Alvarez are not entitled
to qualified immunity. Their actions were objectively unreasonable in light of
clearly established constitutional standards, and they should remain personally
liable for the resulting deprivation of Plaintiff's rights.

**Municipal Liability**

COI is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978),
because the its actions and those of related City staff were undertaken pursuant to
an official policy, practice, or custom of using law enforcement as a mechanism to
manage, deter, or suppress resident complaints about City operations. Specifically,
the record shows that when City employees are criticized or confronted with
allegations of administrative irregularities, the City's established practice is to
initiate police contact with the resident under the guise of "employee safety," even
in the absence of reasonable suspicion or probable cause.

This policy was manifested in the present case through a coordinated series of actions by multiple City departments. After three City representatives reported non-threatening and wholly administrative communications with Plaintiff, and after Officer Olague expressly determined that "no crime could be substantiated," the City's Human Resources Department nonetheless prepared and issued a cease-and-desist letter invoking "employee safety" and referencing the same incident. The timing and language of that letter demonstrate an institutional custom of escalating non-criminal interactions into law-enforcement matters, thereby converting routine citizen petitions into purported "safety" incidents.

COI's leadership—including its City Attorney's Office, Human Resources Department, and Police Department—failed to implement appropriate training, oversight, or disciplinary mechanisms to prevent such misuse of authority. The pattern of overreaction and coordination between administrative staff and law enforcement reflects deliberate indifference to the constitutional rights of residents who petition or criticize City operations. This failure to train and supervise was the moving force behind the violations of Plaintiff's First and Fourth Amendment rights, resulting in unlawful investigation, reputational harm, and the chilling of protected speech.

Accordingly, Defendant COI is liable under Monell for maintaining and ratifying a policy or custom of employing police intervention as a form of administrative retaliation and for failing to prevent predictable constitutional violations arising from that policy.

**Joint and Several Liability**

By acting in concert and under color of state law, Defendants Go, Pham, Alvarez, and Olague jointly participated in the unlawful seizure and investigation of Plaintiff. Go, Pham, and Alvarez set the events in motion through materially false statements and omissions they knew or should have known would prompt a police response. Officer Olague, in turn, endorsed and disseminated those statements as credible official findings, despite lacking reasonable suspicion, probable cause, or corroboration and despite internally acknowledging that "no crime could be substantiated."

Together, these actions constituted a coordinated course of conduct that unlawfully deprived Plaintiff of his liberty, privacy, and security interests guaranteed by the Fourth Amendment. Each Defendant's conduct was a substantial factor in causing the deprivation, and each is therefore jointly and severally liable under 42 U.S.C. § 1983 for the resulting damages, including emotional distress, reputational harm, and loss of constitutional rights.

149

As a direct and proximate result of Defendants' actions, Plaintiff suffered damages including emotional distress, fear, humiliation, and constitutional injury.

**COUNT 3: VIOLATION OF 42 U.S.C. § 1983 – FIRST AMENDMENT (FREEDOM TO PETITION THE GOVERNMENT)**

Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

*Against City of Irvine, Jessica Sanders, Jeffrey Melching, William Go, Trinity Pham, Kalvin Alvarez, and Emma Olague*

At all relevant times, Defendants **COI, IPD**, **Jessica Sanders**, **Jeffrey Melching**, **William Go**, **Trinity Pham**, **Kalvin Alvarez,** and **Officer Emma Olague** acted under color of state law.

Defendants, acting individually and in concert, deprived Plaintiff of his First Amendment right to petition the government for redress of grievances.

Specifically, Defendants **COI**, **Jessica Sanders**, and **Jeffrey Melching** issued a cease-and-desist letter on August 5, 2025, demanding that Plaintiff "immediately cease all direct contact with **COI** staff and offices," and reaffirmed that directive in a second letter dated August 25, 2025. (See ¶¶ 681–683, 706–710.) These directives chilled, burdened, and effectively prohibited Plaintiff from lawfully communicating with elected officials and public employees about matters

150

involving permitting irregularities and building-code violations in hundreds of homes.

Plaintiff's subsequent outreach to Mayor **Larry Agran** and City Manager **Sean Crumby** was met with silence, evidencing institutional endorsement of this unconstitutional restriction at the highest levels of City government. (See ¶¶ 711–712.) Moreover, when alerted by email to the police phone call of July 30, 2025, every **COI** City Councilmember (**William Go**, **Mike Carroll**, **Melinda Liu**, **Betty Martinez Franco**, and **Kathleen Treseder**), even the attorneys amongst them, stayed silent. (See ¶¶ 689-690.)

The stated justifications for the cease-and-desist orders—including alleged "concerns regarding the safety and wellbeing of City staff" and claims of "repeated calls and attempts to contact Ms. Pham"—were wholly pretextual and unsupported by any credible evidence or their own police report. (See ¶¶ 681–683, 750.) These allegations surfaced only after Plaintiff's protected petitioning activity became politically inconvenient and more systemic than initially believed, demonstrating that the true purpose was to suppress speech and avoid accountability.

In the original cease and desist letter issued by the City, Defendants explicitly stated, "It has become necessary for the City and the Irvine Police Department

151

(IPD) to take precautionary matters to preserve Ms. Pham's safety and wellbeing…

This demand to cease and desist is sent to you to both preserve Ms. Pham's safety and prevent further disruption to City operations." (See ¶¶ 681–683.) This admission shows Defendants' conscious decision to invoke police authority not in response to any crime or threat but as a precautionary measure against Plaintiff's lawful communications with government officials. In effect, Defendants repurposed the **IPD** and **Officer Emma Olague** as a private security detail for **COI** staff, weaponizing police power to intimidate a resident engaged in constitutionally protected petitioning.

The unsolicited phone call from **IPD** Officer Olague following Plaintiff's contact with **Councilmember Go's** office via **Ms. Pham** was a further "show of authority," functionally equivalent to a Terry stop conducted by telephone. Such a seizure required reasonable suspicion; none existed. The call served only to intimidate and retaliate against Plaintiff for protected speech. (See ¶¶ 645-657, 750.)

Defendants' actions and omissions were undertaken with the intent and effect of silencing Plaintiff's protected expression and excluding him from the democratic process. These acts included, but were not limited to, restricting communication

with **COI** officials, obstructing public-records requests, and discouraging formal complaints—all activities at the core of the First Amendment's Petition Clause.

**COI Employee Statements and First Amendment Retaliation**

Defendants **Trinity Pham** and **Kalvin Alvarez**, acting under color of state law as COI employees, provided statements to **Officer Olague** that directly triggered and shaped her investigation of Plaintiff's protected activity. (See ¶¶ 769–775.) According to the police report, **Mr. Pham** stated that Plaintiff was "going to expose the city" and **Mr. Alvarez** characterized Plaintiff's communications with the City as a "political threat" while expressly stating that he did not believe any violence would occur. These acknowledgments confirm that Plaintiff's conduct consisted of expressive and petitioning activity directed at government officials, rather than any legitimate public safety concern.

Notwithstanding the absence of any perceived threat of violence, **Mr. Go, Ms. Pham and Mr. Alvarez** escalated the matter to law enforcement more than two hours after Plaintiff's conversation with **Ms. Pham**, foreseeably causing **Officer Olague** to initiate an investigation, access Plaintiff's personal information, conduct in-person surveillance, and escalate the case to IPD's Intelligence and Investigations units. The use of police resources in response to acknowledged political speech constitutes adverse action that would deter a reasonable person

from continuing to engage in protected activity. **Mr. Go, Ms. Pham, and Mr. Alvarez's** conduct was a substantial and proximate cause of the interference with Plaintiff's First Amendment rights, rendering them liable under 42 U.S.C. § 1983.

