# Exhibit 275

**Case Number: IPD-25-08420**
**Report Number:** IPD-25-08420-001



## IRVINE POLICE DEPARTMENT

# CASE REPORT



| ADMINISTRATIVE | | | |
|---|---|---|---|
| **LOCATION OF OCCURRENCE** | | | |
| 1 Civic Center Plz, IRVINE, CA  92606    IPD | | | |
| | UNIVS | 1 | 226 |
| **DATE(S) OCCURRED** | | | |
| 7/30/2025 4:00:00 PM (Wednesday)            **TO**    () | | | |
| **DATE/TIME REPORTED** | | | |
| 7/30/2025 6:20:43 PM | | | |

| RECORDINGS | IBR DISPO | COURTESY REPORT | DICTATION NUMBER |
|---|---|---|---|
| BWC | Active | No | |
| **INTOX REPORT** | **ID THEFT RELATED** | **GANG RELATED** | |
| | | No | |
| **ASSOCIATED CASE NUMBER(S)** | | | |
| | | | |
| **SEND COPIES TO** | | | |
| | | | |
| **SUMMARY AND WORKABLE INFO** | | | |

Jeffery Gu called Council Member William Go's office and was argumentative with his staff. Gu was upset regarding permit issues for newly developed residences. No crime occurred but GU was agitated and threatened to release allegedly damning city information. GU also told a city employee she should kill herself. I contacted GU who stated he had no memory of the statements. No crime could be substantiated.

| FTO (IF APPLICABLE) | 671 - Rakic, Miljan |
|---|---|
| **APPROVED BY** | **APPROVAL DATE/TIME** |
| 511 - Larum, Haldor | 7/31/2025 12:36:44 AM |

CONTROLLED DOCUMENT — DUPLICATION OR REISSUANCE CONTROLLED BY LAW — California Government Code 7923

THE RELEASE OF THIS REPORT IS IN ACCORDANCE WITH SB 54 AND GC 7284.6 AND IS NOT TO BE USED FOR IMMIGRATION PURPOSES OR ENFORCEMENT

| REPORTING OFFICER | ENTERED DATE | PRINTOUT CREATED | PAGE |
|---|---|---|---|
| 757 - Olague, Emma | 7/30/2025 8:53:27 PM | 10/27/2025 10:53:24 AM | 1 of 10 |

**OFFENSE(S)**

CONTROLLED DOCUMENT
DUPLICATION OR REISSUANCE CONTROLLED BY LAW
California Government Code 7923

THE RELEASE OF THIS REPORT IS IN ACCORDANCE WITH SB 54 AND GC 7284.6 AND IS NOT TO BE USED FOR IMMIGRATION PURPOSES OR ENFORCEMENT

| REPORTING OFFICER | ENTERED DATE | PRINTOUT CREATED | PAGE |
|---|---|---|---|
| 757 - Olague, Emma | 7/30/2025 8:53:27 PM | 10/27/2025 10:53:24 AM | 2 of 10 |

**Case Number: IPD-25-08420**
**Report Number:** IPD-25-08420-001

<u>**SUSPECT(S)**</u>

<u>**ARRESTEE(S)**</u>

CONTROLLED DOCUMENT
DUPLICATION OR REISSUANCE CONTROLLED BY LAW
California Government Code 7923

THE RELEASE OF THIS REPORT IS IN ACCORDANCE WITH SB 54 AND GC 7284.6 AND IS NOT TO BE USED FOR IMMIGRATION PURPOSES OR ENFORCEMENT

| REPORTING OFFICER | ENTERED DATE | PRINTOUT CREATED | PAGE |
|---|---|---|---|
| 757 - Olague, Emma | 7/30/2025 8:53:27 PM | 10/27/2025 10:53:24 AM | 3 of 10 |

**Case Number: IPD-25-08420**
**Report Number:** IPD-25-08420-001

**VICTIM(S)**

CONTROLLED DOCUMENT
DUPLICATION OR REISSUANCE CONTROLLED BY LAW
California Government Code 7923

THE RELEASE OF THIS REPORT IS IN ACCORDANCE WITH SB 54 AND GC 7284.6 AND IS NOT TO BE USED FOR IMMIGRATION PURPOSES OR ENFORCEMENT

| REPORTING OFFICER | ENTERED DATE | PRINTOUT CREATED | PAGE |
|---|---|---|---|
| 757 - Olague, Emma | 7/30/2025 8:53:27 PM | 10/27/2025 10:53:24 AM | 4 of 10 |

**Case Number:** IPD-25-08420
**Report Number:** IPD-25-08420-001

**OTHER WITNESS/ENTITY/RELATED PARTY**

### OTHER PARTY

| PARTY CONFIDENTIAL | No |
|---|---|

| O1 | Reporting Party: ▉▉▉▉▉ |
|---|---|

| SEX | RACE | DOB | AGE | HEIGHT | WEIGHT | HAIR | EYES | DLN | DL STATE |
|---|---|---|---|---|---|---|---|---|---|
| ▉ | ▉ | ▉ | ▉ | ▉ | ▉ | ▉ | ▉ | | |

| ALIAS | ALIAS DOB | ALIAS SSN |
|---|---|---|
| | | |

| ADDRESS TYPE | ADDRESS |
|---|---|
| Work | 1 Civic Ctr Plz, Irvine, CA  92602 |

| PHONE TYPE | PHONE NUMBER |
|---|---|
| Work | (949) 724-6220 |

| EMAIL/SOCIAL MEDIA ADDRESS |
|---|
| tpham@cityofirvine.org |

| SCARS / MARKS / TATTOOS | LOCATION | DESCRIPTION |
|---|---|---|
| | | |

| EMPLOYER/SCHOOL | ADDRESS | OCCUPATION/GRADE |
|---|---|---|
| Councilman William Go's aide | 1 Civic Ctr Plz, Irvine, CA  92606 | Supervising Principal Council Executive Assistant |

| ADDITIONAL INFORMATION |
|---|
| |

### OTHER PARTY

| PARTY CONFIDENTIAL | No |
|---|---|

| O2 | Other Entity/Business: Office Of Councilman William Go |
|---|---|

| SEX | RACE | DOB | AGE | HEIGHT | WEIGHT | HAIR | EYES | DLN | DL STATE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

| ALIAS | ALIAS DOB | ALIAS SSN |
|---|---|---|
| | | |

| ADDRESS TYPE | ADDRESS |
|---|---|
| Work | 1 Civic Center Plz, Irvine, CA  92606 |

| PHONE TYPE | PHONE NUMBER |
|---|---|
| Work | (949) 724-7917 |

| EMAIL/SOCIAL MEDIA ADDRESS |
|---|
| |

| SCARS / MARKS / TATTOOS | LOCATION | DESCRIPTION |
|---|---|---|
| | | |

| EMPLOYER/SCHOOL | ADDRESS | OCCUPATION/GRADE |
|---|---|---|
| | , | |

| ADDITIONAL INFORMATION |
|---|
| ▉▉▉▉▉▉▉ |

CONTROLLED DOCUMENT — DUPLICATION OR RE-DISSEMINANCE CONTROLLED BY LAW — California Government Code 7284

### OTHER PARTY

| PARTY CONFIDENTIAL | No |
|---|---|

| O3 | Other Individual: Gu, Jeffrey |
|---|---|

| SEX | RACE | DOB | AGE | HEIGHT | WEIGHT | HAIR | EYES | DLN | DL STATE |
|---|---|---|---|---|---|---|---|---|---|
| Male | Other Asian | 8/28/1989 | 35 | 5' 2" | 135 | Black | Brown | G0004208930807 | Wisconsin |

| ALIAS | ALIAS DOB | ALIAS SSN |
|---|---|---|
| | | |

| ADDRESS TYPE | ADDRESS |
|---|---|
| Home | 2332 N Clay St Apt 3, Denver, CO  80211 |
| Other | 129 Oakstone, Irvine, CA |
| Other | 156 Creation, Irvine, CA |

| PHONE TYPE | PHONE NUMBER |
|---|---|
| Home | (720) 593-1548 |

| EMAIL/SOCIAL MEDIA ADDRESS |
|---|
| jeffwgu@gmail.com |

| SCARS / MARKS / TATTOOS | LOCATION | DESCRIPTION |
|---|---|---|
| | | |

| EMPLOYER/SCHOOL | ADDRESS | OCCUPATION/GRADE |
|---|---|---|
| | , | |

THE RELEASE OF THIS REPORT IS IN ACCORDANCE WITH SB 54 AND GC 7284.6 AND IS NOT TO BE USED FOR IMMIGRATION PURPOSES OR ENFORCEMENT

| REPORTING OFFICER | ENTERED DATE | PRINTOUT CREATED | PAGE |
|---|---|---|---|
| 757 - Olague, Emma | 7/30/2025 8:53:27 PM | 10/27/2025 10:53:24 AM | 5 of 10 |

Case Number: **IPD-25-08420**
Report Number: IPD-25-08420-001

| ADDITIONAL INFORMATION |
|---|
| |

CONTROLLED DOCUMENT
DUPLICATION OR REISSUANCE CONTROLLED BY LAW
California Government Code 7923

THE RELEASE OF THIS REPORT IS IN ACCORDANCE WITH SB 54 AND GC 7284.6
AND IS NOT TO BE USED FOR IMMIGRATION PURPOSES OR ENFORCEMENT

| REPORTING OFFICER | ENTERED DATE | PRINTOUT CREATED | PAGE |
|---|---|---|---|
| 757 - Olague, Emma | 7/30/2025 8:53:27 PM | 10/27/2025 10:53:24 AM | 6 of 10 |

**Case Number:** IPD-25-08420
**Report Number:** IPD-25-08420-001

<u>**Property/Vehicle(s)**</u>

THE RELEASE OF THIS REPORT IS IN ACCORDANCE WITH SB 54 AND GC 7284.6 AND IS NOT TO BE USED FOR IMMIGRATION PURPOSES OR ENFORCEMENT

| REPORTING OFFICER | ENTERED DATE | PRINTOUT CREATED | PAGE |
|---|---|---|---|
| 757 - Olague, Emma | 7/30/2025 8:53:27 PM | 10/27/2025 10:53:24 AM | 7 of 10 |

Case Number: **IPD-25-08420**
Report Number: **IPD-25-08420-001**

<u>NARRATIVE</u>

*The following is a summary account of the events which occurred during this this call for service. The contacts were recorded on my department issued body-worn camera (BWC). For further detail, refer to the video footage recorded on my AXON BWC.*

On Tuesday, 7/30/2025 at approximately 1820 hours, Officer M. Rakic (Badge No. 671) and I (Officer E. Olague, Badge No. 757) were dispatched to City Hall, 1 City Center Plaza, in the City of Irvine, County of Orange, for a criminal threat investigation. A caller allegedly made threatening phone calls to the Office of Counselman William GO.

At the time of the call for service, the reporting party ▮▮▮▮▮▮▮ was no longer working so we responded to her residence to speak with her about this incident. The following is a summary of our conversation with ▮▮▮▮

▮▮▮▮ is the Supervising Principal Council Executive Assistant of City Council Member William GO and was working today when at approximately 1600 hours, she received a telephone call from Jeffrey GU. ▮▮▮▮ explained GU emailed City Council Member GO a couple weeks ago to receive help regarding a permit for Toll Brother's. Toll Brother's is a home builder that creates luxury homes. Gu was referred to the office of Community Development as his questions were related to permits. On 07/17/2025, GU started an email chain regarding these permits; however, he was not happy with the response he received. GU then contacted ▮▮▮▮ on the telephone to get assistance related to this issue.

While speaking with GU, ▮▮▮▮ stated GU seemed frustrated that he was not getting the answer he wanted and was randomly "spouting" things off. ▮▮▮▮ alleged that GU made two threats during the conversation. Gu said "I'm going to expose the city" and "I'm going to come after the city council." ▮▮▮▮ said GU did not elaborate on either of these statements. ▮▮▮▮ also informed us that GU told her, "You should kill yourself." ▮▮▮▮ said that she was not fearful GU was going to come after her and he was just "rambling" when the statements came out.

▮▮▮▮ informed us that she notified the Chief of Staff ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ that he had been in contact with GU as well, and that GU previously threatened him. ▮▮▮▮ did not know the extent of the threats or the date they occurred. She provided us with ▮▮▮▮▮ contact information for further follow up. Based on the statement from ▮▮▮, I was unable to determine that a criminal threat occurred. I informed her that I will investigate the matter further and provided her with the report number. She stated that she understood and had no other questions.

I next contacted ▮▮▮▮▮ on the telephone. The following is a summary of our conversation:

▮▮▮▮▮ was familiar with GU and explained GU had been contacting Counselman GO's office regarding his frustration over new building permits. ▮▮▮▮▮ said GU was initially following up with these permits via email. He continued to explain GU contacted the City of Irvine for permits for 2 different locations. The first location was 129 Oakstone, Irvine and the second location was 156 Creation, Irvine. GU requested that permitting related to a stair railing be expedited at 129 Oakstone. Several weeks later he again contacted the office, now requesting that "new build" permits be expedited at 156 Creation. GU called the office approximately 2 to 3 weeks ago and told ▮▮▮▮▮ that the council office "needed to do their job." GU told ▮▮▮▮▮ multiple times that he was going to release sensitive information about the City of Irvine. ▮▮▮▮▮ said GU stated, "I'm gonna release information and that's a bomb you don't

| REPORTING OFFICER | ENTERED DATE | PRINTOUT CREATED | PAGE |
|---|---|---|---|
| 757 - Olague, Emma | 7/30/2025 8:53:27 PM | 10/27/2025 10:53:24 AM | 8 of 10 |

Case Number: **IPD-25-08420**
Report Number: IPD-25-08420-001

want to deal with." ▮▮▮▮▮▮▮ clarified that "a bomb you don't want to deal with" meant GU was going to release potentially damning information about the city. ▮▮▮▮▮▮▮ said this was a "political threat" and he did not believe any violence was going to occur. ▮▮▮▮▮▮▮ also stated that GU had previously contacted other councilmembers allegedly in hopes of expediting a permitting process.

Using departmental resources, I discovered that GU did not have a known active Irvine address and his last address on record was in Denver, CO. GU also did not hold a California identification card or drivers license. I located a phone number for GU, which had a Colorado area code. Additionally, I did not locate any registered weapons.

I contacted GU over the telephone and had a brief conversation with him. The following is a summary of our conversation:

GU admitted he called the Council Member's office in an attempt to speak to GO. He alleged that the reason for the phone call was to discuss information he found related to the permitting process. I asked GU about the threatening statements but he claimed he had "no memory" of the comments made. I advised him of the allegation's made and he again said he had no memory of the comments. At the end of the brief conversation, I requested GU to remain professional when contacting any city employees. GU stated, "thank you for the intimidation officer." I concluded the conversation.

We drove to to the two addresses provided by ▮▮▮▮▮▮▮ 129 Oakstone appeared to be vacant as there was no furniture or visible activity inside. We then drove to the second location 156 Creation and discovered the house is still under construction.

Based on statements made by all parties, I determined GU contacted the office of City Council Member William GO on several occasions related to various permitting requests. He was not happy with the responses and called the office to follow up and express his frustrations. GU was irate and stated he was going to release information about the City of Irvine. There is no evidence or statements to suggest that GU made a threat of violence against the city, the Counselman or any of his staff. No crime could be substantiated, and this report was taken for documentation purposes. I notified IPD Intel via email and request this incident report be forwarded to IPD Investigations for appropriate disposition. It should be noted that Watch Commander Lt. Turner was notified of the incident and the resolution.

THE RELEASE OF THIS REPORT IS IN ACCORDANCE WITH SB 54 AND GC 7284.6 AND IS NOT TO BE USED FOR IMMIGRATION PURPOSES OR ENFORCEMENT

| REPORTING OFFICER | ENTERED DATE | PRINTOUT CREATED | PAGE |
|---|---|---|---|
| 757 - Olague, Emma | 7/30/2025 8:53:27 PM | 10/27/2025 10:53:24 AM | 9 of 10 |

Case Number: **IPD-25-08420**
Report Number: IPD-25-08420-001

**PHOTOS**

CONTROLLED DOCUMENT
DUPLICATION OR REISSUANCE CONTROLLED BY LAW
California Government Code 7923

THE RELEASE OF THIS REPORT IS IN ACCORDANCE WITH SB 54 AND GC 7284.6
AND IS NOT TO BE USED FOR IMMIGRATION PURPOSES OR ENFORCEMENT

| REPORTING OFFICER | ENTERED DATE | PRINTOUT CREATED | PAGE |
|---|---|---|---|
| 757 - Olague, Emma | 7/30/2025 8:53:27 PM | 10/27/2025 10:53:24 AM | 10 of 10 |

Case Number: **IPD-25-08420**

Report Number: OR-IPD-25-08420-001



## IRVINE POLICE DEPARTMENT

# OFFICER REPORT



| ADMINISTRATIVE | | | |
|---|---|---|---|
| **LOCATION OF OCCURRENCE** | | | |
| 1 Civic Center Plz, IRVINE, CA  92606    IPD | | | |
| | UNIVS | 1 | 226 |
| **DATE(S) OCCURRED** | | | |
| 7/30/2025 6:20:43 PM (Wednesday)           TO      () | | | |
| **DATE/TIME REPORTED** | | | |
| 7/30/2025 6:20:43 PM | | | |

| RECORDINGS | IBR DISPO | COURTESY REPORT | DICTATION NUMBER |
|---|---|---|---|
| BWC | Active | No | |
| **INTOX REPORT** | **ID THEFT RELATED** | **GANG RELATED** | |
| | | No | |
| **ASSOCIATED CASE NUMBER(S)** | | | |
| | | | |
| **SUMMARY AND WORKABLE INFO** | | | |
| This is a supplemental report to original incident report to 25-08420. | | | |

| FTO (IF APPLICABLE) | 671 - Rakic, Miljan |
|---|---|
| **APPROVED BY** | **APPROVAL DATE/TIME** |
| 511 - Larum, Haldor | 7/31/2025 9:54:08 PM |

CONTROLLED DOCUMENT
DUPLICATION OR REISSUANCE CONTRARY TO LAW
California Government Code 7923

THE RELEASE OF THIS REPORT IS IN ACCORDANCE WITH SB 54 AND GC 7284.6
AND IS NOT TO BE USED FOR IMMIGRATION PURPOSES OR ENFORCEMENT

| REPORTING OFFICER | ENTERED DATE | PRINTOUT CREATED | PAGE |
|---|---|---|---|
| 757 - Olague, Emma | 7/31/2025 6:14:13 PM | 10/27/2025 11:47:29 AM | 1 of 8 |

Information in this report is **SUPPLEMENTAL ONLY** will not be used for statistical purposes.

Case Number: **IPD-25-08420**
**Report Number:** OR-IPD-25-08420-001

<u>OFFENSE(S)</u>

CONTROLLED DOCUMENT
DUPLICATION OR REISSUANCE CONTROLLED BY LAW
California Government Code 7923

THE RELEASE OF THIS REPORT IS IN ACCORDANCE WITH SB 54 AND GC 7284.6
AND IS NOT TO BE USED FOR IMMIGRATION PURPOSES OR ENFORCEMENT

| REPORTING OFFICER | ENTERED DATE | PRINTOUT CREATED | PAGE |
|---|---|---|---|
| 757 - Olague, Emma | 7/31/2025 6:14:13 PM | 10/27/2025 11:47:29 AM | 2 of 8 |

Information in this report is **SUPPLEMENTAL ONLY** will not be used for statistical purposes.

**Case Number: IPD-25-08420**
**Report Number:** OR-IPD-25-08420-001

SUSPECT(S)

ARRESTEE(S)

CONTROLLED DOCUMENT
DUPLICATION OR REISSUANCE CONTROLLED BY LAW
California Government Code 7923

THE RELEASE OF THIS REPORT IS IN ACCORDANCE WITH SB 54 AND GC 7284.6
AND IS NOT TO BE USED FOR IMMIGRATION PURPOSES OR ENFORCEMENT

| REPORTING OFFICER | ENTERED DATE | PRINTOUT CREATED | PAGE |
|---|---|---|---|
| 757 - Olague, Emma | 7/31/2025 6:14:13 PM | 10/27/2025 11:47:29 AM | 3 of 8 |

Information in this report is **SUPPLEMENTAL ONLY** will not be used for statistical purposes.

