**Jeffrey Gu**

**jeffwgu@gmail.com**

**2332 N Clay St Apt 3**

**Denver, CO 80211**

**1-720-593-1548**

**Plaintiff Pro Se**

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Jeffrey Gu,<br>　　　　　Plaintiff<br>v.<br>City of Irvine et al,<br>　　　　　Defendants. | **Case No.: 8:25-cv-02134-VBF-DSR**<br><br>**RESPONSE IN OPPOSITION** |

**PLAINTIFF'S OPPOSITION TO MOTION OF DEFENDANTS JEFFREY MELCHING AND JESSICA SANDERS TO DISMISS SECOND AMENDED COMPLAINT AGAINST SAID DEFENDANTS**

1

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................2

TABLE OF AUTHORITIES........................................................................ 3

    Cases............................................................................................... 3

    Statutes.............................................................................................4

    Rules................................................................................................ 5

    Other Authorities............................................................................ 5

I. INTRODUCTION.....................................................................................5

II. FACTUAL BACKGROUND.................................................................. 6

    A. Melching and Sanders Cease-and-Desist Letters.........................6

    B. City of Irvine's Litigation Behavior and Lack of Police Reporting...........7

    C. Publicly Available Records......................................................... 7

III. ARGUMENT........................................................................................8

    A. Melching and Sanders Substitute Unsubstantiated Narrative for Well-Pled Allegations................................................................ 8

    B. The Hostile Letters Were Unprivileged, Coercive Extrajudicial Directives 10

    C. Irvine's Restrictions were Not For Substantial Reasons And Were Unduly Restrictive.................................................................. 11

        1. Official Law Enforcement Records Negate Their "Safety Concern" Pretext.....................................................................12

        2. Public Records and Communication Metrics Refute the "Resource Preservation" Defense............................................. 14

        3. Funneling Communications into an Unmonitored Legal Black Hole Constitutes an Unconstitutional Prior Restraint...................... 16

    D. Melching and Sanders Are Not Protected By Qualified Immunity......... 17

        1. Melching and Sanders had Fair Notice that their Pretextual Directives Violated Clearly Established First Amendment Law............................. 17

        2. Melching and Sanders have Third Party Liability.............................22

        3. The Common Law Defense of Qualified Immunity is Negated By The Statute at Large's Notwithstanding Clause.............................................23

    E. Melching and Sanders' Actions Fall Squarely Within the Purview of the

Ralph Act.............................................................................................................. 24

F. Melching and Sanders' Conduct Satisfies the Bane Act Because the Statute Requires Coercion or Intimidation, Not Actual Violence................ 27

IV. CONCLUSION...........................................................................................29

**CERTIFICATE OF COMPLIANCE....................................................................29**

**TABLE OF AUTHORITIES**

**Cases**

Animal Prot. & Rescue League, Inc. v. Cnty of Riverside,

111 Cal.App.5th 914 (2025) ......................................................... 26

Campbell v. Feld Entm't, Inc., 75 F.Supp.3d 1193 (N.D. Cal. 2014) ................... 26

Cornell v. City & County of San Francisco,

17 Cal. App. 5th 766 (2017) .................................................. 28-29

Harris v. Roderick, 126 F.3d 1189 (9th Cir. 1997) .................................................. 23

Jones v. Alfred H. Mayer Co., 392 U.S. 409 (1968) ............................................. 25

Lacey v. Maricopa County, 693 F.3d 896 (9th Cir. 2012) ......................... 19-21, 23

Manzarek v. St. Paul Fire & Marine Ins. Co., 519 F. 3d 1025 (9th Cir. 2008) .. 9-10

RGC Gaslamp, LLC v. Ehmcke Sheet Metal Co.,

56 Cal. App. 5th 413 (2020) ........................................................................ 10

Rivers v. Roadway Express, Inc., 511 U.S. 298 (1994) ........................................ 26

Shoyoye v. County of Los Angeles, 203 Cal. App. 4th 947 (2012) ...................... 28

Starr v. Baca, 652 F.3d 1202 (9th Cir. 2011) .......................................... 23

Vasquez v. State of California, 45 Cal. 4th 243 (2008) ........................................ 26

Venegas v. County of Los Angeles, 32 Cal. 4th 820 (2004) ................................. 28

White v. Lee, 227 F.3d 1214 (9th Cir. 2000) ............................................. 18-19, 21

**Statutes**

Cal. Civ. Code § 47(b) ......................................................................... 10

Cal. Civ. Code § 51.7 ..................................................................... 6, 25-27