**Pattern and Practice of Retaliation Against Speech**

The unconstitutional conduct described above was not an isolated incident but part of a longstanding pattern and custom within **COI** of suppressing or restricting citizen expression.

1. In 2017, **COI** paid approximately $350,000 to settle a lawsuit brought by *Irvine Community News & Views* ("ICNV"), which alleged that **COI** refused to allow display of its publication in the City Hall lobby because it was "political." (See ¶¶ 743-744.)

2. In 2020, **COI** issued a public statement following *West v. Shea*, a lawsuit involving then-Mayor **Christina Shea**, who deleted comments and blocked users related to the Black Lives Matter movement on her Facebook page. **COI** settled for approximately $40,000 before discovery. (See ¶¶ 745–747.)

3. In 2022, the ACLU of Southern California publicly criticized **COI** City Attorney **Jeffrey Melching** for muting a public commenter during a City Council meeting after the commenter mentioned **Councilmember Mike Carroll's** prior involvement in a civil-fraud case. (See ¶¶ 748–749.)

154

**Municipal Liability**

These incidents collectively demonstrate a municipal pattern of hostility toward protected expression, consistent with the retaliatory actions directed at Plaintiff in 2025. The unconstitutional conduct was undertaken pursuant to an official policy, longstanding custom, or widespread practice of **COI** and **IPD** to restrict or retaliate against disfavored speech. Accordingly, the City is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), as this policy or practice was the moving force behind the violation of Plaintiff's constitutional rights. The conduct of Defendants was willful, malicious, and in reckless disregard of Plaintiff's federally protected rights.

As a direct and proximate result of Defendants' actions, Plaintiff suffered emotional distress, reputational harm, loss of civic standing, and other compensable injuries.

**COUNT 4: VIOLATION OF 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT (PROCEDURAL DUE PROCESS)**

Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

*Against City of Irvine, Jessica Sanders, Jeffrey Melching, William Go, Trinity Pham, Kalvin Alvarez, and Emma Olague*

At all relevant times, Defendants **COI, IPD**, **Jessica Sanders**, **Jeffrey Melching**, **William Go**, **Trinity Pham**, **Kalvin Alvarez,** and **Emma Olague** acted under color of state law.

Defendants violated Plaintiff's rights under the Due Process Clause of the Fourteenth Amendment by depriving him of freedom from arbitrary government intimidation and implied criminal sanction without providing adequate notice, explanation, or an opportunity to be heard.

Defendants attempted to recast Plaintiff's regulatory complaints and public-records requests as "harassment." (See ¶¶ 681–683, 706–710.) In reality, Plaintiff engaged in core protected activity—petitioning government agencies and exercising statutory rights under the CPRA. By contrast, Defendants escalated with aggressive cease-and-desist directives and police intimidation. (See ¶¶ 645-657, 681–683, 706–710, 750.) The disparity between Plaintiff's lawful conduct and Defendants' retaliatory overreach underscores the coercive and unconstitutional nature of their actions.

**Initiation and Escalation of Police Involvement Without Notice or Process**

On July 30, 2025, Defendants **COI, Emma Olague, William Go, Kalvin Alvarez, and Trinity Pham** facilitated a police intervention that bypassed all standard administrative protocols. Despite **Ms. Pham's** own admission that she was "not

156

fearful" and that Plaintiff's grievances were "political" and "rambling," the Defendants initiated a high-priority "criminal threat investigation" dispatch more than two hours after the initial contact to **Mr. Go's** office. (See ¶¶ 761, 769, 773-774.) This investigative label served as a pretextual hook to justify intrusive state action against a non-threatening resident. While the details of the initiating phone call are curiously missing, Defendants provided enough information, false or not, for **IPD** and **Officer Olague** to begin an investigation into Plaintiff.

The pretextual nature of this investigation is illuminated by a comparison with the California Commission on Peace Officer Standards and Training (POST) reporting standards. (See ¶ 879.) According to POST Learning Domain 18, an effective investigative report must be factual and accurate, providing an "exact and literal representation of the event or incident." POST standards mandate that any conclusions made by the reporting officer "must be based on objective facts" articulated within the body of the report. In direct contradiction to these standards, **Officer Olague's** report from the beginning maintains the high-stakes framing of a "criminal threat investigation" while ultimately admitting in her conclusion that "no crime could be substantiated." (See ¶¶ 761, 787.) The use of the word "substantiated" proves that the investigation was not a pursuit of truth but an administrative pretext to authorize state surveillance. The process culminated in an

arbitrary and stigmatizing referral to the IPD Investigations and Intelligence units and advice to escalate to IPD Detectives Smith and Blevins. (See ¶¶ 787, 799.) This referral and advice was made by **Officer Olague** after she explicitly concluded that "no crime could be substantiated," thereby violating the mandatory federal standards of **28 CFR Part 23**, which prohibit the collection of intelligence on a citizen's political views without a criminal predicate. By tagging Plaintiff in a clandestine intelligence database as a response to his permit-related grievances, the Defendants deprived Plaintiff of his liberty interest in his reputation and his right to petition the government without being subjected to secret, extrajudicial monitoring.

**Imposition of Gag and Safety Directive Without Due Process**

Defendants **COI**, **IPD,** City Attorneys **Jessica Sanders** and **Jeffrey Melching**, and **IPD** officer **Emma Olague**, acting under color of state law, violated Plaintiff's Fourteenth Amendment right to due process by issuing a cease-and-desist letter dated August 5, 2025, that imposed sweeping restrictions on Plaintiff's ability to contact **COI** officials, departments, and staff without any notice, hearing, or lawful basis. (See ¶¶ 681–683.)

The letter demanded that all **COI** communication, outside of emergencies and public meetings, from Plaintiff be sent either to **Ms. Sanders** or **Mr. Melching**. The letter also invoked vague "safety" concerns purportedly to protect employee

158

**Ms. Pham**, yet identified no threat, incident, or evidence, revealing the concern as entirely pretextual.

By unilaterally labeling Plaintiff's lawful petitioning activity a safety risk and coordinating with the **IPD** and **Emma Olague** to enforce that restriction, Defendants **COI**, **IPD**, **Sanders**, **Melching**, and **Emma Olague** deprived Plaintiff of liberty and expressive rights through an arbitrary and pretextual exercise of municipal power, in violation of both procedural and substantive due process. This misuse of governmental authority, cloaked in a false "public safety" rationale, constitutes a deprivation of rights secured by the Fourteenth Amendment.

**Systematic Refusal to Explain or Process Plaintiff's Grievances**

Following both the police phone call and gag directive, Plaintiff repeatedly requested clarification and explanation from Defendants, including from the **COI** City Manager **Sean Crumby** and Mayor **Larry Agran**. These requests were ignored. The **COI's** refusal to provide even a minimal post-deprivation process, or to identify what policies governed these actions, further compounded the constitutional harm. (See ¶¶ 689, 698-699, 711-712.)