Case Number: **IPD-25-08420**
Report Number: OR-IPD-25-08420-001

**VICTIM(S)**

CONTROLLED DOCUMENT
DUPLICATION OR REISSUANCE CONTROLLED BY LAW
California Government Code 7923

THE RELEASE OF THIS REPORT IS IN ACCORDANCE WITH SB 54 AND GC 7284.6
AND IS NOT TO BE USED FOR IMMIGRATION PURPOSES OR ENFORCEMENT

| REPORTING OFFICER | ENTERED DATE | PRINTOUT CREATED | PAGE |
|---|---|---|---|
| 757 - Olague, Emma | 7/31/2025 6:14:13 PM | 10/27/2025 11:47:29 AM | 4 of 8 |

**Case Number: IPD-25-08420**
**Report Number:** OR-IPD-25-08420-001

OTHER WITNESS/ENTITY/RELATED PARTY

CONTROLLED DOCUMENT
DUPLICATION OR REISSUANCE CONTROLLED BY LAW
California Government Code 7923

THE RELEASE OF THIS REPORT IS IN ACCORDANCE WITH SB 54 AND GC 7284.6
AND IS NOT TO BE USED FOR IMMIGRATION PURPOSES OR ENFORCEMENT

| REPORTING OFFICER | ENTERED DATE | PRINTOUT CREATED | PAGE |
|---|---|---|---|
| 757 - Olague, Emma | 7/31/2025 6:14:13 PM | 10/27/2025 11:47:29 AM | 5 of 8 |

Case Number: **IPD-25-08420**
**Report Number:** OR-IPD-25-08420-001

**Property/Vehicle(s)**

CONTROLLED DOCUMENT
DUPLICATION OR REISSUANCE CONTROLLED BY LAW
California Government Code 7923

THE RELEASE OF THIS REPORT IS IN ACCORDANCE WITH SB 54 AND GC 7284.6
AND IS NOT TO BE USED FOR IMMIGRATION PURPOSES OR ENFORCEMENT

| REPORTING OFFICER | ENTERED DATE | PRINTOUT CREATED | PAGE |
|---|---|---|---|
| 757 - Olague, Emma | 7/31/2025 6:14:13 PM | 10/27/2025 11:47:29 AM | 6 of 8 |

Information in this report is **SUPPLEMENTAL ONLY** will not be used for statistical purposes.

Case Number: **IPD-25-08420**
Report Number: OR-IPD-25-08420-001

**NARRATIVE**

*The following is a summary account of the events which occurred during this this call for service. The contacts were recorded on my department issued body-worn camera (BWC). For further detail, refer to the video footage recorded on my AXON BWC.*

On Tuesday, 7/30/2025 at approximately 1630 hours, Officer M. Rakic (Badge No. 671) and I (Officer E. Olague, Badge No. 757) were notified that Jefferey GU contacted Counselman William GO'S office again today.

Prior to this call for service, I was informed the City of Irvine's Human Resources (HR) department initiated a cease and desist letter which will later be served to GU.

I contact ▆▆▆ on the telephone and the following is a summary of our conversation:

▆▆▆ was notified by HR receptionists that GU contacted HR 3 to 4 times today. ▆▆▆ did not speak with GU but he was attempting to get in contact with her through the HR receptionist. GU also asked the HR receptionist for ▆▆▆ contact information several times. It should be noted that ▆▆▆ information was not released to GU. ▆▆▆ said she believed that the city may have blocked GU from calling because she did not receive any telephone calls from him today. Additionally, I instructed ▆▆▆ not to engage in conversation with GU and to document any further interaction with him. I informed ▆▆▆ a cease and desist letter was initiated through the City of Irvine HR department. I also provided ▆▆▆ with Detective Smith and Detective Belvin's contact information. She did not provide any additional information, so I concluded the conversation.

I request this supplemental report be attached to the original incident report, DR 25-08420.

CONTROLLED DOCUMENT
DUPLICATION OR REISSUANCE CONTROLLED BY LAW
California Government Code 7924

THE RELEASE OF THIS REPORT IS IN ACCORDANCE WITH SB 54 AND GC 7284.6
AND IS NOT TO BE USED FOR IMMIGRATION PURPOSES OR ENFORCEMENT

| REPORTING OFFICER | ENTERED DATE | PRINTOUT CREATED | PAGE |
|---|---|---|---|
| 757 - Olague, Emma | 7/31/2025 6:14:13 PM | 10/27/2025 11:47:29 AM | 7 of 8 |

Information in this report is **SUPPLEMENTAL ONLY** will not be used for statistical purposes.

Case Number: **IPD-25-08420**
**Report Number:** OR-IPD-25-08420-001

**<u>PHOTOS</u>**

CONTROLLED DOCUMENT
DUPLICATION OR REISSUANCE CONTROLLED BY LAW
California Government Code 7923

THE RELEASE OF THIS REPORT IS IN ACCORDANCE WITH SB 54 AND GC 7284.6 AND IS NOT TO BE USED FOR IMMIGRATION PURPOSES OR ENFORCEMENT

| REPORTING OFFICER | ENTERED DATE | PRINTOUT CREATED | PAGE |
|---|---|---|---|
| 757 - Olague, Emma | 7/31/2025 6:14:13 PM | 10/27/2025 11:47:29 AM | 8 of 8 |

Information in this report is **SUPPLEMENTAL ONLY** will not be used for statistical purposes.

# Exhibit 276



# Request for Police Records

**Submitted On:**

Aug 3, 2025, 09:34PM PDT

Irvine Police Department

| | |
|---|---|
| **NAME** | Jeffrey Gu |
| **COMPANY** | Proffer LLC |
| **ADDRESS\*** | ███████████ |
| **CITY** | ████ |
| **STATE** | ██████ |
| **ZIP** | ███ |
| **PHONE\*** | ██████ |
| **FAX\*** | 000-000-0000 |
| **EMAIL\*** | ███████████ |
| **REQUEST** | This request is related to the information surrounding the phone call made to ███ ██████ my number, at 8:47pm on July 30, 2025.<br><br>1. Name and title of the officer and badge number who made the phone call, seemingly female.<br>2. Name and title of the other individual in the room with the officer, as the officer was consulting someone, seemingly male.<br>3. The name and title of any supervisors of this officer.<br>4. The notes and communications provided to the officer or the Irvine Police Department from the city council's office to instigate the phone call.<br>5. Names and titles of the individual or individuals in the city council office who provided the notes for the officer's call (Trinity Pham and others).<br>6. Names and titles of the individuals who motivated the police to instigate the phone call.<br>7. The location the phone call was made from.<br>8. Any recording or notes produced from the officer's phone call itself.<br>9. Any emails or written communications between the following entities and each other: City Attorney Jeffrey Melching/his law firm, the HR department, the communications and engagement dept, the building and safety dept, the city council's office, and the Irvine Police Department regarding this police phone call to me and my call to William Go's office, from July 30, 2025 and forward. |
| **SEND RESPONSE BY** | EMAIL |



**CITY CLERK'S OFFICE**

**Office of Records and Information**

# REQUEST FOR PUBLIC RECORDS

In accordance with the California Public Records Act (California Government Code §7920.000 et. seq.), public records are open for inspection at all times during regular office hours.  Any person may request to inspect and/or copy a public record, excluding records exempt from disclosure by law.  In most instances, copies may be provided upon request, unless additional time is required for research and records retrieval.  In such cases, the City will respond to your request within ten (10) days of receiving this form. All document duplication fees are based on the City's current fee resolution (City Council Resolution 23-56).

The City of Irvine strives to provide prompt and efficient access to public records.  For your convenience, Agendas, Minutes, Resolutions, Ordinances, and Building Permits are available online at irvinequickrecords.com.

## CONTACT INFORMATION

| NAME | DATE |
|---|---|
| JEFFREY GU | 08/03/2025 |

| COMPANY |
|---|
| PROFFER LLC |

| ADDRESS* |
|---|
| ███████████ |

| CITY | STATE | ZIP |
|---|---|---|
| ████ | ██ | ██ |

| E-MAIL* | PHONE* |
|---|---|
| ████████████ | █████████ |

## REQUEST FOR INFORMATION

*(Please provide a complete description of the documents you are requesting.)*

This request is related to the information surrounding the phone call made to ██████████ my number, at 8:47pm on July 30, 2025.

1. Name and title of the officer and badge number who made the phone call, seemingly female.
2. Name and title of the other individual in the room with the officer, as the officer was consulting someone, seemingly male.
3. The name and title of any supervisors of this officer.
4. The notes and communications provided to the officer or the Irvine Police Department from the city council's office to instigate the phone call.
5. Names and titles of the individual or individuals in the city council office who provided the notes for the officer's call (Trinity Pham and others).
6. Names and titles of the individuals who motivated the police to instigate the phone call.
7. The location the phone call was made from.
8. Any recording or notes produced from the officer's phone call itself.
9. Any emails or written communications between the following entities and each other: City Attorney Jeffrey Melching/his law firm, the HR department, the communications and engagement dept, the building and safety dept, the city council's office, and the Irvine Police Department regarding this police phone call to me and my call to William Go's office, from July 30, 2025 and forward.

The City of Irvine takes your privacy seriously.  This form asks you to provide the City with certain personal information.  Such information is being requested and will be utilized by the City for the specific and limited purpose of future City correspondence regarding the subject-matter of this form.  Pursuant to Measure S, an initiative ordinance passed by City voters in 2008, the personal information noted by an asterisk (*) on this form will be kept confidential.  Unless you expressly indicate to us otherwise or unless compelled by a court order, it will not be shared with other agencies, businesses or individuals.

# Exhibit 277

 Gmail                                      Jeffrey Gu <jeffwgu@gmail.com>

---

# Your June 19, 2025, July 29, 2025, July 30, 2025, and August 1, 2025 Public Records Requests to the City of Irvine

---

**Jeffrey Gu** <jeffwgu@gmail.com>                          Mon, Aug 11, 2025 at 11:39 AM
To: "Sanders, Jessica" <jsanders@rutan.com>
Cc: William Go Web <WilliamGo@cityofirvine.org>, Mike Carroll Web <MikeCarroll@cityofirvine.org>, Melinda Liu Web <MelindaLiu@cityofirvine.org>, Betty Martinez Franco Web <bettymartinez@cityofirvine.org>, Kathleen Treseder Web <KathleenTreseder@cityofirvine.org>, jmelching@rutan.com, LarryAgran@cityofirvine.org, cm@cityofirvine.org

Hi Ms. Sanders,

I understand the City prefers to channel responses through CPRA, but my questions relate directly to your own statements and your and Mr. Melching's silence as attorneys. CPRA procedure aside, an attorney making factual allegations should be able to produce the supporting evidence without hiding behind a public records process — particularly when you and Mr. Melching are entities distinct from the City itself.

To be clear, the July 30, 8:47 p.m. police phone call is a matter of record. More than five business days is more than enough time to confirm your law firm's involvement.

As a reminder, here is my question from that July 31 email: *Before I proceed with any public records requests or further correspondence, I'd like to ask directly, were you or your office involved in any way with this call or the decision to contact law enforcement?*

-Jeffrey

On Fri, Aug 8, 2025 at 4:38 PM Sanders, Jessica <jsanders@rutan.com> wrote:

> Dear Mr. Gu,
>
> Please find the attached letters attached related to your California Public Records Act (CPRA) requests dated June 19, 2025, July 29, 2025, July 30, 2025, and August 1, 2025.
>
> We have further received your claim for damages sent by email to myself, Mr. Melching, the City Clerk, and the City Council on August 8, 2025. This claim has been forwarded to the City Clerk for review and processing.
>
> Consistent with my August 5, 2025 letter to you, to the extent the responses to any of your questions in your August 31, 2025 and August 5, 2025 emails to Attorney Melching and myself are contained within the documents produced to you in response to your multiple CPRA requests, any responsive, non-exempt records will be provided in compliance with the CPRA. However, in an effort to efficiently manage limited staff time and resources going forward, the City will not be separately inquiring and responding to your questions beyond what is required by the CPRA.
>
> Thank you

**Jess Sanders**

18575 Jamboree Road, 9th Floor | Irvine, CA 92612
O. (714) 641-5100 | D. (714) 662-4617

jsanders@rutan.com | www.rutan.com



_____
Privileged And Confidential Communication.
This electronic transmission, and any documents attached hereto, (a) are protected by the Electronic
Communications Privacy Act (18 USC §§ 2510-2521), (b) may contain confidential and/or legally privileged
information, and (c) are for the sole use of the intended recipient named above. If you have received this
electronic message in error, please notify the sender and delete the electronic message. Any disclosure,
copying, distribution, or use of the contents of the information received in error is strictly prohibited.

 Gmail

Jeffrey Gu <jeffwgu@gmail.com>

---

## Demand to Cease Contact with City of Irvine Staff

**Jeffrey Gu** <jeffwgu@gmail.com>                                    Thu, Aug 7, 2025 at 1:01 PM
To: "Sanders, Jessica" <jsanders@rutan.com>
Cc: William Go Web <WilliamGo@cityofirvine.org>, Mike Carroll Web <MikeCarroll@cityofirvine.org>, Melinda Liu Web
<MelindaLiu@cityofirvine.org>, Betty Martinez Franco Web <bettymartinez@cityofirvine.org>, Kathleen Treseder Web
<KathleenTreseder@cityofirvine.org>, jmelching@rutan.com, LarryAgran@cityofirvine.org, cm@cityofirvine.org

Hi Ms. Sanders,

I am still waiting on your and the City's response to the 4 points from my last email and my email dated 7/31 to you
and Mr. Melching, which has gone unanswered and unacknowledged for 5 business days.

Please again note from my last email: *repeatedly asking me to route inquiries to generally unresponsive individuals
such as yourself and Mr. Melching could be construed as acts of bad faith.*

-Jeffrey

On Tue, Aug 5, 2025 at 12:57 PM Jeffrey Gu <jeffwgu@gmail.com> wrote:

Hi Ms. Sanders,

In your letter, you make certain claims, and I would like to ask you to detail certain ones.

1) Could you please name the date, time, and individual I supposedly contacted for Ms. Pham's contact
information?
2) Could you please name the date and times on which I supposedly tried to contact Ms. Pham again?
3) Could you please provide the factual basis for the City and the Irvine Police Department's decision to "take
precautionary measures to preserve Ms. Pham's safety and well-being" in response to my alleged actions?
4) Which individuals or City departments were notified by you, your office, or the City to take "precautionary
measures to preserve Ms. Pham's safety and well-being" as a result of my alleged actions?

Given the mysterious Irvine Police Department phone call from an unknown number I received on 7/30 at 8:47pm
(approximately 4 and a half hours after I called Councilman Go's office and ended up speaking with Ms. Pham), I
specifically avoided calling the City Council's office again after that point, due to the fact that it seemed to signify I
would be treated with undue hostility. As such, some of these claims are news to me. To be clear, while I did indeed
contact the City of Irvine HR department on 7/31 at 12:22pm (a call lasting 12 minutes) to confirm Ms. Pham's full
name and title (which the individual on the phone said is "Supervising Principal Council Executive Assistant" and not
"Marketing Communications Manager" as it states on her LinkedIn), I did not attempt to gain any other information
about her during that call. To note, it would've been superfluous for me to ask for her contact info, since calling
Councilman Go's office appears to be one manner of reaching her. Lastly, when I called the general City of Irvine
number on 8/1, someone from the HR department informed me that they could not even release the title of Kalvin
Alvarez to me, so I assume the information you may provide, if it exists, will be dated as 7/31.

In addition to the letter you just emailed me, I am attaching a copy of an email I sent last Thursday, which as of yet,
3 business days later, remains unanswered by either you or Mr. Melching. While I understand that the City finds my
communications and research with the Building & Safety Department to be sensitive for some reason, repeatedly
asking me to route inquiries to generally unresponsive individuals such as yourself and Mr. Melching could be
construed as acts of bad faith.

I await your response to the 4 matters above.

-Jeffrey

On Tue, Aug 5, 2025 at 10:15 AM Sanders, Jessica <jsanders@rutan.com> wrote:

Good morning Mr. Gu,

Please find the attached letter related to your recent contact with the City of Irvine.  As mentioned therein, please direct all correspondence related to City inquiries and records requests to me.  I will coordinate with the City to ensure your records requests are processed in the manner required by law.

With regard to your email to Mr. Floyd, the City has received your email.  To the extent any of the documents provided in response to your records requests contain the information you seek, those documents will be provided where required by the Public Records Act.

Thank you

**Jess Sanders**

18575 Jamboree Road, 9th Floor | Irvine, CA 92612
O. (714) 641-5100 | D. (714) 662-4617

jsanders@rutan.com | www.rutan.com



_____

Privileged And Confidential Communication.
This electronic transmission, and any documents attached hereto, (a) are protected by the Electronic Communications Privacy Act (18 USC §§ 2510-2521), (b) may contain confidential and/or legally privileged information, and (c) are for the sole use of the intended recipient named above. If you have received this electronic message in error, please notify the sender and delete the electronic message. Any disclosure, copying, distribution, or use of the contents of the information received in error is strictly prohibited.

 Gmail

Jeffrey Gu <jeffwgu@gmail.com>

# Handrail guidance

**Jeffrey Gu** <jeffwgu@gmail.com>                                      Fri, Jun 27, 2025 at 4:10 PM
To: Jesse Cardoza <JCardoza@cityofirvine.org>
Cc: Stephanie Frady <SFrady@cityofirvine.org>, Claudia Landeras-Sobaih <clanderas-sobaih@cityofirvine.org>, Michelle Grettenberg <mgrettenberg@cityofirvine.org>, Kalvin Alvarez <KalvinAlvarez@cityofirvine.org>, William Go Web <WilliamGo@cityofirvine.org>, Mike Carroll Web <MikeCarroll@cityofirvine.org>, Melinda Liu Web <MelindaLiu@cityofirvine.org>, Betty Martinez Franco Web <bettymartinez@cityofirvine.org>, Kathleen Treseder Web <KathleenTreseder@cityofirvine.org>

Hi Jesse,

I will assume, because of your professional history, that you were basing it on your engineering judgment.

-Jeffrey

On Thu, Jun 26, 2025 at 1:48 PM Jeffrey Gu <jeffwgu@gmail.com> wrote:

> Hi Jesse,
>
> Could you please provide some clarity on the prior?
>
> -Jeffrey
>
> On Tue, Jun 24, 2025 at 5:11 PM Jeffrey Gu <jeffwgu@gmail.com> wrote:
>
>> Sure, thank you for confirming that the City did not follow the protocol here because it did not believe it needed to. If I am mistaken in my summary, please let me know.
>>
>> And when you used the phrase "professional experience", which professional experience were you referring to?
>>
>> On Tue, Jun 24, 2025 at 3:55 PM Jesse Cardoza <JCardoza@cityofirvine.org> wrote:
>>
>>> Mr. Gu,
>>>
>>> Thank you for your follow-up question, and I apologize for the delayed response.
>>>
>>> You mentioned in your initial email that the CSBC provided you with information about "alternative approvals" per CBC 1.8.7, and you asked whether the City adhered to these protocols for the approval of the handrails in question. I previously provided a detailed response explaining the relevance of the section you referred to and outlined my responsibility to interpret the code in this context.
>>>
>>> You then stated that your inquiry was a "yes" or "no" question, suggesting no other response was possible. However, in this case, there is another option – "not applicable."
>>>
>>> Simply put, the approval protocol you mentioned does not apply to the handrails in question because there was no approval of an alternate.
>>>
>>> Please let me know if you have any further questions.
>>>
>>>
>>> **Jesse Cardoza, PE, CASp**
>>>
>>> Deputy Director of Community Development/Chief Building Official
>>>
>>> 949-724-6377

**From:** Jeffrey Gu <jeffwgu@gmail.com>
**Sent:** Tuesday, June 24, 2025 10:54 AM
**To:** Jesse Cardoza <JCardoza@cityofirvine.org>
**Cc:** Stephanie Frady <SFrady@cityofirvine.org>; Claudia Landeras-Sobaih <clanderas-sobaih@cityofirvine.org>; Michelle Grettenberg <mgrettenberg@cityofirvine.org>; Kalvin Alvarez <KalvinAlvarez@cityofirvine.org>; William Go Web <WilliamGo@cityofirvine.org>; Mike Carroll Web <MikeCarroll@cityofirvine.org>; Melinda Liu Web <MelindaLiu@cityofirvine.org>; Betty Martinez Franco Web <bettymartinez@cityofirvine.org>; Kathleen Treseder Web <KathleenTreseder@cityofirvine.org>
**Subject:** Re: Handrail guidance

 **CAUTION:** EXTERNAL EMAIL

Hi Jesse,

I will assume the answer is "no" until I hear otherwise. If there is someone who can also answer this question, I am happy to talk to them.

-Jeffrey

On Thu, Jun 19, 2025 at 8:46 AM Jeffrey Gu <jeffwgu@gmail.com> wrote:

Hi Jesse,

Yes, I do have another question. My last question was a yes or no question. Is your answer to it yes or no?

-Jeffrey

On Wed, Jun 18, 2025 at 7:09 PM Jesse Cardoza <JCardoza@cityofirvine.org> wrote:

Mr. Gu,

Thank you for your inquiry and the reference email.

I am aware of the requirements of California Building Code (CBC) Section 1.8.7.2.1, similar to CBC 104.11 but applicable only to housing construction; however, as stated in my previous email, since the code language applicable to handrail graspability explicitly allows for handrail sections that provide equivalent graspability, a discretionary approval of an alternate design per CBC 1.8.7 is unnecessary.

Instead, my task is to determine whether the handrail dimensions "provide equivalent graspability" based on my understanding of the code's intent, professional experience, and industry practice. I have done so, and as previously stated, I have determined the specific increased size does not significantly affect graspability for the vast majority of users.

Please let me know if you have any further questions.