Cal. Civ. Code § 52.1 ..................................................................... 6, 28-30

Cal. Civ. Proc. Code § 425.16(e) ......................................................... 10

Cal. Civ. Proc. Code § 1858 .............................................................. 26

Cal. Gov't Code § 7922.540(b) ........................................................... 17

Civil Rights Act of 1871, ch. 22, § 1, 17 Stat. 13 ............................................. 24-25

**Rules**

Fed. R. Civ. P. 13 ................................................................................................ 11

Fed. R. Civ. P. 65 ................................................................................................ 11

**Other Authorities**

Assemb. B. 1775, 2020 Cal. Stat. ch. 327 ...................................................... 25-27

Patrick Jaicomo & Daniel Nelson, *Section 1983 (Still) Displaces Qualified*

  *Immunity*, 49 Harv. J.L. & Pub. Pol'y 151 (2026) ...................................... 25

Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*,

  111 Calif. L. Rev. 201 (2023) ................................................................. 25

## I. INTRODUCTION

Plaintiff Jeffrey Gu respectfully submits this Opposition to Defendants Jeffrey Melching (Melching) and Jessica Sanders' (Sanders) Motion to Dismiss Plaintiff's Second Amended Complaint (SAC). See Doc. No. 174 (MTD). The motion should be denied because Melching and Sanders a) ask the Court to construe facts

unfavorably towards the Plaintiff, b) sent clearly coercive communications c) are not protected by qualified immunity, and d) indeed violated the Ralph and Bane Acts.

## II. FACTUAL BACKGROUND

### A. Melching and Sanders Cease-and-Desist Letters

Melching and Sanders sent two cease-and-desist letters as recounted in Plaintiff's Second Amended Complaint (SAC), in ¶¶ 681, 706, 812 :

681. **Key Fact:** On August 5, 2025, **COI**, via attorney Jessica Sanders of Rutan & Tucker, issued a cease-and-desist letter via email to **JG**. (See Exhibit 217 COI Cease and Desist.pdf )

706. On August 25, 2025, **COI** issued its second cease-and-desist letter to **JG**. (See Exhibit 227 COI Cease and Desist 2.pdf )

812. The cease and desist letter from Jessica Sanders dated August 5, 2025 lists the email jmelching@rutan.com at the top. (See Exhibit 217 COI Cease and Desist.pdf )

See Second Amended Complaint, Doc. No. 130 at 103, 106, 122 (SAC).

**B. City of Irvine's Litigation Behavior and Lack of Police Reporting**

City of Irvine, William Go, Trinity Pham, Jeffrey Melching, and Jessica Sanders to date have not asked the Court for a civil restraining order or injunction under Fed. R. Civ. P. 65. Moreover, in response to any of Plaintiff's complaints, they have only filed motions to dismiss or answers, not any counterclaims under Fed. R. Civ. P. 13. See Doc. Nos. 118, 144, 174. Nor have the City of Irvine, William Go, Trinity Pham, Jeffrey Melching, or Jessica Sanders filed any additional reports with the Irvine Police Department after August 1, 2025, as the only police report associated with Plaintiff is the one that was initiated by the City of Irvine and its employees on July 30, 2025. See SAC, ECF No. 130 at 113, ¶ 750.

**C. Publicly Available Records**

Transparent California (accessible at https://transparentcalifornia.com/) alleges to obtain accurate salary information of public employees in California, from which Plaintiff accessed the information of Jesse Cardoza, Sam Floyd, and Emmerline Kim. Moreover, via the California Public Records Act (CPRA), Plaintiff has received contractual information relating to Rutan & Tucker, LLP (Rutan & Tucker) and an Irvine Police Department Incident Details Report relating to

7

Plaintiff. More details about these documents are contained in Plaintiff's Request for Judicial Notice and Declaration.

**III. ARGUMENT**

**A. Melching and Sanders Substitute Unsubstantiated Narrative for Well-Pled Allegations**

Melching and Sanders state that their two cease and desist letters (Hostile Letters) were issued in response to "Plaintiff's actions causing significant disruption to the operations of the city and raising concerns regarding the safety and wellbeing of city staff," which were, ostensibly, the "substantial governmental concerns [that] underlie[d]" the limitations they imposed upon Plaintiff. See MTD, Doc. No. 174 at 8, 17. While Plaintiff attached the Hostile Letters as exhibits to the SAC to establish the paper trail of extrajudicial chilling, attaching an exhibit does not grant Melching and Sanders license to convert a Rule 12(b)(6) Motion to Dismiss into a platform for unsworn factual speculation. Binding precedent precludes such a usurpation of the narrative.