**COI** has repeatedly delayed releasing information requested through CPRA beyond a reasonable amount of time to Plaintiff, exhibiting stonewalling behavior and a desire to prevent Plaintiff from understanding the basis of these

159

constitutional violations. On September 8, 2025, Plaintiff submitted a CPRA request seeking internal **COI** communications concerning purported measures to "preserve Ms. Pham's safety and wellbeing," as referenced in the first cease-and-desist letter issued by Defendant **Ms. Sanders**. On October 1, 2025, Plaintiff received a notice of extension from **Ms. Sanders**, stating that "non-exempt public records responsive to your request [will be made] available to you on a rolling production basis beginning on or about November 10, 2025" and a final correspondence about the CPRA matter on March 5, 2026. (See ¶¶ 717-718.) This represents a half year of delay to produce records that directly concern the **COI's** rationale in its original cease and desist letter for restricting Plaintiff's constitutional rights. Even more egregiously, for a CPRA request Plaintiff made for information relating to the police phone call, **COI** has responded that responded records will not be made available until December 8, 2025, and the only records it made available in its first batch of this "response" were simply documents and correspondence Plaintiff had already made with **COI**. Lastly, **Ms. Sanders** lumped together two unrelated CPRA request responses into one, seemingly an attempt to actively obscure the facts behind the original police phone call. (See ¶¶ 721-726.)

**COI's** prolonged and unexplained delay in fulfilling this records request—especially where the underlying correspondence was already well known to **Ms. Sanders** and **Mr. Melching**—illustrates a continued pattern of administrative stonewalling and concealment. By deferring and withholding information critical to Plaintiff's ability to contest the lawfulness of the cease-and-desist order, **IPD**, **Ms. Sanders**, and **Mr. Melching** have further deprived Plaintiff of procedural due process under the Fourteenth Amendment, compounding earlier denials of fair notice and opportunity to be heard.

On August 8, 2025, Plaintiff submitted a Claim for Damages to **COI** in the amount of $5,719,254, detailing **COI's** role in permitting unlicensed construction, its retaliatory use of cease-and-desist orders, and related constitutional violations. On August 11, 2025, **COI's** third-party claims administrator, George Hills, contacted Plaintiff by telephone to acknowledge receipt of the claim. (See ¶¶ 691-692.) Only two days later, on August 13, 2025, **COI** summarily rejected the claim in its entirety without investigation, hearing, or explanation. (See ¶ 697.)

This denial—issued less than 48 hours after acknowledgment—illustrates **COI's** systematic refusal to process or meaningfully consider grievances raised by residents, especially those implicating **COI** officials and favored developers. By rejecting Plaintiff's claim without factual review or procedural safeguard,

161

Defendants deprived Plaintiff of due process of law guaranteed by the Fourteenth Amendment, compounding the arbitrary and retaliatory conduct alleged elsewhere in this Complaint.

**Violation CPRA Compliance Requirements**

COI redacted the names of public employees Trinity Pham and Kalvin Alvarez from the police report, despite the matter being closed and non-criminal. (See ¶¶ 750-760.) Under California Government Code § 6254(f)(2), law-enforcement agencies shall disclose the names and addresses of persons involved or witnesses to an incident unless a statutory exemption applies. No such exemption existed here. By concealing this information, COI deprived Plaintiff of access to material facts necessary to pursue redress and obscured the identities of government actors whose conduct is at issue, thereby violating Plaintiff's rights under the Fourteenth Amendment and the CPRA.

**An Unaccountable, Unelected Bureaucracy**

The COI's Human Resources Department, acting outside the scope of its lawful authority, coordinated with IPD to initiate a police response to a resident's protected petitioning activity, evidencing a municipal practice of treating constituent criticism as a security matter. (See ¶ 792.)

162

By accepting the uncorroborated statements of municipal employees as sufficient cause to initiate a law-enforcement inquiry, IPD abandoned its duty of impartiality and substituted COI's subjective discomfort for an objective basis of suspicion. Such deference to government actors over private citizens constitutes unequal enforcement of the law and violates the Fourteenth Amendment.

COI's failure to set clear limits on employee recourse to police intervention allowed subjective discomfort to substitute for objective threat assessment, resulting in an unconstitutional use of law-enforcement authority against protected petitioning activity.

**Municipal Liability**

The unconstitutional conduct described above—specifically the extrajudicial "intelligence" monitoring of political critics and the summary imposition of gag orders—was undertaken pursuant to the official policies, longstanding customs, and widespread practices of COI. Accordingly, COI is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), as these practices were the "moving force" behind the deprivation of Plaintiff's constitutional rights.

**1. Custom of "Political Threat" Intelligence Gathering**

163

The IPD maintains a custom and practice of utilizing its specialized Investigations and Intelligence units to monitor, catalog, and "tag" residents who engage in aggressive but protected petitioning activity. As evidenced by the referral of Plaintiff to these units *after* a finding that "no crime could be substantiated," COI utilizes law enforcement intelligence databases to bypass constitutional constraints on political surveillance. (See ¶ 787.) This practice violates the mandatory standards of **28 CFR Part 23** and serves as a municipal tool for political management rather than legitimate law enforcement.

**2. Policy of Punitive Administrative "Gag" Orders**

COI maintains a policy or custom of issuing "cease-and-desist" directives that bypass all procedural due process requirements—including notice and the right to a hearing—whenever a resident's regulatory inquiries cause "subjective discomfort" to municipal staff or favored developers. This policy allows unelected city attorneys to unilaterally strip residents of their First Amendment right to petition government agencies based on pretextual and uninvestigated "safety" concerns. (See ¶¶ 681, 706.)

**3. Custom of "Administrative Stonewalling" to Obscure Wrongdoing**

164

COI has maintained a widespread practice of utilizing the CPRA not as a tool for transparency, but as a defensive shield to conceal the identities of government actors and the rationale behind constitutional violations. The systematic delay and lumping of unrelated requests serve a municipal policy of preventing residents from understanding the basis of state actions, thereby frustrating the "post-deprivation process" required by the Fourteenth Amendment. (See ¶¶ 717, 833, 837.)

**4. Failure to Train and Supervise**

COI has demonstrated deliberate indifference by failing to train their employees and officers on the constitutional limits of police intervention in administrative disputes. Specifically, COI failed to train staff on the distinction between a "political threat" to their business model and a "criminal threat" to their safety. This failure to train resulted in the predictable misuse of high-priority dispatch and intelligence-gathering systems to suppress protected speech. (See ¶ 750.)

As a direct and proximate result of these municipal policies and customs, Plaintiff suffered emotional distress, reputational harm, loss of civic standing, and other compensable injuries.

**COUNT 5: VIOLATIONS OF THE BANE ACT (Cal. Civ. Code § 52.1)**

Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

*All Defendants*

Cal. Civ. Code § 52.1 (the "Bane Act") prohibits any person, whether or not acting under color of law, from interfering or attempting to interfere, by threats, intimidation, or coercion, with another person's exercise or enjoyment of rights secured by the Constitution or laws of the United States or of the State of California.

Defendants, acting individually and in concert, interfered with and attempted to interfere with Plaintiff's exercise of protected rights through coordinated threats, intimidation, and coercive conduct.

**Building Investigation Retaliation**

Beginning in May 2025, Defendants issued or orchestrated false and retaliatory accusations, including claims of trespass and harassment, resulting in at least eight cease-and-desist letters between May 27, 2025 and March 12, 2026. (See ¶¶ 203, 563-591, 596, 681, 693, 703, 706, 868.) These letters were calculated to, and did, interfere with Plaintiff's lawful rights to:

1. Document construction conditions;

2. Document entity irregularities;

3. Request contractor information from public agencies;

4. Report violations to the California CSLB and other regulators; and

5. Petition government officials for redress of grievances.

Defendants' conduct was undertaken with the specific intent to chill and deter Plaintiff's oversight and advocacy. The escalating tone of official correspondence, the invocation of police authority, abuse of the judicial process, and the refusal to engage in good-faith dialogue together demonstrate a concerted campaign of coercion and intimidation designed to silence Plaintiff's protected activity. (See ¶¶ 491, 645, 681, 693-696.)