**Jesse Cardoza, PE, CASp**

Deputy Director of Community Development/Chief Building Official

949-724-6377

**From:** Jeffrey Gu <jeffwgu@gmail.com>
**Sent:** Wednesday, June 18, 2025 4:21 PM
**To:** Jesse Cardoza <JCardoza@cityofirvine.org>
**Cc:** Stephanie Frady <SFrady@cityofirvine.org>; Claudia Landeras-Sobaih <clanderas-sobaih@cityofirvine.org>
**Subject:** Fwd: Handrail guidance

 **CAUTION:** EXTERNAL EMAIL

Hi Jesse,

The CSBC provided me this information about alternative approvals. Does the City indeed believe it followed this protocol here?

-Jeffrey

---------- Forwarded message ---------
From: **CBSC@DGS** <CBSC@dgs.ca.gov>
Date: Wed, Jun 18, 2025 at 3:41 PM
Subject: RE: Handrail guidance
To: Jeffrey Gu <jeffwgu@gmail.com>

Hello Jeffrey,

Thank you for contacting the California Building Standards Commission (CBSC) with your inquiry. CBSC administers the development, adoption, and publication of the California Building Standards Code (Title 24, California Code of Regulations), in coordination with various other state agencies. However, the responsibility for the enforcement and administration of building standards, including alternative approvals, is under the authority of the local city or county building departments.

For residential projects, there is a section in the California Residential Code (below) that local jurisdictions must follow. Many cities and counties have amended this section, so this is another reason to check with the local jurisdiction. For non-residential projects, similar provisions can be found in the California Building Code Section 1.2.3.

I have to reiterate that many cities and counties amend this section, so discussion with the local building department is always a plus.

I hope this information helps.

**1.8.7.2.1 Approval of alternates.**

The consideration and approval of alternates by a local building department shall comply with the following procedures and limitations:

1. *1.The approval shall be granted on a case-by-case basis.*
2. *2.Evidence shall be submitted to substantiate claims that the proposed alternate, in performance, safety and protection of life and health, conforms to, or is at least equivalent to, the standards*

*contained in this code and other rules and regulations promulgated by the Department of Housing and Community Development.*

3. *3.The local building department may require tests performed by an approved testing agency at the expense of the owner or owner's agent as proof of compliance.*
4. *4.If the proposed alternate is related to accessibility in covered multifamily dwellings or in facilities serving covered multifamily dwellings as defined in CBC Chapter 2, the proposed alternate must also meet the threshold set for equivalent facilitation as defined in Chapter 2 of the California Building Code.*

*For additional information regarding approval of alternates by a building department pursuant to the State Housing Law, see California Health and Safety Code Section 17951(e) and California Code of Regulations, Title 25, Division 1, Chapter 1, Subchapter 1.*

### 1.8.7.3 Department of Housing and Community Development.

The Department of Housing and Community Development may approve alternates for use in the erection, construction, reconstruction, movement, enlargement, conversion, alteration, repair, removal or demolition of apartments, condominiums, hotels, motels, lodging houses, dwellings, or an accessory thereto and permanent buildings in mobilehome parks and special occupancy parks. The consideration and approval of alternates shall comply with the following:

1. *1.The department may require tests at the expense of the owner or owner's agent to substantiate compliance with the California Building Standards Code.*
2. *2.The approved alternate shall, for its intended purpose, be at least equivalent in performance and safety to the materials, designs, tests or methods of construction prescribed by this code.*

**Stoyan Bumbalov**

Executive Director

California Building Standards Commission

dgs.ca.gov/BSC

(916) 263-0998



CONFIDENTIALITY NOTICE: *This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed. It may contain information that is confidential and prohibited*

*from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination or copying of this message or any attachment is strictly prohibited. If you have received this message in error, please notify the original sender immediately by telephone or by return e-mail and delete this message, along with any attachments, from your computer. Thank you.*

# Exhibit 278

 

## IPD REPORT REQUEST 25-08420

1 message

**IPD Record Request** <IPDRecordRequest@cityofirvine.org>          Mon, Oct 27, 2025 at 9:57 PM
To: "jeffwgu@gmail.com" <jeffwgu@gmail.com>

Your request for body-worn camera (BWC) footage has been denied. BWC footage is not released unless it is subpoenaed in an active court case.

Please be advised that any inquiries or responses to this email address are not monitored.

The information contained in this email is confidential and is intended only for the use of the individual to whom it is addressed. This document is not to be copied, viewed, or stored by anyone other than the intended recipient. This document shall not be released in any manner without consent by Irvine Police Department.

# Exhibit 279

 Gmail

## Information on Case number 25 - 08420

**Jeffrey Gu** <jeffwgu@gmail.com>
To: hr@cityofirvine.org

Wed, Oct 29, 2025 at 12:27 PM

Hello,

I made another phone call at 9:04am to your department again asking for the same information. I was rudely hung up on by an employee named "Tai."

-Jeffrey

On Tue, Oct 28, 2025 at 12:28 PM Jeffrey Gu <jeffwgu@gmail.com> wrote:

Hello,

I am recounting a phone call I recently made to your department.

I spoke with Kira.
I asked her to provide me information about the individual who provided information to the IPD about case number IPD-25-08420.
She put me on hold twice.
She offered to find somebody who could call me later.

She then said the following:
I am not allowed to release confidential information.
I am not allowed to release any employee information.
I am not allowed to release anything.
I will transfer you to the police department.

I insisted to Kira on talking to an HR manager or supervisor. She said she'd get Nikki, on the phone. Nikki is not an HR manager or supervisor. I eventually get hung up on abruptly after being told to talk to Jessica Sanders.

-Jeffrey

10:44

✕  City of Irvine Main

Call History

**Outgoing Call**  Yesterday · 12:08 PM

Canceled

**Outgoing Call**  Yesterday · 12:04 PM

3 minutes

**Outgoing Call**  Tuesday · 12:02 PM

21 minutes

**Outgoing Call**  Tuesday · 12:01 PM

4 seconds

**Outgoing Call**  10/16/25 · 11:53 AM

8 minutes

**Outgoing Call**  10/16/25 · 11:51 AM

2 minutes

# Exhibit 280

 Gmail

Jeffrey Gu <jeffwgu@gmail.com>

---

## Report Number: OR-IPD-25-08420-001

**Emma Olague** <eolague@cityofirvine.org>                    Mon, Nov 3, 2025 at 4:08 PM
To: Jeffrey Gu <jeffwgu@gmail.com>

As previously mentioned, I'm unable to provide any additional information beyond the contents of the report you have received including who initiated the contact.

Officer Olague

Get Outlook for iOS

---

**From:** Jeffrey Gu <jeffwgu@gmail.com>
**Sent:** Monday, November 3, 2025 8:26:01 AM
**To:** Emma Olague <eolague@cityofirvine.org>
**Subject:** Re: Report Number: OR-IPD-25-08420-001

**CAUTION:** EXTERNAL EMAIL

Hi Officer Olague,

I called the records department this morning, and the staff said that they have no way of clarifying or adding to reports. Essentially, they said that you would be the primary source of information for a specific report. Could you please provide or direct me to another source of information for clarification on who initiated the supplemental report?

-Jeffrey

On Fri, Oct 31, 2025 at 5:46 PM Emma Olague <eolague@cityofirvine.org> wrote:

For any  questions or clarification concerning the report, please reach out to the Irvine Police Department Records Department.

Officer Olague

Get Outlook for iOS

---

**From:** Jeffrey Gu <jeffwgu@gmail.com>
**Sent:** Friday, October 31, 2025 10:51:07 AM

**To:** Emma Olague <eolague@cityofirvine.org>
**Subject:** Re: Report Number: OR-IPD-25-08420-001

**CAUTION:** EXTERNAL EMAIL

Hi Officer Olague,

I understand. For transparency, could you please tell me why?

-Jeffrey

On Fri, Oct 31, 2025 at 1:35 PM Emma Olague <eolague@cityofirvine.org> wrote:

> Good Morning,
>
> I'm unable to provide any additional information beyond the contents of the report you have received.
>
> Officer Olague
>
>
> Get Outlook for iOS
>
> _____
>
> **From:** Jeffrey Gu <jeffwgu@gmail.com>
> **Sent:** Friday, October 31, 2025 10:19:00 AM
> **To:** Emma Olague <eolague@cityofirvine.org>
> **Subject:** Re: Report Number: OR-IPD-25-08420-001
>
> **CAUTION:** EXTERNAL EMAIL
>
> Hi Officer Olague,
>
> Would you be able to provide clarity on this question?
>
> -Jeffrey
>
> On Thu, Oct 30, 2025 at 11:43 AM Jeffrey Gu <jeffwgu@gmail.com> wrote:
>> Hi Officer Olague,
>>
>> I am currently reading the narratives you wrote in the reports for case number IPD-25-08420. In the supplemental report, you write that "Officer M. Rakic (Badge No. 671) and I (Officer E. Olague, Badge No. 757) were notified that Jefferey GU contacted Counselman William GO'S office again today" and "I was informed the City of Irvine's Human Resources (HR) department initiated a cease and desist letter ".
>>
>> Could you please tell me who the initiators of contact were in these 2 situations?
>>
>> -Jeffrey

# Exhibit 281

**RUTAN**
RUTAN & TUCKER, LLP

Jess Sanders
E-mail: jsanders@rutan.com

November 3, 2025

**VIA E-MAIL**

Jeffrey Gu
jeffwgu@gmail.com
jeffreygu@proffer.info

  Re: Public Records Act Request Received October 28, 2025

Dear Mr. Gu,

  As you know, this office serves in the capacity of City Attorney for the City of Irvine ("City"). This letter is being sent in response to the above-referenced request under the California Public Records Act, Gov. Code, § 7920.000 et seq. (CPRA), which seeks the following:

> The name or names of the City of Irvine HR employees who spoke with the Irvine Police Department for reports of the case number IPD-25-08420.
>
> The name or names of the City of Irvine HR employees who helped draft the cease and desist letter sent on August 5, 2025 and also referenced in these police reports.

  This office has now determined that your request seeks certain records that are exempt from disclosure, including pursuant to Government Code sections 7922.000, 7923.600, 7927.705 (attorney-client and work product privileges). (Gov. Code, §§ 7922.000, 7923.600; 7927.705; *City of San Jose v. Superior Court* (1999) 74 Cal.App.4th 1008.)  The City did not identify any non-exempt public records responsive to your request.

  Please feel free to contact me should you have any questions regarding this matter.

    Very truly yours,

    RUTAN & TUCKER, LLP

    *Jess Sanders*

    Jess Sanders

JS:js
cc: City Clerk (via e-mail only)

Rutan & Tucker, LLP | 18575 Jamboree Road, 9th Floor
Irvine, CA 92612 | 714-641-5100 | Fax 714-546-9035
Orange County | Palo Alto | San Francisco | www.rutan.com

2905/048170-0301
22997681.1 a11/03/25

# Exhibit 282

 Gmail                                                    Jeffrey Gu <jeffwgu@gmail.com>

## CAD 25-08420

**Cord Blevins** <CBlevins@cityofirvine.org>                    Tue, Nov 4, 2025 at 11:13 AM
To: Jeffrey Gu <jeffwgu@gmail.com>

Good morning Mr. Gu,

I have been out of the office for a training class all last week.

Per the cease and desist letter, any further communications regarding City-related non-emergency matters should be directed via email to the City Attorney's Office, and specifically to Jess Sanders at jsanders@rutan.com.

 Cord Blevins | Detective | SWAT
Irvine Police Department | Threat Management
949-724-7051 | 1 Civic Center Plaza, Irvine, CA 92606
*cblevins@cityofirvine.org* | *cityofirvine.org*

---

**From:** Jeffrey Gu <jeffwgu@gmail.com>
**Sent:** Friday, October 31, 2025 11:50 AM
**To:** Cord Blevins <cblevins@cityofirvine.org>
**Subject:** Re: CAD 25-08420

**CAUTION:** EXTERNAL EMAIL

Hi Detective Blevins,

I've been trying to reach you to discuss case number 25-08420, having called your direct line several times since Monday. Please let me know when you might have time next week as there are certain details that are ambiguous.

-Jeffrey

On Thu, Oct 16, 2025 at 2:33 PM Jeffrey Gu <jeffwgu@gmail.com> wrote:
> Hi Detective Blevins,
>
> I was hoping to confirm a few details about this case, and I fully realize that there will be more details provided through my CPRA request.
>
> I called the IPD again to confirm whether or not there was a separate CAD number for a situation described in an August 5, 2025 letter from City Attorney Jessica Sanders. Seemingly, there is not, and the officer informed me that I should ask you about this. In the letter, Ms. Sanders describes that "It has become necessary for the City and the Irvine Police Department (IPD) to take precautionary matters to preserve Ms. Pham's safety and wellbeing." I would like to know about any details about these precautionary "measures" and how the IPD was involved.
>
> -Jeffrey

# Exhibit 283



January 26, 2021 1:24 PM
33,114 of 33,830






February 3, 2026 at 5:22 PM
33,136 of 33,830










February 19, 2025 at 5:07:27 PM
33,133 of 33,830

























February 27, 2026 at 6:23:25 PM
33,415 of 33,830













# Exhibit 284



















# Exhibit 285



18100 Von Karman Ave., Suite 700
Irvine, CA 92612
p (949) 271-8700
f (949) 627-2611
www.phlklaw.com

Rae Richardson, Attorney
rrichardson@phlklaw.com

March 12, 2026

**CEASE AND DESIST**

**VIA EMAIL & U.S. MAIL**

Jeffrey Gu                                          Jeffrey Gu
129 Oakstone                                   2332 N. Clay Street, Apt. 3
Irvine, CA  92618                            Denver, CO  80211
jeffwgu@gmail.com

Re:  ***Gu, Jeffrey v. The New Home Company, et al.***
      **Immediate Cease and Desist-Harassing Employees**
      PHLK File No.:        0066-2818

Dear Mr. Gu:

As you know, our office is outside counsel for Risewell Homes Inc. f/k/a The New Home Company Inc. ***The purpose of this letter is to once again request that you immediately cease and desist from trespassing on Risewell construction sites and from harassing conduct as it relates to Risewell and Risewell employees.***

We were advised that on March 3, 2025, you were found trespassing and harassing a Risewell employee working in the Olivewood Community by standing in front of him, face to face, and demanding that he tell you his name and the name of the company he works for. When a Risewell supervisor arrived onsite and asked you to leave, you became hostile, demanded that the employee answer your questions, and used profanity toward Risewell employees.  A city inspector was also onsite, and was verbally abused by you during this incident.  Further, you contacted Ms. Woodfin of this office on March 3, 2026 admitting that you were present at the construction site on March 3, 2026.

Despite Risewell's prior requests that you discontinue your pattern of trespassing and harassing conduct against Risewell and its employees, you continue to trespass and harass Risewell's employees.  Your prior and ongoing trespass and harassment of Risewell and its employees is outlined in our prior correspondence dated May 27, 2025, June 23 2025, July 17, 2025, August 5, 2025 and August 22, 2025.

**As such, you are hereby placed on notice that any continued trespass and harassment of Risewell or Risewell employees may result in immediate legal action without further warning.**  Nothing herein shall be deemed a waiver of any kind whatsoever.  To the contrary,



Risewell expressly reserves all rights, claims, and remedies to protect itself from further trespass and harassment.  Risewell reserves the right to pursue all appropriate corrective actions, including injunctive relief, restraining orders, and both civil and criminal penalties.

Sincerely,

Rae Richardson

RR

cc:     Brian C. Plante, Esq.
        Melanie S. Woodfin, Esq.
        Janelle Launi, Paralegal

# Exhibit 286

**RUTAN**
RUTAN & TUCKER, LLP

Jess Sanders
E-mail: jsanders@rutan.com

March 5, 2026

**VIA E-MAIL**

Jeffrey Gu
jeffwgu@gmail.com
jeffreygu@proffer.info

    Re:    <u>Public Records Act Request Received September 8, 2025</u>

Dear Mr. Gu,

    As you know, this office serves in the capacity of City Attorney for the City of Irvine ("City"). This letter is being sent in response to the above-referenced request under the California Public Records Act, Gov. Code, § 7920.000 et seq. (CPRA), which seeks the following:

> - Any communications between the City Attorney, the City Council's office, and the Irvine Police Department to justify actions taken to "preserve Ms. Pham's safety and wellbeing" as a result Jeffrey Gu's alleged actions
>
> - Any evidence showing Jeffrey Gu's "repeated calls and attempts to contact Ms. Pham, and requests for her personal contact information"

    On September 18, 2025, the City informed you that due to the need to search for, collect, and appropriately examine a voluminous amount of separate and distinct records and/or the need to consult with another agency having substantial interest in the determination of the request or among two or more components of the agency having substantial subject matter interest therein, the City's response time for this request would be extended to October 2, 2025 (Gov. Code, § 7922.535, subds. (b) & (c).)  On October 1, 2025, the City contacted you to inform you that the City was diligently processing your request, and estimated that responsive records would be available on or around November 10, 2025.  On November 10, 2025, the City provided you a first batch of non-exempt public records responsive to your request, and notified you that a second batch of non-exempt public records responsive to your request would be provided on or around December 22, 2025.  On November 22, 2025, the City provided you a second batch of non-exempt public records responsive to your request, and notified you that a third batch of non-exempt public records responsive to your request would be provided on or around March 9, 2026.

    This office has now determined that your request seeks certain records that are exempt from disclosure, including pursuant to Government Code sections 7922.000, 7923.600, 7927.200,

Rutan & Tucker, LLP | 18575 Jamboree Road, 9th Floor
Irvine, CA 92612 | 714-641-5100 | Fax 714-546-9035
Orange County | Palo Alto | San Francisco | www.rutan.com

2905/048170-0301
23490332.1 a03/05/26



Jeffrey Gu
March 5, 2026
Page 2

7927.500, and 7927.705 (attorney-client and work product privileges), and the City of Irvine Personal Information Privacy Act. (Gov. Code, §§ 7922.000, 7923.600, 7927.200, 7927.500, 7927.705; City of Irvine Personal Information Privacy Act, approved by the voters November 4, 2008.) Subject to and without waiving the above exemptions, a third and final batch of non-exempt disclosable records that the City deems to fall within the scope of your request are now being provided to you attached to this correspondence. For responsive records in which only portions of the records are protected by an applicable privilege or exemption, those redacted records or portions thereof, if any, are provided as well.

> This completes the City's review and processing of your request.

> Very truly yours,

> RUTAN & TUCKER, LLP

> *Jess Sanders*

> Jess Sanders

JS:js
cc:     City Clerk (via e-mail only)

2905/048170-0301
23490332.1 a03/05/26

| | |
|---|---|
| **From:** | Sam Floyd <SFloyd@cityofirvine.org> |
| **Sent:** | Monday, August 4, 2025 3:21 PM PDT |
| **To:** | Jeffrey Gu ████████████ |
| **CC:** | Business License <BusinessLicense@cityofirvine.org> |
| **Subject:** | RE: Notice of Unlicensed Operator in the City of Irvine 3 |

Hello Jeffrey,

Any further communications regarding any of your public records requests or other City-related matters should be directed via email to the City Attorney's Office, and specifically to Jess Sanders at jsanders@rutan.com.

**Sam Floyd** | CD Strategist
Community Development
949-724-7175 | 1 Civic Center Plaza, Irvine, CA 92606
*sfloyd@cityofirvine.org* | *cityofirvine.org*

**From:** Business License <BusinessLicense@cityofirvine.org>
**Sent:** Thursday, July 31, 2025 1:24 PM
**To:** Sam Floyd <SFloyd@cityofirvine.org>; Jeffrey Gu ████████████
**Subject:** FW: Notice of Unlicensed Operator in the City of Irvine 3

Hi Jeffery,

Thank you for your email. I am forwarding your email to my supervisor Sam Floyd to assist.

Thank you,

City of Irvine, Business Licensing
Community Develeopment
949-724-7128

**From:** Jeffrey Gu <j████████████
**Sent:** Thursday, July 31, 2025 12:00 PM
**To:** Business License <businesslicense@cityofirvine.org>
**Subject:** Notice of Unlicensed Operator in the City of Irvine 3

**CAUTION:** EXTERNAL EMAIL

Hello,

Harco National Insurance Company, part of IAT Insurance Group, appears to be operating in Irvine without a license. Their bonds cover construction companies, like TNHC Realty and Construction Inc, that operate within the city bounds.

Senior Claims Officer and Vice President of Legal: Frank Tanzola

973-776-8770
Frank.Tanzola@iatinsurance.com



-Jeffrey Gu

| | |
|---|---|
| **From:** | Baljit Gill <BGill@cityofirvine.org> |
| **Sent:** | Wednesday, August 20, 2025 3:18 PM PDT |
| **To:** | Nicolle Rogers <nrogers@cityofirvine.org> |
| **Subject:** | FW: City Attorney Cease-and-Desist and First Amendment Concerns |
| **Attachments:** | Sanders [2025_08_05] LTR to J. Gu re_ Inquiries to City of Irvine.pdf |

Hi Nicolle- How would I action on this email?