Under Rule 12(b)(6), the Court's analysis is strictly bounded by the complaint, "exhibits attached to the complaint, and matters properly subject to judicial

8

notice." Manzarek v. St. Paul Fire & Marine Ins. Co., 519 F. 3d 1025, 1030-31 (9th Cir. 2008). In evaluating a motion to dismiss, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." Ibid.

Melching and Sanders' motion urges the Court to infer that Plaintiff's actions were "disruptive" and implicated "employee safety," but Plaintiff's SAC clearly outlines how he communicated with City representatives such as Councilmember William Go (Go) and Chief Building Official Jesse Cardoza with little friction (certainly, with no police or attorney involvement) *until* a phone call with employee Trinity Pham (Pham), with whom he discussed "permitting failures, code violations, and lack of qualifications of certain employees in the COI Building Department." See SAC, Doc No. 130, p. 98, ¶ 642. Further, Plaintiff does not write in his SAC that he spoke with Pham about "hurting herself," because it never happened (and, thus, would be a plausible reason why he would not remember speaking about the matter, either). Ibid. Lastly, Plaintiff also recounts how he made "2 hours and 13 minutes of phone calls made over the previous 5 months to COI, with most being unanswered," which amounted to about an average of 27 minutes of airtime a month, or 54 seconds per day. Id. at 103, ¶ 287. Melching and Sanders produced nothing that detailed in their Hostile Letters, but, somehow, this lack of

9

substantiation has still creeped its way into their current motion, against the standard required today to dismiss Plaintiff's complaint. Therefore, based on the standard in <u>Manzarek</u>, Melching and Sanders' motion to dismiss should be denied because it perpetuates a self-serving narrative that is not corroborated by the Plaintiff's record (or the public record, for that matter).

**B. The Hostile Letters Were Unprivileged, Coercive Extrajudicial Directives**

Melching and Sanders, by not invoking it, have seemingly waived the litigation privilege, Cal. Civ. Code § 47(b), with respect to their Hostile Letters, that would have shielded them under Cal. Civ. Proc. Code § 425.16(e). In doing so, Melching and Sanders have essentially admitted that the Hostile Letters were never sent in serious contemplation of litigation (<u>RGC Gaslamp, LLC v. Ehmcke Sheet Metal Co.</u>, 56 Cal. App. 5th 413, 428 (2020) (holding pre-litigation communications are privileged only when made in anticipation of litigation contemplated in good faith and under serious consideration)), even though the first Hostile Letter states that "[f]ailure to comply with this demand may result in further legal action…" and the second Hostile Letter states that "[f]ailure to comply with these directives will leave us with no choice but to consider…instituting legal action against you." <u>See</u> Doc. No. 130-7 at 166, 224, Exs. 217, 227. Seemingly, either Plaintiff's actions

were never substantial enough to warrant contemplating litigation or criminal action seriously, *or* Melching and Sanders never had enough objective evidence of the allegedly harassing actions to press forward in a civil or criminal proceeding against the Plaintiff. The facts that the City of Irvine and/or Pham did not assert compulsory counterclaims under Fed. R. Civ. P. 13 in their answer (twice) or ask the court for a restraining order or preliminary injunction under Fed. R. Civ. P. 65 are further evidence that the City of Irvine *and* Pham never actually had any harassment claims to assert against the Plaintiff in the first place. See Doc. Nos. 118, 144.

In light of these facts, the only reasonable conclusion is that Melching and Sanders' Hostile Letters were sent in retaliation for Plaintiff's petitioning activities, not for the "disruption" and "safety" justifications espoused in the Hostile Letters and instant motion.

**C. Irvine's Restrictions Were Not for Substantial Reasons and Were Unduly Restrictive**

Melching and Sanders argue that their Hostile Letters directives did not violate the First and Fourteenth Amendments because "the City of Irvine's governmental concerns with Plaintiff's actions were substantial" and "Plaintiff was expressly

afforded an avenue of contact…through the City Attorney's Office." See MTD, Doc. No. 174 at 16. To support this purported "substantial" government interest, Melching and Sanders cite no objective administrative record or evidentiary finding; instead, they engage in circular reasoning, citing the Hostile Letters attached to the SAC as proof of the facts asserted within them. Id. at 15. Irvine Police Department Officer Emma Olague's (Olague) report of the events leading up to the Hostile Letters and the City of Irvine's publicly available salary data negate these self-referencing conclusions.