After Plaintiff identified permitting irregularities and building code violations involving **TNHC** within Irvine, the retaliation escalated beyond California. In a direct extension of that campaign, **Toll Brothers** initiated a federal lawsuit against Plaintiff in Colorado, incorporating into its initial pleading details from Plaintiff's California-based regulatory complaints against **TNHC** and **Bert L. Howe & Associates, Inc**. (See ¶¶ 491, 693-696.) This lawsuit was undertaken with knowledge of Plaintiff's ongoing petitioning activity and was intended to chill and punish his lawful participation in government oversight. Such litigation-based intimidation constitutes "threats, intimidation, or coercion" within the meaning of

167

§ 52.1. This cross-jurisdictional lawsuit reflects a continuation of the same coercive pattern described herein—an effort by affiliated builder interests to deter and punish Plaintiff's protected investigative and petitioning activity through the burden of interstate litigation. Notably, **Toll Brothers** has previously retained the same outside counsel that represented **TNHC** in California, suggesting the exchange of information and alignment of strategy among related builder entities. (See ¶¶ 344, 599.)

Rather than address the underlying statutory violations, permitting discrepancies, and code violations identified by Plaintiff, Defendants and their allies chose to weaponize legal process and official authority to punish speech and advocacy. The coordination between municipal actors and private builder interests underscores the coercive nexus prohibited by the Bane Act.

The pattern of coercion continued in late 2025 and into 2026. While Plaintiff was lawfully present on a publicly accessible street and engaged in protected activity— documenting construction conditions and potential regulatory violations—TNHC's employees and lawyers escalated from implicit deterrence to explicit threats of state action. (See ¶¶ 864, 868.) On March 3, 2026, after Plaintiff photographed unmarked construction vehicles lacking required CSLB identifying information, a supervisor affiliated with Risewell Homes Inc., TNHC Realty and Construction

Inc., and/or The New Home Company Southern California LLC refused to identify his employer and instead threatened to call the police on Plaintiff. (See ¶ 849.) This encounter was followed by a March 12, 2026 cease-and-desist letter accusing Plaintiff of "trespassing and harassing" employees despite his presence on a public roadway and his attempt to disengage. (See ¶ 868.) The sequence—lawful documentation, followed by threats of police intervention and formal legal warnings—constitutes coercive conduct intended to deter a reasonable person from continuing protected activity.

Other Defendants' use of legal process further reflects a pattern of intimidation untethered from consistent or good-faith factual bases. In the Colorado litigation, Toll Brothers Defendants alleged damages exceeding $75,000 to invoke federal jurisdiction, yet later sought only approximately $5,588.55 in costs against nominal defendants (a $69,411.45 difference), a disparity that underscores the disproportionate nature of the action and supports an inference that the litigation served a deterrent or burdening purpose rather than redressing substantial harm. (See ¶¶ 870-871.)

At the same time, BHA in both the Colorado and California litigation, advanced shifting factual allegations regarding an alleged trespass, initially attributing the conduct to Plaintiff's brother before later asserting that Plaintiff himself was

169

responsible for the same incident. (See ¶¶ 872-878.) These inconsistencies, when viewed alongside repeated threats of legal action and escalating accusations, support a reasonable inference that Defendants employed litigation and related accusations not to redress genuine harm, but as part of a coordinated effort to intimidate and silence Plaintiff's ongoing investigative and petitioning activity.

**The July 30, 2025, Police Intervention as Coercion**

Defendants COI, Jeffrey Melching, Jessica Sanders, Trinity Pham, Kalvin Alvarez, and William Go utilized the Irvine Police Department as a coercive instrument to intimidate Plaintiff into ceasing his lawful regulatory inquiries and CPRA requests. (See ¶ 750.) Despite Defendant Pham's admission that she was "not fearful" and that Plaintiff's grievances were purely "political," Defendants knowingly initiated a high-priority criminal threat dispatch hours after a non-threatening phone call. (See ¶¶ 769, 773-774.) This intentional escalation—bringing the weight of armed law enforcement into a construction dispute—constitutes "intimidation and coercion" under the Bane Act.

**Clandestine Intelligence Referral and Extrajudicial Monitoring**

The IPD episodes resulted in administrative coercion when Officer Emma Olague referred Plaintiff's case to the IPD Investigations and Intelligence units and advised Ms. Pham to contact IPD detectives. (See ¶¶ 787, 799.) This referral

170

occurred after Officer Olague explicitly concluded that "no crime could be substantiated." By tagging Plaintiff in a clandestine intelligence database for engaging in political speech, the Defendants created a permanent chilling effect on Plaintiff's First Amendment rights. This use of specialized intelligence units to monitor a cleared resident is an extrajudicial tactic designed to coerce Plaintiff into silence by threatening his reputation and future liberty.

**The CPRA Obstruction as "Threat of Silence"**

COI, Jessica Sanders, and Jeffrey Melching's coordinated effort to withhold the July 30, 2025 police report (#IPD-25-08420-001) in response to Plaintiff's July 31 emails and August 3, 2025, CPRA requests further illustrate the coercive scheme. (See ¶ 666, 837.) By concealing the officer's name, "no crime" admission, and IPD Intelligence referral for over two months, when they reasonably could have released it within ten days, the Defendants used their administrative power to prevent Plaintiff's ability to seek legal redress. This stonewalling is a form of procedural coercion used to insulate government officials from the consequences of their constitutional overreach.

As a direct and proximate result of Defendants' acts and omissions, Plaintiff suffered emotional distress, reputational harm, loss of civic standing, and other compensable injuries.

Defendants' conduct was willful, malicious, oppressive, and in reckless disregard of Plaintiff's rights, entitling Plaintiff to recover compensatory and punitive damages, as well as statutory attorney's fees under Cal. Civ. Code § 52(b).

**COUNT 6: 42 U.S.C. § 1983 — DENIAL OF ACCESS TO COURTS**

Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

*Against City of Irvine*

**Litigation Falsehoods**

Defendant **COI** has engaged in a sophisticated cover-up strategy designed to obstruct Plaintiff's access to judicial relief by systematically falsifying their responses to this Court. In their Answer to the FAC (ECF No. 118), Defendant **COI** repeatedly asserted it was "without sufficient knowledge or information to form a belief as to the truth of the allegations" contained in ¶¶ 645-657 and denied allegations in ¶¶ 745-747 (which are numbered the same in this complaint). These paragraphs detailed the July 30, 2025 police intervention and the subsequent intimidation of the Plaintiff and past civil rights violations and/or settlements.

172

This "lack of knowledge" defense for ¶¶ 645-657 was a demonstrable falsehood and an act of bad faith. At the time of filing ECF No. 118, **COI** was in actual or constructive possession of the police report in question, which provides a forensic account of the exact events they claimed they could not verify. (See ¶ 750.) Specifically, while **COI** denied knowledge of the entire phone call, its own police records detail the events surrounding it.

This "denial of allegation" defense for ¶¶ 745-747 was also a demonstrable falsehood and an act of bad faith. **COI** filed the press release in question, so their denial of any "allegation" therein is a lie designed to obscure the public record. (See ¶ 745.)