**Baljit Gill** | Senior Executive Assistant
City Manager's Office
949-724-7550 | 1 Civic Center Plaza, Irvine, CA 92606
*bgill@cityofirvine.org* | *cityofirvine.org*

**From:** Jeffrey Gu
**Sent:** Wednesday, August 20, 2025 2:39 PM
**To:** Larry Agran Web <LarryAgran@cityofirvine.org>; cm <cm@cityofirvine.org>
**Subject:** City Attorney Cease-and-Desist and First Amendment Concerns

**CAUTION:** EXTERNAL EMAIL

Hello Mr. Agran and Mr. Crumby,

I'm writing to express concern about the cease-and-desist letter issued to me on August 5, 2025, by City Attorney Jessica Sanders. The letter instructed me to refrain from direct communication with City staff, and to route all further correspondence exclusively through her office. I have attached the letter for reference.

Because this directive was presented as an official position of the City, I would like to confirm whether it reflects the City's stance towards my inquiries. Given that the letter touches on issues of protected speech and access to public officials, I thought it appropriate to ensure you're both informed.

At this point, I'm simply looking to clarify the City's position so I can proceed with confidence that my conduct aligns with expectations and legal norms. If you believe this matter has been appropriately handled, no further response is necessary.

Sincerely,

Jeffrey Gu

**RUTAN**
RUTAN & TUCKER, LLP

**Jess Sanders**
E-mail: jmelching@rutan.com

August 5, 2025

**VIA E-MAIL ONLY**

Jeffrey Gu

██████████████

Re:     Demand to Cease and Desist Direct Contact with Irvine City Staff and Offices

Dear Mr. Gu,

This office serves in the capacity of City Attorney for the City of Irvine ("City"). My office has been advised that your recent actions and contact with City staff have caused a significant disruption to the operations of the City and have raised concerns regarding the safety and wellbeing of City staff.

Beginning on or around June 1, 2025, you have submitted over 24 separate public records requests pursuant to the California Public Records Act (Gov. Code, § 7920.000 et seq.) (CPRA), and have been in persistent contact with the City's Community Development Department, Human Resources Department, City Clerk's Department, and Councilmember Go's office, sometimes calling as many as three to four times per day.  You have contacted various staff members with a deluge of inquiries in a volume that has materially impaired the City's ability to conduct its business efficiently.

In addition, your conduct regarding a member of Councilmember Go's staff, Ms. Trinity Pham is of particular concern.  Your repeated calls and attempts to contact Ms. Pham, and requests for her personal contact information are inappropriate and not related to any legitimate request for service or information from the City.  It has become necessary for the City and the Irvine Police Department (IPD) to take precautionary matters to preserve Ms. Pham's safety and wellbeing.

While the City is committed to transparency and compliance with all applicable laws, your actions to date have escalated beyond reasonable requests for information or service.  This demand to cease and desist is sent to you to both preserve Ms. Pham's safety and prevent further disruption to City operations.

Accordingly, we demand that you **immediately cease all direct contact with City staff and offices**, except for attending duly noticed public meetings conducted by the City and in cases of emergency where calls for service may be directed to the Irvine Police Department.  Any further communications regarding any of your CPRA requests or other City-related matters should be directed via email to the City Attorney's Office, and specifically to myself at jsanders@rutan.com.



Jeffrey Gu
August 5, 2025
Page 2

As of the date of this correspondence, the City has expended significant amounts of staff and City Attorney time, as well as City funds and resources to manage your numerous and ongoing inquiries. This imposes an unreasonable burden on City staff and resources, which are for the benefit of the people of the City as a whole. To the extent the answers to any of your inquiries are contained within documents produced to you in response to your CPRA requests, any responsive, non-exempt records will be provided in compliance with the CPRA. However, in an effort to conserve City resources moving forward, the City will not be separately inquiring and responding to your inquiries outside of the scope of what is required by the CPRA. These measures are not taken to single you out or deny you any rights to access City documents or meetings provided by applicable law, but rather to efficiently manage the limited resources available to serve all City residents.

Any direct correspondence to City staff will be forwarded to myself for review and response as appropriate. Unless deemed necessary or appropriate, you will not receive further direct responses from City staff in response to your inquiries or requests. To the extent any of your communications require a response, you will receive responses from our office as appropriate, but no more than once every two weeks. This timeframe does not apply to responding to your CPRA requests in compliance with the timeframes provided therein.

Failure to comply with this demand may result in further legal action to protect the safety and operations of the City and its employees. We hope to resolve this matter amicably and without the need for further intervention.

Thank you for your immediate attention to this matter.

Very truly yours,

RUTAN & TUCKER, LLP

Jess Sanders

JS.js

| From: | Jeanne Baran <JBaran@cityofirvine.org> |
|---|---|
| Sent: | Monday, August 25, 2025 5:22 PM PDT |
| To: | Michelle Grettenberg <mgrettenberg@cityofirvine.org> |
| Subject: | FW: City Attorney Cease-and-Desist and First Amendment Concerns |
| Attachments: | [2025_08_25] Ltr to J. Gu RE_ Further Demand to Cease and Desist Contact with City Staff and Contractors.pdf |

 **Jeanne Baran** | Chief of Staff, Mayor Agran
949-724-6226 | 1 Civic Center Plaza, Irvine, CA 92606
*jbaran@cityofirvine.org* | *Website* | *FB*

**From:** Jeffrey Gu ██████████████
**Sent:** Monday, August 25, 2025 4:04 PM
**To:** Larry Agran Web <LarryAgran@cityofirvine.org>; cm <cm@cityofirvine.org>
**Subject:** Re: City Attorney Cease-and-Desist and First Amendment Concerns

**CAUTION:** EXTERNAL EMAIL

On Mon, Aug 25, 2025 at 7:02 PM Jeffrey Gu  wrote:

Hi Mr. Agran and Mr. Crumby,

I am attaching another letter sent by the City Attorney's office to me and wanted to confirm that you affirm the content of the letter. I suppose if so, like with my other email, no further response is necessary.

-Jeffrey

On Fri, Aug 22, 2025 at 5:47 PM Jeffrey Gu ██████████████ wrote:

Hi Mr. Agran and Mr. Crumby,

I'm just confirming that it's been 2 business days since I sent the previous email regarding potential civil rights violations with no responses or acknowledgements from either of you.

-Jeffrey

On Wed, Aug 20, 2025 at 5:39 PM Jeffrey Gu  wrote:

Hello Mr. Agran and Mr. Crumby,

I'm writing to express concern about the cease-and-desist letter issued to me on August 5, 2025, by City Attorney Jessica Sanders. The letter instructed me to refrain from direct communication with City staff, and to route all further correspondence exclusively through her office. I have attached the letter for reference.

Because this directive was presented as an official position of the City, I would like to confirm whether it reflects the City's stance towards my inquiries. Given that the letter touches on issues of protected speech and access to public officials, I thought it appropriate to ensure you're both informed.

At this point, I'm simply looking to clarify the City's position so I can proceed with confidence that my conduct aligns with expectations and legal norms. If you believe this matter has been appropriately handled, no further response is necessary.

Sincerely,

Jeffrey Gu



**Jess Sanders**
E-mail: jmelching@rutan.com

August 25, 2025

**VIA E-MAIL ONLY**

Jeffrey Gu

████████████████

    Re:    <u>Further Demand to Cease and Desist Direct Contact with Irvine City Staff and Offices</u>

Dear Mr. Gu,

As you know, this office serves in the capacity of City Attorney for the City of Irvine ("City").

I am writing to follow up on the cease and desist letter issued to you by my office on August 5, 2025 which demanded in part that you immediately cease all direct contact with City staff and offices. Despite the clear instructions to direct all correspondence exclusively through me by email, it has come to our attention that you continue to harass multiple City staff, contractors, and offices via persistent emails and phone calls, including calls where you have researched and raised the respondent's personal details on social media.

Your behavior is disruptive and threatening, and in flagrant default of the City's August 5, 2025 cease and desist letter.

You are hereby reminded that **all communications regarding City matters, including those directed to City staff and contractors must be directed solely to me via email.** I will transmit public comments and questions to the relevant City parties as necessary and appropriate. **You are not to contact City staff and offices directly by either email or phone calls.** Those staff and offices have been directed not to engage with your attempts to contact them except through me via email. You are further directed not to contact our office by telephone. Your calls will be terminated and will not be answered. You may correspond with myself and Attorney Melching via email **only**.

You may continue to exercise your legal rights to access City records through the California Public Records Act, submit emergency calls for service to the City's Police Department, comment on matters of public business (which must be submitted to me by email and will be forwarded as appropriate), and attend public meetings. However, you are reminded there is no legal right for members of the public to have unfettered access to public employees, offices, and officials.

Rutan & Tucker, LLP | 18575 Jamboree Road, 9th Floor
Irvine, CA 92612 | 714-641-5100 | Fax 714-546-9035
Orange County | Palo Alto | San Francisco | Scottsdale | www.rutan.com



Jeffrey Gu
August 25, 2025
Page 2

  Failure to comply with these directives will leave us with no choice but to consider further action to protect the City's interests, including instituting legal action against you.  We urge you to adhere to the direction in this letter and the City's August 5, 2025 cease and desist letter to avoid further escalation.

  We hope to resolve this matter amicably and without the need for further intervention. Your immediate compliance with these directives is expected and appreciated.

    Very truly yours,

    RUTAN & TUCKER, LLP

    Jess Sanders

    Jess Sanders

JS.js

| From: | Ashley Uribe <AUribe@cityofirvine.org> |
| Sent: | Thursday, September 4, 2025 8:59 AM PDT |
| To: | Daniel Kim <dkim@cityofirvine.org> |
| Subject: | [Review/Approve] - Extension Letter - J. Gu #4457333 |
| Attachments: | Extension - J. Gu #4457333.docx |

Hi Daniel,

Please review/approve the attached extension letter for J. Gu # 4457333.

Thanks!



**Ashley Uribe, MPA** | Lead Information Specialist
City Clerk Department – Office of Records
949-724-6741 | 1 Civic Center Plaza, Irvine, CA 92606
auribe@cityofirvine.org | cityofirvine.org



CITY CLERK'S OFFICE OF RECORDS AND INFORMATION

One Civic Center Plaza, P.O. Box 19575, Irvine, CA  92623-9575

September 4, 2025

Jeffrey Gu
2332 N. Clay St.
Denver, CO 80211

Dear Jeffrey Gu:

This letter is in reference to your August 25, 2025, request under the California Public Records Act (Government Code § 7920.000 et seq.) regarding the following items:

- The contents and metadata related to Jeffrey Gu's "calls where you have researched and raised the respondent's personal details on social media", related to the cease and desist letter.

- The emails and call metadata related to formulating the cease and desist letter.

Additional time is required to search for and collect the requested records from field facilities or other establishments that are separate from the office processing the request.  Under the California Public Records Act (Government Code § 7922.535(c) et seq.), an extension of an additional 14 days is appropriate under these circumstances.

Based on the initial 10-day response period and the additional 14-day extension period, our office will contact you on or before September 18, 2025, regarding the disposition of the requested records.

Sincerely,

Daniel Kim
Municipal Records Administrator

# Exhibit 287

**Basic Course Workbook Series**



# Learning Domain 18

# Investigative Report Writing

*Version 4.0*

**COMMISSION** ON **PEACE OFFICER STANDARDS** AND **TRAINING**

**Basic Course Workbook Series**
**Student Materials**
**Learning Domain 18**
**Investigative Report Writing**
**Version 4.0**

© Copyright 2008
California Commission on Peace Officer Standards and Training (POST)
All rights reserved.

Published 1999
Revised January 2006
Revised July 2008
Correction May 2015
Revised April 2021
Revised July 2025

This publication may not be reproduced, in whole or in part, in any form or by any means electronic or mechanical or by any information storage and retrieval system now known or hereafter invented, without prior written permission of the California Commission on Peace Officer Standards and Training, with the following exception:

California law enforcement or dispatch agencies in the POST program, POST-certified training presenters, and presenters and students of the California basic course instructional system are allowed to copy this publication for non-commercial use.

All other individuals, private businesses and corporations, public and private agencies and colleges, professional associations, and non-POST law enforcement agencies in-state or out-of-state may purchase copies of this publication, at cost, from POST as listed below:

From POST's Website:

*https://post.ca.gov*

Go to *https://post.ca.gov/Download-Student-Workbooks*

# POST COMMISSIONERS



*The POST Commission forms a balanced group of city and county administrators, law enforcement professionals, educators, and public members. The Governor appoints 15 of the Commissioners, with the advice and consent of the Senate, for three-year overlapping terms. The Speaker of the Assembly and the Senate Pro Tempore also each appoint one Commissioner. The Attorney General is an ex-officio member and serves as the 18th POST Commissioner*

**Geoff Long**- *Chair*
Public Member

**Rick Braziel** - *Vice Chair*
Educator,
Cal Poly Humboldt

**Alan Barcelona**
Special Agent,
Department of Justice

**Shannan Moon**
Sheriff,
Nevada County Sheriff's Office

**Kelly Gordon**
Chief,
Santa Barbara Police Department

**Tina Nieto**
Sheriff,
Monterey County Sheriff's Office

**Benjamin Therriault**
Sergeant,
Richmond Police Department

**Jacob Johnson**
Officer,
California Highway Patrol

**Ingrid Braun**
Sheriff,
Mono County Sheriff's Office

**P. Lamont Ewell**
Public Member

**Jim Cooper**
Sheriff,
Sacramento County Sheriff's Office

**Justin Doering**
Senior Deputy Sheriff,
Ventura County Sheriff's Office

**Rob Bonta**
Attorney General,
Department of Justice
Ex Officio Member

## THE MISSION OF POST

The mission of the California Commission on Peace Officer Standards and Training is to continually enhance the professionalism of California law enforcement in serving its communities.

## THE ACADEMY TRAINING MISSION

The primary mission of basic training is to prepare students mentally, morally, and physically to advance into a field training program, assume the responsibilities, and execute the duties of a peace officer in society.

## FOREWORD

The California Commission on Peace Officer Standards and Training sincerely appreciates the efforts of the many curriculum consultants, academy instructors, directors and coordinators who contributed to the development of this workbook. We must also thank the California law enforcement agency executives who allowed their personnel to participate in the development of these training materials.

This student workbook is part of the POST Basic Course Training System. The workbook component of this system provides a self-study document for every learning domain in the Basic Course. Each workbook is intended to be a supplement to, not a substitute for, classroom instruction. The objective of the system is to improve academy student learning and information retention and ultimately contribute to you becoming a peace officer committed to safety, and to the communities you will serve.

The content of each workbook is organized into sequenced learning modules to meet requirements as prescribed both by California law and the POST Training and Testing Specifications for the Basic Course.

It is our hope that the collective wisdom and experience of all who contributed to this workbook will help you, the student, to successfully complete the Basic Course and to enjoy a safe and rewarding career as a peace officer.


MANUEL ALVAREZ, Jr.
Executive Director

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ I

HOW TO USE THE WORKBOOK ............................................................................ II

**CHAPTER 1 INTRODUCTION TO INVESTIGATIVE REPORT WRITING** ..................................... 1-1

OVERVIEW............................................................................................. 1-1

INVESTIGATIVE REPORTS AND THE JUDICIAL PROCESS .................................................. 1-2

USES OF INVESTIGATIVE REPORTS ............................................................... 1-6

CHARACTERISTICS OF AN EFFECTIVE INVESTIGATIVE REPORT .................................... 1-11

CHAPTER SYNOPSIS ............................................................................ 1-17

WORKBOOK LEARNING ACTIVITIES ........................................................ 1-18

**CHAPTER 2 FIELD NOTES** ............................................................................... 2-1

OVERVIEW............................................................................................. 2-1

INTRODUCTION TO FIELD NOTES............................................................... 2-3

NOTETAKING PROCESS DURING A FIELD INTERVIEW ................................. 2-9

OPINIONS, FACTS, AND CONCLUSIONS .................................................... 2-14

CHAPTER SYNOPSIS ............................................................................ 2-17

WORKBOOK LEARNING ACTIVITIES ........................................................ 2-18

**CHAPTER 3 FUNDAMENTAL CONTENT ELEMENTS OF INVESTIGATIVE REPORTS** ................. 3-1

OVERVIEW............................................................................................. 3-1

QUESTIONS ANSWERED BY AN EFFECTIVE INVESTIGATIVE REPORT ............................. 3-3

FUNDAMENTAL CONTENT ELEMENTS ...................................................... 3-9

CHAPTER SYNOPSIS ............................................................................ 3-15

WORKBOOK LEARNING ACTIVITIES ........................................................ 3-17

**CHAPTER 4 INVESTIGATIVE REPORT WRITING MECHANICS** ..................................... 4-1

OVERVIEW............................................................................................. 4-1

RECOMMENDED GRAMMAR FOR INVESTIGATIVE REPORTS ........................................... 4-3

WRITING CLEARLY AND PRECISELY ....................................................... 4-8

PROOFREADING ................................................................................... 4-19

CHAPTER SYNOPSIS ............................................................................ 4-21

WORKBOOK LEARNING ACTIVITIES ........................................................ 4-23

**SUPPLEMENTARY MATERIAL** ....................................................................... S-1

OVERVIEW............................................................................................. S-1

PARTS OF SPEECH ............................................................................... S-2

PUNCTUATION ..................................................................................... S-3

COMMON LAW ENFORCEMENT ABBREVIATIONS ....................................... S-5

STATE ABBREVIATIONS ........................................................................ S-12

CRIME INFORMATION REFERENCE GUIDE .............................................. S-13

**GLOSSARY** ............................................................................................ **G-1**

# INTRODUCTION

## Student Workbooks

The student workbooks are part of the POST Basic Course Instructional System. This system is designed to provide students with a self-study document to be used in preparation for classroom training.

## Regular Basic Course Training Requirement

Completion of the Regular Basic Course is required, prior to exercising peace officer powers, as recognized in the California Penal Code and where the POST-required standard is the POST Regular Basic Course.

## Student Workbook Elements

The following elements are included in each workbook:

- Chapter contents, including a synopsis of key points,

- Supplementary material, and

- A glossary of terms used in this workbook.

## HOW TO USE THE WORKBOOK

### Introduction

This workbook provides an introduction to the training requirements for this Learning Domain. It is intended to be used in several ways: for initial learning, for test preparation, and for remedial training.

### Workbook Format

To use the workbook most effectively, follow the steps listed below.

| Step | Action |
|:---:|---|
| 1 | Begin by reading the: Introduction and How to Use the Workbook, which provides an overview of how the workbook fits into the POST Basic Course Instructional System and how it should be used. |
| 2 | Refer to the Chapter Synopsis section at the end of each chapter to review the key points that support the chapter objectives. |
| 3 | Read the text. |
| 4 | Complete the Workbook Learning Activities at the end of each chapter. These activities reinforce the material taught in the chapter. |
| 5 | Refer to the Glossary section for a definition of important terms. When first referenced these terms will be bolded and underlined (e.g., **term**). |

II

# Chapter 1
# Introduction to Investigative Report Writing

## OVERVIEW

### Learning Need

A peace officer's ability to clearly document the facts and activities of an investigation not only reflects on the officer's own professionalism, but also on the ability of the justice system to prosecute the criminal case.

### Learning Objectives

The chart below identifies the student learning objectives for this chapter.

| After completing study of this chapter, the student will be able to: | Objective ID |
|---|---|
| • Explain the legal basis for requiring investigative reports. | 18.01.2 |

### In This Chapter

This chapter focuses on background information regarding the writing of investigative reports. Refer to the following table for specific topics.

| Topic | See Page |
|---|---|
| Investigative Reports and the Judicial Process | 1-2 |
| Uses of Investigative Reports | 1-6 |
| Characteristics of an Effective Investigative Report | 1-11 |
| Chapter Synopsis | 1-17 |
| Workbook Learning Activities | 1-18 |

# INVESTIGATIVE REPORTS AND THE JUDICIAL PROCESS

## Introduction

As much as 40% of a peace officer's work involves writing. Good investigative skills can be diminished if officers do not have the necessary writing skills to record their observations, findings, and actions clearly and concisely.

## Investigative Report

An **investigative report** is a written document prepared by a peace officer that records in detail the officer's observations and actions as they relate to a specific event or incident.

Each investigative report is a legal document that becomes a permanent written record of that event or incident.

## Judicial Process

A suspect's freedom, rights or privileges cannot be taken away or denied unless there is sufficient cause to justify such action.

In order to ensure *due process*, officers, prosecutors, judges, etc., must have sufficient information and evidence to initiate or continue the judicial process and successfully prosecute or exonerate a suspect.

## Officer's Reports and The Judicial Process

The judicial process cannot function without the investigative reports written by the officers who have the direct knowledge of an event or incident.

An officer's report must present each event or incident in a complete and clear manner. Any investigation, arrest, prosecution, or other action taken must be initiated, supported, or justified by the information included in the report written by that officer.

Because peace officer's reports are so important to the judicial process, each one must be able to stand up to critical review and legal scrutiny.

## Statutory Requirement

State and federal statutes mandate that law enforcement agencies report certain events and incidents. *Penal Code Section 11107* requires each sheriff or police chief executive to furnish reports of specified misdemeanors and felonies to the Department of Justice.

Such reports must:

- Describe the nature and character of each crime,

- Note all particular circumstances of that crime, and

- Include all additional or supplemental information pertaining to the suspected criminal activity.

Although the statutes are directed at the executive level, officers in the field are the ones who carry out the task of writing the reports. It is those officers' reports that contain the information that will eventually be forwarded to the Department of Justice.