**1. Official Law Enforcement Records Negate Their "Safety Concern" Pretext**

Melching and Sanders assert that their directives were justified by "concerns regarding the safety and wellbeing of city staff." Id. at 8, 15. However, Olague clearly states in her report, after her conversation with Pham, that "I was unable to determine that a criminal threat occurred." See Doc. No. 130-10 at 9, Ex. 275. At the end of her report, after investigating Plaintiff's background, visiting his parent's house (perhaps, to confront the Plaintiff), and calling him, Olague concludes that "[t]here is no evidence or statements to suggest that GU made a threat of violence against the city, the Counselman or any of his staff" and that

"[n]o crime could be substantiated, and this report was taken for documentation purposes." Id. at 10.

Olague responded to another incident on July 31, 2025, where she recounted that "[Pham] did not speak with GU but he was attempting to get in contact with her through the HR receptionist. GU also asked the HR receptionist for [Pham's] contact information several times…[Pham] said she believed that the city may have blocked GU from calling because she did not receive any telephone calls from him today." Id. at 18. This narrative history begs several questions. If Plaintiff had already contacted Pham through Go's office, why would he have tried to gain her contact information through the City of Irvine Human Resources Department or even attempt to be routed to her through the department when they are not a call routing office? Also, if Pham (or Councilman Go's office) did not receive any phone calls from Plaintiff on that day, why did Olague again respond to the City because she was "notified that Jeffrey [sic] GU contacted Councilman [sic] William GO'S office again today"? Obviously, these mysteries bring up more factual questions about the City, Melching, and Sanders' actions than the Plaintiff's.

13

Also mysteriously, in their second Hostile Letter, Melching and Sanders accuse Plaintiff of "rais[ing] the respondent's personal details on social media." See Doc. No. 130-7 at 223, Ex. 227. Plaintiff has never engaged in such conduct, and Melching and Sanders offer zero supporting evidence or record documentation to substantiate this allegation. Unfortunately and ironically, Sanders herself included what appears to be Pham's unredacted home address (the *Costa Mesa* address visited by an *Irvine* police officer) in a CPRA production of the Incident Details Report provided to Plaintiff—despite redacting roughly 75% of the comments in the document. See Ex. 6. If safeguarding municipal staff information were the true, good-faith impetus behind Melching and Sanders' administrative directives, Sanders would have redacted Pham's residential address rather than non-sensitive operational details. This glaring contradiction demonstrates that employee protection was merely a post hoc pretext designed to justify suppressing Plaintiff's protected petitioning activity.

Ultimately, Officer Olague's official law enforcement record of the events of July 30 and 31, 2025—coupled with Sanders' own contradictory disclosure of Pham's residential information—directly refutes the post hoc safety rationale advanced in the Hostile Letters. At the motion to dismiss stage, Defendants cannot defeat Plaintiff's 42 U.S.C. § 1983 (Section 1983) First Amendment claims by relying on

unsworn, extra-record assertions of "safety concerns" that are contradicted by the contemporaneous police logs. Because the objective record establishes, at minimum, a sharp factual dispute regarding the validity of Melching and Sanders' asserted government interest, their safety justification cannot support dismissal under Rule 12(b)(6).

**2. Public Records and Communication Metrics Refute the "Resource Preservation" Defense**

Secondly, Melching and Sanders also contend that the City of Irvine was concerned with Plaintiff's office resource usage but again support it with nothing but a reference to their own Hostile Letter. See MTD, Doc. No. 174 at 15 (they cite the "burdens placed on staff time and resources in responding to Plaintiff's numerous communications."). Based upon publicly available salary and contract information, Melching and Sanders' contention that Plaintiff is, at the very least, facially incomplete and, at most, an egregious overstatement.

As stated *supra*, Plaintiff's phone communications with the City of Irvine amounted to about an average of 27 minutes of airtime a month, or 54 seconds per day, over 5 months. Id. at 103, ¶ 287. Though he interacted with various employees, he notably interacted with Chief Building Official Jesse Cardoza,