By providing these intentionally evasive and contradictory answers, **COI** has successfully prevented Plaintiff's ability to move for summary judgment or establish an undisputed record. This forensic obstruction—using official silence to contradict its own internal reports—constitutes a Denial of Access to Courts. It is not merely a defensive tactic; it is an active interference with the judicial process designed to shield the **COI's** illegal behavior from federal scrutiny by feigning ignorance of its own documented actions.

**Intentional Concealment of Material Evidence via CPRA Obstruction**

Defendant **COI** engaged in a deliberate pattern of administrative stonewalling designed to prevent Plaintiff from identifying the state actors involved in the July 30, 2025, incident. Despite Plaintiff's exhaustive and specific CPRA requests submitted on August 3, 2025, and September 8, 2025, **COI** intentionally withheld the most critical piece of evidence—the formal police report (#IPD-25-08420-001)—until October 2025.

Plaintiff's August 3, 2025, requests explicitly sought the names and titles of the officer who made the call, the supervisors involved, and the internal communications between the City Attorney, HR, and the IPD that instigated the dispatch. (See ¶ 837.) Furthermore, the September 8, 2025, request sought the evidentiary basis for the "safety and wellbeing" justifications used to restrict Plaintiff's rights. (See ¶ 717.)

**COI** was in actual possession of the police report as of July 30, 2025, a document that contained the very identities and "no crime substantiated" findings Plaintiff was seeking. (See ¶ 750.) By deferring the production of this record for over two months and only releasing it after a perfectly targeted demand, **COI** successfully obscured the identities of individual defendants and the non-criminal nature of the investigation.

This delay was not a mere administrative backlog; it was a tactical concealment intended to frustrate Plaintiff's ability to file an accurate and timely complaint and to prevent him from seeking pre-deprivation injunctive relief. By withholding the names of the additional state actors (**Officer Olague** and **Kalvin Alvarez**) and the details of the IPD Intelligence and Investigations referral, **COI** intentionally interfered with Plaintiff's access to the courts and his right to hold government officials accountable for constitutional overreach.

**Preservation of Information**

At all relevant times, **COI**, acting under color of state law, had a duty to preserve evidence relating to the July 30, 2025 incident once it was on notice of a potential dispute and reasonably foreseeable litigation. **COI** was placed on such notice through, inter alia, Plaintiff's litigation hold, formal Claim for Damages referencing the incident, and subsequent targeted requests under the CPRA seeking recordings and related evidence. (See ¶¶ 595, 666, 836-837.)

The police reports generated in connection with the incident expressly state that the interaction was recorded on **Officer Olague's** department-issued body-worn camera ("BWC"), directing that further detail could be obtained from the "video footage recorded on [the officer's] AXON BWC." (See ¶ 835.) These

175

representations establish that contemporaneous audiovisual evidence of the incident existed.

Despite this, and notwithstanding Plaintiff's specific requests for recordings of the officer's call, **COI** failed to produce any BWC footage. **COI** has provided inconsistent explanations regarding the existence and retention of such footage, including asserting both that BWC footage would only be retained for a limited period and that retention periods may extend significantly longer depending on the case. (See ¶¶ 841-843.) These inconsistencies support a reasonable inference that relevant evidence was not preserved in accordance with **COI's** obligations after notice of the dispute.

**COI's** failure to preserve and produce this evidence has materially impaired Plaintiff's ability to investigate, prepare, and prove his claims. The missing BWC footage constitutes the only objective recording of the interaction between Plaintiff, **Officer Olague, Trinity Pham,** and **Kalvin Alvarez** and would provide critical evidence regarding each employee's statements, tone, and conduct. In its absence, Plaintiff is deprived of essential proof necessary to substantiate his claims, including his claim for unreasonable seizure under the Fourth Amendment.

By failing to preserve and maintain material evidence after being placed on notice of potential litigation, **COI** has interfered with Plaintiff's constitutional right of access to the courts, in violation of the First and Fourteenth Amendments to the United States Constitution.

**COUNT 7: VIOLATIONS OF THE RALPH CIVIL RIGHTS ACT OF 1976 (Cal. Civ. Code § 51.7)**

Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

*Against City of Irvine, Jessica Sanders, Jeffrey Melching, William Go, Trinity Pham, Kalvin Alvarez, Bert L. Howe and Associates, Inc., Risewell Homes Inc., The New Home Company Southern California LLC, and TNHC Realty and Construction Inc.*

The Ralph Civil Rights Act of 1976, Cal. Civ. Code § 51.7, provides that all persons within California have the right to be free from "violence, or intimidation by threat of violence" committed against their persons or property because of political affiliation.

Under Cal. Civ. Code § 51.7(b)(2), "intimidation by threat of violence" specifically includes "making or threatening to make a claim or report to a peace officer or law enforcement agency that falsely alleges that another person has engaged in

177

unlawful activity ... knowing that the claim or report is false, or with reckless

disregard for the truth or falsity of the claim or report."

Beginning in May 2025, the aforementioned Defendants issued or orchestrated

false and retaliatory accusations, including claims of trespass and harassment,

resulting in at least eight cease-and-desist letters between May 27, 2025 and March

12, 2026 that threatened or admitted use of law enforcement action based on false

allegations of unlawful or threatening activity committed by Plaintiff. (See ¶¶ 563-

591, 596, 681, 693, 703, 706, 868.) These letters were calculated to, and did,

interfere with Plaintiff's lawful rights to: (a) Document construction conditions; (b)

Document entity irregularities; (c) Request contractor information from public

agencies; (d) Report violations to the California CSLB and other regulators; and

(e) Petition government officials for redress of grievances.

Defendants' conduct was undertaken because of Plaintiff's political affiliation—

specifically his role as an advocate for government oversight, his political

grievances regarding municipal corruption, and his protected investigations of

construction activity and entities.

Defendants' conduct was undertaken with the specific intent to chill and deter

Plaintiff's oversight and advocacy. The invocation of police authority and the

refusal to engage in good-faith dialogue together demonstrate a concerted campaign of intimidation by threat of violence (specifically the threat of state-sanctioned force) designed to silence Plaintiff's protected activity. (See ¶¶ 491, 645, 681, 693-696.) Rather than address the underlying statutory violations, Defendants and their allies chose to weaponize official authority to punish speech and advocacy.

As a direct and proximate result of Defendants' violations of the Ralph Civil Rights Act of 1976, Plaintiff has suffered and continues to suffer general and special damages, including emotional distress, fear, and the costs of defending against retaliatory legal and state action.

**VI. PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, and grant the following relief:

**1. Declaratory Relief**

The requested declaratory relief is also necessary to establish the scope of Defendants' unlawful conduct, which in turn is relevant to determining the scale of punitive damages warranted for Defendants' retaliatory and willful misconduct.

WHEREFORE, Plaintiff respectfully requests that the Court:

179

1. Enter judgment declaring the matters set forth in Count 1, (1)–(7);

2. Order **COI** to correct or supplement its permit records to accurately reflect the ownership and licensing status of the entities involved;

3. Award Plaintiff costs and such other relief as the Court deems just and proper.

**2. Injunctive Relief**

Issue appropriate injunctive orders restraining Defendants from further retaliation, unlawful restriction of speech or petitioning, or interference with Plaintiff's statutory and constitutional rights.

**3. Compensatory Damages**

Award compensatory damages for emotional distress, reputational harm, and other non-economic and economic injuries resulting from the violations of Plaintiff's rights.