## Specified Crimes

Specified misdemeanors and felonies that require investigative reports, as required under *Penal Code Section 11107*, include, but are not limited to:

- Forgery,

- Fraud-bunco,

- Bombings,

- Receiving or selling stolen property,

- Safe and commercial burglary,

- Grand theft,

- Child abuse,

- Homicide,

- Threats,

- Offenses involving lost, stolen, found, pledged, or pawned property,

- Domestic abuse, and

- Sex crimes.

## Failure To File a Report

Peace officers have a legal and moral duty to investigate and accurately report crimes or incidents that come to their attention. Failure to uphold this responsibility can have negative consequences for officers.

- Deliberate failure to report a crime may be considered a violation of agency regulations and grounds for disciplinary action.

- Any officer who knowingly files a false report will be guilty of a crime. *(Penal Code Section 118.1)*

## Ethics

All reports are to be true, unbiased, and unprejudiced. These are easy words to say, but sometimes hard to live by. It is not always easy to know or find out the truth. Clearly it is the peace officer's moral obligation to seek the truth, lying is wrong. Truth and public trust cannot be separated.

## Agency Policies

Different agencies vary in their policies, regulations, and guidelines regarding the roles and responsibilities of peace officers for writing investigative reports.

It is the responsibility of each officer to be familiar with and follow that officer's specific agency policies.

# USES OF INVESTIGATIVE REPORTS

## Introduction

Even though it is the officer in the field who gathers the initial information regarding a crime, that officer may not be the person who must use that information to make decisions regarding further actions. Those decisions are usually made by other people removed from the actual event. They must rely on the information in the investigating officer's report to make decisions.

## How Investigative Reports Are Used

The investigative reports written by peace officers have many different uses within the criminal justice system and beyond.

The following table identifies a number of ways investigative reports can be used.

| Reports are used to... | by... |
|---|---|
| Assist with the identification, apprehension and prosecution of criminals | • Serving as a source document for filing criminal complaints, <br> • Providing a record of all investigations, <br> • Providing information to identify the mode of operation of an individual offender, or <br> • Providing a basis for follow up investigations. |
| Assist prosecutors, defense attorneys, and other law enforcement agencies | • Providing records of all investigations, <br> • Serving as source documents for criminal prosecution, or <br> • Documenting agency actions. |
| Assist officers prior to or during court appearances | • Refreshing the officer's memory before testifying, or <br> • Preparing to provide hearsay testimony at preliminary hearings. |

| Reports are used to... | by... |
|---|---|
| Aid in determining potential civil liability | <ul><li>Documenting events such as:<ul><li>Accidents or injuries on city or county property,</li><li>Industrial injuries, or</li><li>Fires or other events that prompt a peace officer response.</li></ul></li><li>Presenting justification for an officer's behavior or actions.</li></ul> |
| Assist decision makers and criminal justice researchers | <ul><li>Providing statistical information in order to:<ul><li>Analyze crime trends,</li><li>Determine the need for additional employees and equipment,</li><li>Determine personnel deployment requirements,</li><li>Assess community needs,</li><li>Generate uniform crime reports, or</li><li>Identify specialized law enforcement needs.</li></ul></li><li>Satisfying mandatory reporting requirements for specific criminal acts. (e.g., child abuse, incidents of domestic violence, missing persons, etc.)</li></ul> |
| Serve as reference material | <ul><li>Providing information to:<ul><li>The public</li><li>Insurance companies,</li><li>The media, or</li></ul></li><li>Other local, state, and federal law enforcement agencies.</li></ul> |

| Reports are used to... | by... |
|---|---|
| Provide information for evaluating an officer's performance | • Giving the evaluating agency insight into the officer's ability to:<br>- Write clearly, accurately, and mechanically (error-free),<br>- Demonstrate a knowledge of law,<br>- Demonstrate a knowledge of agency policies and procedures,<br>- Investigate criminal acts, and<br><br>- Recognize potential evidence and relevant information. |

## User Needs

Investigative reports must take into account the needs of each potential user of that report. The report must provide not only a clear word-picture of the event or incident but also the critical information necessary for those users to do their jobs.

## Report Users

The following table identifies a number of prospective users and how they will use an officer's investigative report.

| Prospective Users | Purpose for Using an Officer's Investigative Report |
|---|---|
| Immediate supervisors and Field Training Officers | • To determine the next action (e.g., referral for further investigation, file a complaint, forward to a prosecutor, etc.)<br>• To evaluate an officer's:<br>  - Ability to convert observations and verbal information into a written format that others can use<br>  - Performance during an investigation |
| Detectives and investigators | • To gather information to use during the follow up investigation of a specific event or incident<br>• To clear or close out cases |
| Representatives of other law enforcement agencies | • To develop mandatory crime reports<br>• To aid in further investigations (e.g., Highway Patrol, Fire Department) |
| Prosecuting and defense attorneys | • To determine if all elements of the crime(s) have been met<br>• To prepare their cases<br>• To determine if officers acted appropriately<br>• To ensure the rights of the suspect |

| Prospective Users | Purpose for Using an Officer's Investigative Report |
|---|---|
| Other attorneys | • To evaluate the basis for civil litigation<br>• To establish a basis for appeals |
| Parole, probation and custody personnel | • To determine probation conditions<br>• To set requirements for parole<br>• To aid in classifying inmates based on special needs or security requirements |
| Involved parties | • Under certain circumstances, victims, witnesses, or suspects may gain access for court preparation. |
| Media representatives | • As a source of news material |
| Insurance agencies | • To provide information for their own investigations<br>• To verify claims |

# CHARACTERISTICS OF AN EFFECTIVE INVESTIGATIVE REPORT

## Introduction

Peace officers are faced with a variety of events and incidents. The specific contents of an officer's reports must reflect that specific event or incident. Although the details may vary, there are six characteristics that all effective investigative reports have in common.

## Characteristics of an Effective Report

No matter what type of investigative report is being written (i.e., arrest report, incident report, etc.) that report must be:

- **F**actual,
- **A**ccurate,
- **C**lear,
- **C**oncise,
- **C**omplete, and
- **T**imely.

Peace officers can use the acronym **FACCCT** to help them remember these characteristics.

## Leadership

In a free and democratic society, all segments of the criminal justice system are open to public scrutiny and subject to public record. A police report is often the first and most significant documented account of a possible crime. As such, the police report is a fundamental instrument of democratic law enforcement. Therefore, we place high value on our officers' ability to write good reports. A good report is one that the officer is proud of and will stand the test of time. It must be factual, clear, concise, and complete. Accuracy and attention to detail will provide others in the criminal justice system with a clear picture of what happened.

## Factual

Critical decisions made based on an officer's investigative report require that each report be factual. Users of the report must have an exact and literal representation of the event or incident.

The factual report provides an *objective* accounting of the relevant facts related to the event or incident under investigation. Any conclusions made by the reporting officer must be based on *objective facts*. These facts must be articulated and documented within the body of the report.

## Accurate

The decisions made and actions taken by the users of the report must be supported by accurate information. There must be *no inconsistencies or discrepancies* between what took place and what is documented in the officer's report.

If any specific information is found to be inaccurate, the credibility and reliability of the report itself may be jeopardized.

Accuracy is achieved by carefully, precisely, impartially, and honestly documenting all relevant information.

## Clear

An investigative report must speak for the investigating officer at a time when that officer is not present. There should be no doubt or confusion about what the investigating officer is reporting.

Clarity is achieved by the use of appropriate language and logical order. The following table identifies a number of factors that can affect the clarity of an investigative report.

| Factor | Recommendations/Rationales |
|---|---|
| Organization of information | • Information is easier for the reader to understand when facts and events are presented in chronological order.<br>• Events relating to the incident should have clear and logical ties to one another. |
| Language used | • Simple, common language will make the writer's meaning clear.<br>• Readers do not need to be impressed; they need to be informed.<br>• Slang or profanity should not be used unless it is in the form of an exact quote. |
| Writing mechanics | • A poorly written or sloppy report can imply poor or sloppy investigative skills.<br>• Proper use of commas and other punctuation marks can help convey the writer's meaning.<br>• Writing in the first-person will help the reader clearly understand who did what or who said what.<br>• Pronoun use must leave no doubt in the reader's mind as to exactly whom or what the writer is referring.<br>• Errors in spelling, word choice, or grammar can distract readers. |

## Concise

Reports should be brief yet, contain all relevant information the users will need to do their jobs. Wordiness can make a report less readable and therefore less effective.

Accuracy, completeness, or clarity should never be sacrificed for the sake of brevity. The following table identifies a number of factors that can affect a writer's ability to write concisely.

| Factor | Recommendations/Rationales |
|---|---|
| Word selection | • Statements should be direct and concrete.<br>• Use of abstract phrases can confuse or mislead the reader.<br>• Plain English is the most effective way to convey information.<br>• Do not use a synonym for a word, merely to avoid repeating a word. Using the exact word may seem less interesting, but it will eliminate misunderstanding. |
| Sentence structure and grammar | • Sentences should be short yet complete (subject-verb-object).<br>• Fragments can be misinterpreted or lead to confusion.<br>• Long drawn-out sentences can be confusing and misleading.<br>• Avoid using passive voice sentence structure. |
| Relevance | • Only the information that will be needed by the user should be included in the report. |

## Complete

An officer's report must contain all the relevant information and facts the user of that report will need. If the user must contact the writer to gather additional information, the report is not complete.

| A report is complete when... | Description |
|---|---|
| It presents a complete word-picture of the event or incident. | • Descriptions are comprehensive.<br>• Physical conditions are noted.<br>• Users are able to visualize the scene. |
| There are no questions left in the user's mind regarding the event or incident. | • Key information regarding the *what, when, where, who, how,* and *why* is documented.<br>• Facts are presented.<br>• Statements are supported by details.<br>• The order of events is clear and easy to follow. |
| The actions taken by officers are reported. | • Actions are described.<br>• Decisions are justified.<br>• Statements regarding probable cause are present. |
| Both supporting and conflicting information are presented. | • Information that may conflict with stated conclusions or actions must also be included.<br>• Investigators, prosecutors, etc. can only determine the merit of information that they are aware of. |

NOTE:    Report formats used by officers can vary. Some jurisdictions require that certain information be noted on a standardized form that is often used as the report's face sheet. Officers who use such formats must be sure that all relevant blocks or portions of the standardized forms are completed, even if the same information is duplicated in a later narrative.

## Timely

No decisions can be made or actions taken if an officer's report does not reach the users in a timely fashion. Evidence can be lost, suspects or witnesses may disappear, and the support and goodwill in the community can be lost if action toward resolving a case is delayed.

## Common Characteristics

The following table illustrates the six common characteristics of an effective investigative report.

| Characteristic | Well Written | Poorly Written |
|---|---|---|
| **F**actual | The victim could not provide additional information about the suspect. | The victim could not remember what the guy looked like but thought he was a minority. There seems to be a number of those around lately. |
| **A**ccurate | On 1-5-99 at 16:00 hrs. | During the first part of the day shift... |
| **C**lear | She left for work at 0700 hrs. and returned for lunch at 1130 hrs. | She went to work as usual in the morning and when she came home for lunch like she always does she found the conditions stated as such. |
| **C**oncise | She discovered her TV and VCR were missing. | She looked around and she found some books knocked over. She looked around some more and noticed her TV and VCR were not where they were supposed to be. |
| **C**omplete | I told her that an evidence technician would be sent to her home. | I told her someone would follow up. |
| **T**imely | Officers should be aware of their own agency policies regarding when reports need to be submitted. | |

## CHAPTER SYNOPSIS

**Learning Need**

A peace officer's ability to clearly document the facts and activities of an investigation not only reflects on the officer's own professionalism, but also on the ability of the justice system to prosecute the criminal case.

**Investigative Reports [18.01.1]**

An investigative report is a written document prepared by a peace officer that records in detail that officer's observations and actions as they relate to a specific event or incident.

# WORKBOOK LEARNING ACTIVITIES

## Introduction

To help you review and apply the material covered in this chapter, a selection of learning activities has been included. No answers are provided. However, by referring to the appropriate text, you should be able to prepare a response.

## Activity Questions

1. Why should the ability to take accurate field notes and to write effective investigative reports be *personally* important to a peace officer? Why is it legally important to the officer's agency?

2. You are preparing to write the report after investigating a residential robbery where a number of expensive antiques were stolen. List the prospective users of that officer's report. Explain what decisions will be made or actions taken by each. What type of information will each be looking for within that officer's report?

| Prospective Users | Decisions/Actions | Information Needed |
|---|---|---|
|  |  |  |

3.  Sergeant Richards is reviewing a report written by Officer Young regarding an investigation of a domestic violence incident. What qualities should the sergeant look for in the report to determine if Young's performance as a peace officer was adequate? What qualities of the report might indicate that Young's performance was inadequate?

4.  Consider your past experiences with conveying information in a written form. Who were the readers of your document? Were they able to understand the message you wanted them to receive from your document? What is your strongest writing skill? What areas do you have the most difficulty with?

5. Complete the following table with the appropriate characteristics of an effective report represented by the letters FACCCT. In your own words, describe *why* each characteristic is important to the identified prospective users.

| To be effective an investigative report must be... | Prospective Users | | |
|---|---|---|---|
| | An investigator assigned to the case | A reporter from the local newspaper | A defense attorney |
| F | | | |
| A | | | |
| C | | | |
| C | | | |
| C | | | |
| T | | | |

6. Read the following narrative from an officer's investigative report. Would it meet the FACCCT standard? If not, mark the specific statements that need improvement. Describe why and how each should be improved.

While I was patrolling on the street next to the city park, I saw a man who was in the park after closing hours stumble and fall down. He tried to get up but fell down a second time. When I stopped to check on the man, he appeared to be drunk. He was carrying a bag which contained a half empty can of beer. I asked him if he had been drinking, and he said he had a few beers with a friend but was now on his way home. He also told me that the path through the park was a shortcut. I asked the man for ID and he produced his driver's license. I arrested the man because the man was drunk and had an open container of alcohol while being in the park after it was officially closed.

## Additional Classroom Activities

Writing an investigative report that is factual, accurate, clear, concise, complete, and timely is a skill that requires practice. As part of the classroom activities, students will have the opportunity to enhance their own writing skills under the supervision of the instructor.

# Chapter 2
# Field Notes

## OVERVIEW

### Learning Need

Peace officers must recognize that the information gathered during their initial investigation in the field will become the foundation for their investigative reports.

### Learning Objectives

The table below identifies the student learning objectives for this chapter.

| After completing study of this chapter, the student will be able to: | Objective ID |
|---|---|
| • Discuss the importance of taking notes in preparation for writing reports. | 18.02.2 |
| • Apply appropriate actions for taking notes during a field interview. | 18.02.3 |
| • Distinguish between:<br>- Opinion,<br>- Fact, and<br>- Conclusion. | 18.02.4<br>18.02.5<br>18.02.6 |

## In This Chapter

This chapter focuses on taking field notes that will be used to write investigative reports. Refer to the following chart for specific topics.

| Topic | See Page |
|---|---|
| Introduction to Field Notes | 2-3 |
| Notetaking Process During a Field Interview | 2-9 |
| Opinions, Facts, and Conclusions | 2-14 |
| Chapter Synopsis | 2-17 |
| Workbook Learning Activities | 2-18 |

# INTRODUCTION TO FIELD NOTES

## Introduction

The officers who investigate a crime or incident are responsible for providing the information other participants in the criminal justice system need to effectively do their jobs. Officers should rely on accurate sources of information when writing their reports.

## Field Notes

**Field notes** are abbreviated notations written by an officer in the field while investigating a specific incident or crime.

An officer's field notes are the **primary source** the officer will use when writing the investigative report. If the officer's field notes are incomplete, difficult to read, or poorly organized, they will be of little use to that officer.

NOTE: There are a number of formats and styles used when taking field notes. Officers should select the format or style they are comfortable with.

## When To Take Notes

Field notes are recorded while information is fresh in the investigating officer's mind. They should be taken:

- At the scene of an event or incident,
- When interviewing persons (e.g., victims, witness, suspects, etc.),
- Whenever an officer wishes to record specific facts for inclusion in the report, and
- Any time the officer wishes to remember specific details at a later time.

NOTE:    Body camera footage as well as in-car camera footage can assist with recording crime scenes, victim, witness and/or suspect statements, and for time-stamping certain points during the investigative process.

## Important Considerations

When determining what to include in their field notes, officers should consider the points noted in the following table.

| Consideration | Explanation |
|---|---|
| Field notes are more reliable than an officer's memory. | • An investigative report is often written several hours after the investigation of a specific event or incident has occurred.<br>• Certain types of information such as statements, times, observations, addresses, etc., can be easily forgotten or confused with other information if not recorded while still fresh in the officer's mind. |
| Field notes are the primary source of information for the investigative report. | • Well-taken notes provide officers with the **detailed information** they will need to have in order to accurately write their reports.<br>• Well-organized notes will help officers capture vital information regarding the events, persons, statements, and other information related to the investigation. |

When determining what to include in their field notes, officers should consider the points noted in the following table.

| Consideration | Explanation |
|---|---|
| Detailed field notes reduce the need to recontact the involved parties at a later time. | • Complete field notes should contain enough information to answer any pertinent questions about the incident or persons involved. |
| Field notes can be used to defend the credibility of an investigative report. | • An officer's field notes can be an indicator of that officer's thoroughness and efficiency as an investigator.<br>• During a trial, an officer may be asked to identify the source the officer used when writing a specific report. If the officer relied on field notes the reliability and credibility of the report may be easier to defend. |

NOTE:    Field notes are discoverable in court. If kept, they should be prepared accordingly.

NOTE:     If officers use footage from body worn cameras and/or in-car camera footage to assist with preparing a written report, the officer should follow their department policy on when such videos can be reviewed.

NOTE:    If officers use surveillance camera footage to recreate or describe the crime, the report should indicate the narrative reflects what the cameras captured.

## Information To Include

Every event or incident is different; therefore, the facts and information the officer must gather will differ. An officer's field notes should contain the facts and information that will aid that officer in answering the questions *what, when, where, who, how,* and *why*.

The following table identifies some examples of the basic information officers should capture in their field notes.

| | Basic Information | Examples of Additional Information |
|---|---|---|
| Victims and witnesses | • Full name<br>• Age<br>• Date of birth<br>• Race<br>• Sex<br>• Telephone numbers (home, cellular, and work)<br>• Address<br>• Email address(es) | • How to contact by phone and in person<br>• Place to contact<br>• Best time to contact<br>• Place of employment (including address) |
| Occurrence | • Type of crime<br>• Location<br>• Date and time of incident<br>• Date and time reported<br>• Was physical evidence handled?<br>• Who observed it?<br>• To whom was it given?<br>• Chain of custody for evidence<br>• Direction of the suspect's flight<br>• Type and description of weapon(s)<br>• Threat made with weapon(s)<br>• Direct statements made by the suspect (e.g., "I'll kill you!")<br>• Case number<br>• Assisting officer's actions | • Person(s) involved<br>  - Informants<br>  - Reporting party<br>  - Victims<br>  - Witnesses<br>  - Suspects<br>  - Officers<br>  - Members of other agencies<br>  - Medical personnel<br>  - Members of the media |

| | Basic Information | Examples of Additional Information |
|---|---|---|
| Suspects | <ul><li>Race</li><li>Sex</li><li>Age</li><li>Type of body build (i.e., heavyset, medium, small frame)</li><li>Approximate weight</li><li>Approximate height</li><li>Color of eyes</li><li>Color of hair</li><li>Hair style (e.g., long, short, curly)</li><li>Existence of facial hair</li><li>Clothing</li><li>Type (e.g., hats, jeans, jackets, etc.)</li><li>Color</li><li>Style (e.g., casual, conservative)</li><li>Prior knowledge of name and street name</li><li>Unusual physical attributes</li><li>Scars</li><li>Tattoos</li><li>Limp</li><li>Moles</li><li>Unusual odors</li><li>Missing teeth</li><li>Can the victim identify the suspect?</li></ul> | <ul><li>Unusual or memorable gestures</li><li>Speech peculiarities</li><ul><li>Accents</li><li>Tone (e.g., loud, soft)</li><li>Pitch (e.g., high, low)</li><li>Speech disorders</li></ul><li>Jewelry</li><ul><li>Rings (identify which hand and finger)</li><li>Necklaces</li><li>Earrings</li><li>Body piercing</li></ul><li>Right or left-handed</li><ul><li>Which hand was dominant?</li><li>Which handheld the weapon?</li><li>Which hand opened a door?</li><li>Where was a watch worn?</li></ul><li>Any gang affiliation?</li></ul> |

## Incident Specific Information

The type of crime or incident will also indicate what specific information is required for the officer's notes.

For example, specific information for a burglary may include, but not be limited to:

- Point of entry,

- Point of exit,

- Property damage,

- Types and value of property taken,

- Description of suspect's vehicle,

- Nature and location of evidence collected, or

- Unique characteristics of the crime.

# NOTETAKING PROCESS DURING A FIELD INTERVIEW

## Introduction

The effectiveness of an officer's investigation may be dependent on that officer's ability to obtain information and statements from the involved parties.