15

Community Development Strategist Sam Floyd, and Records Information Specialist Emmerline Kim. See SAC, Doc. No. 130 at 104 ¶¶ 610; Doc. No. 130-7 at 536, Ex. 246; and Ex. 1. Transparent California alleges to obtain public sector salaries via CPRA requests. See Ex. 2. The 2025 salaries from the website for the aforementioned individuals state that Jesse Cardoza made $356,918 in total salary and benefits, Sam Floyd $232,495, and Emmerline Kim $128,001. See Ex. 3. If we assume a public sector worker is compensated for 40 hours a week, 52 weeks a year for 2,080 hours total, this hourly rate is correspondingly $171.59, $111.78, and $61.54 per hour for these individuals. As a result of a CPRA request for contractual information from the City of Irvine, Plaintiff obtained some insight into how much the City pays to Rutan & Tucker for its City Attorney and Deputy City Attorney services, which is probably currently above $280 per hour, as this CPRA request resulted in contractual information that is likely now outdated. See Ex. 4. At this older hourly rate, the City Attorneys charge a rate 63% higher than the City of Irvine's Chief Building Official and 355% higher than a records specialist who was processing (and still probably is) Plaintiff's CPRA requests. Thus, the City's argument that it was protecting a substantial interest–its office resources–by filtering Plaintiff through an even higher cost medium–Rutan & Tucker, the very same firm defending this case with two attorneys (who have

nearly a century of bar experience between them) and thus also benefiting from the alleged constitutional harms–is facially absurd and is at odds with the most basic accounting.

**3. Funneling Communications into an Unmonitored Legal Black Hole Constitutes an Unconstitutional Prior Restraint**

Melching and Sanders note that "Plaintiff was left with the ability to freely let the city know what might be on his mind by contacting the City Attorney's Office in writing." See MTD, Doc. No. 174 at 15. And while Plaintiff agrees that "[t]he right to petition via communications to public officials does not include a corresponding right to a response from, or even official consideration by, public officials to such communications," (ibid.) Melching and Sanders' admonishment to funnel all Plaintiff's communications to them *only* through email (but, definitely, as noted in their second Hostile Letter, not by phone) has resulted in virtually no responses from them, the only one being when Plaintiff recently questioned Jessica Sanders on the source and legitimacy of redactions to a recent CPRA request under Cal. Gov't Code § 7922.540(b). See Ex. 5. Melching and Sanders try to paint their routing as being reasonable under City of Renton v. Playtime Theaters, Inc., 475 U.S. 41 (1986). However, Renton addresses

content-neutral zoning of commercial speech, not extrajudicial directives target-banning an individual citizen from petitioning municipal offices. Forcing a vocal citizen to submit all inquiries exclusively to Melching and Sanders' inboxes—where emails are routinely ignored—functions as an extrajudicial, content-based restriction. By cutting off access to public departments and routing all communications into a non-responsive administrative black hole, Melching and Sanders imposed an unconstitutional prior restraint designed to chill Plaintiff's protected petitioning activity under the First Amendment, and, as such, the third and fourth causes of action should not be dismissed.

**D. Melching and Sanders Are Not Protected By Qualified Immunity**

**1. Melching and Sanders had Fair Notice that their Pretextual Directives Violated Clearly Established First Amendment Law**

As demonstrated in Section III.C *supra*, Plaintiff has shown that Defendants Melching and Sanders violated Plaintiff's First Amendment rights. Under the qualified immunity framework articulated in Saucier v. Katz, 533 U.S. 194 (2001) and Pearson v. Callahan, 555 U.S. 223 (2009), the inquiry should then turn to whether the unconstitutionality of Melching and Sanders' conduct was "clearly established" at the time it occurred. They contend that White v. Lee, 227 F.3d 1214

(9th Cir. 2000) and <u>Lacey v. Maricopa County</u>, 693 F.3d 896 (9th Cir. 2012) fail to place the unconstitutionality of the Hostile Letters directives beyond debate. <u>See</u> MTD, Doc. No. 174 at 21. Plaintiff respectfully disagrees. These authorities firmly establish that using administrative threats and police actions to chill protected petitioning activity violates the First Amendment.

In <u>White</u>, the Ninth Circuit concluded that

> [t]he plaintiffs' claim is founded on bedrock First Amendment principles and legal rules that this court and the Supreme Court have applied for decades, if not centuries. In 1993 and 1994, reasonable government officials would have known that <u>they could not conduct an eight-month investigation into the vocal but entirely peaceful opposition</u> of residents to a housing project proposed for their neighborhood, <u>or into their efforts to persuade the appropriate government agencies of their point of view</u>. They would also have known that <u>accusations of law-breaking</u>, threatened subpoenas, improper broad demands for documents and information, and admonishments to cease nonfrivolous litigation and <u>the publication of "discriminatory" statements would chill "uninhibited, robust, and wide-open" debate on public issues</u>.

<u>White v. Lee</u>, *supra*, 227 F.3d at 1239 (emphases added). Thus, in 2025, more than three decades after the events of <u>White</u>, Melching and Sanders, if they did not know, should have known that accusations of law-breaking, threatened legal action, and warnings to City of Irvine staff about Plaintiff would chill his protected petitioning directed towards the City Council and Building Department.