**4. Statutory Damages**

Award statutory damages pursuant to Cal. Civ. Code § 52.1 and 51.7, including for each proven act of interference with Plaintiff's protected rights.

**5. Punitive Damages**

Plaintiff seeks punitive damages against the individual Defendants in their personal capacities, and against corporate and municipal Defendants, in amounts sufficient to punish and deter willful, malicious, and reckless violations of law.

The harm at issue extends far beyond a single residence. It reflects a multidecade pattern of misconduct spanning multiple builders—including John Laing Homes, The New Home Company, Lennar, and Toll Brothers—and exposes systemic failures in the City of Irvine's permitting, enforcement, and oversight practices. These intertwined relationships have allowed unlicensed or misrepresented entities to construct and sell homes throughout Irvine with municipal approval, eroding public confidence in California's contractor-licensing framework and consumer-protection laws.

The magnitude of this systemic harm is reflected in the scale and value of the affected neighborhoods. Plaintiff's family home in **TNHC's** *Olivewood* had a final purchase price of **$3,867,154**, and there are approximately 100 homes in the neighborhood. Toll Brothers' *Elevate* community includes approximately 80 homes starting at **$2,789,000** each. Lennar's various Great Park subdivisions– encompassing more than 400 homes initially priced between **$1.25 and $2.25 million**–further illustrate the breadth of this municipal-sanctioned misconduct.

Collectively, these developments represent well over **$1 billion** in residential construction activity conducted under the same deficient licensing and oversight regime.

The economic scale of the entities involved underscores the need for meaningful deterrence. Toll Brothers Inc. maintains a market capitalization of approximately **$12.6 billion**; Lennar Corporation exceeds **$30.2 billion**; and The New Home Company's acquisition of Landsea Homes Corporation valued the combined enterprise at roughly **$1.2 billion**. Even the municipal defendant, the City of Irvine, operates with an annual budget of **$298 million**. (See Exhibit 274 Actor Size.pdf) These figures confirm that the misconduct alleged is not an isolated administrative lapse, but a coordinated pattern among entities of immense financial and institutional capacity—each fully capable of compliance, yet choosing concealment and retaliation instead.

The damages claim of **$5,719,254** previously submitted to COI represents only the measurable portion of the direct harm associated with Plaintiff's family's property. The true injury encompasses broader economic, civic, and constitutional dimensions—namely, the erosion of statutory safeguards, suppression of lawful petitioning, and institutionalized disregard for contractor licensing and public accountability.

Accordingly, Plaintiff requests that the Court and jury award punitive damages pursuant to **42 U.S.C. § 1983** and **Cal. Civ. Code § 52(b)**, in amounts proportionate to:

1. the gravity and duration of Defendants' violations;

2. the financial capacity of corporate and municipal actors involved; and

3. the need to deter future collusion between public agencies and private developers that undermines consumer protection and constitutional guarantees.

Such an award is necessary not only to compensate for individual harm, but to restore integrity to California's systems of public oversight and affirm that coordinated misconduct between private developers and municipal authorities will not be tolerated under federal or state law.

**6. Attorneys' Fees and Costs**

Award reasonable attorneys' fees and litigation costs pursuant to 42 U.S.C. § 1988 and Cal. Civ. Code § 52.1(h), including expert witness fees, deposition costs, and related expenses.

**7. Additional Legal or Equitable Relief**

Grant such other and further relief—legal or equitable—as the Court deems just

183

and proper, including declaratory relief and any additional orders necessary to

prevent ongoing or future violations of Plaintiff's rights.

**VII. DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully Submitted,



July 12, 2026

Jeffrey Gu, Plaintiff, Pro Se

**Exhibits**

Exhibit 1 Gmail - Toll Brothers Inc Thank you for your interest in The Ridge at Ward Station.pdf

Exhibit 2 Colorado Ops.pdf

Exhibit 3 Consumer Journey.pdf

Exhibit 4 tollbrothers.com whois.pdf

Exhibit 5 DE SOS Toll Brothers, Inc..pdf

Exhibit 6 Gmail - Toll Brothers Inc Best and Finals offers now open for Building 15.pdf