## Interviews

An **interview** is the process of gathering information from a person who has knowledge of the facts an officer will need to conduct an investigation.

## Role Of Statements

The field notes taken by officers during an interview must be *clear, accurate* and *complete.*

Statements can be critical in tying together the specific facts of a specific incident or crime. The existence of some crime elements may only be revealed within the statements of witnesses, victims, and the suspects themselves.

**Before The Interview Begins**

Before beginning any field interview, officers should prepare properly. The following table identifies a number of actions the interviewing officer should take.

| Actions Prior to the Actual Interview | Guidelines |
|---|---|
| Separate the involved parties | • If possible, move the person to a location where there will be no interruptions or distractions.<br>• Focus the person's attention on speaking with the officer rather than interacting with others. |
| Establish rapport | • Tell the interviewee why the interview is being conducted.<br>• Describe the interview process that will be followed.<br>• Assure the person that by using this process, the officer will be able to gather that person's statement accurately.<br>• Be courteous, considerate, and patient.<br>• Control the interview by remaining calm and polite. |

**Recording The Interview**

Some officers may choose to use a digital recording device, in-car camera, or body camera while conducting an interview. Officers should be aware this may inhibit the person from talking freely. Electronic equipment can also malfunction, leaving the officer with little or no information.

Even if an officer is recording the interview, that officer should also take thorough and complete notes of the conversation.

## Three Step Process

The most effective way for officers to gather clear, accurate, and complete information while conducting an interview is to use a systematic process.
One such process involves the following three steps.

Step One:     Listen Attentively
Step Two:     Take Notes and Ask Questions
Step Three:   Verify Information

## Step One: Listen Attentively

In the first step of the process, the officer's focus should be strictly on the other person. The officer should be **listening** --- *not taking notes*.

The following table identifies a number of guidelines for officers during step one of the notetaking process.

| Actions | Guidelines |
|---|---|
| Ask the person to recount what has happened. | • Allow the person to speak freely.<br>• Have the person describe the incident just as that person understands it, using that person's own words. |
| Keep the person focused. | • If the person begins to wander from the specific topic, guide the person back to the subject (i.e., "You mentioned that...." "Let's go back to...").<br>• Maintain eye contact and use nonverbal gestures (e.g., nodding the head) to encourage the person. |
| Listen carefully to what is being said. | • Be particularly attentive to the essentials of the incident the person describes by including the:<br>- Role of the person being interviewed (victim, witness, etc.),<br>- Type of crime, if any, that has been committed,<br>- Time of the occurrence, and<br>- Exact location of the person during the crime or incident. |

**Step Two: Take Notes and Ask Questions**

When the person has finished, the officer can begin to write information. The following table identifies a number of guidelines for officers during step two of the process.

| Actions | Guidelines |
|---|---|
| Obtain identification information. | • Confirm the person's role in the event or incident. (e.g., victim, witness, possible suspect, etc.)<br>• Note the person's:<br>  - Complete name,<br>  - Address and phone number (home, cellular, work and email address), and<br>  - Any other information necessary for identification purposes. |
| Ask the interviewee to repeat their account of what happened. | • Guide the interview by asking questions that will keep the person from becoming distracted and wandering from the point.<br>• Stop the person and ask questions when necessary to clarify points.<br>• Write down information in short statements, recording only the most important words.<br>• If a statement is particularly important, quote the entire statement. |
| Ask additional questions. | • Obtain detailed descriptions of property, suspects, etc. |

## Step Three: Verify Information

For the investigative report to be reliable, the officer's field notes must be accurate. The following table identifies a number of guidelines for officers during step three of the process.

| Actions | Guidelines |
|---|---|
| Review information with the person. | • Repeat specific information to verify the information is accurate and complete.<br>• Give the person an opportunity to add facts as necessary. |
| Ask for confirmation. | • Have the person confirm important details such as:<br>  - Direct quotes,<br>  - Time relationships,<br>  - Information regarding weapons, or<br>  - Physical descriptions. |
| Make modifications or corrections as necessary. | • Information may have been initially recorded incorrectly because the officer:<br>  - Misunderstood something the interviewee said,<br>  - Wrote something down incorrectly, or<br>  - The officer's wording may have incorrectly characterized the interviewee's statement. |
| Verify changes. | • Once any changes have been made, the information that has been added or modified should be verified. |

# OPINIONS, FACTS, AND CONCLUSIONS

## Introduction

An effective investigative report must be **factual**. It must present an objective accounting of the relevant facts related to the event or incident under investigation. An officer must be able to distinguish between opinion, fact, and conclusion.

## Opinions, Facts, And Conclusions

The basis for determining relevant information requires peace officers to make the fine distinctions between an **opinion**, a **fact**, and a **conclusion**. The following table illustrates these distinctions.

| | Description | Example |
|---|---|---|
| Opinion | • A statement that:<br> - Can be open to different interpretations,<br> - Expresses a belief not necessarily substantiated by proof. | The victim was in pain. |
| Fact | • A statement that:<br> - Can be verified or proven<br> - Has real, demonstrable existence. | The victim's arm was broken. |
| Conclusion | • A statement that is based on the analysis of facts and opinions.<br>• Conclusions should always be accompanied with the supporting facts and opinions. Conclusions presented without supporting information may be considered unwarranted. | The victim was not able to explain what had happened because she was in pain due to her broken arm. |

## Factual But Irrelevant

It is possible for information to be factual yet still not be relevant to the incident or event being investigated. The following table illustrates points that are all factual but may or may not be relevant in an investigative report.

| Factual and Relevant | Factual but Irrelevant |
|---|---|
| The address of the incident/crime scene | The route followed to the scene of the incident/crime |
| A description of how the suspect was apprehended | The number of fences the officer had to jump while apprehending a suspect |
| Statements given by witnesses | Humorous comments given by bystanders |

## Relevant And Irrelevant Information

The following are examples of relevant and irrelevant information.

| Victim's Statement | Relevant Facts | Irrelevant Facts |
|---|---|---|
| "I just bought this bike from the guy down the street a couple of weeks ago. It wasn't new but it was in really good shape. After a long ride, I parked the bike in front of my building at the bottom of the stairs. I didn't bother locking it up or anything because I thought it would be safe there, you know." | The bike was left unlocked in front of the victim's residence. | I thought it was safe there. |
| "I went inside my apartment to fill my water bottle and was gone for less than 5 minutes." | The bike was left unattended for about 5 minutes. | The victim went into his apartment to fill his water bottle. |
| "When I came out, the bike was gone. I was really mad and started yelling and cursing. I looked up and down the street but didn't see anyone or any signs of my bike." | No suspect was seen or heard by the victim. | The victim yelled and cursed when he realized his bike was stolen. |

# CHAPTER SYNOPSIS

## Learning Need

Peace officers must recognize that the information gathered during their initial investigation in the field will become the foundation for their investigative reports.

## Content Of Field Notes [18.02.6]

When determining what to include in their field notes, officers should consider the following.

- Field notes are the primary source of information for the investigative report.
- Detailed field notes reduce the need to re-contact the involved parties.
- Field notes are more reliable than an officer's memory.
- Field notes can be used to defend the credibility of an investigative report.

## Taking Notes During an Interview [18.02.2]

The most effective way for officers to gather clear, accurate, and complete information while conducting an interview is to follow a systematic process.

## Opinions, Facts, And Conclusions [18.02.3]

An opinion is a statement that can be open to different interpretations and expresses a belief not necessarily substantiated by proof. A fact is a statement that can be verified or proven and has real, demonstrable existence. A conclusion is a statement that is based on the analysis of facts and opinions. Conclusions should always be accompanied with the supporting facts and opinions. Conclusions presented without supporting information may be considered unwarranted.

# WORKBOOK LEARNING ACTIVITIES

## Introduction

To help you review and apply the material covered in this chapter, a selection of learning activities has been included. No answers are provided. However, by referring to the appropriate text, you should be able to prepare a response.

## Activity Questions

1. In your own words, explain what makes a fact relevant for the purposes of an investigative report. Are all relevant details facts? Explain your answer.

2. Using only your memory, recount *exactly* what you were doing from 1800 hrs. to 1900 hrs. two days ago. Write your actions as if you were taking field notes for an investigative report. How much of your account do you feel is exact? How much is speculation or assumption?

Read the following scenario and then answer the following questions.

At 2245 hrs., you were called to a local supermarket where a man was caught by the store's night manager attempting to shoplift a bottle of vodka. The suspect struggled and tried to hit the night manager in an attempt to escape.

Upon arrival, you handcuffed the suspect and walked him to the patrol vehicle. All individuals involved declined your offer for medical assistance. You asked the store's night manager, Joe Smith, to tell you what happened. Appearing shaken he told you the following:

"Well... let me get it together now... OK officer... I'm the night manager here and I was in the back when one of the clerks, Ester over there, came over and said there was this guy over in aisle three that was just hanging out and looking kind of suspicious. So, I went over there just to see for myself, and this guy saw me looking at him, so he started moving toward the front of the store. Well, I thought his coat looked funny, you know, like he had something under it so I kind'a followed him until I caught up and tried to make conversation, you know, to get a better look. You gotta be careful, you know... don't want to offend any legitimate customer, you know. Well, he turned around and looked at me and then instead of stopping, he just bolted for the door. He took off so I took off and he must of slipped or something cause he dropped the bottle of vodka he'd tried to get away with. I kept after him, still in pretty good shape ya' know 'cause I work out, and grabbed the guy's jacket. Well he spun 'round and before I could get any kind of grip on the guy, he belted me! Caught me a good one right here under my eye... still bleeding some I guess... but I didn't let go and I got him down on the ground, stuck my knee in his back, and I guess one of the clerks had called 'cause that's when you guys got here. So what happens now? Nothin' like this has ever happened to me before, ya' know."

3. Continuing the scenario from the previous page, begin step two of the notetaking process. Ask Mr. Smith to repeat his account of what happened. Assuming his account remains the same, write your notes below.

4. What additional questions would you like to ask Mr. Smith?

5.  After you finished interviewing Mr. Smith, you talked to the suspect. You read him his Miranda rights, and he acknowledged he understood and waived them. He told you the following:

"I didn't do nothing man! This guy just jumps me! I mean I just went in there to get some booze, ya know, cause I'm going to this party over at my buddies and I wanted to take something with me and this dude starts giving me a hard time and starts chasing me down the aisle. I wasn't doing anything. I was goin' to pay for the stuff, ya know, but the guy, he just started yelling so he's the one that chased me out, ya know. Then the dude grabs my jacket, so I swung at the guy. It was self-defense, man! I gotta right to defend myself, ya know!

Assuming his account remains the same when you ask him to repeat it, write your notes below.

6.  What additional questions would you like to ask the suspect?

7. Look back at the statements given by Mr. Smith and the suspect. In the following table note the facts, opinions, and conclusions that are provided.

| Opinions | Facts | Conclusions |
|----------|-------|-------------|
|          |       |             |

## Additional Practice

Taking complete and accurate field notes is a skill that requires practice and experience. During classroom discussions and activities, officers will have additional opportunities to practice taking field notes related to arrest situations and criminal investigations.

# Chapter 3
# Fundamental Content Elements of Investigative Reports

## OVERVIEW

### Learning Need

Peace officers must recognize in order for an investigative report to be of use in the judicial process, the report must be well organized and include facts needed to establish that a crime has been committed and all actions taken by officers were appropriate.

### Learning Objectives

The table below identifies the student learning objectives for this chapter.

| After completing study of this chapter, the student will be able to: | Objective ID |
|---|---|
| • Summarize the primary questions that must be answered by an investigative report. | 18.03.3 |
| • Identify the fundamental content elements in investigative reports including:<br>- Initial information,<br>- Identification of the crime,<br>- Identification of involved parties,<br>- Victim/witness statements,<br>- Crime scene specifics,<br>- Property information, and<br>- Officer actions. | 18.03.4<br>18.03.5<br>18.03.6<br>18.03.7<br>18.03.8<br>18.03.9<br>18.03.10 |

## In This Chapter

This chapter focuses on the content elements in effective investigative reports. Refer to the following table for specific topics.

| Topic | See Page |
|---|---|
| Questions Answered by an Effective Investigative Report | 3-3 |
| Fundamental Content Elements | 3-9 |
| Chapter Synopsis | 3-15 |
| Workbook Learning Activities | 3-17 |

# QUESTIONS ANSWERED BY AN EFFECTIVE INVESTIGATIVE REPORT

## Introduction

No matter how an investigative report is organized, it must be factual, accurate, clear, concise, complete, and timely (FACCCT). It must provide prosecutors, investigators, and other participants in the judicial process with the accuracy of the information needed to do their jobs.

## Investigative Report Formats

An investigating officer communicates with the other participants in the judicial process through that officer's written investigative report. The adequacy of that communication is dependent on the officer's ability to logically organize events and clearly state the relevant facts related to the incident.

## Agency Policy

Each agency has its own policies regarding formats and forms officers must use when writing investigative reports. It is the responsibility of each officer to be familiar with and comply with their agency's requirements.

## Community Policing

Police reports have a variety of users in the community. Prosecutors, judges, insurance agencies, and attorneys all rely on police reports to ensure a fair and just outcome. A well-written report can be a significant tool in providing justice for victims. Police reports are useful in prosecutions, in defense against wrongful accusations, as a permanent history in long-term investigations, and in holding peace officers accountable when they are involved in the incident. The peace officer is the "eyes and ears" of the event. A good report will greatly increase the effectiveness of everyone involved.

## Primary Questions

The users of an officer's investigative report should be able to locate the answers to six primary questions within the body of the report. These questions are noted below.

- What?
- When?
- Where?
- Who?
- How?
- Why?

If an officer is not able to answer a question, the report should provide as much information as possible. This information may prove vital for investigators assigned to the case.

## Supporting Facts and Information

The information that answers each question will vary depending on the details of the specific incident or crime.

NOTE:    The following table is not intended to be all inclusive. Specific crimes will require certain information that should be noted by the investigating officer in the report.

The following table presents examples of the specific facts and information that can be included in the body of the report to help answer each question.

| | Supporting Facts/Information |
|---|---|
| What... | • Was the crime that was committed?<br>• Are the elements of the crime?<br>• Were the actions of the suspect before and after the crime?<br>• Actually happened?<br>• Do the witnesses know about it?<br>• Evidence was obtained?<br>• Was done with the evidence?<br>• Weapons were used?<br>• Action did the officers take?<br>• Further action should be taken?<br>• Knowledge, skill or strength was needed to commit the crime?<br>• Other agencies were notified?<br>• Other agencies need to be notified? |
| When... | • Was the crime committed?<br>• Was it discovered?<br>• Were the authorities notified?<br>• Did they arrive at the scene?<br>• Was the victim last seen alive?<br>• Did officers arrive?<br>• Was any arrest made?<br>• Did witnesses hear anything unusual?<br>• Did the suspect decide to commit the crime? |

| | **Supporting Facts/Information** |
|---|---|
| Where... | • Was the crime committed?<br>• Was the crime discovered?<br>• Was entry made?<br>• Was the exit?<br>• Was the weapon obtained that was used to commit the crime?<br>• Was the victim found?<br>• Was the suspect seen during the crime?<br>• Was the suspect last seen?<br>• Were the witnesses during the crime?<br>• Did the suspect live?<br>• Does the suspect currently live?<br>• Is the suspect now?<br>• Would the suspect likely go?<br>• Was the evidence found?<br>• Was the evidence stored? |

When noting locations, officers should include:

- The exact address including:

  - Wing,

  - Housing unit,

  - Floor of the building, etc., and

- Identification of the area (e.g., business, apartment complex, private residence, vehicle.)

| | **Supporting Facts/Information** |
|---|---|
| Who... | • Are the involved parties in the incident? (i.e., victim(s), witness(es), suspect(s))<br>• Were the participating officers?<br>• Was the complainant?<br>• Discovered the crime?<br>• Saw or heard anything of importance?<br>• Had a motive for committing the crime?<br>• Committed the crime?<br>• Had the means to commit the crime?<br>• Had access to the crime scene?<br>• Searched for, identified and gathered evidence?<br>Also with whom...<br>• Did the victim associate?<br>• Did the suspect associate?<br>• Was the victim last seen?<br>• Do the witnesses associate?<br>• Did the suspect commit the crime? |

When noting information regarding specific people, officers should include that person's full name, including middle name or initial. The correct spelling of each name should be confirmed by the officer as well.

Additional information regarding specific people can include, but not be limited to:

- Phone numbers (home, cellular and work),

- Addresses (home, work, and email),

- Age and date of birth,

- Social security number,

- Occupations, and

- Physical descriptions as required.

|  | **Supporting Facts/Information** |
|---|---|
| How... | • Was the crime committed? (e.g., force, violence, threats, etc.)<br>• Did the suspect leave the scene? (e.g., on foot, by car, etc.)<br>• Did the suspect obtain the information necessary to commit the crime?<br>• Was the crime discovered?<br>• Was entry made? (e.g., smashing, breaking, key, etc.)<br>• Was the weapon/tool for the crime obtained?<br>• Was the weapon/tool used?<br>• Was the arrest made?<br>• Much damage was done? |
| Why...<br>(if known) | • Was the crime committed?<br>• Was a certain weapon/tool used?<br>• Was the crime reported?<br>• Was the crime reported late?<br>• Were witnesses reluctant to give information?<br>• Is the suspect lying?<br>• Did the suspect commit the crime when they did?<br>• Did the suspect commit the crime where they did? |

# FUNDAMENTAL CONTENT ELEMENTS

## Introduction

Every incident is different, and different crimes require different information. On the other hand, certain content elements remain constant regardless of the crime or the formats used to present the information.

## Fundamental Content Elements

The following table identifies the fundamental content elements that are common within all investigative reports.

| An effective investigative report contains... | |
|---|---|
| Initial information... | • Establishing how the officer(s) became involved with the specific incident and additional background information. |
| Identification of the crime... | • Including the facts that are necessary to show that the specific crime has taken place. |
| Identification of the involved parties... | • Such as the reporting person(s), victim(s), witness(es), or suspect(s). |
| Witness/victim statements... | • Noting the details of the events the involved parties observed or experienced. |
| Crime scene specifics... | • Necessary to accurately reestablish the scene and events of the crime. |
| Property information... | • Including descriptions and details pertaining to stolen items as well as physical evidence. |
| Officer actions... | • Including descriptions of all actions taken by peace officers that are related to the incident. |

NOTE:    The order in which information is presented in an investigative report is dependent upon the format used and agency policy.

## Initial Information

Each investigative report should describe the manner in which the peace officers learned of the incident. The initial information should also describe the officer's immediate observations and any actions they took upon arrival at the scene.

Content elements specific to the initial information may include, but are not limited to:

- The name(s) and badge number(s) of the responding officer(s),
- How the officer(s) learned of the incident (e.g., radio dispatch),
- The exact date and time the officer(s) arrived,
- The exact location, and
- Details regarding the officer(s) own observations of who was where and what was happening upon arrival.

## Identification of the Crime

The facts which are the evidence of a crime are referred to as the **corpus delicti**, or *the body of the crime.*

Specific crimes have their own required crime elements. Investigative reports must clearly identify these elements as facts in order to establish that a crime has occurred.

Crime identification information within the body of the investigative report must clearly state the:

- Common name of the crime,
- Statutory code reference number for the crime (i.e., Penal Code, Health & Welfare Code, etc.), and
- Existence of each of the required crime elements necessary for the crime to be complete.

NOTE:    Additional information regarding the crime elements for specific crimes is included in the supplementary materials at the end of this workbook.

## Identification Of Involved Parties

The involved parties of a crime can include the person who reported the incident, victim(s), witness(es), or suspect(s). Officers should take care to collect complete and accurate information that clearly identifies each as well as providing a means of further contacts if necessary.

Specific information regarding the involved parties should include, but is not limited to:

- Full names,
- Sex, ethnic origin,
- Date of birth (DOB),
- Home address,
- Home phone, cellular phone,
- Workplace, school or email addresses,
- Workplace or school phone,
- Their role in the incident (i.e., reporting party, witness, etc.), and
- The reporting party's relationship with other involved parties.

## Witness/Victim Statements

Statements of the involved parties (i.e., witnesses, victims) help place events in their proper sequence and establish the elements of the crime. Along with the person's statements, officers should note:

- Location/proximity of the person to the event,

- Circumstances and actions observed or experienced,

- Complete and detailed descriptions, (e.g., items stolen, distinguishing features, injuries sustained, etc.) and

- Information regarding suspect(s). (e.g., name, aliases, identifying marks, relationship to the victim, etc.)

If the reporting officers use a person's exact words within a report, quotation marks and the word *said* followed by a comma should be used to introduce the speaker's words.

Example:    Smith said, "I don't know. I'd really have to take a closer look. I'm just not sure if that's all that was taken."

If the reporting officer paraphrases what the speaker said, quotation marks are not used.

Example:    Smith said she was not sure if anything else was taken.

## Crime Scene Specifics

The users of any investigative report should be able to clearly understand and accurately visualize the scene of the crime as well as the events that took place.

Investigative reports should include, but not be limited to, identification and description of:

- The physical condition of the scene itself,

- The chronology of events,

- Location of physical evidence, and

- All factual information supporting the existence of the elements of the crime (e.g., the point of entry, the location of key objects).