In <u>Lacey</u>, Dennis Wilenchick (Wilenchick) was an Independent Special Deputy Maricopa County Attorney who worked at the behest of notorious Maricopa County Sheriff Joseph Arpaio. Wilenchick is probably the most analogous in that case to Melching and Sanders because of his status as an attorney who represented a governmental body at that time.

The court declared that "Wilenchik's actions were sufficient to chill Lacey's protected speech" because he

> issued broad, invalid subpoenas demanding that the paper reveal its sources, disclose its reporters' notes, and reveal information about anyone who visited the *New Times's* website; Wilenchik's motions for arrest warrants, contempt findings, and fines show that he meant the *New Times* to fear them as valid.

<u>Lacey v. Maricopa County</u>, *supra*, 693 F.3d at 917. They also found that "Wilenchik's actions against Lacey, Larkin, and the *New Times* were plainly intended to punish them for their First Amendment activities and deter them from future activities." <u>Ibid.</u> These actions included arresting the publishers the same day as they published an article critical of him and the lack of probable cause for doing so. <u>Ibid.</u> The court also opined that it was "hard to conceive of a more direct assault on the First Amendment than public officials ordering the immediate arrests of their critics." <u>Ibid.</u>

20

Melching and Sanders try to downplay their actions, saying, "[t]he actions of the City Attorney Defendants as alleged in the SAC do not remotely approach the egregious conduct of the defendants in *White* and *Lacey*." See MTD, Doc. No. 174 at 21. But what they also downplay in their motion is their hand in involving the Irvine Police Department, because there is reason to believe that Melching and Sanders were involved during the initial police investigations themselves. On point, Olague's police report suggests that Melching and Sanders were involved as early as July 31, 2025, where she recounts, "[p]rior to this call for service, I was informed the City of Irvine's Human Resources (HR) department initiated a cease and desist letter which will later be served to GU." See Doc. No. 130-10 at 18, Ex. 275. While it is true that Melching and Sanders do not work in the City of Irvine Human Resources Department, it is indisputable that they were involved in the drafting of the aforementioned cease and desist letter (the first of the Hostile Letters), which implies they were involved at this very early stage (which was at least five days before the actual transmission of the first Hostile Letter on August 5). Later in the chain of events, Melching and Sanders directly invoke police involvement in the first Hostile Letter, writing, "[i]t has become necessary for the City and the Irvine Police Department (IPD) to take precautionary matters to preserve Ms. Pham's safety and wellbeing." See Doc. No. 130-7 at 165, Ex. 217.

The letter ominously notes "precautionary measures" and explicitly warns Plaintiff–in boldface–to "immediately cease all direct contact with City staff and offices…" Ibid. If Plaintiff would have visited the City of Irvine *not* during a "duly noticed public meeting," perhaps in order to inquire about some record not readily available online, what would Melching, Sanders, and the City of Irvine have done? Clearly, the first Hostile Letter was a warning that Plaintiff could have faced police intervention should he have crossed that line.

Jessica Sanders' active personal involvement in the policing chapter is further underscored by her hands-on management of police department records. Practically a year after the July 30, 2025 incident—and despite, supposedly, having no contemporaneous presence, firsthand knowledge, or law enforcement role in the event—Ms. Sanders stepped in to redact roughly 75% of the police department's Incident Details Report before its production under the CPRA. See Exs. 5, 6. This direct, retroactive intervention to filter the contemporaneous law enforcement record demonstrates her central, personal role in controlling the official narrative and maintaining the restrictive directives at issue (with the entire Irvine City Council copied, to boot).

22

Absent a genuine safety concern, the most obvious explanation for Melching and Sanders' police involvement was a motivation to quiet him over the fact that he found deep incompetence and, perhaps, corruption and was going to bring this to light.

**2. Melching and Sanders have Third Party Liability**

Melching and Sanders' attempt to reframe the conduct as originating with Go, Pham, Olague, or the Irvine Police Department does not defeat Plaintiff's third party liability theory. See MTD, Doc. No. 174 at 24 ("Plaintiff fails to allege any facts that the City Attorney Defendants were responsible in any way for the involvement or alleged conduct of the Irvine Police Department."). The relevant point is not whether Melching and Sanders were the first actors in the chain, but whether they knowingly participated in, induced, ratified, or leveraged conduct that chilled Plaintiff's protected governmental petitioning. Where a complaint plausibly alleges that government officials acted with retaliatory or coercive intent and used third-party involvement to suppress protected activity, Section 1983 liability remains available. Lacey, *supra*, 693 F.3d at 915-16, 938-39; Starr v. Baca, 652 F.3d 1202, 1207-08 (9th Cir. 2011); Harris v. Roderick, 126 F.3d 1189, 1196-97, 1204 (9th Cir. 1997).