Exhibit 7 Colorado Toll Brothers License.pdf

Exhibit 8 Gmail - License Expiration Date Toll Brothers.pdf

Exhibit 9 Public License Lookup - DRE CA.pdf

Exhibit 10 Gmail - Toll Brothers Inc Received Your Offers.pdf

Exhibit 11 Agreement of Sale.pdf

Exhibit 12 DE SOS Toll Southwest.pdf

Exhibit 13 CO Toll Southwest LLC.pdf

Exhibit 14 5131 Walls In Question.pdf

Exhibit 15 Acknowledgment by Architect of Bedroom Walls.pdf

Exhibit 16 DJT Design Admitting Contract was with Toll Brothers Inc.pdf

Exhibit 17 Gmail - Toll Bros Receipt.pdf

Exhibit 18 Toll Integrated Systems, Inc.pdf

Exhibit 19 Gmail - Building #15 framing update 1.pdf

185

Exhibit 20 Toll Brothers Fortune 2022 Press Release.pdf

Exhibit 21 5-22-22 2nd floor.pdf

Exhibit 22 6-7-22 Roof.pdf

Exhibit 23 5131 Vivian Permit.pdf

Exhibit 24 Rough Frame Inspection 7-15-22.pdf

Exhibit 25 LinkedIn Andrew Haessler.pdf

Exhibit 26 Wheat Ridge CAA Contracts.pdf

Exhibit 27 Gmail - Change orders for 5131 Vivian St.pdf

Exhibit 28 8-7-22.pdf

Exhibit 29 Gmail - Pre-drywall walk.pdf

Exhibit 30 Busnardo Inspection.pdf

Exhibit 31 Gmail - Pre-drywall items mention of missing wall Megan.pdf

Exhibit 32 Electrical Inspection 1 9-21-22.pdf

Exhibit 33 Electrical Inspection 1 9-21-22 Note.pdf

Exhibit 34 9-24-22 No Wall Present.pdf

Exhibit 35 Electrical Inspection 2 9-26-22.pdf

Exhibit 36 Rough Frame Inspection 9-27-22.pdf

Exhibit 37 10-1-22 Wall Present.pdf

Exhibit 38 10-8-22 Wall Present 2.pdf

Exhibit 39 10-8-22 Wall Present 3.pdf

Exhibit 40 IRC 2018 R6026 Drilling and notching of studs.png.pdf

Exhibit 41 IRC 2021 R6026 Drilling and notching of studs diagram.pdf

Exhibit 42 5131 Vivian COO.pdf

Exhibit 43 Drywall Fastening Inspection 10-25-22.pdf

Exhibit 44 11-25-22 Stud Jutting Drywall.pdf

Exhibit 45 Final Closing Disclosure.pdf

Exhibit 46 Colorado CP-1 2022.pdf

Exhibit 47 Gmail -Colorado DRE CP-1 Comment.pdf

187

Exhibit 48 5131 Vivian St Special Warranty Deed.pdf

Exhibit 49 AZ Toll Southwest LLC 2023.pdf

Exhibit 50 AZ Toll Southwest 2017.pdf

Exhibit 51 Gmail - Helpful information about caring for your new home.pdf

Exhibit 52 Gmail - How was your Toll Brothers Home Building Experience?.pdf

Exhibit 53 tollbrothersinc.com whois.pdf

Exhibit 54 Gmail -  Garage door wont properly close.pdf

Exhibit 55 Gmail - Large amount of LVP bubbling.pdf

Exhibit 56 Gmail - Re Large amount of LVP bubbling.pdf

Exhibit 57 Gmail - Re Large cracks in slab.pdf

Exhibit 58 Gmail - Garage door closes inconsistently.pdf

Exhibit 59 Toll Brothers CDARA Structure Letter.pdf

Exhibit 60 Toll Brothers CDARA Window Letter.pdf

Exhibit 61 2nd floor ceiling crack.pdf

Exhibit 62 3rd floor carpet tenting.pdf

Exhibit 63 Renter noting larger crack.pdf

Exhibit 64 Pennsylvania AG Confirmation Receipt.pdf

Exhibit 65 Gmail - Felten Group emails.pdf

Exhibit 66 Chris Ferguson not admitting employment.pdf

Exhibit 67 Toll Brothers Matt Care PA AG Response 1.pdf

Exhibit 68 Email Chain with Brian Murray 1.pdf

Exhibit 69 TB Formal CDARA Letter.pdf

Exhibit 70 Care, Matthew Charles.pdf

Exhibit 71 Toll CDARA Response.pdf

Exhibit 72 Gmail - Re_ Toll CDARA Response.pdf

Exhibit 73 Cease and Desist.pdf

Exhibit 74 Gmail - Toll Brother Inc Contractor Info.pdf

Exhibit 75 Wheat Ridge License.pdf

189

Exhibit 76 Gmail - Building plan CORA request.pdf

Exhibit 77 Gmail - Toll Brothers CORA Clarification.pdf

Exhibit 78 Gmail - Dahl Followup.pdf

Exhibit 79 Gmail - Toll Brothers in Colorado.pdf

Exhibit 80 CAA Snodgrass Email.pdf

Exhibit 81 Neighbor being treated normally Sept 10 2025.pdf

Exhibit 82 Wheat Ridge Cease Letter.pdf

Exhibit 83 Gmail - CORA Request for Directive.pdf

Exhibit 84 Gmail - CORA Request for Privilege Logs.pdf

Exhibit 85 Toll Brothers About.pdf

Exhibit 86 DE SOS TB Proprietary Corp.pdf

Exhibit 87 Corporate Hierarchy.pdf

Exhibit 88 Toll Brothers Registrations.pdf

Exhibit 89 Toll Brothers Trademark.pdf

Exhibit 90 Americans Luxury Homebuilder Trademark.pdf

Exhibit 91 Toll Holdings 100 of Toll Bros.pdf

Exhibit 92 DE SOS Toll Holdings.pdf

Exhibit 93 Toll Brothers Inc 100 of Toll Holdings.pdf

Exhibit 94 Subsidiaries List.pdf

Exhibit 95 202102734 Contact Info.pdf

Exhibit 96 Wheat Ridge License.pdf

Exhibit 97 Gmail - Toll Brothers License CORA Request.pdf

Exhibit 98 Information to prove toll brothers permit.pdf

Exhibit 99 CO Douglas Registration 2025.pdf

Exhibit 100 Littleton Contractor License 2025.pdf

Exhibit 101 Erie Contractor License 2025.pdf

Exhibit 102 Aurora Contractor License 2025.pdf

Exhibit 103 Centennial Contractor License 2025.pdf

Exhibit 104 Colorado Springs Contractor License 2025.pdf

Exhibit 105 Littleton COI 2024.pdf

Exhibit 106 Wheat Ridge COI.pdf

Exhibit 107 CO Douglas COI 2024.pdf

Exhibit 108 Erie COI.pdf

Exhibit 109 Colorado Spring COI 2024.pdf

Exhibit 110 Centennial COI 2024.pdf

Exhibit 111 Superior COI Naming Toll Brothers Inc.pdf

Exhibit 112 AZ MARSH USA LLC.pdf

Exhibit 113 Marsh Homepage.pdf

Exhibit 114 MarshMcLennan Homepage.pdf

Exhibit 115 MM Trademark.pdf

Exhibit 116 marsh.com.pdf

Exhibit 117 marshmclennan.com.pdf

Exhibit 118 30 South 17th Street.pdf

Exhibit 119 1717 Arch Street.pdf

Exhibit 120 Toll Brothers Consumer Affairs.pdf

Exhibit 121 Toll Brothers Consumer Affairs Frequency.pdf

Exhibit 122 Medium North Carolina.pdf

Exhibit 123 Toll Brothers Reddit 1.pdf

Exhibit 124 Toll Brothers Reddit 2.pdf

Exhibit 125 Toll Brothers Northside Piers.pdf

Exhibit 126 Final Warranty List.pdf

Exhibit 127 Warranty Portal Contact Page.pdf

Exhibit 128 Owner's Representative and Claims Support Agreement.pdf

Exhibit 129 Defect Pictures.pdf

Exhibit 130 DRE Complaint Number.pdf

Exhibit 131 SB800 Initial Letter.pdf

Exhibit 132 SB800 Final Letter.pdf

Exhibit 133 Cease and Desist 1.pdf

Exhibit 134 LVP Warranty Text.pdf

Exhibit 135 Toll Brothers What Acquisitions Investor FAQ.pdf

Exhibit 136 About — The Manhattan Building Company.pdf

Exhibit 137 CamWest Press Release.pdf

Exhibit 138 CamWest Delinquencies after 2013 acquistion.pdf

Exhibit 139 Camwest Annual Reports.pdf

Exhibit 140 10-K 2012.pdf

Exhibit 141 AZ Daniel Rhea.pdf

Exhibit 142 Officers Cert 2024.pdf

Exhibit 143 Officers Cert 2022.pdf

Exhibit 144 Doulgas Yearley.pdf

Exhibit 145 Mark Bailey LinkedIn.pdf

Exhibit 146 Dan Rhea LinkedIn.pdf

Exhibit 147 Reggie Carveth LinkedIn.pdf