NOTE:     Investigative points to be noted can vary based on the specific crime that is being reported.

## Property Information

Any item pertaining to the crime must be identified clearly and described within the investigative report. Such items may include stolen or damaged property as well as physical evidence.

Information should include, but not be limited to:

- Brand names,

- Model/serial numbers,

- Description (including color, unique markings, dimensions, etc.),

- Value of stolen item,

- Identification of the owner/possessor/finder,

- Location where found (or stolen from),

- Relationship of the item to the crime/incident, and

- Physical evidence, including methods of collection and preservation.

## Officer Actions

An investigative report is not complete unless it clearly identifies all actions taken by the officer or officers.

Officer actions to be noted can include, but not be limited to:

- Stops made,
- Searches conducted,
- Seizures of evidence,
- Arrests made,
- Standard procedures followed (e.g., knock and notice, field show-ups, etc.),
- Miranda admonishments,
- Use of force,
- Medical attention (offered, accepted, or refused),
- Safety measures taken,
- Disposition of suspects, or
- Methods used to preserve evidence or capture essential information.

## Information In Support of Officer Actions

Complete and accurate descriptions of an officer's actions should also include the officer's reasons or justifications for taking those actions. This can include, but is not limited to the:

- Exigent circumstances that led the officer to act (i.e., enter without permission, use force, etc.),
- Basis for an officer's reasonable suspicion to conduct a cursory/frisk search for weapons,
- Probable cause to conduct any other authorized searches,
- Probable cause to seize evidence,
- Probable cause leading to an arrest, and/or
- Detailed information describing acts or conditions that justify the level of force used to gain or maintain control.

# CHAPTER SYNOPSIS

**Learning Need**

Peace officers must recognize in order for an investigative report to be of use in the judicial process, the report must be well organized and include facts needed to establish that a crime has been committed and all actions taken by officers were appropriate.

**Primary Questions to Be Answered [18.03.3]**

The users of an officer's investigative report should be able to locate the answers to six primary questions within the body of the report.

**Initial Information [18.03.4]**

Establishing how the officer(s) became involved with the specific incident and additional background information.

**Identification Of the Crime [18.03.5]**

Including the facts that are necessary to show that the specific crime has taken place.

**Identification Of the Involved Parties [18.03.6]**

Such as the reporting person(s), victim(s), witness(es), or suspect(s).

**Witness/Victim Statements [18.03.7]**

Noting the details of the events the involved parties observed or experienced.

**Crime Scene Specifics [18.03.8]**

Necessary to accurately visualize the scene as well as events that took place.

## Property Information [18.03.9]

Including descriptions and details pertaining to stolen items as well as physical evidence.

## Officer Actions [18.03.10]

Including descriptions of all actions taken by peace officers that are related to the incident.

## WORKBOOK LEARNING ACTIVITIES

### Introduction

To help you review and apply the material covered in this chapter, a selection of learning activities has been included. No answers are provided. However, by referring to the appropriate text, you should be able to prepare a response.

### Activity Questions

1. List reasons why it is important to fully document within the report the officer's reasons or rationales for taking specific actions. Describe the possible effects on an investigation, the officer, and the officer's department if this information is not included.

2. In order for the crime of vandalism (*Penal Code Section 594*) to be complete, the necessary crime elements include:

- An act of a person or persons

- With malicious intent

- To deface, damage, or destroy with graffiti or other inscribed material

- Personal or real property

- Not their own.

The following statement is an excerpt from an investigative report. Has the writer noted sufficient information to establish that the crime of vandalism has been committed? Underline the information that supports the existence of each element of the crime. If an element is not present, identify the information that is missing.

...As my partner and I approached the scene, we could see the spray-painted markings on the windshield of a blue Ford Taurus, CA license number 12345, which was parked in the street in front of 9876 Rose Lane. The owner of the Taurus, Clyde Smith, who lived at 9876 Rose Lane came out of the house carrying two empty cans of spray paint that he found in the gutter three houses down, at 9870 Rose Lane...

3. You are an officer who has responded to a call involving a home burglary. The homeowner tells you that her son's computer, the family's television, and three pieces of her jewelry were taken. List questions you can ask the homeowner that will aid you in describing the stolen property later in your report.

4. Without looking back in the chapter, list the seven fundamental content elements of an investigative report. Give a reason why each element should be included when possible. Provide examples of the type of information that could be included within each element.

| Content Element | Reason for Importance | Type of Information Included |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

5.  Assume that you are a supervisor and have received the following narrative from an investigative report. Based on the information given, you will be required to decide on the next action that should be taken.

On 01-5-08 at 1600 hours my partner and I were called to the scene of a residential burglary. The homeowner, Alice Smith, met us as we arrived and gave the following information.

Smith left for work today at 0630 hours, locking all doors and windows. She returned home for lunch at 1130 hours and discovered the front door had been kicked in and was left standing open. She entered her home but found nobody inside. She discovered her TV and VCR were missing along with a home computer. Smith said that the only other items disturbed in the house were several books that had been knocked off a shelf in the office. Smith will attempt to locate serial numbers for the TV, VCR, and computer and forward that information to us.

Smith did not see anyone around her home, but did observe a blond male driving a red car. The driver was turning off her street when she came home. Smith did not recognize the person and had not seen the vehicle in the area before. She could not provide any additional descriptions of the driver or vehicle.

Complete the following table with the information provided in the report. Note any information that you feel is missing or that is unclear or confusing.

| | Facts/Information Included | Missing/Confusing Information |
|---|---|---|
| What? | | |
| When? | | |
| Where? | | |
| Who? | | |
| How? | | |
| Why? | | |

## Additional Classroom Activities

As part of the classroom activities, students will have the opportunity to practice their investigative report writing skills after viewing a series of video scenarios depicting possible criminal activities. Classroom instructors will evaluate each student's work and provide individual feedback.

# Chapter 4
# Investigative Report Writing Mechanics

## OVERVIEW

### Learning Need

Peace officers must recognize that an effective report must exhibit the writer's command of the language and be relatively free of errors in sentence structure, grammar, and other writing mechanics.

### Learning Objectives

The table below identifies the student learning objectives for this chapter.

| After completing study of this chapter, the student will be able to: | Objective ID |
|---|---|
| • Apply guidelines for recommended grammar used in investigative reports including use of:<br>- Proper nouns,<br>- First person pronouns,<br>- Third person pronouns,<br>- Past tense, and<br>- Active voice. | 18.04.1<br>18.04.2<br>18.04.3<br>18.04.4<br>18.04.5 |
| • Organize information within a paragraph for clarity and proper emphasis. | 18.04.6 |
| • Select language that will clearly convey information to the reader of the investigative report. | 18.04.7 |

| After completing study of this chapter, the student will be able to | Objective ID |
|---|---|
| • Distinguish between commonly used words that sound alike but have different meanings. | 18.04.8 |
| • Proofread for content and mechanical errors, including:<br>  - Spelling<br>  - Punctuation<br>  - Grammar<br>  - Word choice<br>  - Syntax | 18.04.9 |

## In This Chapter

This chapter focuses on common report writing conventions. Refer to the following table for specific topics.

| Topic | See Page |
|---|---|
| Recommended Grammar for Investigative Reports | 4-3 |
| Writing Clearly and Precisely | 4-8 |
| Proofreading | 4-19 |
| Chapter Synopsis | 4-21 |
| Workbook Learning Activities | 4-23 |

## RECOMMENDED GRAMMAR FOR INVESTIGATIVE REPORTS

### Introduction

**Grammar** may be defined as the rules and guidelines used by writers to make their message clear and understandable to the reader. There are a large number of grammatical guidelines in the English language and peace officers should be aware of them when writing investigative reports.

### Proper Nouns

A **noun** is a naming word. It can be used to identify people, places, or things. **Proper nouns** name **specific** persons, places or things and always begin with a capital letter.

When referring to a specific person within a report, officers should use proper nouns (Tom Smith, Alice Jones) to clearly convey to the reader whom they are writing about. After the full name has been used once, just the last name may be used when referring to the same person. (Smith, Jones)

Example:      Tom Smith said he saw the woman leap from the deck and run across the yard. Smith went on to describe the woman as...

## Pronouns

A **<u>pronoun</u>** is a word that substitutes for a noun or a proper noun. There are two types of pronouns of which writers of investigative reports should be aware.

| Pronoun | Use when referring to the: | Examples of Pronouns | Examples of Use |
|---|---|---|---|
| First person | Person writing the report. | • I/My/Mine/Me<br>• We/Our/Ours/Us | • **I** told my partner...<br>• **Our** vehicle was... |
| Third person | Person, place, or thing being written about. | • He/His/Him<br>• She/Hers/Her<br>• It/Its<br>• They/Their/ Theirs/Them | • **He** said that it was ...<br>• **She** told her sister...<br>• **It** was no longer present...<br>• **Their** father was ... |

NOTE:    First person pronouns can also be used within quotes to refer to the person speaking. (e.g., Wilson said, "*I ran as fast as I could.*")

## First Person Pronouns

When writing investigative reports, officers should use **<u>first person pronouns</u>** when referring to themselves. By doing so, the reader has a clear understanding of what the officer actually did, observed, experienced, etc.

Referring to themselves as "the reporting officer" or "the writer of this report" or using third person pronouns can be needlessly awkward and lead to confusion as to who was actually doing what.

Example:    My partner and I spoke with the witness about what they saw and heard during the fight.

## Third Person Pronouns

When a **<u>third person pronoun</u>** is used within an investigative report, it must clearly refer to or agree with the noun or proper noun that is directly before it.

Alone, third person pronouns lack any specific meaning. It must be clear to the reader, exactly who, what, or where the pronoun is referring to.

The following table illustrates how the use of third person pronouns can lead to confusion within a report if not properly placed.

| Confusing | Clear |
|---|---|
| Jones saw the man's car crash into the tree. **He** immediately reported the accident. | Jones saw the man's car crash into the tree. **Jones** immediately reported the accident. |
| Smith told his neighbor to get rid of the junk car **he** kept in front of **his** house. | Smith told his neighbor to get rid of the junk car **the neighbor** kept in front of **his** house. |
| After McFay gave her daughter the gun, **she** began to worry. | McFay began to worry after **she** gave the gun to **her** daughter. |

NOTE:    To avoid confusion, it may be preferable to repeat the proper name rather than use a third person pronoun

## Past Tense

Since most investigative reports are written about things that have already happened, the words that are used should clearly indicate the events have already taken place.

**Verbs** are words or groups of words which express action. A **verb's tense** refers to the time the action took place. A **past tense** verb expresses an action completed in the past. A **present tense** verb expresses an action currently taking place.

The following table illustrates some examples of present and past tense verbs.

| Present Tense | Past Tense |
|---|---|
| He **says** his wife did **kick** him... | He **said** his wife **kicked** him... |
| I then **have** Officer Baker . . . | I then **had** Officer Baker... |
| She **states** her husband... | She **stated** her husband... |
| On 04-06-98 at 0735 hours I **respond** to a call... | On 04-06-98 at 0735 hours I **responded** to a call... |
| The suspect **arrives** at the scene... | The suspect **arrived** at the scene... |

## Active Voice

The word "voice," when used to describe a type of verb, refers to whether the verb is active or passive.

A verb is in the **<u>active voice</u>** when the subject of the sentence is the individual or thing that is actually doing or performing the action. A verb is in the **<u>passive voice</u>** when the subject of the sentence is someone or something other than the doer or performer of the action.

Officers writing investigative reports should use verbs in the active voice rather than the passive voice. Most readers find sentences written in the active voice easier to follow and understand.

The following table illustrates differences between using a passive or active voice in an investigative report.

| Passive Voice | Active Voice |
|---|---|
| The victim **was given** the report form **by** me. | I **gave** the report form to the victim. |
| The seminar **was attended by** law enforcement personnel. | Law enforcement personnel **attended** the seminar. |
| The witness **was talked** to **by** me. | I **talked** to the witness. |
| The suspect **was patted** down for weapons **by** my partner. | My partner **patted** down the suspect for weapons. |
| The driver **was asked** for his driver's license **by** me. | I **asked** the driver for his driver's license. |

NOTE:    The subject of the sentence does not have to be a person. It can also be a place or thing.

NOTE:    A common indicator of passive voice is the word "by" in the sentence.

## WRITING CLEARLY AND PRECISELY

### Introduction

Effective investigative reports must present all relevant information simply, or logically. They must be written in plain English in order to be useful for the reader.

### Paragraph Organization

Paragraphs are the structural units for grouping information. No matter which format is used for the investigative report (narrative or category), all paragraphs within the report must be clear and easy to understand.

When writing an investigative report, the first sentence (lead-in sentence) of each paragraph should clearly state the *primary topic or subject of the paragraph*. The sentences that follow within the paragraph should present facts, ideas, reasons, or examples that are directly related to that primary topic.

The following table presents examples of poorly organized and well-organized paragraphs.

| Poorly Organized | Well Organized |
|---|---|
| When we arrived, the husband let us into the house. We were responding to a 9-1-1 call. My partner and I had been dispatched to an incident of domestic violence. A woman called for help to keep her husband from beating her. | My partner and I were dispatched to a domestic violence incident after a woman dialed 9-1-1. The woman called for help because she was afraid her husband would beat her. When we arrived, the husband let us into the house. |
| Marie Parker said her husband refused to answer the door at first when he heard the man on the other side begin to shout. I took her statement approximately 45 minutes after the assault took place. She was sitting in the family room when her husband went to see who was at the door. | I took Marie Parker's statement approximately 45 minutes after the assault took place. Parker said she was sitting in the family room when her husband went to see who was at the door. Initially her husband refused to answer the door when he heard the man on the other side begin to shout. |

## Transitional Words

**Transitions** are words or phrases that show relationships between thoughts, sentences, or paragraphs. By selecting appropriate transitional words, officers can help readers move smoothly and logically from detail to detail and sentence to sentence within the investigative report.

The following table suggests only a few of the possible transitional words and phrases officers may use within their reports.

| Type of Transition | Words/Phrases | Examples |
|---|---|---|
| Time | <ul><li>Immediately</li><li>In the meantime</li><li>At the same time</li><li>When</li><li>Before</li><li>Prior to</li></ul> | Caster said he noticed the door was not completely shut, so he decided to find out why. **Immediately after** entering the room, he saw the window was broken. |
| Place | <ul><li>Near</li><li>Beyond</li><li>Next to</li><li>Under</li><li>Behind</li><li>Around</li></ul> | Caster said he saw broken glass on the floor under the window. **Near the** glass, he saw a large brick. |
| Order | <ul><li>Finally</li><li>In addition</li><li>Lastly</li><li>First</li><li>Then</li><li>Further</li></ul> | **In addition,** Caster saw his laptop computer was not on the desk where he left it the night before. |

## Concrete vs. Abstract Words

Officers who are writing investigative reports should select simple, common, concrete language whenever possible. The use of simple language can help keep reports concise and brief, addressing relevant information quickly and clearly.

Words that are used to make an investigative report sound eloquent or scholarly may actually serve to make the report wordy, vague and less effective. Inflated language is never appropriate, and officers should resist the temptation to impress their readers.

The following table presents examples of abstract words along with more concrete alternatives.

| Abstract Words | Concrete Words |
|---|---|
| • A number of | • Seven |
| • At a high rate of speed | • 75 MPH |
| • Appeared intoxicated | • Breath smelled of an alcoholic beverage |
| • Hostile behavior | • Repeatedly struck the officer |
| • Physical confrontation | • Fight |
| • Verbal altercation | • Argument |
| • Extensive record | • Six DUI offenses over two years |
| • Employed | • Used |
| • Dispute | • Argument |
| • Inquired | • Asked |
| • In the vicinity of | • Near |
| • Articulated | • Said, told |
| • Hit | • Punched, slapped, or clubbed |

## Words That Sound Alike

Officers should take care to use the correct word for what they are trying to say when writing investigative reports.

There are a number of frequently used words that sound alike but have completely different spellings and meanings. The following table identifies the most commonly confused sound-alike words.

| Words | Definitions | Examples |
|---|---|---|
| Accept | To take with approval or agree to | I **accepted** the medal with pride. |
| Except | To omit or exclude; preposition meaning 'but' | We did everything *except* interview the witness. |
| | | |
| Access | An approach, admittance, or route | There is an **access** road running east to west in front of the drug store. |
| Excess | Surplus: an amount greater than wanted | The amount of cocaine found was in **excess** of what had initially been reported. |
| | | |
| Advice | Worthy suggestion or information; noun | My sergeant gave me **advice** on how to handle the situation. |
| Advise | To give suggestions, data, or counsel; verb | My sergeant **advised** me on how to handle the situation. |

| Words | Definitions | Examples |
|-------|-------------|----------|
| Affect | To act upon or produce change or influence; verb | The suspect was **affected** by the pepper spray. |
| Effect | Result of cause; belongings; noun | Dilated pupils are a physical **effect** of the drug.<br>The coroner removed the personal **effects** from the victim. |
| | | |
| Allude | Make reference to | The witness **alluded** to the suspect's collection of guns. |
| Elude | Escape or evade | The suspect **eluded** arrest by going into a store. |
| | | |
| Assure | To offer assurances | The officer **assured** the victim that the batterer would be jailed. |
| Ensure | To make secure or certain | The officer **ensured** the suspect was correctly handcuffed. |
| Insure | To make secure or certain (as with ensure); or to guarantee life or property against risk. | The man **insured** his house against fires and floods. |
| | | |
| Brake | To stop a vehicle | Her car's **brakes** failed, and she ran into the truck in front of her. |
| Break | To burglarize a home or other structure; forcibly entering or exiting a house; to damage | The officer watched the suspect **break** into the store. |

| Words | Definitions | Examples |
|---|---|---|
| Its | Adjective showing possession | The car lost **its** rear tire after striking the pothole in the road. |
| It's | Short form of 'it is' or 'it has' | **It's** been six years since the suspect contacted his brother. |
| | | |
| Know | To be cognizant of or be acquainted with | The victim claimed that she did not **know** the suspect. |
| No | Negative | The suspect shouted, "**No.**" |
| | | |
| Pain | Strong sense of hurt | The victim screamed in **pain** after being shot. |
| Pane | Window glass set in a frame | The burglar had broken the **pane** to gain access to the house. |
| Passed | To move forward or around; to circulate | As we pursued the suspect, we **passed** four other vehicles on the highway. |
| Past | History; ended or accomplished; beyond | The suspect had a number of **past** convictions. |
| | | |
| Personal | Belonging to someone | The victim's **personal** property was put in a bag. |
| Personnel | Company's employees | The department had a **personnel** meeting. |

| Words | Definitions | Examples |
|---|---|---|
| Cite | Refer to an official document or rule as proof; verb | The district attorney **cited** the Penal Code. |
| Site | Place or setting of an event; noun | The officers returned to the **site** of the crime to gather more evidence. |
| Sight | Ability to see | The contraband lay on the table in plain **sight**. |
| | | |
| Elicit | To draw out or forth; evoke | The officer was able to **elicit** a confession from the suspect. |
| Illicit | Something not permitted by law. | The suspect had committed a lewd and **illicit** act. |
| | | |
| Formally | Something done ceremoniously or in a regular, methodical fashion | The suspect was **formally** indicted for the crime. |
| Formerly | Something that happened in the past | He was **formerly** a firefighter. |
| | | |
| Hear | To perceive sound | The officers could **hear** the argument through the door. |
| Here | Place or location | I asked the victim to come **here** and answer some questions. |

| Words | Definitions | Examples |
|---|---|---|
| Precede | To go before in time, place, or rank | The burglary **preceded** the rape. |
| Proceed | To advance, go toward | The burglar then **proceeded** to the bedroom. |
| | | |
| Pride | Self-esteem | The officer took great **pride** in his work. |
| Pried | To raise, move, or force with a lever (past tense of pry) | The burglar **pried** the window open with a screwdriver in order to enter the building. |
| | | |
| Principal | Chief official; chief actor or perpetrator present at time of crime | Manuel Ortega was the **principal** person in the robbery of the bank. |
| Principle | Rule of conduct; law of nature or scientific fact | Peace officers are expected to uphold high moral **principles**. |
| | | |
| Quiet | Still or silent | When we arrived at the dispute, the house was **quiet**. |
| Quite | To a great degree, completely | The suspect was **quite** agitated and began swearing. |

| Words | Definitions | Examples |
|---|---|---|
| Scene | Location of an event | The officers secured the crime **scene**. |
| Seen | Past tense of "to see" (sight) | The suspect was **seen** driving a green car. |
| | | |
| Steal | To take without any right | Robbery and theft are forms of **stealing**. |
| Steel | Strong alloy of iron | The pipe was made of **steel**. |
| | | |
| Than | Introduces comparative clauses | The suspect was taller **than** me. |
| Then | Designates time (next) | The suspects **then** fled from the bank on foot. |
| | | |
| There | At or in that place; to, toward, or into that place | Morez went **there** after she talked with the officer. |
| Their | Possession of them, by them | The brothers went by **their** home on *their* way to the corner. |
| They're | Short form of 'they are' | The woman said, "**They're** going to shoot him." |

| Words | Definitions | Examples |
|---|---|---|
| Threw | Past tense of "throw" | She **threw** the vase at her husband. |
| Through | Motion from side to side or end to end within something | The suspect ran **through** the mall to evade arrest. |
| | | |
| To | Movement toward a place, person, or thing | The victim stated he was going **to** the grocery store when he was stopped. |
| Too | Also, besides, in excessive degree | The reporting party stated that the noise was **too** loud for her to hear the person talking. |
| Two | The number two (2) | The building had **two** entrances. |
| | | |
| Waist | Part of the body between the ribs and the hips | The suspect grabbed the victim around the **waist** and wrestled her to the ground. |
| Waste | To consume, weaken, or squander | She **wasted** water by washing her car twice every day. |
| | | |
| Weak | Not strong | His use of heroin left him very **weak**. |
| Week | Seven days' duration | The suspect stalked his victim for three **weeks**. |

| Words | Definitions | Examples |
|-------|-------------|----------|
| Your | Belongs to a specific you or a specific person | Young heard Johnson say, "**Your** dog is on my property again." |
| You're | Short form of 'you are' | The officer said **you're** under arrest. |
| | | |
| Wave | To signal | She **waved** to her neighbor. |
| Waive | To surrender or relinquish | She **waived** her Miranda rights. |

# PROOFREADING

## Introduction

Proofreading may seem time-consuming to both experienced and inexperienced writers. In the case of investigative reports where accuracy, clarity, and completeness are essential, proofreading is critical.