Here, Plaintiff's SAC alleges that Go, Pham, and Olague induced Melching and Sanders to take action that burdened Plaintiff's building department investigations and related petitioning activity. See SAC, ECF No. 130 at 119-20, ¶ 792. At the pleading stage, that is enough. The SAC and police report plausibly alleges that Go, Pham, and Olague knew of Plaintiff's protected activity, acted with retaliatory or coercive intent, and caused, encouraged, ratified, or leveraged third-party conduct to suppress it. See Doc. No. 130-10 at 9, Ex. 275. Melching and Sanders' contrary argument improperly asks the Court to resolve factual disputes and draw inferences in their favor, which, again, is not permitted on a motion to dismiss.

**3. The Common Law Defense of Qualified Immunity is Negated By The Statute at Large's Notwithstanding Clause**

While Plaintiff recognizes that this Court is bound by existing Supreme Court precedent applying qualified immunity under Section 1983, Plaintiff explicitly preserves for appellate review the historical argument that Section 1983 textually abrogated all common-law official immunities.

As enacted in Section 1 of the Civil Rights Act of 1871, the statute contained an explicit clause, what some scholars call the Notwithstanding Clause, declaring that state actors violating constitutional rights "shall...be liable," "any such law, statute,

24

ordinance, regulation, custom, or usage of the State to the contrary notwithstanding." Civil Rights Act of 1871, ch. 22, § 1, 17 Stat. 13; Patrick Jaicomo & Daniel Nelson, *Section 1983 (Still) Displaces Qualified Immunity*, 49 Harv. J.L. & Pub. Pol'y 151 (2026); Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Calif. L. Rev. 201 (2023).

The non-substantive omission of this clause for concision during the 1874 codification of the Revised Statutes did not alter the statute's original displacement of common-law defenses. Jones v. Alfred H. Mayer Co., 392 U.S. 409, 422 n.29 (1968) (recognizing the deletion of near-identical notwithstanding clauses in the Revised Statutes as "immaterial" surplusage). Plaintiff asserts this historical record to preserve the issue for potential appellate or *certiorari* review.

**E. Melching and Sanders' Actions Fall Squarely Within the Purview of the Ralph Act**

Melching and Sanders cite at least two cases to support the outdated proposition that violations of California Civil Code § 51.7 (the Ralph Act) require "that the defendant committed or threatened a violent act against the plaintiff." See MTD, ECF No. 174, at 23. However, both cases relied upon by them predate—or concern underlying facts that predate—the sweeping 2020 Assembly Bill 1775

amendments to the Act, which took effect on January 1, 2021. <u>Campbell v. Feld Entm't, Inc.</u>, 75 F.Supp.3d 1193 (N.D. Cal. 2014) and <u>Animal Prot. & Rescue League, Inc. v. Cnty of Riverside</u>, 111 Cal.App.5th 914 (2025) (adjudicating events occurring exclusively in 2018).

Under Cal. Civ. Proc. Code § 1858, a court's role in construing a statute is simply to ascertain and declare what is contained therein, "not to insert what has been omitted, or to omit what has been inserted." <u>See</u> Cal. Civ. Proc. Code § 1858; <u>Vasquez v. State of California</u>, 45 Cal. 4th 243, 253 (2008) (holding that the court's office is "not to change [a statute's] scope by reading into it language it does not contain or by reading out of it language it does"). While a historical judicial construction of a statute is authoritative as to what the text meant at the time of that decision, it does not preclude the Legislature from subsequently altering the law. <u>Rivers v. Roadway Express, Inc.</u>, 511 U.S. 298, 305 (1994) (noting that a legislative response may reflect a decision "that the old law should be amended, but only for the future"). Accordingly, where the Legislature has amended the operative language of a statute, the Court must apply the newly amended text rather than an outdated "judicial gloss" that construed an obsolete version of the law. Here, because the Legislature explicitly amended the Ralph Act via AB-1775

in 2020, the post-amendment statutory language controls, and any contrary pre-2021 case law relied upon by Melching and Sanders is legally obsolete. See Assemb. B. 1775, 2020 Cal. Stat. ch. 327 (amending Cal. Civ. Code § 51.7).