Exhibit 148 AZ Toll Bros Inc Annual Report 2017.pdf

Exhibit 149 May 20 2025 photos.pdf

Exhibit 150 SNA to DEN.pdf

Exhibit 151 Tokio Marine ACIC Turnstyle Rejection Letter.pdf

Exhibit 152 Statements of Authority.pdf

Exhibit 153 Ken Greenspan LinkedIn.pdf

Exhibit 154 Greenspan Docs.pdf

Exhibit 155 Toll Directors and Officers Pages 1999 to 2021.pdf

Exhibit 156 Gary, Kenneth J. PA Bar.pdf

Exhibit 157 Toll Brothers (TOL) IPO Date.pdf

Exhibit 158 Ken Gary LinkedIn.pdf

Exhibit 159 Gary Announcement Beazer Homes 8-K 2005.pdf

Exhibit 160 Beazer Homes says fires general counsel.pdf

Exhibit 161 Gary Docs.pdf

Exhibit 162 Gary current work.pdf

Exhibit 163 Maryann Heatherby | LinkedIn.pdf

Exhibit 164 Crystal Vecchione | LinkedIn.pdf

Exhibit 165 Email - Receipt Employees' Employer.pdf

Exhibit 166 Email - Employees' Employer.pdf

Exhibit 167 Email - Employees' Employer 2.pdf

Exhibit 168 Gmail - Nicole avoiding question.pdf

Exhibit 169 Gmail - Patricia Rice Notary CO.pdf

Exhibit 170 Toll Brothers Employee phone calls.pdf

Exhibit 171 Liz Stein Pennsylvania.pdf

Exhibit 172 Gmail - Employer Information Dave.pdf

Exhibit 173 Gmail - Employment Information Gilma.pdf

Exhibit 174 TNHC Realty License.pdf

Exhibit 175 Gmail - Gilma Current for sale homes.pdf

Exhibit 176 The New Home Company Inc.pdf

Exhibit 177 The New Home Company Southern California LLC.pdf

Exhibit 178 TNHC Realty and Construction Inc.pdf

Exhibit 179 Larry Webb | LinkedIn.pdf

Exhibit 180 New Home CIO Wayne Stelmar to Retire.pdf

Exhibit 181 WL Homes LLC Trademark.pdf

Exhibit 182 WL Homes LLC.pdf

Exhibit 183 John Laing Homes (California), Inc.pdf

Exhibit 184 JLH Realty and Construction Inc.pdf

Exhibit 185 JLH CSLB License.pdf

Exhibit 186 John Laing Homes Permits and Declarations.pdf

Exhibit 187 JLH DRE License.pdf

Exhibit 188 Webb Steps Down as CEO of John Laing Homes 2008.pdf

Exhibit 189 Wachovia v JLH.pdf

Exhibit 190 Home builder John Laing files for bankruptcy | Reuters.pdf

Exhibit 191 Miek Debeuckelaer Harbur Cali bar.pdf

Exhibit 192 NWHM IPO Date.pdf

Exhibit 193 Miek Harbur | LinkedIn.pdf

Exhibit 194 Combined SI-PT.pdf

Exhibit 195 Form SI-PT Info.pdf

Exhibit 196 New Home Co IPO Form 424B4 2019 Speaks sparingly of

bankruptcy.pdf

Exhibit 197 Felten Plans First Page.pdf

Exhibit 198 CO Deed.pdf

Exhibit 199 PA Deed.pdf

Exhibit 200 Wheat Ridge CGIA Notice of Claim.pdf

Exhibit 201 Toll Brothers Damages - Total Damages.pdf

198

Exhibit 202 Tokio Marine ACIC Aliso Air Inc Rejection Letter.pdf

Exhibit 203 IAT Harco Glass Fence Bond Claim Denial.pdf

Exhibit 204 Melanie Woodfin produces no trespassing evidence.pdf

Exhibit 205 Cease and Desist 2.pdf

Exhibit 206 DEN to MKE.pdf

Exhibit 207 Melanie Woodfin Response to IAT - Harco Stair Railing Bond
Claim.pdf

Exhibit 208 IAT Harco Door Trim Bond Claim Denial.pdf

Exhibit 209 Tokio Marine PIIC July 29 Rejection Letter.pdf

Exhibit 210 129 Oakstone Construction Permit.pdf

Exhibit 211 TNHC All FBNs.pdf

Exhibit 212 TNHC CSLB License.pdf

Exhibit 213 Irvine Police Phone Call Details.pdf

Exhibit 214 Trinity Pham | LinkedIn.pdf

Exhibit 215 Irvine PD July 30 Phone Call.pdf

199

Exhibit 216 129 Oakstone Declaration Docs.pdf

Exhibit 217 COI Cease and Desist.pdf

Exhibit 218 Cease and Desist 3.pdf

Exhibit 219 Irvine Call Log.pdf

Exhibit 220 Claim for Damages Full.pdf

Exhibit 221 BHA Cease and Desist.pdf

Exhibit 222 Irvine Claim Denial Letter Aug 13.pdf

Exhibit 223 Gmail - Agran and Crumby No Response.pdf

Exhibit 224 Gmail - HOA Builder at Olivewood.pdf

Exhibit 225 Cease and Desist 4.pdf

Exhibit 226 Tokio Marine PIIC CDI Response.pdf

Exhibit 227 COI Cease and Desist 2.pdf

Exhibit 228 Gmail - Agran and Crumby No Response 2.pdf

Exhibit 229 Olivewood proof of ownership.pdf

Exhibit 230 Gmail - Cardoza Contradicting Bumbalov.pdf

Exhibit 231 Jesse Cardoza Resume and LinkedIn.pdf

Exhibit 232 A101.1.pdf

Exhibit 233 Gmail - US Bank Preapproval Instructions.pdf

Exhibit 234 Sep 2025 Olivewood Webpage.pdf

Exhibit 235 October 2023 Olivewood Webpage.pdf

Exhibit 236 Purchase Agreement Final.pdf

Exhibit 237 Closing Warranty.pdf

Exhibit 238 129 Oakstone Grant Deed.pdf

Exhibit 239 Signed CD.pdf

Exhibit 240 TNHC DRE License.pdf

Exhibit 241 Buyer Statement.pdf

Exhibit 242 Toll Brothers Irvine Elevate.pdf

Exhibit 243 Gmail - Cardoza Toll Brothers Permit.pdf

Exhibit 244 Gmail - Cardoza Toll Brothers Permit 2.pdf

Exhibit 245 Gmail - Cardoza TNHC Permit.pdf

Exhibit 246 Gmail - Floyd TNHC Permit.pdf

Exhibit 247 Sanders Response to CPRA Request for Pham Safety.pdf

Exhibit 248 TNHC Employee Noting Owner Builder.pdf

Exhibit 249 Sanders Response to CPRA Request for Pham Safety.pdf

Exhibit 250 OC Recorder Says No FBN John Laing Homes.pdf

Exhibit 251 John Laing 2000 deed.pdf

Exhibit 252 John Laing 2003 deed.pdf

Exhibit 253 John Laing 2003 Notice of Completion.pdf

Exhibit 254 Toll Bros CSLB License.pdf

Exhibit 255 Toll Brothers Permit 453 Promontory.pdf

Exhibit 256 Katie Berg-Curtis | LinkedIn.pdf

Exhibit 257 West v Shea.pdf

Exhibit 258 City Pays ICNV $350,000 To Settle Free Speech Case - Irvine

Community News and Views.pdf

Exhibit 259 Gmail - Email to all Irvine City Councilmembers.pdf

Exhibit 260 ACLU Calls Out Irvine City Attorney For Silencing Public

Commenter.pdf

Exhibit 261 Statement Regarding West v. Shea Matter | City of Irvine.pdf

Exhibit 262 Irvine Construction Hours.pdf

Exhibit 263 Pacific Line CSLB.pdf

Exhibit 264 TNHC No Sign.pdf

Exhibit 265 All Declarations.pdf

Exhibit 266 All Olivewood Permits.pdf

Exhibit 267 All The Groves Permits.pdf

Exhibit 268 Lennar Home Permits.pdf

Exhibit 269 TNHC Corporate Hierarchy.pdf

Exhibit 270 TNHC Document Representations.pdf

Exhibit 271 TNHC Entity Document List.pdf

Exhibit 272 Police Call CPRA Request Oct 7.pdf

Exhibit 273 Irvine Production File 1.pdf

Exhibit 274 Actor Size.pdf

Exhibit 275 Police Report.pdf

Exhibit 276 CPRA Requests.pdf

Exhibit 277 Councilmember Emails.pdf

Exhibit 278 Gmail - IPD BWC REQUEST.pdf

Exhibit 279 COI HR Contacts.pdf

Exhibit 280 Olague Emails.pdf

Exhibit 281 HR Info Denial.pdf

Exhibit 282 Blevins Emails.pdf

Exhibit 283 Unmarked vehicles photos 2026.pdf

Exhibit 284 Unmarked vehicles photos March 3.pdf

Exhibit 285 PHLK March 2026 Cease and Desist.pdf

Exhibit 286 March 5 CPRA Production

Exhibit 287 POST Investigative Report Writing.pdf