## Proofreading Content

As noted in chapter one of this workbook, the content of an investigative report must be factual, accurate, clear, concise, complete, and timely (FACCCT).

When proofreading reports, officers should ask themselves:

- Is the correct crime(s) cited in the report?
- Are all the elements appropriately articulated?
- Are the facts correct (based on the officer's field notes)?
- Is the report well organized?
- Is all the necessary information included?
- Is the information in the proper order?
- Are things said efficiently, or are statements too wordy?
- Are all conclusions supported by facts?
- Are there any gaps in logic?
- Are the names spelled correctly?

## Proofreading Mechanics

A report's effectiveness and an officer's credibility can be damaged by a report with too many mechanical errors. When proofreading the reports they have written, officers should look for:

- Inappropriate use of the parts of speech (e.g., use of nouns, pronouns verbs, etc.),

- Language that may be vague or confusing,

- Incorrect or inappropriate use of words,

- Spelling errors,

- Inappropriate punctuation, and

- Incorrect use of law enforcement abbreviations.

NOTE:     Additional information is provided in the supplementary materials portion of this workbook.

## Reading Aloud

Slowly reading a completed report aloud is one of the most effective methods for proofreading the content and mechanics of any document. When sentences are heard, it may be easier for the writer to identify obstacles such as:

- Mechanical errors,

- Gaps in logical flow,

- Skewed time sequences,

- Incorrect verb tenses,

- Cumbersome phrasing, etc.

## CHAPTER SYNOPSIS

**Learning Need**

Peace officers must recognize that an effective report must exhibit the writer's command of the language and be relatively free of errors in sentence structure, grammar, and other writing mechanics.

**Proper Nouns [18.04.1]**

Persons should be referred to by their proper names to avoid confusion. Once the full name has been used once, the last name may be used when referring to the same person.

**First Person Pronouns [18.04.2]**

Officers should refer to themselves in the first person (i.e., "I," "we," etc.). Use of a person's name or a third person pronoun is appropriate when referring to another person.

**Third Person Pronouns [18.04.3]**

When a third person pronoun is used, it must clearly refer to or agree with the noun or proper noun that is directly before it.

**Past Tense [18.04.4]**

Past tense verbs should be used to clearly indicate that events have already taken place.

**Active Voice [18.04.5]**

The active voice should be used to ensure the information presented is direct, brief, and clearly establishes the actions of the sentence.

**Paragraph Organization [18.04.6]**

When writing an investigative report, the first sentence (a lead-in sentence) of each paragraph should clearly state the primary topic of the paragraph.

**Concrete Language [18.04.7]**

Officers should select simple, concrete language that readers clearly understand.

**Words That Sound Alike [18.04.8]**

Officers should not confuse words that sound alike but have differing meanings and spellings.

**Proofreading [18.04.9]**

There are two relatively distinct tasks involved when officers proofread their investigative reports.

# WORKBOOK LEARNING ACTIVITIES

## Introduction

To help you review and apply the material covered in this chapter, a selection of learning activities has been included. No answers are provided. However, by referring to the appropriate text, you should be able to prepare a response.

## Activity Questions

1.  You have just been handed the following narrative from an officer's investigative report. The officer who wrote the report has also asked you to suggest other revisions that would improve the quality and effectiveness of the report. List the recommendations you would make. Identify any specific errors within the report.

    On 5-31-99 I was dispatched at 1153 hrs. to 33 "A" Street for a reported theft. I arrived at the address at approx. 1156 hrs. As I got out of my car I could see Mr. Jones waiting on the porch of his apartment waiting for me. As I walked towards Jones I asked him if he was the one who called in the report. He said yes. I asked Jones to tell me what happened. Jones told me he parked his mtn. bike against the stairs of his apartment while he ran into his apartment to fill his water bottle. Jones said he was inside for no more than 5 minutes. When he came out his bike was gone. Jones then gave me a complete description of his bike. I asked his neighbor if she saw anything but she said no.

2. Rewrite each of the following sentences using active voice, first person, or any other modifications necessary to make sure the writer's intent is clear. In all sentences Officer Brown is the reporting officer.

a) Officer Brown had been approaching the suspect and at this time he noticed that the woman appeared intoxicated.

b) Jones was asked by Brown to describe the gun, and she said that she didn't know much about them, but it was small enough to fit in his waste band.

c) Logan was then transported by Brown to jail for booking. During the search procedure, Logan said, I except responsibility for everything but shooting her. I guess I better ask advice from my attorney.

d) The suspect was patted down for weapons by Brown's partner. The immediate effect was to cause Russell to exhibit hostile behavior.

e) At this time Johnson was being advised of his Miranda options by Brown's partner. The suspect was asked if he understood each right as it was read by him to him. He said yes.

3. Rewrite the following segment from an officer's investigative report. Correct all mechanical errors as well as any other modifications you feel would improve the segment.

On 5/3/99 about 1147 I was dispatch to a report of a petty theft. I talked to Mark Jones. He told me that he went into his home to get some water. When he returned to the past location of his bike, someone stole his bike. It was a mountain bike, red with black trim. He told me that he had seen no one. His neighbor came out and I asked him if he had scene anyone take it but he said no.

4. Why is it important that the first sentence of a narrative paragraph clearly state the primary topic or subject of the paragraph?

5.  Circle the correct word choice for each of the following sentences.

a)  The [affect/effect] on the car was minimal.

b)  The Browns said they were returning to [there/their/they're] home.

c)  The [cite/site/sight] was covered with trash and broken glass.

d)  The witness saw two boys [braking/breaking] the windows.

e)  The other driver was going over 70 MPH when she [passed/past] us.

f)  Someone [pride/pried] the hinges from the frame of the door.

g)  The injured man refused to [accept/except] medical aid.

h)  Jones [alluded/eluded] to the location of the stolen vehicle.

6. Write a sentence that illustrates the proper use of each of the following words.

| Word | Examples of Proper Use |
| --- | --- |
| threw | |
| proceed | |
| waste | |
| principal | |
| proceed | |
| waist | |
| through | |
| principle | |

7.  Rewrite and reorganize the following statements/sentences into a clear narrative paragraph.

- 07/07/99

- 1945 pm

- The suspect ran north on Wilson Street with what appeared to be a metal bar in his hand.

- My partner and I were called to the incident in response to a silent alarm.

- A man was standing below a rear window of the building.

- A rear window was cracked but remained locked and secured.

- As I approached the rear of the building on foot, the man began to run away.

- The suspect was approximately 6 ft tall, 180 labs, wearing dark pants, a black nylon jacket, black baseball cap, and was a white male with brown hair and medium build.

# Supplementary Material

## OVERVIEW

### Introduction

The following materials can be referred to by peace officers when writing investigative reports.

### In This Section

Refer to the following table for specific reference documents included in this section.

| Topic | See Page |
|---|---|
| Parts of Speech | S-2 |
| Punctuation | S-3 |
| Common Law Enforcement Abbreviations | S-5 |
| State Abbreviations | S-13 |
| Crime Information Reference Guide | S-14 |

PARTS OF SPEECH

## Introduction

The sentence is the basic structure of written English. It is made up of words that have unique characteristics and functions.

## Parts Of Speech

The eight parts of speech are identified in the following table.

| | Description | Examples |
|---|---|---|
| Noun | Names a person, place, or thing | The **officer** stopped the *car*. <br> The **suspect** fled from the **officers**. |
| Pronoun | Takes the place of a noun | **He** ran between the cars. <br> **They** were close together. |
| Verb | Expresses action or state of being ("be verbs") | The officer **ran** after the suspect. <br> The suspect **was** fast. |
| Adverb | Describes a verb, adjective, or other adverb | The suspect ran **quickly**. <br> He became **extremely** exhausted |
| Adjective | Describes a noun or pronoun | The **tall** suspect turned around. <br> The **short** suspect continued to run. |
| Noun | Preposition | Shows how a noun or pronoun is related to another word in a sentence; followed by nouns or pronouns |
| Pronoun | Conjunction | Connects words or parts of sentences; can be coordinating or subordinating |
| Verb | Article | Comes before and usually limits a noun |
| Adverb | Describes a verb, adjective, or other adverb | The suspect ran **quickly**. <br> He became **extremely** exhausted |
| Adjective | Describes a noun or pronoun | The **tall** suspect turned around. <br> The **short** suspect continued to run. |

# PUNCTUATION

## Introduction

Punctuation marks give writers a way to achieve some of the effects they would convey in spoken conversations. (i.e., pauses, changes in tone or pitch, inflections, etc.) They can influence the meaning of words, the flow of thought, and the emphasis intended by the writer.

## Common Punctuation

The following table identifies the most common punctuation marks used within investigative reports.

| Mark | Main Uses | Examples |
|---|---|---|
| Period (.) | Marks the end of a sentence that is not a question or exclamation | Stewart went to the back of the store and told the manager what she saw. |
| Comma (,) | Separates items in a series | She reported that a microwave oven, a computer, and a stereo system were missing from the apartment. |
| | Separates nonessential phrases and clauses from the rest of the sentence | In the meantime, Jones swept up the broken glass. |
| | Separates two independent clauses in a compound sentence | The victim was in pain, but he was still able to speak with us. |
| Quotation marks (" ") | Indicates the beginning and end of direct quotes | Stanley said, "I just didn't see the car coming." |

NOTE:     Punctuation is generally placed inside quotation marks. (i.e., commas, periods)

| Mark | Main Uses | Examples |
|---|---|---|
| Colon (:) | Signals a series is about to follow | The victim reported the following items were missing from the apartment: a microwave oven, a computer, and a stereo system. |
| Apostrophe (') | To show possession in nouns | The victim's car was totaled. |
| | To form a contraction | She couldn't tell the direction he came from. |

NOTE:     The use of contractions in official reports is discouraged except in direct quotes.

NOTE:     Usage of semi-colons may be discouraged, please check agency policy and procedures.

# COMMON LAW ENFORCEMENT ABBREVIATIONS

## Introduction

Peace officers use abbreviations in their notes to expedite time and then write the complete words in their report.

## Guidelines For Use

Abbreviations should be such that the meaning will be readily understood by the person reading the notes. Officers may use abbreviations in their notes but should write the word out for their reports.

Abbreviations containing all capital letters do not require periods (e.g., DMV, CHP).

NOTE:    Review agency policies and procedures before using abbreviations.

The following is an alphabetical listing of common law enforcement abbreviations.

## A

| | |
|---|---|
| Assisted and advised | A&A |
| Address | Add. |
| All points bulletin | APB |
| Also known as | AKA |
| Ambulance | Amb. |
| American Indian | I |
| Arresting officer | A/O |
| Apartment | Apt. |
| Arrest | Arr. |
| Asian Indian | A |
| Assault with deadly weapon | ADW |
| Assistant | Asst. |
| Attempt | Att. |
| Attention | Attn. |
| Avenue | Ave. |

## B

| | |
|---|---|
| Blood alcohol count | BAC |
| Black (color) | Blk. |
| Black (descent) | B |
| Blocks | Blks. |
| Blonde | Bln. |
| Blue | Blu. |
| Be on the lookout | BOLO |
| Brown | Brn. |
| Building | Bldg. |
| Business and Professions Code | B&P |

## C

| | |
|---|---|
| California Highway Patrol | CHP |
| Captain | Capt. |
| California drivers license | CDL |
| California identification card | CID |
| Caucasian | W |
| Cleared by arrest | CBA |
| County | Co. |
| Complainant | Comp. |
| Convertible | Conv. |
| Chief of Police | COP |
| Criminal Justice Information System | CJIS |

## D

| | |
|---|---|
| Dark | Dk. |
| Date of birth | DOB |
| Dead on arrival | DOA |
| Defendant | Def. |
| Department | Dept. |
| Department of Motor Vehicles | DMV |
| District | Dist. |
| Direction of travel | DOT |
| Division | Div. |
| Doing business as | DBA |
| Driving under the influence | DUI |

## E

| | |
|---|---|
| East | E |
| Eastbound | E/B |
| Emergency room | ER |
| Expired | Exp. |
| Estimated | Est. |

## F

| | |
|---|---|
| Felony | Fel. |
| Female | F |
| Field sobriety test | FST |
| Four door | 4D |

## G

| | |
|---|---|
| Gray | Gry. |
| Gone on arrival | GOA |
| Green | G |

## H

| | |
|---|---|
| Had been drinking | HBD |
| Hazel | Hzl. |
| Headquarters | Hdqts. |
| Health & Safety Code | H&S |
| Highway | Hwy. |
| High School | H.S. |

## I

| | |
|---|---|
| Identification | ID |
| Identity | ID |
| Indian, American | I |
| Information | Info. |
| Informant | Inf. |
| Inspector | Insp. |
| Injury | Inj. |
| Injury on duty | IOD |
| Intersection | I/S |

## J

| | |
|---|---|
| Juvenile | Juv. |

## L

| | |
|---|---|
| Left front | L/F |
| Left rear | L/R |
| License | Lic. |
| Lieutenant | LT |
| Light | Lt. |

## M

| | |
|---|---|
| Male | M |
| Maroon | Mar. |
| Medium | Med. |
| Memorandum | Memo |
| Mexican, Latino, Hispanic | H |
| Miles per hour | MPH |
| Miscellaneous | Misc. |
| Misdemeanor | Misd. |
| Modus operandi | M.O. |
| Motorcycle | M/C |

## N

| | |
|---|---|
| National Crime Information Center | NCIC |
| No further description | NFD |
| No middle name | NMN |
| Not applicable | N/A |
| North | N |
| Northbound | N/B |

## O

| | |
|---|---|
| Officer | Off. |
| Oriental | O |

## P

| | |
|---|---|
| Parked | Pkd. |
| Passenger | Pass. |
| Pedestrian | Ped. |
| Penal Code | PC |
| Permanent identification number | PIN |
| Pickup | P/U |
| Point of impact | POI |
| Point of rest | POR |
| Possible | Poss. |

## Q

| | |
|---|---|
| Quiet on arrival | QOA |
| Quiet on departure | QOD |

## R

| | |
|---|---|
| Railroad | RR |
| Referral by other agency | ROA |
| Registration | Reg. |
| Reporting officer | R/O |
| Right front | R/F |
| Right rear | R/R |
| Room | Rm. |

## S

| | |
|---|---|
| Sergeant | Sgt. |
| South | S |
| Southbound | S/B |
| Station wagon | S/W |
| Street | St. |
| Supervisor | Supv. |
| Suspect | Susp |

## T

| | |
|---|---|
| Teletype | TT |
| Temporary | Temp. |
| Traffic accident | TA |
| Two door | 2D |

## U

| | |
|---|---|
| Uniform Crime Reports | UCR |
| Unable to locate | UTL |
| Unknown | Unk. |

## V

| | |
|---|---|
| Vehicle | Veh. |
| Vehicle Code | VC |
| Vehicle identification number | VIN |
| Victim | Vict. |
| Violation | Viol. |

## W

| | |
|---|---|
| Warned and released | W&R |
| Watch Commander | W/C |
| Welfare & Institutions Code | W&I |
| West | W |
| Westbound | W/B |
| White (color) | Wh |
| White (descent) | W |
| Witness | Wit. |

## X

## Y

| | |
|---|---|
| Yellow | Yel. |

## Z

# STATE ABBREVIATIONS

## Introduction

Peace officers may have to refer to specific states within their reports. The U.S. Postal Service has standardized the abbreviations for the states and some Canadian provinces.

## Abbreviations

The following table identifies the U.S. Postal Service's standardized abbreviations.

| State | Abbr. | State | Abbr. |
|---|---|---|---|
| Alabama | AL | Montana | MT |
| Alaska | AK | Nebraska | NE |
| Arizona | AZ | Nevada | NV |
| Arkansas | AR | New Hampshire | NH |
| California | CA | New Jersey | NJ |
| Colorado | CO | New Mexico | NM |
| Connecticut | CT | New York | NY |
| Delaware | DE | North Carolina | NC |
| Dist. of Columbia | DC | North Dakota | ND |
| Florida | FL | Ohio | OH |
| Georgia | GA | Oklahoma | OK |
| Hawaii | HI | Oregon | OR |
| Idaho | ID | Pennsylvania | PA |
| Illinois | IL | Rhode Island | RI |
| Indiana | IN | South Carolina | SC |
| Iowa | IA | South Dakota | SD |
| Kansas | KS | Tennessee | TN |
| Kentucky | KY | Texas | TX |
| Louisiana | LA | Utah | UT |
| Maine | ME | Vermont | VT |
| Maryland | MD | Virginia | VA |
| Massachusetts | MA | Washington | WA |
| Michigan | MI | West Virginia | WV |
| Minnesota | MN | Wisconsin | WI |
| Mississippi | MS | Wyoming | WY |
| Missouri | MO | British Columbia | BC |

NOTE:    State postal abbreviations do not require periods.

# CRIME INFORMATION REFERENCE GUIDE

## Introduction

Within the investigative report, the reporting officer must clearly identify the required crime elements necessary to establish that a crime has been committed. Along with the elements of the crime, officer's reports should include additional information that is specific to that crime.

## Specified crimes

Key information referring to a number of specified crimes is noted in the following pages of this workbook section.

| Category | Specific Crime |
|---|---|
| Property Crimes | <ul><li>Burglary</li><li>Grand theft</li><li>Petty theft</li><li>Vandalism</li></ul> |
| Crimes Against Persons | <ul><li>Assault with a deadly weapon</li><li>Battery with great bodily injury</li><li>Murder</li><li>Robbery</li><li>Battery</li></ul> |
| Crimes Against Children | <ul><li>Lewd or lascivious acts with a child</li><li>Physical abuse of a child</li></ul> |
| Controlled Substances | <ul><li>Being under the influence of a controlled substance</li><li>Possession of a controlled substance</li></ul> |
| Weapons Violations | <ul><li>Carrying a concealed firearm without a license</li><li>Carrying a loaded firearm in a public place</li><li>Possession of a firearm by a convicted felon</li></ul> |
| Other Crimes | <ul><li>Prostitution</li><li>Rape</li><li>Willful infliction of corporal injury</li></ul> |

# Glossary

## Introduction

**The key vocabulary terms for Learning Domain 18: Investigative Report Writing is listed below with the definitions as they apply to this workbook.**

## Active Voice

The use of verbs that refer to or agree with the subject of the sentence actually doing or performing the action

## Conclusion

A statement that is based on the analysis of facts and opinions

## Corpus Delicti

The body or elements of the crime

## FACCCT

Acronym for the characteristics of an effective investigative report; factual, accurate, clear, concise, complete, and timely

## Fact

A statement that can be verified or proven

## Field Notes

Abbreviated notations written by an officer in the field while investigating a specific incident or crime

**First Person Pronoun**

A pronoun that refers to the person speaking (e.g., I, my, we, our, etc.)

**Investigative Report**

A written legal document prepared by a peace officer that records in detail that officer's observations and actions as they relate to a specific event or incident

**Interview**

The process of gathering information from a person who has knowledge of the facts an officer will need to conduct an investigation

**Noun**

A word that is used to identify or name a person, place, or thing

**Opinion**

A statement that can be open to different interpretations and expresses a belief not necessarily substantiated by proof

**Passive Voice**

The use of verbs that refer to or agree with someone or something other than the doer or performer of the action of a sentence

**Past Tense**

A form of a verb that expresses an action that has already taken place

**Present Tense**

A form of a verb that expresses an action that is currently taking place

**Pronoun**

A word that can be used as a substitute for a noun or a proper noun

**Proper Noun**

A noun that names a specific person, place, or thing

**Third Person Pronoun**

A pronoun that refers to or agrees with the noun that is being spoken about (e.g., he, she, it, etc.)

**Transition**

A word or phrase that shows a relationship between thoughts, sentences, or paragraphs

**Verb**

A word which expresses an action or state of being

**Verb Tense**

A form of a verb that refers to the time an action takes place