Here, the amended version of the Ralph Act clearly states that

> …"intimidation by threat of violence" includes…threatening to make a claim or report to a peace officer or law enforcement agency that falsely alleges that another person has engaged in unlawful activity…knowing that the claim or report is false, or with reckless disregard for the truth or falsity of the claim or report.

Cal. Civ. Code § 51.7(b)(2).

As noted *supra*, Melching and Sanders appear to have involved the Irvine Police Department as early as July 31, 2025 (see Doc. No. 130-10 at 18, Ex. 275) and explicitly note the Department's involvement in the first Hostile Letter, despite Plaintiff's peaceful petitioning and non-threatening behavior. See Doc. No. 130-7 at 165, Ex. 217. On July 30, any "criminal threat" Plaintiff posed was left unsubstantiated by Olague, and any subsequent police involvement was either made knowingly falsely or with reckless disregard for the truth as to the safety threat posed by Plaintiff. As such, Melching and Sanders' conduct clearly violated the newly amended version of the Ralph Act.

**F. Melching and Sanders' Conduct Satisfies the Bane Act Because the Statute Requires Coercion or Intimidation, Not Actual Violence**

The Bane Act does not require Plaintiff to plead or prove actual violence. Its operative text reaches interference with rights "by threat, intimidation, or coercion," and the California Supreme Court has explained that section 52.1 applies to interference with rights so long as the defendant's conduct is accompanied by those coercive means. Cal. Civ. Code § 52.1; Venegas v. County of Los Angeles, 32 Cal. 4th 820, 843 (2004) ("[P]laintiffs need not allege that defendants acted with discriminatory animus or intent, so long as those acts were accompanied by the requisite threats, intimidation, or coercion."). The Court of Appeal likewise held in Cornell v. City & County of San Francisco that where an unlawful arrest is properly pleaded and proved, "the egregiousness required by Section 52.1 is tested by whether the circumstances indicate the arresting officer had a specific intent to violate the arrestee's right to freedom from unreasonable seizure," not by whether the plaintiff proved a separate violent act. Cornell v. City & County of San Francisco, 17 Cal. App. 5th 766, 801-802 (2017) (rejecting a rule that would require "independent" coercion beyond an unlawful detention itself). Lastly, Shoyoye v. County of Los Angeles, 203 Cal. App. 4th 947, 948 (2012)

28

discussed the statute's reach in terms of "more egregious conduct than mere negligence," showing the statute is about coercive interference with rights, not a violence-only tort. The question, then, is not whether Melching and Sanders physically struck Plaintiff, but whether they intentionally used intimidation or coercion to chill his complaints and suppress his protected activity.

Plaintiff has plausibly alleged that they did. Cease-and-desist letters do not become immune simply because they are written in the form of correspondence; when used as part of a retaliatory campaign to force Plaintiff to stop engaging in protected petitioning and oversight, they operate as coercive instruments. Section 52.1 reaches interference accomplished by "threat, intimidation, or coercion," and subdivision (k) confirms that "speech alone" is insufficient only in the narrow circumstances specified by the statute. Cal. Civ. Code § 52.1(k). Courts applying the Bane Act have recognized that coercive threats of adverse governmental consequences can satisfy the statute even without physical violence. Cornell, supra, 17 Cal. App. 5th at 801-02. If Melching and Sanders' letters were sent to intimidate Plaintiff into silence by threatening police involvement or other adverse consequences, that is coercive interference, not protected "speech alone." The statute does not immunize the use of legal-sounding threats to suppress

29

complaints; it targets the coercive effect of that conduct. Consequently, Plaintiff's Bane Act claim against Melching and Sanders should not be dismissed.

**IV. CONCLUSION**

Melching and Sanders base their motion on improper pleading standards, incomplete representations of the record, and now superseded case law in the hope of overwhelming this court with irrelevant precedent and gravely distorted facts. As such, Melching and Sanders' motion to dismiss should be **DENIED**.

Respectfully submitted,

_____   July 28, 2026

Jeffrey Gu, Plaintiff, Pro Se

jeffwgu@gmail.com, 2332 N Clay St Apt 3, Denver, CO 80211, 720-593-1548

**CERTIFICATE OF COMPLIANCE**

The undersigned, Plaintiff Jeffrey Gu, certifies that this memorandum contains 5,097 words, which complies with the word limit of L.R. 11-6.1.

_____   July 28, 2026

Jeffrey Gu, Plaintiff, Pro Se

jeffwgu@gmail.com, 2332 N Clay St Apt 3, Denver, CO 80211, 720-593-1548